

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD., <br> SAMSUNG ELECTRONICS AMERICA, INC., <br> SAMSUNG TELECOMMUNICATIONS <br>   AMERICA GENERAL, L.L.C., <br> SAMSUNG SEMICONDUCTOR, INC., and <br> SAMSUNG AUSTIN SEMICONDUCTOR L.L.C., <br><br>                  Plaintiffs, <br><br>                  v. <br><br> ON SEMICONDUCTOR CORP. <br><br> and <br><br> SEMICONDUCTOR COMPONENTS <br> INDUSTRIES, LLC, <br><br>                  Defendants. | Civil Action No. 06-720 (***) <br><br>  |

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO
## DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600

OF COUNSEL:
John M. Desmarais
James E. Marina
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Dated: January 25, 2007

*Attorneys for Samsung Electronics Co., Ltd.,*
*Samsung Electronics America, Inc., Samsung*
*Telecommunications America General, L.L.C.,*
*Samsung Semiconductor, Inc., and Samsung Austin*
*Semiconductor, L.L.C.*

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDING ................................................................................2

SUMMARY OF ARGUMENT ...........................................................................................................2

STATEMENT OF FACTS .................................................................................................................4

ARGUMENT ....................................................................................................................................5

I.    THIS COURT HAD SUBJECT MATTER JURISDICTION OVER THIS ACTION AS
      OF NOVEMBER 30, 2006..........................................................................................................5

II.   THIS ACTION WAS FILED IN GOOD FAITH, AND THE COURT SHOULD
      EXERCISE ITS DISCRETION TO HEAR THIS CASE. ..............................................................10

CONCLUSION ...............................................................................................................................14

## TABLE OF AUTHORITIES

Page(s)

Cases

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,*
846 F.2d 731 (Fed. Cir. 1988)...................................................................................... 12

*Cupo, Inc. v. Dioptics Medical Products, Inc.,*
387 F.3d 1352 (Fed. Cir. 2004)...................................................................................... 11

*Clay Paky, S.p.A. v. Vari-Lite, Inc.,*
Nos. 99 Civ. 11401 and 11402 (BSJ),
2000 U.S. Dist. LEXIS 9802 (S.D.N.Y. July 12, 2000) ...................................................... 6

*Correspondent Servs. Corp. v. First Equities Corp.,*
338 F.3d 119 (2d Cir. 2003)........................................................................................... 10

*Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation,*
297 F.3d 1343 (Fed. Cir. 2002)........................................................................................ 6

*Goodyear Tire & Rubber Co. v. Releasomers, Inc.,*
824 F.2d 953 (Fed. Cir. 1987)........................................................................................ 11

*Growth Horizons, Inc., v. Delaware Cty., Pa.,*
983 F.2d 1277 (3d Cir. 1993).......................................................................................... 5

*Ivoclar Vivadent, Inc. v. Hasel,*
No. 02-CV-0316E(F),
2003 U.S. Dist. LEXIS 12611 (W.D.N.Y. June 30, 2003) .................................................. 6

*Kulick v. Pocono Downs Racing Ass'n,*
816 F.2d 895 (3d Cir. 1987)............................................................................................ 5

*Syngenta Crop. Protection, Inc. v. Monsanto Company,*
No. 03-1062 (KAJ) (D. Del. Apr. 6, 2004)........................................................................ 8

*Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.,*
157 F.R.D. 215 (D. Del. 1993) ....................................................................................... 14

ii

Plaintiffs Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), Samsung Telecommunications America General, L.L.C. ("STA"), Samsung Semiconductor, Inc. ("SSI"), and Samsung Austin Semiconductor, L.L.C. ("SAS") submit this Answering Brief in opposition to Defendants' Motion to Dismiss the Amended Complaint (D.I. 25) for alleged lack of subject matter jurisdiction. This latest motion to dismiss is merely a rehashing of Defendants' motion to dismiss the original Complaint filed on December 27, 2006,[1] and should be denied for the reasons set forth in Plaintiffs' opposition to that earlier motion (D.I. 27-29).

## NATURE AND STAGE OF THE PROCEEDING

SEC filed its original Complaint in this action (the "Delaware Action") on November 30, 2006, seeking a declaration that three United States patents purportedly owned by Defendants — U.S. Patent Nos. 5,563,594 (the "'594 Patent"), 6,362,644 (the "'644 Patent"), and 5,361,001 (the "'001 Patent") — are invalid and not infringed by SEC (D.I. 1).

Less than two business days later, on Monday, December 4, 2006 at 8:22 AM, Defendants filed a patent infringement action against SEC in the United States District Court for the Eastern District of Texas, Case No. 6:06 cv 523 (the "Texas Action"), alleging infringement by SEC of the same three patents at issue in the Delaware Action and a fourth patent, U.S. Patent No. 5,000,827 (the "'827 Patent"). Defendants also named four SEC affiliates as co-defendants in the Texas Action —SEA, STA, SSI, and SAS.

Plaintiffs filed an Amended Complaint in the Delaware Action on December 21, 2006, adding SEA, STA, SSI, and SAS as co-plaintiffs with SEC, adding claims by each of the Plaintiffs for declaratory judgment of noninfringement and invalidity of the '827 patent, and

---

[1] Defendants filed their first motion to dismiss against the original Complaint, instead of responding to the Amended Complaint.

adding a claim by SEC against Defendants for infringement of SEC's U.S. Patent No. 5,252,177 (the "'177 Patent") (D.I. 8). Plaintiffs also filed on December 21, 2006 a motion to enjoin Defendants from pursuing the Texas Action (D.I. 10-12). That motion is fully briefed.

On December 27, 2006, Defendants filed a motion to dismiss the original Complaint, alleging that this Court does not have subject matter jurisdiction over this action because SEC did not have a reasonable apprehension of suit when it filed the original Complaint on November 30, 2006. That motion is also fully briefed.

Defendants filed the instant motion to dismiss the Amended Complaint on January 10, 2007. As discussed below, Defendants' motion to dismiss should be denied.

## SUMMARY OF ARGUMENT

1.    Defendants contend that the Amended Complaint should be dismissed because this Court did not have subject matter jurisdiction over this action when the original Complaint was filed on November 30, 2006. But the record demonstrates that SEC had an objectively reasonable apprehension of being sued by Defendants when it filed this action on November 30, 2006, an apprehension that was proven to be correct when Defendants filed the Texas Action less than two business days later.

2

time the Complaint was filed. This Court therefore had subject matter jurisdiction over this action as of November 30, 2006.

      3.     Defendants nonetheless urge the Court to exercise its discretion under the Declaratory Judgment Act to dismiss this case, contending that SEC filed this action in bad faith to gain "leverage" in licensing discussions with Defendants. But the record shows that SEC filed this action in order to resolve the uncertainty and insecurity caused by Defendants' repeated litigation threats and unreasonable license demands. Furthermore, the concept of negotiating "leverage" assumes continued licensing discussions between the parties, but SEC did not invite additional discussions with Defendants, and discussions between the parties terminated as of November 30, 2006. And because Defendants voluntarily put their patents at risk of adverse rulings by filing the Texas Action, the Delaware Action gives SEC no negotiating "leverage" whatsoever.

      4.     Defendants also contend that SEC misled Defendants and filed this action to gain a tactical advantage in litigation, depriving Defendants of their forum of choice, the Eastern District of Texas. While Defendants argue that they should not be "punish[ed]" for engaging in "good faith" negotiations, Defendants' exorbitant license demands were far from good faith offers. Furthermore, SEC did not mislead Defendants, and SEC's choice of the District of Delaware as a forum for this action is perfectly reasonable and appropriate, given that both Defendants are incorporated in Delaware. The District of Delaware does not give SEC an unfair tactical advantage over Defendants, and Defendants should not be heard to complain that they must litigate this case in their chosen state of incorporation. The Eastern District of Texas, on the other hand, has no relevant connection to the parties, witnesses, or sources of proof in this

case. Defendants' choice of the Eastern District of Texas for their duplicative action is classic

forum shopping that should not be condoned by the Court.

### STATEMENT OF FACTS[2]

The facts concerning the parties, their licensing discussions (including the multiple

threats of litigation made by Defendants against SEC), SEC's filing of this action, and

Defendants' filing of the Texas Action are set forth in Plaintiffs' Opening Brief in support of

their motion to enjoin Defendants' from pursuing the Texas action and supporting Declaration of

Patrick Muir (D.I. 11-12), and in Plaintiffs' Answering Brief in opposition to Defendants' first

motion to dismiss and supporting Declarations of Patrick Muir and Jay Shim (D.I. 27-29),[3] all of

which are incorporated by reference herein.

---

[3] Defendants contend that the parties' licensing discussions are confidential and have requested
that filings concerning those discussions be made under seal. Plaintiffs have agreed to do so as a
courtesy, with a full reservation of rights to challenge Defendants' confidentiality assertion.

REDACTED

## ARGUMENT

I.    **This Court Had Subject Matter Jurisdiction Over This Action As Of November 30, 2006.**

While Plaintiffs have the burden of persuading the Court that subject matter jurisdiction exists, Plaintiffs' burden is light: dismissal for lack of subject matter jurisdiction is only appropriate where "the right claimed 'is so insubstantial, implausible, foreclosed by prior decisions of this Court, or otherwise completely devoid of merit as not to involve a federal controversy.'" *Growth Horizons, Inc., v. Delaware Cty., Pa.*, 983 F.2d 1277, 1280-81 (3d Cir. 1993) (*quoting Kulick v. Pocono Downs Racing Ass'n*, 816 F.2d 895, 899 (3d Cir. 1987) (*quoting Oneida Indian Nation v. County of Oneida*, 414 U.S. 661 (1974))); *see also UD Technology Corp. v. Phenomenex, Inc.*, C.A. No. 05-842-GMS, 2007 U.S. Dist. LEXIS 642, *4-5 (D. Del. Jan. 4, 2007). Furthermore, any factual conflicts should be resolved in favor of the exercise of jurisdiction. *See, e.g, Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation,* 297 F.3d 1343, 1347 (Fed. Cir. 2002); *Millennium Products, Inc. v. Gravity Boarding Co., Inc.*, 127 F. Supp. 2d 974, 979 (N.D. Ill. 2000).

Defendants argue that the Amended Complaint must be dismissed because the Court did not have subject matter jurisdiction over this action when the original Complaint was filed on November 30, 2006, contending that SEC did not have a reasonable apprehension of being sued by Defendants. But as set forth in Plaintiffs' opposition to Defendants' motion to dismiss (D.I. 27-29), the record shows that SEC did have a reasonable apprehension of suit as of November 30, 2006, and therefore that this Court had subject matter jurisdiction over this action as of that date.

The Federal Circuit has held that where a patent holder and a target company are engaged in patent licensing negotiations and the patent holder threatens, during those negotiations, to file

5

suit if it is not satisfied with the result of the negotiations, an actual controversy exists under the Declaratory Judgment Act and the target may file a declaratory judgment action at any time. *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 812 (Fed. Cir. 1996). A reasonable apprehension of suit exists even if the negotiations are on-going at the time the declaratory judgment action is filed. *Id.* at 811-12; *Ivoclar Vivadent, Inc. v. Hasel*, No. 02-CV-0316E(F), 2003 U.S. Dist. LEXIS 12611, *23 (W.D.N.Y. June. 30, 2003); *Clay Paky, S.p.A. v. Vari-Lite, Inc.*, Nos. 99 Civ. 11401 and 11402 (BSJ), 2000 U.S. Dist. LEXIS 9802, *15 (S.D.N.Y. July 12, 2000).

Defendants implicitly and explicitly threatened SEC with litigation no fewer than four times during the parties' licensing discussions — during the parties' February 15, 2006 meeting,[4] during their August 16, 2006 meeting, in Defendants' September 6, 2006 letter to SEC, and during a telephone conversation on September 15, 2006. (D.I. 28, ¶¶ 3, 5; D.I. 29, ¶ 6; D.I. 12, Ex. G.) Although Defendants deny the oral threats they made on February 15, August 16, and September 15, 2006, they cannot hide from the unambiguous litigation threat in their September 6 letter, which is *irrebuttable* and by itself sufficient under *EMC* to meet's SEC's burden of establishing the existence of subject matter jurisdiction:

REDACTED

> ...ON is certainly left wondering if Samsung intends to ignore ON's proposal and abandon any further discussions to resolve the underlying patent issues. If this is indeed the case, then we must *reemphasize* to you that *Samsung's decision will lead ON to pursue other paths to enforce it [sic] legal rights and remedies.*

(D.I. 12, Ex. G.) Since the only other "path" for Defendants to enforce their legal rights and remedies would be to sue SEC, the threat of litigation in this letter is undeniable. Defendants were also *reemphasizing* this threat, which means they made it before. Further, just like in *EMC*, Defendants never abandoned this threatening posture during the weeks between the September 6, 2006 letter and the filing of the Delaware Action on November 30, 2006.

SEC was within its rights to file a declaratory judgment action the moment Defendants threatened to litigate if a satisfactory settlement could not be reached. As the Federal Circuit held in *EMC*, "when the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer is not required to wait for the patentee to decide when and where to sue, but can take the initiative and seek declaratory relief." *EMC*, 89 F.3d at 811.

SEC waited to file suit, however, on the chance that costly and time-consuming litigation could ultimately be avoided through a nuisance payment to Defendants. SEC did not initiate the parties' licensing discussions, and Defendants' litigation threats forced SEC to the negotiating table. When Defendants came back with their second offer REDACTED (D.I. 29, ¶¶ 6-8), however, it was REDACTED clear that the parties were too far apart to reach agreement. SEC therefore chose to file a declaratory judgment action to protect itself against the uncertainty and delay surrounding its right to sell the accused DRAM products caused by Defendants' threats. (D.I. 29, ¶¶ 12-14.) The fact that SEC had a reasonable apprehension of suit is confirmed by the fact Defendants

7

actually sued SEC for patent infringement. *See, e.g., Syngenta Crop. Protection, Inc. v. Monsanto Company*, No. 03-1062 (KAJ) (D. Del. Apr. 6, 2004), at 38-9. (D.I. 27, Ex. 2.) Defendants also included in their Texas complaint a patent they hid from SEC during the parties' discussions, confirming that they planned litigation against SEC all along.[5]

Defendants' arguments concerning relation back of the Amended Complaint (Br. at 6-8) are irrelevant, because they are based on the incorrect assumption that SEC was attempting to "remedy the absence of subject matter jurisdiction in the Original Complaint by relying on later events." [6] (Br. at 6.) First, as discussed above, this Court had subject matter jurisdiction over this action as of November 30, 2006. Second, the Amended Complaint *does not assert any post-November 30 facts* as a basis for *SEC's*[7] declaratory judgment claims against Defendants with respect to the '594, '644, and '001 patents. The Amended Complaint makes the *identical*

---

[5] Although Defendants cite to self-serving statements that they preferred an "amicable resolution" and preferred "not to litigate," the issue is not what they may have preferred, but what they were planning to do if settlement could not be reached. Defendants were prepared to litigate if a satisfactory settlement was not reached, and they informed SEC of that fact on a number of occasions. Further, as the Federal Circuit in *EMC* recognized, the Court must "look to substance rather than form" because "the parties are sensitive to the prospect of a declaratory judgment action and couch their exchanges in terms designed either to create or defeat declaratory judgment jurisdiction." *EMC*, 89 F.3d at 811-12. Defendants also mischaracterize Mr. Shim's statements concerning a preference not to litigate — of course any prudent business prefers an amicable resolution over litigation, provided the terms of the resolution are acceptable — and contend that SEC was interested in continuing discussions with Defendants. SEC, however, was not willing to continue discussions with Defendants, and never made such an invitation. SEC made a single counteroffer to Defendants, which Defendants rejected and called a "joke."

[6] The Amended Complaint adds declaratory judgment claims by SEA, STA, SSI, and SAS against the '594, '644, and '001 patents, adds declaratory judgment claims by all of the Plaintiffs against the '827 patent, and adds a patent infringement claim by SEC against Defendants.

[7] Although Defendants refer to Plaintiffs as single entity named "Samsung," SEC, SEA, STA, SSI, and SAS are separate companies, with separate standing, each asserting their own declaratory judgment claims against Defendants.

*allegations* [8] made in the original Complaint concerning those claims (*compare* D.I.1, ¶¶ 13-15, 20-22, 27-29 and D.I. 8, ¶¶ 23-24, 33-34, 43-44) — allegations sufficient to plead a declaratory judgment claim under Federal Circuit precedent such as *EMC* — and expressly states that "because an actual and justiciable controversy had therefore arisen between SEC and Defendants within the meaning of 28 U.S.C. § 2201, SEC filed its declaratory judgment Complaint in this action on *November 30, 2006*." (D.I. 8, ¶¶ 25, 35, 45.) Thus, the assertion that SEC is relying on the filing of the Texas Action on December 4, 2006 to prove an actual case or controversy between SEC and Defendants — when the Amended Complaint unequivocally alleges that an actual case or controversy existed between SEC and Defendants as of November 30, 2006 — is plainly incorrect.[9]

In view of the foregoing, SEC had a reasonable apprehension of suit when it filed the original Complaint on November 30, 2006, and this Court had subject matter jurisdiction as of

---

[8] The Amended Complaint, which is the operative pleading in this case pursuant to Fed. R. Civ. 15, further alleges that Defendants explicitly threatened SEC with litigation *prior* to SEC's filing of the original Complaint, further demonstrating the existence of an actual case or controversy as of November 30, 2006. (D.I. 8, ¶¶ 26, 36, 46.) Because the threats are alleged to have occurred *before* the filing of the original Complaint, these allegations relate back to the filing date of the original Complaint and may be used to demonstrate the existence of subject matter jurisdiction as of that date. *See, e.g., Correspondent Servs. Corp. v. First Equities Corp.*, 338 F.3d 119, 125 (2d Cir. 2003) (factual allegations in an amended complaint relate back to the filing date of the original complaint for purposes of establishing subject matter jurisdiction "when the underlying facts, if properly pled, would have supported jurisdiction at the time the action commenced").

[9] Nor does the filing of the Amended Complaint change the filing date of this action for purposes of the first-filed rule. This Court had subject matter jurisdiction over SEC's declaratory judgment claims against the '594, '644, and '001 patents as of November 30, 2006, and this action is therefore the first-filed action. *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941), *cert. denied*, 315 U.S. 813 (1942) ("[i]n all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it"). Moreover, Defendants' argument concerning relation back of the declaratory judgment claims against the '827 patent confuses the separate issues of whether this Court has subject matter jurisdiction over this action, and whether this action is first-filed with respect to the '827 patent. As set forth in Plaintiffs' opening and reply briefs in support of their motion to enjoin Defendants from pursuing the Texas Action (D.I. 11 and 31), this action is the first-filed action with respect to the '827 patent as well.

that date. This Court therefore also has subject-matter jurisdiction over the Amended Complaint, and Defendants' motion to dismiss should be denied

## II.    This Action Was Filed In Good Faith, And The Court Should Exercise Its Discretion To Hear This Case.

Defendants also argue that this action was filed in bad faith, and that this Court should exercise its discretion under the Declaratory Judgment Act to dismiss this case. But as set forth more fully in Plaintiffs' opposition to Defendants' first motion to dismiss (D.I. 27-29), the record proves just the opposite — that SEC filed this action in good faith to resolve the uncertainty and insecurity caused by Defendants' repeated litigation threats and unreasonable license demands.

The purpose of declaratory judgment actions in patent cases is "to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987). The Federal Circuit has explained that the Declaratory Judgment Act was intended "to allow a party who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." *Capo, Inc. v. Dioptics Medical Products, Inc.*, 387 F.3d 1352, 1354-55 (Fed. Cir. 2004) (internal citations omitted). Through the Declaratory Judgment Act, alleged infringers have a more attractive course of action than the "*in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988). The Declaratory Judgment Act thus protects industries from patentees who would "infect the competitive environment of the business community with uncertainty and insecurity" through the use of "guerrilla-like" tactics and attempts at "extra-judicial patent enforcement." *Id.*

10

This is a textbook case for application of the Declaratory Judgment Act. Defendants —
who are seeking to enforce their patents against other members of the DRAM industry as well —
accused SEC of infringing their patents through SEC's sales of DRAM products, sales that
amount to more than $1 billion annually. During the course of the parties' licensing discussions,
Defendants never negotiated in good faith, demanding outrageous sums of money from SEC
while repeatedly threatening SEC with litigation if a settlement satisfactory to Defendants could
not be reached. (D.I. 28, ¶¶ 3, 5; D.I. 29, ¶ 6; D.I. 12, Ex. G.) Defendants persisted in
demanding outrageous sums of money — REDACTED — even
though SEC made clear time and time again that it did not infringe Defendants' patents and
would not offer Defendants REDACTED (D.I. 29, ¶¶ 6-8.) Faced with Defendants'
litigation threats and their refusal to put a reasonable offer on the table, on the one hand, and
SEC's growing potential liability for patent infringement on the other, SEC was perfectly within
its rights to file a declaratory judgment action to resolve the uncertainty and insecurity caused by
Defendants' threats.

Defendants nonetheless contend that SEC improperly filed this action in order to gain
"leverage" in the parties' licensing discussions, but the record shows that SEC did not file the
Delaware action to gain "leverage." When SEC filed suit, the parties were at an impasse —
Defendants were demanding REDACTED
(D.I. 29, ¶ 12.) Furthermore, the concept of negotiating "leverage" only makes sense if SEC was
willing to continue negotiations in an effort to force Defendants to accept an offer
REDACTED , which was not the case, as SEC repeatedly told
Defendants that it would not pay more REDACTED (D.I. 29, ¶¶ 6-8.) SEC did not invite
further discussions or request additional meetings, nor did any further discussions or meetings

11

between the parties take place. (D.I. 29, ¶¶ 11, 13.) Indeed, Defendants rejected SEC's counteroffer, calling it a "joke," and immediately thereafter filed the Texas Action. (D.I. 29, ¶ 13.) Finally, because Defendants voluntarily put their patents at risk of adverse rulings by filing the Texas Action, the Delaware Action gives SEC no negotiating "leverage" whatsoever.

Defendants also contend that SEC misled them into believing that SEC would not file suit so that SEC could gain a tactical advantage in litigation, presumably by selecting a favorable forum. But SEC did not mislead Defendants in any way, and never told or led Defendants to believe that it would not file suit or that SEC was willing to negotiate until an agreement could be reached. (D.I. 29, ¶ 10.) Rather, SEC told Defendants time and time again that it would not offer more [REDACTED] (D.I. 29, ¶¶ 6-8), and the assertion that Defendants believed SEC was seriously considering paying [REDACTED] is absurd and simply not credible.

Furthermore, as explained in Plaintiffs' opening brief in support of their motion to enjoin (D.I. 11 at 9-13), SEC did not forum shop or file this action anticipatorily, and therefore did not gain any tactical advantage over Defendants. SEC filed this action in order to remove the cloud over its business put there by Defendants, which was its right under the Declaratory Judgment Act. And because Defendants are both incorporated in Delaware, SEC's choice of Delaware as a forum for this dispute is both rational and appropriate, and Defendants should not be heard to complain that they have been forced to litigate in Delaware. *See, e.g., Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215, 218 (D. Del. 1993) ("Absent some showing of a unique or unexpected burden, [Delaware] corporations should not be successful in arguing that litigation in their state of incorporation is inconvenient.") Delaware does not inconvenience Defendants, nor does it offer Plaintiffs any unfair advantage or convenience over Defendants. SEC therefore did not gain any tactical advantage, unfair or otherwise, over Defendants by filing

12

an action in Delaware. The cases cited by Defendants in its opening brief and in its first motion to dismiss all involved anticipatory filing by the plaintiff, and are therefore inapposite.

Defendants' selection of the Eastern District of Texas as the forum for the Texas Action, on the other hand, is classic forum shopping. The Eastern District of Texas has no relevant connection to the parties, witnesses, or sources of proof in this case. The only logical conclusion is that Defendants chose the Eastern District of Texas because they believed it would be more favorable to their cause. This Court should not condone such blatant forum shopping.

Accordingly, because the Delaware Action was filed in good faith, and because SEC had a reasonable apprehension of suit when it filed this action on November 30, 2006, Defendants' motion to dismiss the Amended Complaint should be denied.

13

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint for

lack of subject matter jurisdiction should be denied.

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
YOUNG CONAWAY STARGATT
& TAYLOR LLP
The Brandywine Building
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600
*alundgren@ycst.com*

*Attorneys for Plaintiffs Samsung Electronics
Co., Ltd., Samsung Electronics America, Inc.,
Samsung Telecommunications America
General, L.L.C., Samsung Semiconductor,
Inc., and Samsung Austin Semiconductor,
L.L.C.*

OF COUNSEL:

John M. Desmarais
James E. Marina
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Dated:  January 25, 2007

14

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on February 8, 2007, I caused to be electronically filed a true and correct copy of the foregoing document with the Clerk of the Court using CM/ECF, which will send notification that such filing is available for viewing and downloading to the following counsel of record:

> Karen Jacobs Louden, Esquire
> Morris Nichols Arsht & Tunnell
> 1201 North Market Street
> PO Box 1347
> Wilmington, DE 19899-1347

I further certify that on February 8, 2007, I caused a copy of the foregoing document to be served by **hand delivery** on the above-listed counsel of record and on the following non-registered participants in the manner indicated:

### BY E-MAIL

> Kenneth R. Adamo, Esquire
> Jones Day
> 2727 North Harwood Street
> Dallas, TX 75201
>
> T. Gregory Lanier, Esquire
> Behrooz Shariati, Esquire
> Jones Day
> 2882 Sand Hill Road, Suite 240
> Menlo Park, CA 94025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

/S/ ANDREW A. LUNDGREN
Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street
Wilmington, DE 19801
302-571-6600
alundgren@ycst.com

# TAB 1

LEXSEE 2000 U.S. DIST. LEXIS 9802



Caution
As of: Jan 25, 2007

CLAY PAKY, S.p.A., Plaintiff, v. VARI-LITE, INC., Defendant. COEMAR, S.p.A., Plaintiff, v. VARI-LITE, INC., Defendant.

99 Civ. 11401 (BSJ), 99 Civ. 11402 (BSJ)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

*2000 U.S. Dist. LEXIS 9802*

July 12, 2000, Decided
July 14, 2000, Filed

**DISPOSITION:** [*1] Defendant's motions to dismiss DENIED. Defendant's motions to transfer to the Northern District of Texas GRANTED.

**COUNSEL:** For CLAY PAKY S.P.A., plaintiff: Edward V. Filardi, Douglas R. Nemec, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York, NY.

**JUDGES:** Barbara S. Jones, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Barbara S. Jones

**OPINION:**

OPINION & ORDER

BARBARA S. JONES
UNITED STATES DISTRICT COURT

In these two related cases, defendant Vari-Lite, Inc., moves pursuant to the Declaratory Judgment Act, *28 U.S.C. § 2201*, and *Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure* (Fed. R. Civ. P.) to dismiss the declaratory judgment actions brought separately by plaintiff Clay Paky S.p.A. and Coemar S.p.A., on the grounds that this Court lacks subject matter

jurisdiction under the Declaratory Judgment Act, and the complaints do not state a claim upon which relief can be granted. n1 In addition, defendant moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). In the alternative, defendant requests that this Court exercise its discretion under *28 U.S.C. § 1404* and transfer these actions to the Northern District of Texas, Dallas Division. For the following reasons, defendant's motions to dismiss are denied, and defendant's motion to transfer [*2] venue is granted.

n1 On June 27, 2000, plaintiffs amended their respective complaints as of right. The amendments have no impact on the merits of the pending motions.

BACKGROUND

The following facts are, unless otherwise noted, undisputed. Vari-Lite is a Texas corporation with its principal place of business in Dallas, Texas, and an office in New York, New York. Vari-Lite is in the business of manufacturing and renting sound and lighting fixtures for use in stage, theater, television, and other applications. In particular, Vari-Lite manufactures "intelligent lighting" -- remotely controlled lights that change colors and

2000 U.S. Dist. LEXIS 9802, *2

positions, project images and are choreographed through the use of a computer. Among other patents, Vari-Lite currently owns U.S. Patent No. 4,392,187 ("the '187 patent"), entitled "Computer Controlled Lighting System." Vari-Lite products are manufactured, serviced and shipped from Vari-Lite's production facility in Dallas.

Plaintiffs Clay Paky and Coemar are Italian corporations, with their [*3] principal places of business in Italy, that manufacture various lighting products.

On August 5, 1999, counsel for Vari-Lite sent a letter to Clay Paky's Italian headquarters. n2 The entire letter is reprinted below:

> This firm represents Vari-Lite, Inc. ("Vari-Lite") in intellectual property matters.
>
> Vari-Lite is the owner of [the '187 patent], which covers lighting systems like the ones sold by Clay Paky. I have enclosed a copy of this patent for your review. Since the issuance of the '187 Patent, Vari-Lite has aggressively enforced its right to exclude others from making, using, or selling products covered by the '187 Patent. Most recently, a federal court in Texas ordered Martin to cease selling certain of its lighting products in the United States that infringe the '187 Patent. I have enclosed a copy of the injunction order for your review.
>
> It has come to our attention that Clay Paky sells a number of products in the United States that may infringe one or more claims of the '187 Patent. Specifically, we believe that the Stage Color line of luminaires (1200, 1000, 575, 300), Stage Zoom 1200, Stage Light 300, Golden Light 300, Golden Scan HPE, Stage Scan, Super Scan Zoom, [*4] Golden Scan 3, the MiniScan series, and Silverado may infringe claim 6 and other claims of the '187 Patent.
>
> This letter is to request that you cease and desist from making, using, selling, leasing, importing or offering for sale or

> lease in the United States the above-identified products, and any other products that infringe the '187 Patent. If you do not wish to discontinue such activities, please contact the undersigned to discuss the potential for licensing arrangement with Vari-Lite.
>
> If you believe that your products do not infringe the '187 Patent, I would appreciate hearing from you the reasons why you believe your products do not infringe no later than August 16, 1999.
>
> Thank you for your attention to this important matter, and I look forward to receiving your response.

(McCormack Aff. in 99 Civ. 11402, Ex. B.)

> n2 The records in these actions are confused. The August 5, 1999, letter to Clay Paky is not in the Clay Paky record, but can be found in the Coemar record. (See McCormack Aff. in 99 Civ. 11402, Ex. B.) Not surprisingly, the August 5, 1999, letter to Coemar can be found as Exhibit B to defendant's affidavit in the Clay Paky action. (See McCormack Aff. in 99 Civ. 11401, Ex. B.)

[*5]

Also on August 5, 1999, defendant sent a nearly identical letter to Coemar. n3 Coemar contacted Vari-Lite's attorneys and requested a face-to-face meeting with Vari-Lite to discuss a license under the '187 patent.

> n3 The letters to Clay Paky and Coemar are identical, except for the second sentence in the third paragraph that identifies which specific products "may infringe" the '187 patent.

On August 26, 1999, Bruno Dedoro, president of Coemar, faxed Vari-Lite's counsel a letter requesting a face-to-face meeting with Vari-Lite on August 30, 1999, when Dedoro planned to be in North America on other business. Dedoro wrote, "The purpose of this meeting would be to understand directly from Vari-Lite on which basis [sic] the mentioned licensing arrangements could be

2000 U.S. Dist. LEXIS 9802, *5

reached without wasting money in disputes . . . . Obviously my approach has not to be interpreted [*sic*] in any way as an acknowledgement [*sic*] of any kind of liability in respect of your client's claim." (McCormack Aff. in 99 Civ. 11402, [*6] Ex. C.) Later that day, Vari-Lite's counsel responded by fax suggesting that Dedoro meet with Vari-Lite's President and CEO Harry R. Brutsche, III, in New York on August 30, 1999, when Brutsche and his lawyer would be in New York on other business.

On August 30, 1999, Vari-Lite CEO Brutsche met with Dedoro in New York and discussed a licensing arrangement. Brutsche and Dedoro agreed to continue negotiations on September 6, 1999, at a trade show in London both would be attending. The day after this initial meeting, Vari-Lite's counsel faxed Dedoro a proposal for a license. This August 31, 2000, letter makes no mention of litigation. n4

n4 Though there is no explicit mention of litigation, the letter, curiously, is captioned: "Re: *Vari-Lite, Inc. v. Martin Gruppen A/S, et al.*" (McCormack Aff. in 99 Civ. 11402, Ex. E.) The "Martin Gruppen" referenced in this letter is presumably the "Martin" mentioned in Vari-Lite's opening salvo to Coemar and Clay Paky and against whom Vari-Lite won an injunction.

On September 6, 1999, Brutsche [*7] and Dedoro met in London, and were joined by Pasquale Quadri and Enrico Caironi of Clay Paky. Through their representatives, Coemar and Clay Paky negotiated jointly at the meeting. Coemar and Clay Paky noted that each had historically enjoyed a good relationship with Vari-Lite and that they wanted to reach a resolution. Both Coemar and Clay Paky said that their presence in the U.S. market was not big enough to warrant litigation, which they wished to avoid. Both companies offered to make their financial records available to Vari-Lite in order to determine a reasonable royalty rate. Brutsche expressed his interest in entering into a licensing agreement with both Coemar and Clay Paky, and the three companies negotiated the amount of the licenses. Brutsche made no threats of litigation and no references to future litigation. Each company agreed to consider the offers on the table and to continue negotiations after Coemar and Clay Paky provided financial information.

On September 22, 1999, Coemar and Clay Paky sent a written joint proposal to Vari-Lite. Their joint proposal contained information regarding Coemar and Clay Paky's sales volumes and earnings. The joint proposal was a counteroffer [*8] to an earlier offer by Vari-Lite. Brutsche considered this joint proposal a starting point for negotiation in earnest as it provided him with his first glimpse at their financial data.

Brutsche responded to the joint proposal by letter to both Coemar and Clay Paky on October 7, 1999. In the letter, Brutsche thanked Coemar and Clay Paky for their counteroffer, but termed it "inadequate to compensate Vari-Lite for sales of infringing products in the United States by Coemar and Clay Paky." Brutsche concluded by reducing Vari-Lite's initial demand by ten percent. Brutsche made no threat or mention of litigation.

In response to Vari-Lite's counteroffer, Enrico Caironi, Commercial Director of Clay Paky, called Brutsche on October 26, 1999. Caironi said that he hoped Vari-Lite was not offended by Coemar and Clay Paky's low offer and that Clay Paky was still hoping to work something out with Vari-Lite.

Later that same day, Dedoro, from Coemar, called Brutsche and expressed his continuing interest in entering into a licensing agreement with Vari-Lite. He said that he would soon be prepared to present another counteroffer for an increased royalty or licensing fee. Brutsche and Dedoro agreed [*9] to continue negotiations on November 19, 1999, when both would be in Orlando, Florida for a trade show.

On November 17, 1999, Clay Paky and Coemar separately filed the complaints in these actions. Nonetheless, Brutsche and Dedoro met in Orlando on November 20, 1999. Dedoro proposed yet another increased counteroffer. Brutsche, who was under the impression that Dedoro was speaking on behalf of both Coemar and Clay Paky, told Dedoro that he would take this latest offer under advisement. There have been no negotiations since. On February 24, 2000, Vari-Lite filed the pending motions.

I. Subject Matter Jurisdiction

Defendant's principal motion is that subject matter jurisdiction does not exist under the Declaratory Judgment Act, 28 U.S.C. § 2201. The purpose of the Declaratory Judgement Act is to protect threatened

parties from the uncertainty and anxiety resulting from a looming lawsuit. See *Shell Oil Co. v. Amoco Corp.*, *970 F.2d 885, 889 (Fed. Cir. 1992).* Section 2201(a) states:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights [*10] . . . of any interested party seeking such declaration . . . . Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

*28 U.S.C. § 2201(a).* An actual controversy is a jurisdictional prerequisite and must be present before a declaratory judgment action is ripe for adjudication. See *Shell Oil, 970 F.2d at 887.* The standard for determining whether an actual controversy is present in a declaratory judgment action concerning a patent has two elements:

> First, the defendant's conduct must have "created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question." Second, "plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity."

*BP Chemicals Ltd. v. Union Carbide Corp., 757 F. Supp. 303, 304 (S.D.N.Y. 1991)* (citations omitted). In order to demonstrate the presence of an actual controversy, "the plaintiff has the burden of establishing by a preponderance [*11] of the evidence, inter alia, that it has a reasonable apprehension that it will be sued." *Shell Oil, 970 F.2d at 887.*

The test used to determine whether a plaintiff's apprehension of a lawsuit is reasonable is an objective one which focuses on whether the defendant's "conduct rose to a level sufficient to indicate an intent to enforce its patent." *Id. at 888.* An explicit charge of infringement would give rise to the reasonable apprehension necessary to demonstrate the presence of an actual controversy, however, an express charge of infringement is not

essential. See *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed. Cir. 1988).* Under the standard articulated by the Federal Circuit in Shell Oil and *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051 (Fed. Cir. 1995),* Vari-Lite's statements that '187 patent "covers" products sold by the plaintiffs and that those products therefore "may infringe" the patent, in the context of a letter that is at least in part an invitation to negotiate a license -- that is, to find a commercial resolution -- may be sufficiently well-crafted [*12] to avoid being an express charge of infringement. See *Shell Oil, 970 F.2d at 889; Phillips Plastics 57 F.3d at 1053-54.*

Assuming, without deciding, that the statements in Vari-Lite's August 5, 1999, letter do not constitute an explicit charge of infringement, I must consider the totality of the circumstances and determine whether the plaintiff has shown that objective circumstances support his apprehension of an impending lawsuit. See *Shell Oil, 970 F.2d at 888; Phillips Plastics, 57 F.3d at 1053-54.*

In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary matters outside the pleadings. *Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985).* In these cases, an examination of the pleadings, the affidavits, and the correspondence between Vari-Lite, Clay Paky and Coemar, submitted as exhibits by the defendant, shows that the plaintiff's apprehension of a lawsuit was objectively reasonable.

Defendants contend that the parties were seeking a business solution and toward that end were involved in negotiations which were either [*13] (1) never terminated by any party, even after these suits were filed, or (2) unilaterally terminated by plaintiffs by filing these suits. The fact that Clay Paky or Coemar may have unilaterally terminated negotiations does not negate their reasonable apprehension of a lawsuit, however, especially when viewed in light of defendant's first letter which clearly threatened litigation. Defendant argues that merely informing Clay Paky and Coemar that Vari-Lite enforces its patent rights does not in and of itself create a reasonable apprehension of litigation. This argument may be true as far as it goes, but Vari-Lite's August 5, 1999, letters went much further than merely alerting Clay Paky and Coemar of Vari-Lite's patent. The letters warned that "Vari-Lite has aggressively enforced" its rights under the '187 patent and named a third party, Martin, that

Vari-Lite had successfully enjoined. Vari-Lite even enclosed copies of the injunction order against Martin. "This is in effect a statement to the plaintiff to take notice that it is next on the list." *United Aircraft Corp. v. Giannini Controls Corp., 1967 U.S. Dist. LEXIS 8901, 156 U.S.P.Q. 557, 558 (S.D.N.Y. 1967).* Vari-Lite [*14] as much as wrote, "If you don't think we mean business and are serious about this matter, look and see what we have done to another alleged infringer." See id.

Defendant contends that the August 5, 1999, letters were merely an invitation to Clay Paky and Coemar to engage in licensing negotiations, and thus were the type of communication that the Federal Circuit has previously held did not create a justiciable controversy. See *Phillips Plastics, 57 F.3d at 1053.* Defendant's reliance on the Phillips Plastic decision, however, is misplaced. In Phillips Plastics, the patentee had not stated nor suggested that it would pursue legal recourse if it were not satisfied with the outcome of the proposed licensing negotiations. Id. The Federal Circuit Court of Appeals held that such circumstances were not sufficiently adverse to create a justiciable controversy. Id. The holding in Phillips Plastics, however, is inapplicable in a case such as the ones presented here, where defendant has obliquely accused Clay Paky and Coemar of infringing its patent, made specific demands on Clay Paky and Coemar, and issued thinly veiled threats of resorting to litigation [*15] if its demands are not met. Just because the parties proceeded to initiate negotiations does not mean that the reasonable apprehension of litigation was ever removed. Vari-Lite, having made its threat of litigation, cannot now claim that Clay Paky and Coemar were unreasonable in their apprehension of impending litigation. n5

n5 This is not a case, like *Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852,* where the defendant, having once made a threat, later alleviated any reasonable apprehension of litigation by entering into a covenant not to sue.

Plaintiffs have shown objective circumstances which support their reasonable apprehension of a lawsuit, thereby satisfying the first requirement of demonstrating that an actual controversy existed at the time this declaratory judgment action was commenced. As to the second element, there is no dispute among the parties that plaintiffs have engaged in selling activity subject to a charge of infringement. Therefore, subject matter jurisdiction exists over this dispute under [*16] the Declaratory Judgment Act, and Vari-Lite's motions to dismiss pursuant to *Fed. R. Civ. P. 12(b)(1)* are DENIED.

Plaintiffs' pleadings include allegations of a present and actual controversy with respect to the validity, infringement, and enforceability of the '187 patent. Such allegations state a cause of action for which the requested relief, a declaratory judgment, could be granted. Accordingly, defendant's motions to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* are DENIED. The court must next consider defendant's alternative request that the complaint be dismissed on the ground of lack of personal jurisdiction, pursuant to *Federal Rule of Civil Procedure 12(b)(2).*

II. Personal Jurisdiction

Although under the Federal Circuit's "courtesy rule," district courts sitting in patent actions are generally guided by the law of the regional "circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law," *Molins PLC v. Quigg, 837 F.2d 1064, 1066, 5 U.S.P.Q.2D (BNA) 1526, 1527 (Fed. Cir. 1988)* (citation omitted), Federal Circuit law governs both substantive and procedural issues "intimately involved in the substance of enforcement" [*17] of the patent rights. See *Viam Corp. v. Iowa Export-Import Trading Co., 84 F.3d 424, 428 (Fed. Cir. 1996)* (applying Federal Circuit law in holding that the district court had personal jurisdiction over out-of-state patentee defending an action seeking declaratory judgment of invalidity and noninfringement); see also *Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995)* (Federal Circuit law governs personal jurisdiction issue when the out-of-state party is the patentee defending a declaratory judgment action, rather than the alleged infringer); *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564-65 (Fed. Cir. 1994)* (applying Federal Circuit law in determining whether district court had personal jurisdiction over an out-of-state corporation accused of patent infringement). Therefore, the Court looks to Federal Circuit precedents in analyzing the personal jurisdictional issues.

In order to defeat a motion to dismiss for lack of personal jurisdiction, Clay Paky and Coemar, as the non-moving parties, need initially make only a prima facie showing of jurisdiction. See *United States v. Ziegler Bolt and Parts Co., 111 F.3d 878, 880 (Fed. Cir. 1997).* [*18] The Court's analysis of the adequacy of a

non-moving party's prima facie showing of personal jurisdiction requires that the Court first examine whether the exercise of jurisdiction is proper under the forum state's law, and then address whether the exercise of personal jurisdiction comports with due process. See *Graphic Controls Corp. v. Utah Medical Products, Inc., 149 F.3d 1382, 1385 (Fed. Cir. 1998).*

New York's CPLR 301 provides general jurisdiction over a non-domiciliary defendant where that defendant is "engaged in such a continuous and systematic course of doing business here as to warrant a finding of [its] presence in this jurisdiction." *Beacon Enter., Inc. v. Menzies, 715 F.2d 757, 762 (2d Cir. 1983)* (quoting *Simonson v. Int'l Bank, 14 N.Y.2d 281, 200 N.E.2d 427, 251 N.Y.S.2d 433 (N.Y. 1964)).* "The non-domiciliary must be doing business in New York not occasionally or casually, but with a fair measure of permanence and continuity." Id. (internal quotations omitted). It is undisputed that Vari-Lite has an office in New York, employing thirteen people and accounting for approximately twelve percent of Vari-Lite's [*19] revenues in the most recent fiscal year, as well as a New York bank account. Vari-Lite is "doing business" in New York and is therefore subject to this Court's exercise of personal jurisdiction. See *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985).*

Jurisdiction under CPLR 301 must also satisfy the constitutional requirement of due process. The exercise of jurisdiction must be based on defendant's "minimum contacts" with the state and must comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945).* By maintaining an office in New York, Vari-Lite "purposefully availed itself of the privilege of conducting activities within the state." *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958).* Given Vari-Lite's presence and continuous business in New York, Vari-Lite cannot complain that it could not have "reasonably anticipated being haled before a court" in New York. *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980).* [*20] Therefore, this Court's exercise of personal jurisdiction over Vari-Lite comports with due process. Accordingly, defendant's motions to dismiss, pursuant to Rule 12(b)(2) for lack of personal jurisdiction are DENIED.

### III. Change of Venue

In short, all aspects of defendant's motions to dismiss are denied. Defendant also moves pursuant to *28 U.S.C. § 1404(a)* to transfer venue from the Southern District of New York to the Northern District of Texas. District courts may transfer an action to another district in which the action could have been brought when doing so would serve the convenience of the parties and the witnesses and would be in the interest of justice. See *28 U.S.C. § 1404(a).* "Whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court." *Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d 513, 520 (2d Cir. 1989).* The burden of demonstrating the desirability of transfer lies with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum unless the [*21] defendant makes "make a clear and convincing showing that the balance of convenience favors" the defendant's choice. *Orb Factory Ltd. v. Design Science Toys Ltd., 6 F. Supp. 2d 203, 210 (S.D.N.Y. 1998)* (internal quotation omitted).

In determining whether a transfer is warranted, a district court considers a number of factors, including: (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interest of justice based on the totality of the circumstances. See, e.g., *Pilates, Inc. v. Pilates Institute, Inc., 891 F. Supp. 175, 183 (S.D.N.Y. 1995); Stein v. Microelectronic Packaging, Inc., 1999 U.S. Dist. LEXIS 11375, No. 98 Civ. 8952, 1999 WL 540443 (S.D.N.Y. 1999)* (MBM).

The "core determination" under § 1404(a) is "the center of gravity of the litigation, a key test [*22] of which is the convenience of witnesses . . . . Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district." *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc., 774 F. Supp. 858, 868 (S.D.N.Y. 1991);* see also *Hernandez v. Graebel Van Lines, 761 F. Supp. 983, 988 (E.D.N.Y. 1991)* ("The convenience of both the party and non-party witnesses is probably considered the

single-most important factor in the analysis of whether a transfer should be granted.") (citing cases); *Arrow Elec., Inc. v. Ducommun Inc., 724 F. Supp. 264, 265 (S.D.N.Y. 1989)* ("In most cases, the convenience of the party and non-party witnesses is the most important factor in the decision whether to grant a motion for transfer.").

In the present case, these factors heavily favor transferring the case to Texas. It is undisputed that with the exception of plaintiffs, who reside in Italy, every witness -- both party and non-party -- resides or works in Dallas, Texas, and most, if not all, of the documentary evidence is in Texas. (See McCormack Aff. in 99 Civ. 11401, Ex. A; McCormack Aff. in 99 Civ. 11402, [*23] Ex. A.) In short, the "center of gravity" of this litigation is plainly in Texas, and the "local interest in having localized controversies decided at home" favors litigation there. *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947).*

To be sure, a plaintiffs' choice of forum is generally entitled to "substantial consideration." *In re Warrick, 70 F.3d 736, 741 (2d Cir. 1995).* However, a plaintiff's choice "is accorded less weight to the degree that the case's operative facts have little or no connection with the transferor forum." *Totonelly v. Cardiology Assocs. of Corpus Christi, Inc., 932 F. Supp. 621, 623 (S.D.N.Y. 1996).* Here, the operative facts have no connection with New York whatsoever. Therefore, plaintiffs' choice of forum is entitled to less deference than it would usually receive, and transfer is warranted. Accordingly, defendant's transfer motions herein are GRANTED and it is hereby ORDERED that these actions be transferred to the Northern District of Texas for all further proceedings.

CONCLUSION

For the foregoing reasons, defendant's motions to dismiss are DENIED. Defendant's motions [*24] to transfer to the Northern District of Texas are GRANTED. The Clerk is directed to transfer these cases to the United States District Court for the Northern District of Texas.

SO ORDERED:

Barbara S. Jones

UNITED STATES DISTRICT JUDGE

New York, New York
July 12, 2000

# TAB 2

LEXSEE 2003 U.S. DIST LEXIS 12611



Cited
As of: Jan 25, 2007

IVOCLAR VIVADENT, INC., Plaintiff, -vs- DR. ROBERT W. HASEL and ABCO RESEARCH, LLC., Defendants.

02-CV-0316E(F)

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

*2003 U.S. Dist. LEXIS 12611*

June 30, 2003, Decided

**DISPOSITION:** [*1] Defendants' motion to dismiss denied in its entirety. Defendants' motion to transfer venue granted.

**COUNSEL:** For Ivoclar Vivadent, Inc, PLAINTIFF: Paul V Nunes, Esq, Underberg & Kessler, Rochester, NY USA.

For Ivoclar Vivadent, Inc, PLAINTIFF: William L Prickett, Esq, Kimberly C Nuzum, Esq, Michael H Brodowski, Esq, Testa, Hurwitz & Thibeault, LLP, Boston, MA USA.

For Robert W Hasel, Abco Research, LLC, DEFENDANTS: Jeremiah J McCarthy, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY USA.

**JUDGES:** JOHN T. ELFVIN, S.U.S.D.J.

**OPINION BY:** JOHN T. ELFVIN

**OPINION:**

MEMORANDUM and ORDER n1

n1 This decision may be cited in whole or in any part.

Plaintiff Ivoclar Vivadent, Inc. ("Ivoclar") commenced this action April 26, 2002, pursuant to *28 U.S.C. § 2201(a)*, seeking a declaration that certain patents owned by defendants Dr. Robert W. Hasel and ABCO Research, LLC ("ABCO") are invalid and unenforceable. Defendants now move to dismiss the Complaint pursuant to *Rules 12(b)(2)and 12(b)(6)* of the Federal Rules [*2] of Civil Procedure ("FRCvP") n2 on the grounds that this Court lacks personal and subject matter jurisdiction. In the alternative, defendants request that this Court exercise its discretion pursuant to *28 U.S.C. § 1404(a)* and transfer this action to the United States District Court for the District of Minnesota. For the reasons stated hereinbelow, defendants' motion to dismiss will be denied and its request to transfer venue will be granted.

n2 Although defendants have erroneously cited *FRCvP 12(b)(6)* as the basis for its motion to dismiss for lack of subject matter jurisdiction, the Court will treat such as a motion to dismiss pursuant to *FRCvP 12(b)(1)*.

The following facts are undisputed unless otherwise noted. Hasel, a resident of the State of Minnesota, is the

2003 U.S. Dist. LEXIS 12611, *2

inventor of *U.S. Patent Nos. 3,547,379* ("the *'379 patent*"), 5,944,527 ("the *'527 patent*") and 6,315,567 ("the '567 patent") -- each entitled "Method of Restoring a Tooth." Hasel and Andrew Grossman are co-owners of ABCO, a Minnesota [*3] corporation whose function is to manage the prosecution and licensure of Hasel's patents. Hasel Decl. P5. Hasel assigned the rights to the three patents to ABCO. Ivoclar is a manufacturer of dental materials with its principal place of business in the Town of Amherst, N.Y.

On January 26, 2000 Grossman sent a letter to Robert A. Ganley, Ivoclar's Chairman of the Board, indicating that several of its marketed dental products infringed one or more of ABCO's patents and concluded with an offer for a license. n3 Hasel Decl. ABCO's counsel sent another letter to Ivoclar on December 4, 2001. The letter reads, in pertinent part:

> "For nearly two years, ABCO and Dr. Hasel pursued patent infringement litigation against Kerr Corporation concerning Kerr's sales of its flowable composite, Revolution(R). Last June, on the eve of trial, after completing all fact and expert discovery, dispositive motions and final pretrial procedures, Kerr agreed to settle the litigation on terms favorable to ABCO. Enclosed is a copy of the Consent Judgment entered by the Court in which Kerr stipulated that the '379 and '537 Patents are valid and enforceable and that Kerr's sales of its Revolution(R) product [*4] and their use constitute infringement of the '527 Patent. As part of the settlement and to allow it to continue to sell its Revolution(R) products, Kerr also agreed to an ongoing license and royalty arrangement with ABCO.

> *****

> "Now that the litigation against Kerr has concluded and ABCO's patent portfolio has been strengthened by the issuance of the '567 Patent, ABCO will be enforcing these patents against other infringers.

> "Please be advised that ABCO believes

that Vivadent/Ivoclar's sales of flowable composite products may infringe one or more claims of the '379 Patent, the '527 Patent, and/or '567 Patent." Compl., Ex. A.

Based on these two letters, plaintiff filed its Complaint seeking a declaratory judgment of non-infringement. In moving to dismiss pursuant to *FRCvP 12(b)(2)*, defendants initially argued that the sending of those two letters was insufficient to subject them to the personal jurisdiction of this Court. In response, plaintiff has offered evidence of defendants' other activities in New York.

> n3 The pertinent text of the letter reads as follows:

> "This letter is to advise you, and to provide notice to you under *35 U.S.C. § 287*, that Vivadent/Ivoclar North America, Inc.'s Tetric Flow, Heliomolar Flow and Compoglass Flow products and possibly other restorative products infringe one or more claims of *U.S. Patent Nos. 5,547,379* and *5,944,527*. A copy of each patent is enclosed.

> "ABCO Research, LLC would be pleased to provide Vivadent/Ivoclar North America, Inc. with a nonexclusive license under the patents (enclosed)." Hasel Decl., Annex.

[*5]

ABCO sent seven letters to Harry Schein, Inc. ("Schein") -- one of Ivoclar's distributors whose headquarters are located in Melville, N.Y. -- between June 20, 2001 and November 16, 2001, regarding Schein's alleged infringement of ABCO's patents and a possible licensing agreement. The first such letter, dated June 20, 2001, contained virtually identical warnings and allegations as the subsequent December 4, 2001 letter sent to Ivoclar and also specified various products, including two of Ivoclar's -- *viz.*, the Heliomolar(R) Flow and the Tetric(R) Flow --, that ABCO believed "may infringe one or more of the claims of the '527 Patent, and,

2003 U.S. Dist. LEXIS 12611, *5

depending on their chemical makeup, perhaps the '379 *Patent* as well." Decl. of Alan S. Korman, Esq., Ex. B. Plaintiff also asserts that defendants met with Schein, on or about July 23, 2001, at Schein's offices in Melville to discuss ABCO's claims of infringement and a possible licensing agreement. n4 Korman Decl. P12. At the meeting, ABCO allegedly "informed Schein that [it] planned to file a patent infringement lawsuit against dental manufacturers, including Ivoclar." *Id.* P16. Ivoclar subsequently sent Schein a November 2, 2001 letter by [*6] which it indicated that ABCO had "elected to proceed to actively enforce their patents directly against manufacturers of flowable composites other than Kerr, including manufacturers who sell their flowable composites through Harry Schein." n5 *Id.*, Ex. G.

> n4 Plaintiff alleges that defendants also met with Pentron Corporation -- another dental manufacturer that had been accused of patent infringement by defendants -- on January 25, 2002 in New York City, to discuss the terms of a possible license agreement between the two parties. Korman Decl. P18.

> n5 Plaintiff claims that defendants filed separate lawsuits, on or about November 2, 2001, against two such manufacturers -- to wit, Danville Manufacturing, Inc. and Pulpdent Corporation -- in the United States District Court for the District of Minnesota. Korman Decl. P17.

Korman also alleges that ABCO's counsel called him several times between February and March of 2002 and offered to meet with him in New York City, or elsewhere, to discuss settlement of defendants' [*7] infringement claims against Ivoclar. The parties agreed to meet, in Chicago, Ill. on April 29, 2002. Ivoclar then commenced this action by filing its complaint with this Court on April 26, 2002. Three days later, on April 29, 2002, Korman met with Grossman and ABCO's attorney, Harry Manbeck, Jr., Esq., in Chicago to discuss settlement of the patent infringement claims. The tone and content of that meeting has been vigorously debated by its participants. Manbeck and Grossman describe the meeting as "cordial" during which Korman had indicated his belief that Ivoclar's products did not infringe ABCO's patents and that such patents may be invalid. When asked to provide information supporting his position, Korman indicated to them that he would have to speak with his associates and get back to them. Manbeck and Grossman also assert that Korman told them that he had filed the April 26, 2002 Complaint but that "he would hold off on serving [it] pending further discussions with us." Grossman Decl. P3; *see also* Manbeck Decl. P8 ("During the meeting, Mr. Korman mentioned that he had filed the complaint in this action the previous Friday, April 26. However, he also said that he would hold [*8] off on serving the complaint pending further discussions with us."). Both Grossman and Manbeck assert that they were both led to believe that further discussions with Korman would follow, pending Korman's attempts to obtain the relevant information. Manbeck then spoke with Korman on June 13, 2002 during which conversation Korman told Manbeck that his European associates were finalizing their position and had been providing him with information for his review and that he would call Manbeck the following Monday, June 17. Manbeck asserts that Korman did not call on June 17 and that he has had no further contact with Korman since that time. Grossman also claims that he had no further contact with Korman after the April 29, 2002 meeting. Plaintiff served defendants with its Complaint on August 14, 2002.

Korman's version of events regarding the April 29, 2002 meeting is much different from that of defendants. Korman disputes defendants' contention that the meeting "was part of ongoing settlement discussions which provided a reasonable probability of producing a non-judicial resolution of [the] dispute." Korman Sur-Reply Decl. P2. Korman alleges that, by April 26, 2002, prospects for settlement [*9] "were very slim" and that, although there had been no apparent change in either party's position before the April 29, 2002 meeting, he "planned to go ahead with the meeting so long as any hope remained ***." *Id.* P3. Korman further states that he "did not expect the discussions to result in a settlement and [he] did not provide either Mr. Manbeck or Mr. Grossman any basis from which a reasonable person could conclude that settlement was more than an improbable possibility" and that he "went ahead with the meeting with very low expectations for a settlement." *Ibid.* Thus, Korman concludes that Ivoclar "had a reasonable apprehension of being sued for patent infringement based on defendants' threats and their actual litigation against other companies." *Ibid.*

Defendants' first argument in support of its motion to dismiss is that this Court lacks personal jurisdiction over them. They argue that both defendants are "located in

Minnesota" and are "neither authorized nor licensed to do business in New York, nor do they have offices, employees, assets, or telephone listings in this state." Defendants further maintain that the two letters sent to plaintiff -- dated January 26, 2000 and [*10] December 4, 2001 -- are insufficient to subject them to this Court's personal jurisdiction.

Plaintiff points to the nature of defendants' business -- viz., licensing and enforcing patents -- and, for purposes of establishing personal jurisdiction under New York's Civil Practice Law and Rules ("CPLR") § 301, contends that they are "doing business" in New York. Additionally, plaintiff argues that defendants are subject to this Court's personal jurisdiction pursuant to CPLR § 302(a)(1) -- New York's long-arm statute -- because their New York activities qualify as a transaction of business as provided for by the statute.

In opposition to defendants' motion to dismiss, plaintiff need make only a prima facie showing of personal jurisdiction in accordance with New York law. See Graphic Controls Corp. v. Utah Medical Products, Inc., 1997 U.S. Dist. LEXIS 7448, 1997 WL 276232, at *2 (W.D.N.Y. 1997) (applying New York law in determining whether the court had personal jurisdiction over the foreign defendant), aff'd, 149 F.3d 1382 (Fed. Cir. 1998); Capitol Records, Inc. v. Optical Recording Corp., 810 F. Supp. 1350, 1352 (S.D.N.Y. 1992) (applying New York law and [*11] holding that the plaintiff needs only make a prima facie showing of personal jurisdiction in opposition to foreign defendant's FRCvP 12(b)(2) motion). In determining the disposition of a FRCvP 12(b)(2) motion, the court may consider facts as presented in evidentiary material outside the pleadings. Teachers' Retirement Sys. of LA v. A.C.L.N., Ltd., 2003 U.S. Dist. LEXIS 7869, 2003 WL 21058090, at *7 (S.D.N.Y. 2003). Such material is construed in the light most favorable to, and any doubts are resolved in favor of, the plaintiff. Ibid.; Graphic Controls, 1997 U.S. Dist. LEXIS 7448, [WL] at *2.

CPLR § 301 provides for jurisdiction over a foreign corporation if it "does business in New York, not occasionally or casually, but regularly, continuously and systematically thereby demonstrating a sufficiently fair measure of permanence to warrant a finding of the corporation's constructive presence here." Graphic Controls, 1997 U.S. Dist. LEXIS 7448, [WL] at *2. This so-called "doing business" test requires a court to analyze

the specific facts of each individual case to determine whether a foreign corporation's contacts and connections with New York demonstrate continuous and systematic activity. Ibid. (citing Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990)). [*12] Finally, unlike New York's long-arm statute, a jurisdictional inquiry under CPLR § 301 does not require that the plaintiff's cause of action "emanate from or have any nexus to the defendant's business activity." Ibid.

Defendants' activities in New York are substantial and sufficiently continuous to support the exercise of personal jurisdiction over them under CPLR § 301. Initially, it is important to note that ABCO's sole function is to manage, enforce and license its patents and that it lacks the "traditional indicia of doing business because it does not manufacture or sell tangible goods." Capitol Records, at 1353. Accordingly, the frequency and nature of ABCO's New York business activities must be analyzed within such a context in determining whether such contacts demonstrate the requisite degree of permanence. See Capitol Records, at 1353 (noting that, for the purposes of establishing personal jurisdiction, a company's business activities conducted in New York must not be peripheral to its "main business" but must be a substantial part of that corporation's business). ABCO sent at least ten letters, between January 26, 2000 and December 4, 2001, to three different [*13] companies that related to its efforts to enforce and license its patents. n6 In addition, ABCO's counsel made numerous phone calls to plaintiff during which ABCO had offered to meet with Ivoclar in New York to negotiate a possible license, solicited licensing fees and reiterated its infringement claims. Korman Decl. P9. ABCO also traveled to New York twice to meet with Schein and Pentron Corp. to discuss possible licensing agreements. Defendants do not dispute that they engaged in such activities and, while the Court recognizes that, without more, the two letters that ABCO had sent to Ivoclar would be insufficient for this Court to exercise jurisdiction over defendants -- see Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1360-1361 (Fed. Cir. 1998) (finding that three cease-and-desist letters did not confer personal jurisdiction over a foreign defendant) -- , defendants' other activities in not only protecting its patents but soliciting licensing fees in New York, when combined with their two "cease and desist" letters, evince the requisite permanence -- i.e., systemic and continuous activity -- to satisfy New York's "doing business" test.

Thus, [*14] although ABCO has no offices, employees, assets or telephone listings in New York, it is subject to the personal jurisdiction of this Court because it has extensively engaged in its primary business activity -- to wit, enforcing and licensing its patents -- in New York. Accordingly, defendants' motion to dismiss for lack of personal jurisdiction will be denied. n7

> n6 Such letters comprised the two "cease and desist" letters to Ivoclar, a virtually identical one sent to Heraeus Kulzer, Inc. and the previously discussed seven letters that had been sent to Schein.

> n7 The Court will decline to address whether ABCO is subject to personal jurisdiction under *CPLR § 302* inasmuch as the issue is moot.

The Court next addresses defendants' motion to dismiss based on its argument that there was no actual controversy at the time plaintiff filed its complaint and that this Court therefore lacks subject matter jurisdiction over this case.

*Section 2201(a) of the Declaratory Judgment Act* authorizes a court to declare the [*15] rights of an interested party in a case of actual controversy. *28 U.S.C. § 2201*. The purpose of the Act "is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit." *Clay Paky, S.p.A. v. Vari-Lite, Inc.*, 2000 U.S. Dist. LEXIS 9802, 2000 WL 977709, at *3 (S.D.N.Y. 2000). However, a prerequisite to any claim brought pursuant to *section 2201(a)* is that an actual controversy must have existed at the time the complaint was filed. *Bausch & Lomb Inc. v CIBA Corp.*, 39 F. Supp. 2d 271, 273 (W.D.N.Y. 1999); *see also R & P Pools, Inc. v. New Kayak Pool Corp.*, 2001 U.S. Dist. LEXIS 1505, 2001 WL 135823, at *2 (W.D.N.Y. 2001) ("To proceed in the absence of a case or controversy would involve the court in rendering a forbidden advisory opinion.") (quotation and citation omitted). And, in a case such as this, plaintiff must demonstrate "'(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. [*16] '" n8 *R & P Pools*, 2001 U.S. Dist. LEXIS 1505, [WL] at *2 (quoting B.P. Chemicals, Ltd. v. Union

*Carbide Corp., 4 F.3d 975, 978) (Fed. Cir. 1993)*. The plaintiff bears the burden of proving that there is an actual controversy. *Ibid*. Nonetheless, even if plaintiff shows that an actual controversy existed, the exercise of jurisdiction over this cause of action is not mandatory but within the "sound discretion of [this] court." *Ibid*.

> n8 There is no issue for the Court regarding plaintiff's satisfaction of the second prong inasmuch as it is undisputed that plaintiff has sold a product that allegedly infringes defendants' patents.

Plaintiff contends that an actual controversy existed because it had a reasonable apprehension that ABCO would imminently file a patent infringement suit. The test for determining whether plaintiff's apprehension was reasonable is an objective one "which focuses on whether the defendant's 'conduct rose to a level sufficient to indicate an intent to enforce its patent.'" *Clay Paky*, 2000 U.S. Dist. LEXIS 9802, [WL] at *4 [*17] (quoting *Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888 (Fed. Cir. 1992))*. In determining whether plaintiff has demonstrated the requisite reasonable apprehension, the Court must objectively consider the totality of the circumstances. n9 *Ibid*.

> n9 In deciding defendants' motion to dismiss for lack of subject matter jurisdiction, this Court may consider evidence outside the pleadings. *Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985)*.

Plaintiff contends that the efforts put forth by ABCO in attempting to enforce and license its patents n10 created a situation where it was reasonable for Ivoclar to apprehend that ABCO was imminently close to filing a patent infringement action against it. Plaintiff places particular significance on the threatening language contained within ABCO's December 4, 2001 letter by which ABCO had (1) alleged that Ivoclar's products may have infringed its patents, (2) informed Ivoclar that it had obtained a Consent Judgment [*18] in its patent infringement action against Kerr corporation, (3) informed Ivoclar that it "will be enforcing [its] patents against other infringers" and (4) invited Ivoclar to negotiate a license. *See* Compl., Ex. A.

n10 Conduct which included the two letters sent to Ivoclar, the various phone conversations between counsel for Ivoclar and ABCO, the seven letters sent to Schein and the commencement of three separate lawsuits against other alleged infringers -- to wit, Kerr Corporation, Pulpdent Corporation and Danville Manufacturing, Inc.

Defendants counter that no actual controversy existed at the time plaintiff filed its Complaint because the parties were still conducting settlement negotiations with regard to the alleged patent infringement. In support, defendants direct the Court to the fact that Ivoclar had commenced this action on April 26, 2002 -- three days before the parties' April 29, 2002 settlement conference in Chicago -- and that Korman had subsequently agreed at the conclusion of such meeting [*19] to refrain from serving the Complaint pending further discussions. Defendants argue that such facts refute plaintiff's contention that it reasonably believed that it was facing an imminent patent infringement lawsuit and, further, that to allow plaintiff to utilize its premature complaint as a negotiating tool during ongoing negotiations would defeat the purpose of the *Declaratory Judgment Act.*

Plaintiff has shown that it was objectively reasonable for it to apprehend that it was the target of an imminent patent infringement lawsuit by ABCO. Defendants' December 4, 2001 letter warned Ivoclar that (1) several of its marketed products "may infringe" ABCO patents, (2) ABCO had pursued patent infringement litigation for nearly two years against another alleged infringer, Kerr Corporation, resulting in a settlement with "terms favorable to ABCO" and (3) it "will be enforcing [its] patents against other infringers." Such warnings, in effect, were "a statement to the plaintiff to take notice that it is next on the list." *Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *4 (quotations and citations omitted). n11 In other words, it was reasonable for Ivoclar to interpret the letter as a threat from ABCO by which ABCO [*20] was saying to Ivoclar, "If you don't think we mean business and are serious about this matter, look and see what we have done to another alleged infringer." *Ibid.* (quotation and citation omitted). In addition to such implicit threats of litigation, defendants' other conduct -- to wit, commencing litigation against other alleged infringers and indicating to Schein that it had "elected to proceed to actively enforce their patents directly against manufacturers of flowable composites

other than Kerr, including manufacturers who sell their flowable composites through Harry Schein" n12 -- contributed to an environment or, more appropriately, adverse circumstances whereby it would have been reasonable for Ivoclar to apprehend that ABCO was about to commence a patent infringement action against it.

n11 *See also Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *4 (finding that a letter, similar to the one here that was sent by ABCO, -- by which the defendant had warned the declaratory plaintiff that (1) it had aggressively enforced its patent rights against a named third-party, (2) plaintiff's product "may infringe" the defendant's patent, (3) plaintiff should "cease and desist" from selling its product and (4) if plaintiff chose to continue selling its product to contact the defendant in order to discuss a license -- was one that "clearly threatened litigation").

[*21]

n12 Korman Decl., Ex. G.

Defendants argue however that the holding in *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051 (Fed. Cir. 1995),* lends support for its motion to dismiss. In *Phillips Plastics,* the Federal Circuit Court of Appeals held that the defendant's conduct in merely attempting to conduct license negotiations did not create a justiciable controversy. Significantly, the Court held that, "the offer of a patent license does not create an actual controversy" and that "when there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down." *Phillips Plastics, at 1053.* Seizing on such language, defendants argue that no justiciable controversy existed in this case because plaintiff filed its Complaint three days before a scheduled meeting where the parties were supposed to discuss a licensing agreement. Defendants' reliance on *Phillips Plastics* is misplaced because therein the patentee had merely invited license negotiations and had neither "stated nor suggested [*22] that it would pursue legal recourse if it were not satisfied with the outcome of the proposed licensing negotiations." *Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *5; *see also Conmed*

*Corp. v. ERBE Electromedizin GMBH, 129 F. Supp. 2d 461, 466 (N.D.N.Y. 2001)* (distinguishing *Phillips Plastics* based on the same premise); *EMC Corp. v. Norand Corp., 89 F.3d 807, 812 (Fed. Cir. 1996)* (distinguishing *Phillips Plastics* as a case where all that was present was "negotiation unaccompanied by threats of legal action"). Here, in contrast, ABCO communicated implicit threats of litigation, which created a situation whereby it was reasonable for Ivoclar to apprehend the imminent commencement of a patent infringement action. As explained by the *Clay Paky* court, defendants' oblique accusations of patent infringement and "thinly veiled threats of resorting to litigation" render the present case inapposite to that of *Phillips Plastics. Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *5. Furthermore, the fact that the parties had entered into negotiations regarding a possible patent license does not necessarily mean that ABCO's reasonable apprehension of litigation had necessarily been removed. *See ibid.* ("Just [*23] because the parties proceeded to initiate negotiations does not mean that the reasonable apprehension of litigation was ever removed."). Thus, the fact that the parties may have been negotiating a possible patent license is not dispositive, but merely a factor that is, in this case, insufficient to overcome defendants' other threatening conduct that gave rise to Ivoclar's reasonable apprehension of an imminent patent infringement suit by ABCO.

Having found that the Court has both personal jurisdiction over the defendants and subject matter jurisdiction over this case, the Court must finally determine whether to exercise jurisdiction in this case. *See EMC Corp., at 810* ("Even if there is an actual controversy, the district court is not required to exercise

declaratory judgment jurisdiction, but has discretion to decline that jurisdiction.") (citing *Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 241, 97 L. Ed. 291, 73 S. Ct. 236 (1952)).* However, the issue has become moot and the Court will decline to exercise jurisdiction in this case because plaintiff has now joined in defendants' request to transfer venue, pursuant to *28 U.S.C. § 1404(a),* from the Western District [*24] of New York to the District of Minnesota. n13 Therefore, rather than exercise jurisdiction in this matter, the Court will transfer this case to the District of Minnesota inasmuch as both parties have indicated that such Court is a mutually preferable and convenient forum.

n13 Plaintiff and defendants have submitted a Stipulation and Order dated June 27, 2003 by which they have agreed to transfer this action to the United States District Court for the District of Minnesota provided that this Court finds an actual case or controversy.

Accordingly, it is hereby *ORDERED* that defendants' motion to dismiss is denied in its entirety, that defendants' motion to transfer venue is granted and that the Clerk of this Court is directed to transfer this case to the United States District Court for the District of Minnesota.

DATED: June 30, 2003

JOHN T. ELFVIN

S.U.S.D.J.

# TAB 3

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                         - - -

4   SYNGENTA CROP PROTECTION, INC.,    :       CIVIL ACTION
                                       :
5              Plaintiff              :
                                       :
6         vs.                          :
                                       :
7   MONSANTO COMPANY and               :
    MONSANTO TECHNOLOGY LLC,           :
8                                      :
            Defendants           .:       NO. 03-1062 (KAJ)
9                         - - -

10
                                    Wilmington, Delaware
11                                  Tuesday, April 6, 2004
                                    11:00 o'clock, a.m.
12
                            - - -
13
    BEFORE:  HONORABLE KENT A. JORDAN, U.S.D.C.J.
14
                            - - -
15
    APPEARANCES:
16
                YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
17              BY:  JOHN W. SHAW, ESQ.

18                   -and-

19              FINNEGAN, HENDERSON, FARABOW, GARRETT &
                DUNNER, L.L.P.
20              BY:  DON O. BURLEY, ESQ. and
                     MICHAEL J. FLIBBERT, ESQ.
21
                       Counsel for Plaintiff
22

23                                  Valerie J. Gunning
                                    Official Court Reporter
24

25

35

1    against giving Delaware -- I don't want to say give it

2    as much weight, but makes it more easy for Monsanto to

3    overcome the weight given to the Delaware filing.

4              The Symbol Technology case, I think in that

5    case you had a situation where two parties were sitting

6    down, this one had these patents, this one had these

7    patents (indicating), and then this one sued on these

8    patents, so the other side turned around and was afraid

9    about these patents.  It was one of those situations

10   where, yeah, maybe the patents aren't related, but they

11   were all being thrown into the same negotiation.  I

12   think that's a distinguishing factor there.

13             On the transfer, your Honor, I think this

14   case has nothing to do with Delaware other than some

15   parties are incorporated here.  Sure, suit was brought

16   first here, but I don't think that that should be -- I

17   think that's more recently overcome by the fact the

18   parties were trying to negotiate a license.  Syngenta

19   rushed to the courthouse and that activity should not be

20   encouraged by keeping the case here.

21             THE COURT:  Okay.  Thank you, sir.

22             I came into court on the basis of the papers

23   with my mind largely made up, but with an opportunity for

24   somebody to make a difference in their argument.  And

25   while the arguments are well presented, I'm still coming

36

1  out where I thought I would on the basis of the papers

2  and that is that the motion to dismiss is denied.  The

3  motion to transfer is denied.  The motion to enjoin is

4  granted.

5          And I'm not going to take the time because,

6  frankly, I don't think it adds to the body of

7  jurisprudence that's important to sit down and write you

8  something, but I will give you your reasons right now.

9          First, there's some dispute about the precise

10 language that the parties used in speaking to each other,

11 but it does not appear to be disputed that there was an

12 initial contact between Monsanto and Syngenta initiated

13 by Monsanto in which specific reference was made to, Oh,

14 you've got these new patents, and, excuse me, this new

15 product and you're going to have more than an implication

16 that you're going to have an issue with us about our

17 patents on the Monsanto side with the precise language of

18 the remark being in dispute, but a clear reference to

19 settle or litigate.  Settle or we turn to our legal

20 solutions, which I think any reasonable person would

21 interpret and understand to mean we come to a business

22 solution or we will be in court.

23          I don't think even if you take the most

24 generous wording from Monsanto and say, they said legal

25 solution instead of we go to court, that that meant,

37

1   you know, we'll send you a contract.  I mean, legal

2   solution in this context I think fairly implied we're

3   going to court.

4         I have to look at the totality of the

5   circumstances, too and, no matter who started it, the fact

6   remains that these two people are not strangers to each

7   other in court, so when somebody says we'll turn to legal

8   solutions in the context of what the parties have

9   experienced before, it was certainly not unreasonable to

10  think, well, that means we're going to see each other in

11  court again.

12        The analysts report is a factor.  It's hard

13  to know quite how to weigh that because I think Mr.

14  Spears has an excellent point.  You cannot control what

15  analysts say, but the reality is I have to look at the

16  reasonableness of the apprehension and it was not

17  unreasonable for them on the Syngenta side to believe

18  that when an analyst's report surfaces with a statement,

19  we believe Monsanto may sue on these patents, that the

20  source of that information was initially and originally

21  somebody from within Monsanto.

22        It might have got amplified, might have got

23  changed, but the seed of it somebody at Monsanto talking

24  about a patent dispute.  So it's a factor.  And it's not

25  unreasonable.

38

1      In fact, it would be wholly reasonable for

2  them to believe they are talking to the trade about our

3  product.  They are implying suit.

4      So when you say they are not being heard,

5  nothing has happened, no customers are threatened, there's

6  more than one way to threaten customers.  And putting a

7  vibe out through the trade press is one way it happens.

8  So it wasn't unreasonable for Syngenta under these

9  circumstances to interpret that as another indicator that

10  we're going to end up in court with these folks.

11      The they aren't being damaged at all argument

12  I think fails to admit an undisputed fact, which is there

13  was a product approved, actively being marketed, and

14  consequently, the damage meter was and is running,

15  because if you're right, they're going to pay you, right

16  back to the -- to the day they started messing around

17  with your patents.  And so that's, again, another factor

18  to be considered.

19      And, finally, and not insignificantly, you

20  sued them.  You, in fact, did it.  And what I -- your

21  opening lines in your brief are very telling to me on

22  this point.  You're distressed that they've taken away

23  your forum of choice, which is not -- I mean, that may

24  very well go to the issue of where is it fair to try

25  this, but it speaks volumes about the reasonableness of

39

1  apprehension of suit to me: That they thought you would

2  sue them, and you did sue them. And the -- and it only

3  verifies that it was not unreasonable.

4          Now, that is not a factor all by itself. It's

5  certainly not dispositive, but it is a factor to be

6  weighed in the mix. And when I weigh that totality of

7  circumstances, I'm persuaded that there was a reasonable

8  apprehension that they will be sued on these patents and

9  that reasonable apprehension turned out to be dead right.

10         So the motion to dismiss for lack of subject

11  matter jurisdiction is denied.

12         The motion to transfer was, frankly, less of

13  a challenge for me, because the -- it got a little bit of

14  the back of Monsanto's hand. I don't think, frankly,

15  there was so much focus on that. To the extent there was

16  focus, it did not meet what I believe is the primary

17  point, which is if you have got a rational, reasonable

18  basis for your selection forum, that's paramount. It can

19  be outweighed, but you've got to have powerful factors to

20  outweigh it.

21         Here, there is a rational basis. Two

22  Delaware corporations in court resolving their problem is

23  not an irrational thing, it just isn't. You know, one

24  side or the other might prefer to be someplace else, but

25  the fact that you would be in your home turf, Monsanto,

40

1   does not make it unreasonable for Syngenta to sue you in

2   the place that Monsanto has chosen to be incorporated.

3            What I was able to take from the briefing

4   indicates to me that this is not only not local, it's not

5   even national.  It's got international implications.  This

6   is a product that two businesses, which are international

7   in character, are likely to be duking it out over, at

8   least in the business marketplace, and maybe in the legal

9   arena as well.  Outside the United States, too.

10            And so it is really a request to say, Hey,

11   give us our home turf, and that is not a sufficient basis

12   for disturbing a rationale choice of forum by the

13   plaintiff in the first instance.

14            I will note also that some of these home turf

15   decisions make specific note that you look at where you

16   are in relation physically to the plaintiff's headquarters

17   and, you know, for what it's worth, which in my mind isn't

18   a whole lot, but it's worth noting at least, they are

19   closer here than they would be out in the Eastern District

20   of Missouri to their American base.

21            And the reality of modern litigation s that

22   whether this is pending here or in the Eastern District,

23   you'd be doing exactly the same things.  You'll be going

24   around taking depositions.  You'll be exchanging documents.

25   You will be sending interrogatories to each other by

41

1   e-mail or by Fax or by overnight, but the reality is, the

2   way the modern litigation rule works, there's virtually

3   nothing that would be different by this suit being

4   pre-tried here as opposed to the Eastern District.

5           The real question then becomes:  Is there

6   some overwhelming issue with respect to trial it that

7   would make it so much less convenient for Monsanto to be

8   here as to be the Eastern District.

9           And while I don't doubt that it would be more

10  convenient to be in your own hometown, I find nothing in

11  the record that indicates to me that this can't be tried

12  and tried perfectly well by sophisticated and well-heeled

13  and experienced, even in this court, corporation like

14  Monsanto if the litigation goes forward here, so there's

15  nothing that does substantially outweigh the paramount

16  consideration which the plaintiff's choice, rational

17  choice of forums do under the law.

18          So those are the reasons that the motion

19  to transfer is denied, and similarly, as all parties

20  acknowledge why it makes sense for me to enjoin further

21  litigation, Monsanto's mirror image suit in the Eastern

22  District.

23          And I want to put something else on the

24  record.  It would certainly have been, I think in the

25  courts -- if I were looking at this from a self-

42

1   interested standpoint, I would drop-kick this case to

2   the Eastern District in a heartbeat because, heaven

3   knows, there's plenty of work in this District for the

4   Judges here to do.

5           This is not a -- this is not turf

6   consciousness or a desire to hold onto things.  On the

7   contrary, if you folks sat down and agreed to settle

8   the case, you might be happier than I, but not much, I

9   promise.  I just give you that assurance, that I'm not

10  holding onto this case because it is going to give

11  personal pleasure or there's a desire here to hold onto

12  stuff that ought to go elsewhere.

13          I am persuaded on the legal principles that

14  that is what I'm required to do, and that's why I'm doing

15  it.  I'm going to hold onto the case here because the

16  merits of what has been presented to me, Syngenta did have

17  a reasonable apprehension of suit.  Jurisdiction lies here.

18  The choice of forum was not irrational or unreasonable.

19  There's no counterveiling and outweighing set of factors

20  for a transfer and it logically follows, then, that the

21  duplicative suit should be enjoined.

22          You'll get a one-sentence order from me that

23  says for the reasons stated in open court, the motions

24  to dismiss and transfer to denied, motion to enjoin is

25  granted.  And then you won't be spending any more time,

43

1    nor will I, on these preliminaries, and we can get to

2    the business of resolving the case on the merits.

3            All right.  Is there anything else that we

4    ought to be addressing while we're all together?  From the

5    plaintiff's side?

6            MR. FLIBBERT:  No, your Honor, I don't believe

7    so.

8            THE COURT:  From the defense?

9            MR. SPEARS:  Nothing further, your Honor.

10           THE COURT:  All right.  We're in recess.

11           (Court recessed at 11:55 p.m.)

12                      - - -

13

14

15

16

17

18

19

20

21

22

23

24

25