IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

**ORIGINAL**

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD.,<br>SAMSUNG ELECTRONICS AMERICA, INC.,<br>SAMSUNG TELECOMMUNICATIONS<br>  AMERICA GENERAL, L.L.C.,<br>SAMSUNG SEMICONDUCTOR, INC., and<br>SAMSUNG AUSTIN SEMICONDUCTOR L.L.C., | : <br> : <br> : <br> : <br> : <br> : |
| Plaintiffs, | : Civil Action No. 06-CV-0720 (***) |
| v. | : |
| ON SEMICONDUCTOR CORP. | : **REDACTED** |
| and | : |
| SEMICONDUCTOR COMPONENTS<br>INDUSTRIES, LLC, | : <br> : <br> : |
| Defendants. | : |

## PLAINTIFFS' OPENING BRIEF IN SUPPORT OF THEIR MOTION
## TO ENJOIN DEFENDANTS FROM
## PURSUING A DUPLICATIVE TEXAS ACTION

OF COUNSEL:

John M. Desmarais
James E. Marina
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800


Dated: December 21, 2006

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600
jshaw@ycst.com

Attorneys for Samsung Electronics Co., Ltd.,
Samsung Electronics America, Inc., Samsung
Telecommunications America General, L.L.C.,
Samsung Semiconductor, Inc., and Samsung Austin
Semiconductor, L.L.C.

## TABLE OF CONTENTS

Page

NATURE AND STAGE OF THE PROCEEDING .................................................................................1

SUMMARY OF ARGUMENT...........................................................................................................2

STATEMENT OF FACTS..................................................................................................................3

ARGUMENT ...................................................................................................................................6

I.      LEGAL STANDARDS. ..........................................................................................................6

II.     THE TEXAS ACTION IS DUPLICATIVE OF THE DELAWARE ACTION AND THE
        FIRST-FILED RULE APPLIES UNLESS THERE IS AN APPLICABLE EXCEPTION.............8

III.    DEFENDANTS CANNOT DEMONSTRATE AN EXCEPTION TO THE FIRST-
        FILED RULE. ......................................................................................................................9

        A.      SEC Is Not Guilty Of Inequitable Conduct, Bad Faith, Or Forum
                Shopping. ...............................................................................................................9

        B.      The Interests Of Expediency And Justice Do Not Weigh In Favor Of
                Departing From The First-Filed Rule. ...................................................................13

CONCLUSION ..............................................................................................................................17

i

TABLE OF AUTHORITIES

Page(s)

Cases

*ADE Corp. v. KLA-Tencor Corp.,*
    138 F. Supp. 2d 565 (D. Del. 2001) ................................................................. 15

*Affymetrix, Inc. v. Synteni, Inc.,*
    28 F. Supp. 2d 192 (D. Del. 1998) ............................................................. 14, 15

*Chase Manhattan Bank, U.S.A., N.A. v. Freedom Card, Inc.,*
    265 F. Supp. 2d 445 (D. Del. 2003) ............................................................ 7, 14

*Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.,*
    821 F. Supp. 962 (D. Del. 1993) ...................................................................... 15

*Crosley Corp. v. Hazeltine Corp.,*
    122 F.2d 925 (3d Cir. 1941),
    *cert. denied,* 315 U.S. 813 (1942) ................................................................. 6, 7

*Dorman Products, Inc. v. Pontiac Coil, Inc.,*
    No. 06-3157, 2006 WL 2927307 (E.D. Pa. Oct. 10, 2006) .............................. 12

*E.E.O.C. v. University of Pa.,*
    850 F.2d 969 (3d Cir. 1988), *aff'd,* 493 U.S. 182 (1990) ..................................... 7

*Electronics for Imaging, Inc. v. Coyle,*
    394 F.3d 1341 (Fed. Cir. 2005) ........................................................................... 9

*Epic Systems Corp. v. Acacia Research Corp.,*
    No. 06-255, 2006 WL 3355185 (D. Del. Nov. 16, 2006) ................................. 10

*Genentech Inc. v. Eli Lilly & Co.,*
    998 F.2d 931 (Fed Cir. 1993) ....................................................................... 6, 7, 8

*Goodyear Tire & Rubber Co. v. Releasomers, Inc.,*
    824 F.2d 953 (Fed. Cir. 1987) ....................................................................... 9, 11

*Intel Corp. v. AmberWave Systems Corp.,*
    233 F.R.D. 416 (D. Del. 2005) ........................................................................ 8, 9

*J. Lyons & Co. Ltd. v. Republic of Tea, Inc.,*
    892 F. Supp. 486 (S.D.N.Y. 1995) .................................................................... 12

*Matsushita Battery Industrial Co., Ltd. v. Energy Conversion Devices, Inc.,*
    No. 96-101, 1996 WL 328594 ............................................................... 7, 13, 14

*Motorola, Inc. v. PC-Tel, Inc.,*
   58 F. Supp. 2d 349 (D. Del. 1999) .................................................................................. 14

*Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.,*
   157 F.R.D. 215 (D. Del. 1993) .................................................................................... 13

### Statutes

28 U.S.C. § 2201 ................................................................................................................ 10

Plaintiffs respectfully move this Court for an order enjoining Defendants from pursuing in the United States District Court for the Eastern District of Texas a second-filed action that addresses the same issues of patent infringement and validity that are at issue in this first-filed declaratory judgment action. As set forth below, an order enjoining the Texas action is warranted under the long-established "first-filed" rule.

## NATURE AND STAGE OF THE PROCEEDING

Plaintiff Samsung Electronics Co., Ltd. ("SEC") filed its original Complaint in this action (the "Delaware Action") on November 30, 2006, seeking a declaration that three United States patents purportedly owned by Defendants — U.S. Patent Nos. 5,563,594 (the "'594 Patent"), 6,362,644 (the "'644 Patent"), and 5,361,001 (the "'001 Patent") — are invalid and not infringed by SEC. (D.I. 1.)

Four days later, on December 4, 2006, Defendants filed a patent infringement action against SEC in the United States District Court for the Eastern District of Texas, Case No. 6:06 cv 523 (the "Texas Action"), alleging infringement by SEC of the same three patents at issue in the Delaware Action and a fourth patent, U.S. Patent No. 5,000,827 (the "'827 Patent"). (Ex. 1.) Defendants also named four SEC affiliates as co-defendants in the Texas Action — Samsung Electronics America, Inc. ("SEA"), Samsung Telecommunications America General L.L.C. ("STA"), Samsung Semiconductor, Inc. ("SSI"), and Samsung Austin Semiconductor L.L.C. ("SAS").

On December 21, 2006, Plaintiffs filed an Amended Complaint in the Delaware Action adding SEA, STA, SSI, and SAS as co-plaintiffs with SEC, adding a claim for declaratory judgment of noninfringement and invalidity of the '827 patent, and adding a claim against Defendants for infringement of an SEC patent — U.S. Patent Nos. 5,252,177 (the "'177 Patent").

Because the Delaware Action is the first-filed action, and because the Texas Action is duplicative of the Delaware Action, Plaintiffs move this Court for an order enjoining Defendants from proceeding with the Texas Action.

## SUMMARY OF ARGUMENT

1.    Absent an exception, the "first-filed" rule requires that this first-filed Delaware Action be permitted to proceed in SEC's chosen forum, and that Defendants' later-filed Texas Action involving the same issues of patent infringement and validity be enjoined.  Because Defendants can demonstrate no applicable exception to the first-filed rule, Plaintiffs' motion to enjoin the Texas Action should be granted.

2.    First, SEC did not forum shop or otherwise act inequitably or in bad faith when it filed the Delaware Action.  SEC and Defendants engaged in licensing discussions over the course of a year, during which Defendants repeatedly threatened litigation while at the same time demanding exorbitant licensing fees from SEC.  Faced with Defendants' unreasonable demands and a cloud of uncertainty hovering over its business with respect to when Defendants might make good on their threats of litigation, SEC properly chose to avail itself of the protections of the Declaratory Judgment Act by filing the Delaware Action.  Both of the Defendants are Delaware companies, and SEC's choice of Delaware as the forum for its declaratory judgment action was therefore appropriate.

3.    Second, the interests of expediency and justice do not favor the Eastern District of Texas over the District of Delaware as a forum for the parties' dispute.  Both Defendants are Delaware companies and should not be heard to complain that it would be inconvenient for them to litigate in their chosen state of incorporation.  Furthermore, Defendants had revenues in excess of $1.2 billion in 2005, and cannot credibly argue that it would pose a financial hardship for them to litigate in Delaware.

2

4.    Nor do witness convenience and location of documents weigh in favor of proceeding in the Eastern District of Texas over the District of Delaware. Because they are a Korea-based family of companies, most of Plaintiffs' witnesses and technical documentation concerning the design and development of the accused DRAM products are located in Korea. Defendants are headquartered in Phoenix, Arizona, and have facilities across the United States and abroad. Discovery in this case will take place in Korea, throughout the United States, and possibly in other countries, and therefore the overall burden of litigating this case will be the same to the parties whether trial is held in Delaware or Texas.

5.    Finally, there are no public interest factors that favor the Eastern District of Texas over the District of Delaware as a forum for the parties' dispute. To the contrary, because Defendants and two of the Plaintiffs are Delaware companies, and because none of the parties are incorporated in Texas or have a principal place of business in the Eastern District of Texas, the public interest favors the Delaware forum.

6.    Because Defendants cannot demonstrate an applicable exception to the first-filed rule, this Court should enjoin Defendants from proceeding with the Texas Action.

## STATEMENT OF FACTS

SEC manufactures and sells, among other things, semiconductor products known as dynamic random access memories, or DRAMs. On September 15, 2005, Defendants — who manufacture and sell semiconductor products throughout the United States and abroad (*see* 2005 10-K and website excerpts attached as Ex. 2) — sent a letter to SEC accusing SEC of infringing the '594 and '644 patents and requesting a meeting with SEC to discuss licensing of the '594 and '644 patents. (Muir Dec. Ex. A.) The '594 and '644 patents relate to circuits that are used in semiconductor products such as integrated circuits. (Amended Complaint Exs. A and B.)

3

REDACTED

REDACTED

REDACTED

The Texas Action includes claims against SEC, SEA, STA, SSI, and SAS for infringement of the '594, '644, and '001 patents, as well as a fourth patent not disclosed to SEC during licensing discussions, the '827 patent. (Ex. 1; Muir Dec. ¶ 18.) Like the '001 patent, the '827 patent relates to the manufacture of semiconductor products, and more particularly to a method of electroplating silicon wafers with metallization bumps. (Amended Complaint, Ex. D.)

Plaintiffs filed an Amended Complaint in the Delaware Action on December 21, 2006 adding SEA, STA, SSI, and SAS as co-plaintiffs, adding a request for declaratory judgment of noninfringement and invalidity of the '827 patent, and adding a claim of patent infringement against Defendants for infringement of SEC's '177 patent. The '177 patent relates to a method of semiconductor manufacturing wherein a connection is formed between two conductive layers through an intervening insulation layer. (Amended Complaint Ex. E.)

## ARGUMENT

### I. Legal Standards.

The "first-filed" rule states that "[i]n all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it." *Crosley Corp. v. Hazeltine Corp.*, 122 F.2d 925, 929 (3d Cir. 1941), *cert. denied*, 315 U.S. 813 (1942); *see also Genentech Inc. v. Eli Lilly & Co.*, 998 F.2d 931, 938 (Fed Cir. 1993) ("When the declaratory action can resolve the various

6

legal relations in dispute and afford relief from the controversy that gave rise to the proceeding, and absent sound reason for a change of forum, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action.").

The first-filed rule gives the court hearing a first-filed declaratory judgment action the power to enjoin a later-filed infringement action. *See, e.g, Chase Manhattan Bank, U.S.A., N.A. v. Freedom Card, Inc.*, 265 F. Supp. 2d 445 (D. Del. 2003) (enjoining a second-filed trademark infringement action in favor of a first-filed declaratory judgment action); *Matsushita Battery Industrial Co., Ltd. v. Energy Conversion Devices, Inc.*, No. 96-101, 1996 WL 328594 (D. Del. Apr. 23, 1996) (enjoing a second-filed patent infringement action in favor of a first-filed declaratory judgment action) (Ex. 3).

As the Court noted in *Chase*, the policy underlying the first-filed rule is "at least two fold and eminently practical." *Chase*, 265 F. Supp. 2d at 488. First, "[f]or the benefit of litigants, 'the party who first brings a controversy into a court of competent jurisdiction for adjudication should . . . be free from the vexation of subsequent litigation over the same subject matter.'" *Id.* (quoting *Crosley*, 122 F.2d at 930). Second, "[f]or the benefit of courts and the public they serve, 'courts already heavily burdened with litigation with which they must of necessity deal should . . . not be called upon to duplicate each other's work involving the same issues and parties.'" *Id.* (quoting *Crosley*, 122 F.2d at 930).

While there are exceptions to the first-filed rule, only in "rare or extraordinary circumstances" should the first-filed action give way to one filed later. *E.E.O.C. v. University of Pa.*, 850 F.2d 969, 972 (3d Cir. 1988), *aff'd*, 493 U.S. 182 (1990). Such circumstances include "inequitable conduct, bad faith, or forum shopping," *id.*, or when "justice or expediency requires, as in any issue of choice of forum." *Genentech*, 998 F.2d at 937. Forum shopping, however, is

7

not by itself sufficient grounds for departing from the first-filed rule when the plaintiff had "sound reasons" for filing in its forum of choice. *Id.* at 938.

As set forth below, this is a textbook case for application of the first-filed rule. Defendants should, therefore, be enjoined from proceeding with the Texas Action.

II.    **The Texas Action Is Duplicative Of The Delaware Action And The First-Filed Rule Applies Unless There Is An Applicable Exception.**

The Texas Action is duplicative of the Delaware Action. The same three patents that were the subject of SEC's original Complaint in the Delaware Action — the '594 patent, the '644 patent, and the '001 patent — are all asserted in the Texas Action by Defendants. (Ex. 1.) Thus, the identical issues of infringement and validity raised in the Texas Action with respect to the '594, '644, and '001 patents are already at issue in the Delaware Action.

Additionally, Plaintiffs have filed an Amended Complaint adding to the Delaware Action the fourth patent asserted by Defendants in the Texas Action — the '827 patent. Thus, the '827 patent — which, given the fact that it was not disclosed to SEC during the yearlong licensing discussions, appears to have been added by Defendants to manufacture an argument that the two cases are not identical — is also at issue in the Delaware Action. And because there is substantial overlap of core issues with respect to Defendants' patents, the Delaware Action is deemed to be the first-filed action with respect to the '827 patent as well. *See Intel Corp. v. AmberWave Systems Corp.*, 233 F.R.D. 416 (D. Del. 2005) (permitting under the first-filed rule amendment of a declaratory judgment complaint to add a new patent that was the subject of an infringement suit filed in a different forum after the original declaratory judgment complaint was filed, because there was a substantial overlap of core issues). Just like in the *Intel* case, because all four of Defendants' patents relate to design and manufacture of semiconductor products, presentation of the parties' respective infringement and noninfringement positions for all four

8

patents "will require a judge, on the summary judgment motions that are sure to be filed, and a jury, at any trial of the case, to become familiar with the same field of art, the same fundamental science and technology associated with methods of semiconductor fabrication, the same allegedly infringing devices, and, in any damages analysis, the same pricing, sales, and related market data." *Id.* at 418.

Third, with the filing of the Amended Complaint adding SEA, STA, SSI, and SAS as co-plaintiffs, the parties to the Delaware and Texas Actions are identical. Even as originally filed, however, both actions had Samsung's interests on one side and Defendants' interests on the other.

In view of the foregoing, it would be a waste of judicial resources and the parties' resources for the Delaware Action and the Texas Action to proceed concurrently. Because SEC filed the Delaware Action first, and because, as discussed below, Defendants cannot demonstrate an exception to the first-filed rule, the Court should enjoin Defendants from pursuing their duplicative Texas Action.

## III.    Defendants Cannot Demonstrate An Exception To The First-Filed Rule.

SEC did not forum shop or otherwise act inequitably or in bad faith in filing the Delaware Action, nor would the interests of expediency or justice be better served if this case were to proceed in Texas rather than Delaware. The first-filed rule therefore applies and Defendants should be enjoined from pursuing the Texas Action.

### A.    SEC Is Not Guilty Of Inequitable Conduct, Bad Faith, Or Forum Shopping.

The purpose of declaratory judgment actions in patent cases is "to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987); *see also Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1346 (Fed. Cir. 2005). In view of Defendants' pre-suit

9

threats, SEC had more than adequate grounds to file this declaratory judgment action, and to file it in Delaware.

The Declaratory Judgment Act requires the existence of an actual controversy before a federal court may exercise jurisdiction in a declaratory judgment action. 28 U.S.C. § 2201. In a patent case, an actual case or controversy exists when there is "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity.'" *Epic Systems Corp. v. Acacia Research Corp.*, No. 06-255, 2006 WL 3355185, *2 (D. Del. Nov. 16, 2006) (Ex. 4.) Furthermore, "[w]hen the patentee's conduct falls short of an explicit threat, a court must look to the 'totality of the circumstances' to determine whether the patentee's conduct gives rise to reasonable apprehension under the first prong of the test." *Id.* Both prongs of this test are met in this case.



REDACTED

REDACTED

In view of the foregoing, Defendants cannot credibly argue that SEC filed the Delaware Action anticipatorily in an effort to forum shop. Defendants never indicated that they planned to file suit against SEC within a specific or definite timeframe, or that they were considering bringing suit in the Eastern District of Texas. (Muir Dec. ¶ 16.) Because both Defendants are Delaware companies, filing a declaratory judgment action in Delaware was a perfectly sound choice by SEC. Further, Delaware does not offer Plaintiffs any special advantage or convenience over other forums. Patent law is uniform throughout the United States, and Delaware therefore does not offer Plaintiffs law that is more favorable than other jurisdictions. Nor does Delaware offer Plaintiffs any particular advantage or convenience over the Defendants with respect to location of witnesses or documents, as neither Plaintiffs nor Defendants are located in Delaware.

This case does not have any of the hallmarks one would expect to see in a case of anticipatory filing. For example, Defendants never indicated to SEC that they were about to file an infringement action, such as by sending a letter stating Defendants' "intention to file suit, a filing date, and/or a specific forum for the filing of suit," *J. Lyons & Co. Ltd. v. Republic of Tea, Inc.,* 892 F. Supp. 486, 491 (S.D.N.Y. 1995), or by providing SEC with a draft infringement complaint. *See Dorman Products, Inc. v. Pontiac Coil, Inc.,* No. 06-3157, 2006 WL 2927307 (E.D. Pa. Oct. 10, 2006) (Ex. 5). Nor did SEC's filing of the Delaware Action secure a venue that differed from the venue that one would have expected Defendants to choose. The District of Arizona, not Eastern District of Texas, is Defendants' home forum, and SEC is headquartered in

12

Seoul, Korea.  Defendants would therefore not have been expected to choose the Eastern District of Texas as a forum.

In view of the foregoing, SEC's filing of the Delaware Action was proper and not anticipatory.

**B.    The Interests Of Expediency And Justice Do Not Weigh In Favor Of Departing From The First-Filed Rule.**

Nor do the interests of expediency and justice warrant a departure from the first-filed rule.  A plaintiff's choice of forum should be given substantial weight and should not be disturbed unless the defendant can establish that the balance of the convenience of the parties and witnesses strongly favors the defendant.  *See, e.g., Matsushita*, 1996 WL 328594 at *4. Here, the Eastern District of Texas does not offer any more convenience for the parties and witnesses than Delaware.

As an initial matter, Defendants are Delaware companies with headquarters in Phoenix and offices across the United States and abroad (Ex. 2), and none of the Plaintiffs are headquartered in the Eastern District of Texas.[1]  Under the circumstances, Defendants' choice of the Eastern District of Texas suggests that Defendants are the ones who engaged in forum shopping.

Regardless, Defendants cannot argue that they would be inconvenienced by litigating this case in Delaware.  Because Defendants are Delaware companies, they have a heightened burden of proving that litigation in Delaware would be inconvenient.  *See, e.g., Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215, 218 (D. Del. 1993) ("Absent some showing of a

---

[1] SEC has its principal place of business in Seoul, Korea. SEA has its principal place of business in Ridgefield Park, New Jersey. STA has its principal place of business in Richardson, Texas, which is in the Northern District of Texas. SSI has its principal place of business in San Jose California. SAS has its principal place of business in Austin, Texas, which is in the Western District of Texas.

unique or unexpected burden, [Delaware] corporations should not be successful in arguing that litigation in their state of incorporation is inconvenient."). When the typical private and public interest factors in a choice-of-forum analysis are considered, however, it is clear that Defendants cannot come close to meeting their heavy burden. *See, e.g., Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d Cir. 1995) (setting forth examples of private and public interests a court may consider when analyzing a motion for transfer).

First, SEC's choice of Delaware as a forum for its litigation is rational and appropriate given that both Defendants are Delaware companies, and that Delaware has an interest in cases that involve companies that have availed themselves of the protection of Delaware's laws. *See Chase*, 265 F. Supp. 2d at 451, *quoting Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 356 (D. Del. 1999) ("Clearly this forum's interest extends to these corporate citizens that have sought the protection of Delaware's laws.").

Second, the Eastern District of Texas is no more convenient to Defendants — who are headquartered in Phoenix — than the District of Delaware. Defendants are sophisticated companies with operations throughout the United States and abroad. In 2005, Defendants had over $1.2 billion in revenue. (Ex. 2.) As the court in *Matsushita* noted, "for a company engaged in business throughout the United States, the claim that litigation away from the most convenient forum is burdensome is somewhat suspect." *Matsushita*, 1996 WL 328594 at *4; *see also Affymetrix, Inc. v. Synteni, Inc.*, 28 F. Supp. 2d 192, 202 (D. Del. 1998) (litigating in Delaware "should not impose an undue financial burden" on the parties because they were "multi-million dollar corporations with interests and activities spanning the globe"). And in this case, unlike in *Matsushita*, the Eastern District of Texas is not even the most convenient forum for Defendants.

14

Third, the convenience of witnesses does not render Texas more convenient than Delaware. Consistent with *Jumara*, this Court has held that party witnesses or witnesses who are employed by a party carry "no weight" in a convenience analysis, because each party is able and obligated to procure the attendance of its own witnesses for trial. *Affymettrix*, 28 F. Supp. 2d at 203. In any event, Defendants operate nationally and internationally. Plaintiffs are a Korea-based family of companies with headquarters in Korea. The products that are accused of infringement, SEC's DRAMs, were designed and developed in Korea. (Muir Dec. ¶ 19.) Thus, most of the SEC witnesses who have knowledge of the accused products are located in Korea, as are the relevant technical documents. *Id.* Additionally, the infringement alleged by Defendants in the Texas Action is not focused on any one single jurisdiction, but is alleged to occur throughout the United States. (Ex. 1.) Thus, discovery in this case will take place in Korea and throughout the United States, and the overall burden and cost of litigating this case will be the same whether the trial takes place in Delaware or Texas.

Fourth, the location of documents does not favor a Texas forum over SEC's chosen Delaware forum. There is no reason that documents could be produced any more easily in the Eastern District of Texas than they could in Delaware. The reality is that in a patent case of this nature, the location of documents does not impact convenience. The two most common practices for producing documents in patents cases — like in other complex cases — is either to produce them electronically, or to copy and mail them to opposing counsel. *See, e.g., ADE Corp. v. KLA-Tencor Corp.*, 138 F. Supp. 2d 565, 571 (D. Del. 2001) ("With new technologies for storing and transmitting information, the burden of gathering and transmitting documents 3,000 miles is probably not significantly more than it is to transport them 30 miles"); *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 821 F. Supp. 962, 966-67 (D. Del. 1993) ("The location of

documents, in the context of access to proof, in a document-intensive case such as this can be misleading . . . Regardless of where trial is held, the documents will be copied and mailed to the offices of counsel and subsequently transported to trial."). Either way, the ultimate location of trial has no impact on document production.

Fifth, none of the public interests cited in *Jumara* — enforceability of the judgment, practical considerations that could make the trial easy, expeditious, or inexpensive, the relative administrative difficulty in the two fora resulting from court congestion, the local interest in deciding local controversies at home, the public policies of the fora, and the familiarity of the trial judge with the applicable state law in diversity cases — favor the Texas forum over the Delaware forum. To the contrary, given that none of the parties have as their home forum the Eastern District of Texas, that Defendants are both Delaware companies, and that two of the Plaintiffs are Delaware companies and none are Texas companies,[2] the public interest favors Delaware over the Eastern District of Texas.

In view of the foregoing, the interests of expediency and justice do not warrant departure from the first-filed rule.

---

[2] SEC is a corporation organized under the laws of the Republic of Korea. SEA is a New York corporation. STA is a Delaware limited liability company. SSI is a California corporation. SAS is a Delaware limited liability company.

16

## CONCLUSION

For the foregoing reasons, pursuant to the first-filed rule, Plaintiffs respectfully request

that the Court grant this Motion and enjoin Defendants from pursuing the Texas Action.

Respectfully submitted,

Josy W. Ingersoll (No. 1088)
*jingersoll@ycst.com*
John W. Shaw (No. 3362)
*jshaw@ycst.com*
Andrew A. Lundgren (No. 4429)
*alundgren@ycst.com*
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
(302) 571-6600

OF COUNSEL:

John M. Desmarais
James E. Marina
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

*Attorneys for Plaintiffs Samsung Electronics
Co., Ltd., Samsung Electronics America, Inc.,
Samsung Telecommunications America General,
L.L.C., Samsung Semiconductor, Inc., and
Samsung Austin Semiconductor, L.L.C.*

Dated: December 21, 2006

17

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on December 21, 2006, the

foregoing document was electronically filed with the Clerk of the Court using CM/ECF and

served upon the defendants' registered agent as indicated below:

### BY HAND DELIVERY

ON Semiconductor Corporation
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

Semiconductor Components Industries, LLC
c/o The Corporation Trust Company
Corporation Trust Center
1209 Orange Street
Wilmington, DE 19801

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street
Wilmington, DE 19801
302-571-6600
*alundgren@ycst.com*

# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

FILED CLERK
U.S. DISTRICT COURT

2006 DEC -4  AM 8: 22

TE . . . . . . . ERN

BY_____ _____

ON SEMICONDUCTOR CORPORATION, and
SEMICONDUCTOR COMPONENTS
INDUSTRIES, L.L.C.,
        Plaintiffs,

    v.

SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC.,
SAMSUNG TELECOMMUNICATIONS
AMERICA GENERAL, L.L.C.,
SAMSUNG SEMICONDUCTOR, INC., and
SAMSUNG AUSTIN SEMICONDUCTOR,
L.L.C.,
        Defendants.

Civil Action No. 6:06cv523

COMPLAINT

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ON Semiconductor Corp. ("ON Semiconductor") and plaintiff Semiconductor

Components Industries, L.L.C. ("Semiconductor Components") (collectively, "Plaintiffs"), for

their Complaint against defendants Samsung Electronics Co., Ltd., Samsung Electronics

America, Inc., Samsung Telecommunications America General, L.L.C., Samsung

Semiconductor, Inc. and Samsung Austin Semiconductor, L.L.C. (collectively "Defendants"),

state as follows.

## THE PARTIES

1.    Plaintiff ON Semiconductor is a Delaware corporation with its principal place of

business at 5005 East McDowell Road, Phoenix, AZ 85008.

MPI-41884v1

- 1 -

2.    Plaintiff Semiconductor Components, a Delaware limited liability company with its principal place of business at 5005 East McDowell Road, Phoenix, AZ 85008, is the principal domestic operating subsidiary of ON Semiconductor, and does business under the name of ON Semiconductor.

3.    On information and belief, Defendant Samsung Electronics Co., Ltd. ("SEC") is a corporation organized and existing under the laws of Republic of Korea with its principal place of business at Samsung Main Building, 250, Taepyong-ro 2-ka, Chung-ku, Seoul 100-742, South Korea. On information and belief, SEC manufactures and, in cooperation with its subsidiaries, markets throughout the world, including in this district and elsewhere in the United States, a variety of semiconductor products including dynamic random access memory ("DRAM") devices.

4.    Defendant Samsung Electronics America, Inc. ("SEA") is a New York corporation with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey 07660. On information and belief, SEA is a subsidiary of SEC and sells and otherwise markets, in this district and elsewhere in the United States, a variety of electronic and semiconductor products

5.    Defendant Samsung Telecommunications America General, L.L.C. ("STA") is a Delaware limited liability company with its principal place of business at 1301 East Lookout Drive, Richardson, Texas 75082. On information and belief, STA is a subsidiary of SEC and sells and otherwise markets, in this district and elsewhere in the United States, a variety of electronic and semiconductor products.

6.    Defendant Samsung Semiconductor, Inc. ("SSI") is a California corporation with its principal place of business at 3655 North First Street, San Jose, California 95134. On

information and belief, SSI is a subsidiary of SEC and sells and otherwise markets, in this district and elsewhere in the United States, a variety of electronic and semiconductor products.

7.    On information and belief, Defendant Samsung Austin Semiconductor, L.L.C. ("SAS") is a Delaware limited liability company with its principal place of business at 12100 Samsung Boulevard, Austin, Texas 78754. On information and belief, SAS is a subsidiary of SEC and sells and otherwise markets, in this district and elsewhere in the United States, a variety of semiconductor products including DRAM devices.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq.*

9.    This Court has personal jurisdiction over each of the Defendants. The Defendants have had minimum contacts with this forum as a result of business regularly conducted within the State of Texas and within this district and specifically as a result of, at least, the Defendants' distribution network wherein Defendants place their products that infringe Semiconductor Component's patents within the stream of commerce, which stream is directed at this district as well as Texas, and by committing the tort of patent infringement and/or contributing to or inducing acts of patent infringement by others within Texas and this district.

10.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Defendants have regularly conducted business in this judicial district and certain of the acts complained of herein occurred in this judicial district.

## COUNT 1 – INFRINGEMENT OF U.S. PATENT NO. 5,563,594

11.    The allegations contained in paragraphs 1 through 10 are incorporated by reference as if fully set herein.

12.    United States Patent No. 5,563,594 ("the '594 patent"), entitled "Circuit and Method of Timing Data Transfers," was duly and legally issued by the United States Patent and Trademark Office on October 8, 1996. Plaintiffs hold all right and interest in the '594 patent, including the right to sue for past, present and future infringement. A copy of the '594 patent is attached hereto as Exhibit A.

13.    Defendants are infringing the '594 patent under one or more sections of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States by the manufacture, use, sale, offer for sale and/or importation into the United States of product(s) falling within the scope of one or more claims of the '594 patent.

14.    On information and belief, Defendants also contribute to and/or induce the infringement of at least one claim of the '594 patent.

15.    Plaintiffs have been damaged by Defendants' infringement of the '594 patent. Plaintiffs are entitled to recover from each of the Defendants the damages sustained by them as a result of each of the Defendants' wrongful acts.

16.    Defendants' infringement of Semiconductor Component's exclusive rights under the '594 patent will continue to damage Plaintiffs' business, causing irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is enjoined by this Court.

17.    Defendants have had actual knowledge of the '594 patent and their infringement is deliberate and willful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 6,362,644

18.    The allegations contained in paragraphs 1 through 17 are incorporated by reference as if fully set herein.

19.    United States Patent No. 6,362,644 ("the '644 patent"), entitled "Programmable Termination for Integrated Circuits," was duly and legally issued by the United States Patent and Trademark Office on March 26, 2002. Plaintiffs hold all right and interest in the '644 patent, including the right to sue for past, present and future infringement. A copy of the '644 patent is attached hereto as Exhibit B.

20.    Defendants are infringing the '644 patent under one or more sections of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States by the manufacture, use, sale, offer for sale and/or importation into the United States of product(s) falling within the scope of one or more claims of the '644 patent.

21.    On information and belief, Defendants also contribute to and/or induce the infringement of at least one claim of the '644 patent.

22.    Plaintiffs have been damaged by Defendants' infringement of the '644 patent. Plaintiffs are entitled to recover from each of the Defendants the damages sustained by Plaintiffs as a result of each of the Defendants' wrongful acts.

23.    Defendants' infringement of Semiconductor Component's exclusive rights under the '644 patent will continue to damage Plaintiffs' business, causing irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is enjoined by this Court.

24.    Defendants have had actual knowledge of the '644 patent and their infringement is deliberate and willful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

MP1-41884v1                                        - 5 -

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 5,361,001

25. The allegations contained in paragraphs 1 through 24 are incorporated by reference as if fully set herein.

26. United States Patent No. 5,361,001 ("the '001 patent"), entitled "Circuit and Method of Previewing Analog Trimming," was duly and legally issued by the United States Patent and Trademark Office on November 1, 1994. Plaintiffs hold all right and interest in the '001 patent, including the right to sue for past, present and future infringement. A copy of the '001 patent is attached hereto as Exhibit C.

27. Defendants are infringing the '001 patent under one or more sections of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States by the manufacture, use, sale, offer for sale and/or importation into the United States of product(s) falling within the scope of one or more claims of the '001 patent.

28. On information and belief, Defendants also contribute to and/or induce the infringement of at least one claim of the '001 patent.

29. Plaintiffs have been damaged by Defendants' infringement of the '001 patent. Plaintiffs are entitled to recover from each of the Defendants the damages sustained by Plaintiffs as a result of each of the Defendants' wrongful acts.

30. Defendants' infringement of Semiconductor Component's exclusive rights under the '001 patent will continue to damage Plaintiff's business, causing irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is enjoined by this Court.

31. Defendants have had actual knowledge of the '001 patent and their infringement is deliberate and willful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 5,000,827

32.     The allegations contained in paragraphs 1 through 31 are incorporated by reference as if fully set herein.

33.     United States Patent No. 5,000,827 ("the '827 patent"), entitled "Method and Apparatus for Adjusting Plating Solution Flow Characteristics at Substrate Cathode Periphery to Minimize Edge Effect," was duly and legally issued by the United States Patent and Trademark Office on March 19, 1991. Plaintiffs hold all right and interest in the '827 patent, including the right to sue for past, present and future infringement. A copy of the '827 patent is attached hereto as Exhibit D.

34.     Defendants are infringing the '827 patent under one or more sections of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States by the manufacture, use, sale, offer for sale and/or importation into the United States of product(s) falling within the scope of one or more claims of the '827 patent.

35.     On information and belief, Defendants also contribute to and/or induce the infringement of at least one claim of the '827 patent.

36.     Plaintiffs have been damaged by Defendants' infringement of the '827 patent. Plaintiffs are entitled to recover from each of the Defendants the damages sustained by Plaintiffs as a result of each of the Defendants' wrongful acts.

37.     Defendants' infringement of Semiconductor Component's exclusive rights under the '827 patent will continue to damage Plaintiffs' business, causing irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in its favor against each of the Defendants, and requests the following relief:

A. An adjudication that Defendants have infringed, contributed to the infringement of, and/or induced infringement of the '594, '644, '001, and '827 patents;

B. An adjudication that the '594, '644, '001, and '827 patents are valid and enforceable;

C. An accounting of all damages sustained by Plaintiffs as a result of Defendants' acts of infringement;

D. An award to Plaintiffs of actual damages adequate to compensate them for Defendants' acts of direct, contributory, and/or inducement of infringement, together with prejudgment and post-judgment interest and costs;

E. An award to Plaintiffs of enhanced damages, up to and including trebling of Plaintiffs' damages, pursuant to 35 U.S.C. § 284 for Defendants' willful infringement;

F. A preliminary and permanent injunction order against further infringement of the '594, '644, '001 and '827 patents by each of the Defendants, their officers, agents, servants, employees, subsidiaries, and those persons acting in concert with it, including related individuals and entities, customers, representatives, manufacturers, OEMs, dealers, and distributors;

G. An award to Plaintiffs their costs and reasonable attorney fees incurred in this action as provided by 35 U.S.C. § 285; and

H. That the Court award such other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues and claims so triable.

MPI-41884v1                        - 8 -

Date: December 4, 2006

Respectfully submitted.

*Nilda C. Galvan*

Kenneth R. Adamo
State Bar No. 00846960
kradamo@jonesday.com
Hilda C. Galvan
State Bar No. 00787512
hcgalvan@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

Tharan Gregory Lanier
tglanier@jonesday.com
CA Bar No. 138784
JONES DAY
2882 Sand Hill Road, Suite 240
Menlo Park, CA 94025
Telephone: (650) 739-3939
Facsimile: (650) 739-3900

Carl R. Roth
State Bar No. 17312000
cr@rothfirm.com
Michael C. Smith
ms@rothfirm.com
115 N Wellington Suite 200
P O Box 876
Marshall, Texas 75670
Telephone: (903) 935-1665
Facsimile: (903) 935-1797

ATTORNEYS FOR ON SEMICONDUCTOR
CORPORATION AND SEMICONDUCTOR
COMPONENTS INDUSTRIES, L.L.C.

Of Counsel:
Behrooz Shariati
JONES DAY
2882 Sand Hill Road, Suite 240
Menlo Park, CA 94025

MPI-41884v1

- 9 -

# EXHIBIT 2

## SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# Form 10-K

(Mark One)

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES AND EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2005

Or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

000-30419
*(Commission File Number)*

# ON Semiconductor Corporation
*(Exact name of registrant as specified in its charter)*

| | |
|---|---|
| Delaware | 36-3840979 |
| *(State or other jurisdiction of incorporation or organization)* | *(I.R.S. Employer Identification No.)* |

5005 E. McDowell Road
Phoenix, AZ 85008
(602) 244-6600
*(Address and telephone number of principal executive offices)*

Securities Registered Pursuant to Section 12(b) of the Act:
None

Securities Registered Pursuant to Section 12(g) of the Act:
Common stock, par value $0.01 per share

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained therein, and will not be contained to the best of registrant's knowledge in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K.   Yes ☑   No ☐

Indicate by check mark whether the Registrant is a large accelerated filer, an accelerated filer, or a non-accelerated filer. See definition of "accelerated filer and large accelerated filer" in Rule 12b-2 of the Exchange Act. (Check one): Large accelerated filer ☐   Accelerated filer ☑   Non-accelerated filer ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   Yes ☐   No ☑

The aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant was $651,085,418 as of July 1, 2005, based on the closing sale price of such stock on the Nasdaq National Market on that date. Shares held by executive officers, directors and persons owning directly or indirectly more than 10% of the outstanding common stock have been excluded from the preceding number because such persons may be deemed to be affiliates of the registrant.

The number of shares of the registrant's common stock outstanding at February 10, 2006 was 312,027,864.

### Documents Incorporated by Reference

Portions of the Proxy Statement for the Annual Meeting of Stockholders to be held on May 17, 2006 are incorporated by reference into Part II and Part III hereof.

PART I

Item 1.  *Business*

Business Overview

ON Semiconductor Corporation and its subsidiaries ("we") are a global supplier of power and data management semiconductors and standard semiconductor components. We design, manufacture and market an extensive portfolio of semiconductor components that addresses the design needs of sophisticated electronic systems and products. Our power management semiconductor components distribute and monitor the supply of power to the different elements within a wide variety of electronic devices. Our data management semiconductor components provide high-performance clock management and data flow management for precision computing and communications systems. Our standard semiconductor components serve as "building block" components within virtually all electronic devices.

We serve a broad base of end-user markets, including computing, automotive electronics, consumer electronics, industrial electronics, wireless communications and networking. Applications for our products in these markets include portable electronics, computers, game stations, servers, automotive and industrial automation control systems, routers, switches, storage-area networks and automated test equipment.

We have four main product lines: power management and standard analog devices, metal oxide semiconductor (MOS) power devices, high frequency clock and data management devices and standard components. Our extensive portfolio of devices enables us to offer advanced integrated circuits and the "building block" components that deliver system level functionality and design solutions. Our product portfolio increased from approximately 26,000 products in 2004 to approximately 30,800 products in 2005, due to the introduction of additional lead-free products, and we shipped approximately 27.9 billion units in 2005. We specialize in micro packages, which offer increased performance characteristics while reducing the critical board space inside today's ever shrinking electronic devices. We believe that our ability to offer a broad range of products provides our customers with single source purchasing on a cost-effective and timely basis.

Our reportable segments, under generally accepted accounting principles, are aligned internally as the Integrated Power Group and the Analog Products Group. In general, the power management and standard analog product line as well as the high frequency clock and data management product line are aligned under the Analog Products Group, while the MOS power devices product line and the standard components product line are aligned under the Integrated Power Group. Our discussion of customers, trends and competitive conditions can generally be aligned accordingly. Our standard logic product unit, however, whose results are included in the Analog Products Group segment, is part of our standard components product line. The standard logic product unit had revenues of approximately $107.1 million in 2005 and $89.7 million in 2004. In instances where the characteristics of the standard components product line are significantly impacted by the standard logic product unit, these impacts are addressed separately herein. For required disclosures regarding our reportable segments, see Note 18, "Segment Information" of the notes to our audited consolidated financial statements included elsewhere in this report.

We have approximately 203 direct customers worldwide, and we also service approximately 328 significant original equipment manufacturers indirectly through our distributor and electronic manufacturing service provider customers. Our direct and indirect customers include: (1) leading original equipment manufacturers in a broad variety of industries, such as Intel, Motorola, Nokia, Philips, Siemens and Sony; (2) electronic manufacturing service providers, such as Flextronics, Jabil and Solectron; and (3) global distributors, such as Arrow, Avnet, EBV Elektronik, Future, Solomon Enterprise and World Peace.

We currently have major design operations in Arizona, Rhode Island, Texas, China, the Czech Republic, Korea and France, and we currently operate manufacturing facilities in Arizona, China, the Czech Republic, Japan, Malaysia, the Philippines and Slovakia. We ceased manufacturing operations at our Rhode Island

3

manufacturing facility in the second quarter of 2005 and exited the facility in the fourth quarter of 2005. The Rhode Island manufacturing facility is currently being marketed for sale. In the second quarter of 2005, we announced the transfer of wafer fabrication manufacturing operations from our front end fabrication facility in Malaysia to Arizona. We plan to complete this transfer by the fourth quarter of 2006 and to maintain the fabrication facility in Malaysia for other manufacturing processes. The transfer from Malaysia to Arizona did not impact our assembly and test operations in Malaysia. We also plan to sell certain unused portions of our property at our corporate headquarters in Arizona and use some of the proceeds from the sale to upgrade portions of our corporate headquarters. We will maintain our headquarters offices and existing manufacturing facilities on the portions of the property that are not for sale.

Company History and Capital Structure

Formerly known as the Semiconductor Components Group of the Semiconductor Products Sector of Motorola, Inc., we were a wholly-owned subsidiary of Motorola prior to August 4, 1999. We continue to hold, through direct and indirect subsidiaries, substantially all the assets and operations of the Semiconductor Components Group of Motorola's Semiconductor Products Sector. On August 4, 1999, we were recapitalized (the "recapitalization") and certain related transactions were effected pursuant to an agreement among us, our principal domestic operating subsidiary, Semiconductor Components Industries, LLC, Motorola and affiliates of Texas Pacific Group ("TPG"). At the time of the recapitalization, Motorola agreed to provide us with transition and manufacturing services in order to facilitate our transition to a stand-alone company independent of Motorola. As of December 31, 2003, all transition and manufacturing services related to the recapitalization agreement had been fulfilled.

On April 3, 2000, we acquired all of the outstanding capital stock of Cherry Semiconductor Corporation for $253.2 million in cash (including acquisition related costs), which we financed with cash on hand and borrowings of $220.0 million under our senior bank facilities. Cherry Semiconductor Corporation, which we have renamed Semiconductor Components Industries of Rhode Island, Inc., designs and manufactures analog and mixed signal integrated circuits for the power management and automotive markets.

On May 3, 2000, we completed the initial public offering of our common stock, selling 34.5 million shares with an issue price of $16 per share. Net proceeds from the initial public offering (after deducting issuance costs) were approximately $514.8 million. The net proceeds were used to redeem all outstanding preferred stock (including accrued dividends), redeem a portion of the senior subordinated notes and prepay a portion of the loans outstanding under the senior bank facilities.

On September 7, 2001, we obtained $100.0 million ($99.2 million, net of issuance costs) through an equity investment by an affiliate of Texas Pacific Group, our principal shareholder. In this transaction, we issued 10,000 shares of mandatorily redeemable cumulative convertible preferred stock. This investment was required because we were not in compliance with certain minimum interest expense coverage ratio and leverage ratio covenants under our senior bank facilities. In November 2005, we entered into a Conversion and Termination Agreement with TPG to convert our redeemable convertible preferred stock into approximately 49.4 million shares of our common stock. To induce the conversion, we issued approximately 3.9 million additional shares of our common stock to TPG. Following the conversion, none of the authorized shares of our preferred stock remained outstanding. (See Note 9 "Redeemable Preferred Stock" of the notes to our audited consolidated financial statements and "Management's Discussion and Analysis of Financial Condition and Results of Operations," in each case included elsewhere in this report).

4

Although we have production at several locations, we have initiated process improvements and selective low cost capital acquisitions that we expect will increase our overall capacity. Our profitability enhancement programs will continue to focus on:

- consolidation of manufacturing sites to improve economies of scale;

- transfer of production to lower cost regions;

- increase in die manufacturing capacity in a cost-effective manner by moving production from 4" to 6" wafers and increasing the number of die per square inch;

- reduction of the number of new product platforms and process flows; and

- focusing production on profitable product lines.

**Return to Profitability**

In the third quarter of 2004 we returned to profitability after 14 consecutive quarters of net losses. We were also profitable during all four quarters of 2005. Our net income for the year ended December 31, 2005 was $100.6 million, and was the highest annual net income since we began as a company after the recapitalization in 1999. This return to profitability was the result of increased demand for our products and cost savings from profitability enhancement programs and restructuring programs, as well as debt refinancing opportunities that have reduced our interest costs.

**Products and Technology**

The following table provides information regarding our primary product lines:

| | Power Management and Standard Analog | MOS Power Devices | High Frequency Clock and Data Management | Standard Components (1) |
|---|---|---|---|---|
| *Revenues* | | | | |
| 2005 | $373.2 million | $223.2 million | $80.3 million | $583.9 million |
| 2004 | $381.3 million | $235.0 million | $90.4 million | $560.2 million |
| 2003 | $333.4 million | $152.5 million | $80.5 million | $502.7 million |
| Primary product function | Power control and regulation in portable and high-power applications. | Power conditioning and switching in a broad range of applications. | Interfacing and synchronizing functions, such as interconnecting and routing (moving) electronic signals within electronic systems. | Power control, interface and data protection in a broad range of products. |
| Sample applications | Intelligent power management and battery protection in portable applications, desktop computers and automotive electronics. | Power management for computers, automobiles, servers and battery protection in portable applications. | Fast routing of signals used in communication and networking switches, high-end servers, high-performance workstations, storage networks and precision measurement test systems. | Power management and interface elements for computer, consumer and portable equipment and automotive control systems. |
| Types of product | Amplifiers, comparators, voltage regulators and references, AC-DC /DC-DC converters. | Ignition insulated gate bipolar transistors (IGBT's), power MOS field effect transistors (MOSFET's). | Clock distribution, drivers/receivers, multiplexers, phase detectors, prescalers. | MicroIntegration™, MiniGate™ logic, small signal transistors, zeners, rectifiers, standard logic integrated circuits, bipolar power transistors, small signal diodes and thyristors. |

6

ON Semiconductor

  

**ON Semiconductor®**

Contact Us | Company | Inv

Part =/Keyword     Cros

HOME        PRODUCTS        DESIGN SUPPORT        QUALITY        MY ON

- Leadership
- Company News
- Investor Relations
- Careers
- Global Locations
  - Americas
  - Asia Pacific
  - Europe
  - Locate Sales Support
- Corporate Awards
- Environmental Health & Safety
- Intellectual Property

Home > Company > Global Locations

### Global Locations

Worldwide, ON Semiconductor employs more than 8.000 people with 1,300 working in the U.S. Headquarte in Phoenix, Arizona, USA, the company owns and operates several development centers and several manufacturing facilities located in the U.S., Europe and Asia.

**Development Centers**
U.S.:Austin, TX,
    Chandler and Phoenix, AZ,
    East Greenwich, RI
France: Toulouse
Czech Republic: Roznov
China: Hong Kong and Shanghai
Korea: Seoul
Slovak Republic: Bratislava

**Manufacturing Facilities**
US: Arizona, Oregon
China: Leshan
Czech Republic: Roznov
Slovak Republic: Piestany
Japan: Aizu
Philippines: Carmona
Malaysia: Seremban

Copyright © 1999-2006 ON Semiconductor

Privacy Policy | Terms of Use | Site Map | Careers | Contact Us | Terms and Conditions

# EXHIBIT 3

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
(Cite as: Not Reported in F.Supp.)

Page 1

**H**
Briefs and Other Related Documents
Matsushita Battery Industrial Co., Ltd. v. Energy
Conversion Devices, Inc.D.Del.,1996.Only the West-
law citation is currently available.
United States District Court, D. Delaware.
MATSUSHITA BATTERY INDUSTRIAL CO.,
LTD., Toyota Motor Corporation, and Toyota Motor
Sales, U.S.A., Inc., Plaintiffs,
v.
ENERGY CONVERSION DEVICES, INC. and
Ovonic Battery Company, Inc. Defendants.
No. CIV. A. 96-101-SLR.

April 23, 1996.

Kent A. Jordan, of Morris, James, Hitchens & Willi-
ams, Wilmington, Delaware, for plaintiff. Of Counsel
for plaintiff Matsushita Battery Industrial Co.: Mor-
ton Amster, Michael J. Berger, and Abraham Kasdan,
of Amster, Rothstein & Ebenstein, New York, New
York; Of Counsel for plaintiffs Toyota Motor Cor-
poration and Toyota Motor Sales, U.S.A., Inc.: Ed-
ward W. Greason, and Arthur D. Gray, of Kenyon &
Kenyon, New York, New York.
Bruce M. Stargatt, Josy W. Ingersoll, and John W.
Shaw, of Young, Conaway, Stargatt & Taylor, Wilm-
ington, Delaware, for defendants. Of Counsel:
Chester T. Kamin, David J. Bradford, and Jeffrey A.
Koppy, of Jenner & Block, Chicago, Illinois;
Lawrence G. Norris, of Rothwell, Figg, Ernst &
Kurz, Washington, D.C.; and Marvin S. Siskind, Vice
President/Patent Counsel, Energy Conversion
Devices, Inc., Troy, Michigan.

MEMORANDUM OPINION
SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 Plaintiff Matsushita Battery Industrial Co. Ltd.
("MBI") filed this declaratory judgment action on
February 28, 1996.[FN1] Plaintiffs seek a declaration
of invalidity and non-infringement of Ovonic's
United States Patent Number 5,348,822 ("'822 pat-
ent"). On February 29, 1996, defendants Energy Con-

version Devices, Inc. ("ECD") and Ovonic Battery
Company Inc. ("Ovonic") filed suit against plaintiffs
in the United States District Court for the Eastern
District of Michigan, claiming infringement of the
same patent. Currently before the court are defend-
ants' motion to stay or dismiss the declaratory judg-
ment action or, in the alternative, to transfer the case
to the Eastern District of Michigan (D.I. 6) and
plaintiffs' motion to enjoin defendants' infringement
suit in the Eastern District of Michigan. (D.I. 19) The
motions have been fully briefed, and the court heard
oral arguments on April 10, 1996. For the reasons set
forth below, defendants' motion will be denied and
plaintiffs' motion to enjoin will be granted.

II. BACKGROUND

Defendant ECD and its subsidiary Ovonic are
Delaware corporations whose principal place of busi-
ness is Troy, Michigan. (D.I. 8 at Ex. B) Over the
past fifteen years, Ovonic has developed new techno-
logy in the field of rechargeable nickel metal hydride
("NiMH") batteries, and holds numerous patents in
this area. (D.I. 8 at Ex. B) Batteries made with this
new technology have the advantages of long life, no
memory effect, and no environmentally hazardous
materials. Ovonic has found particular success in
marketing its technology for use in "consumer batter-
ies" (e.g., batteries for camcorders, laptop computers,
and cellular telephones) and in the development of a
commercially viable electric vehicle ("EV") battery.
(D.I. 8 at Ex. B) In June 1994, Ovonic formed a joint
venture with General Motors Corporation ("GM") to
produce and market batteries for EVs on a worldwide
basis. (D.I. 8 at Ex. B) Ovonic has also been awarded
several contracts by the United States Advanced Bat-
tery Consortium ("USABC"), which is composed of
Ford Motor Company, GM, and Chrysler Corpora-
tion, to further develop EV battery technology. (D.I.
8 at Ex. B)

Plaintiff MBI, a Japanese corporation with its
headquarters in Osaka, operates worldwide as one of
the largest producers of batteries. (D.I. 11 at ¶ 3) MBI
has also conducted extensive research and develop-
ment in the area of NiMH batteries. Toyota, a Japan-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
(Cite as: Not Reported in F.Supp.)

ese corporation, and Toyota Sales, which is incorporated and based in California, have joined MBI in testing programs for MBI's EV batteries. (D.I. 11 at ¶¶ 4, 5, 16, 17)

In 1992, defendants and MBI negotiated a series of licensing agreements concerning NiMH technology for use in consumer batteries. During those negotiations, the parties apparently discussed licensing EV battery technology as well, but were unable to reach agreement. They did, however, execute a side letter in which they agreed "if necessary and appropriate, to explore the possibility of arriving at mutually acceptable terms for the grant to MBI of patent licenses under ECD/OBC's Hydride Battery Patents for large hydride battery applications such as electric vehicle propulsion." (D.I. 8 at Ex. 1)

*2 Between 1992 and 1995, ECD/Ovonic and MBI continued to communicate while working independently to develop NiMH batteries for EV application. The record indicates that fairly frequent correspondence, meetings between engineers from both companies, and an exchange of sample batteries took place during this period. (D.I. 8 at Ex. I-K)

In May 1995, Stanford Ovshinsky, President and CEO of ECD, contacted Steve Kawauchi, Executive Vice President of MBI, and requested a meeting to discuss ECD's proposal for the licensing of EV battery technology. (D.I. 21 at B109) Two months later, MBI broke off negotiations, indicating through its attorney that it had "no interest in pursuing the ECD/OBC Proposal given to Mr. Kawauchi by Mr. Ovshinsky and also does not have any counterproposal to make to ECD/OBC." (D.I. 21 at B111) In response to this communication, ECD notified MBI that it was prepared to take legal action, ostensibly for patent infringement. (D.I. 8 at Ex. B-2) After a conciliatory reply from MBI and a letter from GM to MBI's parent company urging that negotiations resume, ECD decided not to file suit, and negotiations of some sort apparently continued. (D.I. 8 at Ex. B-4, B-5, B-6, B-7; D.I. 21 at B113-B129)

The final breakdown in negotiations, which led to this suit, occurred after ECD learned that Toyota planned a program for testing EVs in the United

States using NiMH batteries manufactured by MBI. On February 5, 1996 ECD sent letters protesting this action to Toyota Sales, Southern California Edison Company (which was involved in the planned project), and MBI. (D.I. 21 at B89-92; D.I. 8 at Ex. B-8) In its letter to MBI, ECD stated, "ECD would urge Matsushita to accelerate its discussions about the possibilities for the GM Ovonic J[oint] V [[[enture]]. If a definite plan is developed for MBI participation and investment in GM Ovonic, ECD is prepared to resume discussions with MBI to resolve our outstanding issues in a satisfactory manner." (D.I. 8 at Ex. B-8) In response to this communication, ECD received a letter dated February 15 which stated, in its entirety, "Your letter to Steve Kawauchi was received while he is on a business trip out of the country. He will respond to you on his return." (D.I. 8 at Ex. B-9) On February 26, 1996 Ovonic, through its attorney, notified MBI of its belief that MBI was infringing Ovonic's '822 patent by supplying Toyota with EV batteries for testing in the United States. Ovonic demanded that MBI cease and desist or Ovonic would take legal action. (D.I. 8 at Ex. B-10) Two days later, without responding further to either of ECD/Ovonic's letters, MBI filed the instant declaratory judgment action.

III. DISCUSSION

A. Dismissal under the Declaratory Judgment Act

Plaintiffs filed this suit pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02. The Act gives the court before which a declaratory judgment action is brought discretion to hear, or refuse to hear, the suit. Wilton v. Seven Falls Co., 115 S. Ct. 2137 (1995); Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 936 (Fed. Cir. 1993), cert. denied, 114 S. Ct. 1126 (1994); Samuel Goldwyn, Inc. v. United Artists Corp., 113 F.2d 703, 709 (3d Cir. 1940). In general, a court may not dismiss a suit for a declaration of non-infringement on the ground that an infringement suit was subsequently filed. Genentech, 998 F.2d at 937; see generally Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929 (3d Cir. 1941), cert. denied, 315 U.S. 813 (1942) ("In all cases of federal concurrent jurisdiction, the court which first has possession of the subject must decide it."). This "first filed rule" gives

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
(Cite as: Not Reported in F.Supp.)

the district court hearing the first filed case the power to enjoin later filed cases involving the same parties and the same issues. *EEOC v. University of Pennsylvania*, 850 F.2d 969, 971 (3d Cir. 1988), aff'd, 493 U.S. 182 (1990).

\*3 There are, however, certain recognized exceptions to the first filed rule, and other exceptions may be made "when justice or expediency requires, as in any issue of choice of forum." *Genentech*, 998 F.2d at 937, citing *Kahn v. General Motors Corp.*, 889 F.2d 1078, 1081-83 (Fed. Cir. 1989). Defendants urge the court to find an exception to the first filed rule in this case because plaintiffs engaged in an improper "race to the courthouse" in order to avoid litigating in the Eastern District of Michigan. Defendants maintain that plaintiffs filed this action in bad faith, knowing that defendants were awaiting a response to their request for further negotiations. To allow this action to proceed, they argue, would penalize good faith efforts to negotiate and reward precipitous litigation. In addition, defendants argue that the comparative convenience of each forum to the parties and nonparty witnesses weighs in favor of dismissing this action in favor of the later filed suit.

Whether a party has filed a declaratory judgment action anticipatorily or in bad faith is a proper factor for the court to consider in deciding whether to dismiss a first filed action. *Serco Services Co., L.P. v. Kelley Co., Inc.*, 51 F.3d 1037, 1039-40 (Fed. Cir. 1995); *Dovox Corp. v. Digital Systems Int'l, Inc.*, 846 F. Supp. 144, 148 (D. Mass. 1993); *Bausch & Lomb Inc. v. Alcide Corp.*, 684 F. Supp. 1155, 1158-60 (W.D.N.Y. 1987). In *Serco Services*, the Federal Circuit held that "we cannot say that it was an abuse of discretion to consider that [plaintiff] intended to preempt [defendant's] infringement suit, as the district court found, as one factor in the decision whether to dismiss the declaratory suit in favor of [the] subsequent infringement action." *Serco Services*, 51 F.3d at 1040 (emphasis added).

In the case at bar, the parties have offered conflicting versions of the tenor of their negotiations. Defendants maintain that they had a long and fruitful history of negotiations with plaintiffs, that they were patiently and in good faith awaiting a reply from Mr. Kawau-

chi, and that they were shocked to discover that plaintiffs had filed suit without having responded to defendants' offer to negotiate. Plaintiffs, on the other hand, characterize their decision to file suit as a reasonable response to defendants' repeated demands that MBI enter into a joint venture, despite MBI's emphatic rejection of previous such demands. Having received a letter from defendants explicitly threatening imminent legal action, plaintiffs argue that they reasonably and in good faith made the decision to file for declaratory judgment.

After reviewing the numerous affidavits and items of correspondence submitted by the parties, the court finds that the record is unclear as to the precise tone of the negotiations between the parties. Although MBI may have acted hastily in filing suit without responding to ECD/Ovonic's February 1996 letters, despite its indications that Mr. Kawauchi would respond, the court cannot conclude from the record before it that an improper race to the courthouse took place. Furthermore, even if plaintiffs' actions could be considered anticipatory, absent any other factors weighing toward dismissal or transfer, the court declines to grant defendants' motion on this ground alone. See *Id.*[FN2]

### B. Transfer of Venue

\*4 Title 28, Section 1404(a) provides:
For the convenience of parties and witnesses, in the interests of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

Congress intended through Section 1404 to place discretion in the district court to adjudicate motions to transfer according to an individualized, case-by-case consideration of convenience and the interests of justice. *Stewart Organization, Inc. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988). "The standard under which transfer applications are considered requires district courts to consider the convenience of parties and witnesses, the interest of justice, and whether the action could have been brought in the transferee court." *SportsMEDIA Technology Corp. v. Upchurch*, 839 F. Supp. 8, 9 (D. Del. 1993). The parties do not dispute that the Eastern District of Michigan is a proper ven-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
(Cite as: Not Reported in F.Supp.)

ue for this action.

A plaintiff's choice of forum should not be lightly disturbed. As a general rule, "[b]ecause plaintiffs' choice of forum is accorded substantial weight, the burden is on the defendants to establish that the balance of convenience of the parties and witnesses strongly favors the defendants." *Bergman v. Brainin, 512 F. Supp. 972, 973 (D. Del. 1981)* (citing *Shutte v. Armco Steel Corp., 431 F.2d 22,25 (3d Cir. 1970), cert denied, 401 U.S. 910 (1971)*) (emphasis added). Plaintiffs' choice of forum is "paramount." *E.g., Wesley-Jessen Corp. v. Pilkington Visioncare, 157 F.R.D. 215, 216 (D. Del 1993).*

### 1. Convenience of Parties and Witnesses

Defendants contend that "the Eastern District of Michigan is an unusually appropriate and convenient forum for all concerned." They assert that defendants and all of their likely fact witnesses reside in Michigan, that plaintiffs regularly conduct business there, and that third party witnesses, "all relevant files and corporate records," and Ovonic's testing facilities are located in Michigan.

Even if the Eastern District of Michigan were the more convenient trial forum for both the parties and the non-party witnesses, this factor would not be sufficient to compel a transfer. This case is analogous to *Wesley-Jessen Corp. v. Pilkington Visioncare, Inc., 157 F.R.D. 215 (D. Del. 1993).* In that case, a defendant made a similar showing regarding the locations of parties, documents, and nonparty witnesses. The court concluded that transfer was inappropriate for three reasons. First, the court noted that, for a company engaged in business throughout the United States, the claim that litigation away from the most convenient forum is burdensome is somewhat suspect. *Wesley-Jessen, 157 F.R.D. at 218.* Defendants in this case have argued that they do not operate nationally, and that their small size would result in a disproportionate burden on them if they were forced to litigate in Delaware. The record indicates, however, that defendants have attended meetings and negotiations throughout the world. The second factor noted by the court in *Wesley-Jessen* is the incorporation of defendant in Delaware. Here again, the court

outlined the heightened burden on such a business. "Absent some showing of a unique or unexpected burden, these corporations should not be successful in arguing that litigation in their state of incorporation is inconvenient." *Id.* Finally, the court noted the somewhat archaic nature of the "convenience of the parties" factor in determining a motion to transfer:

*5 A third reason for denying the motion to transfer is that technological advances have substantially reduced the burden of having to litigate in a distant forum .... These technologies have shortened the time it takes to transfer information, reduced the bulk or size of documents or things on which information is recorded and can be transferred and have lowered the cost of moving that information from one place to another.

*Id.* The court also notes that discovery in this case will take place throughout the United States and in Japan. The overall burden of litigating this case, therefore, will likely be the same regardless of where the trial itself is to be held. In light of these factors, the court finds that defendants have not demonstrated that litigation in Delaware imposes on them a unique or unexpected burden.

### 2. Interests of Justice

Defendants argue that a transfer is warranted in the interests of justice. In analyzing this claim, the court must consider judicial resources, cost to the parties, access to proof, and the availability of compulsory process. *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc. 821 F. Supp. 962, 966 (D. Del. 1993).* No party contends that a transfer would have any impact on judicial resources or cost to the parties. Addressing compulsory process, defendants maintain that several important witnesses, who according to defendants are likely to be reluctant to testify, reside outside the reach of the court's subpoena power. The court addressed an analogous contention in *Critikon, 821 F. Supp. at 967.* In that case, defendant ha[d] not represented to the [c]ourt that [the third party witness] would be unwilling to testify at trial voluntarily. Because [the witness] is a former employee of [defendant], ... the [c]ourt must assume that he would be willing to testify absent a subpoena.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.
Not Reported in F.Supp., 1996 WL 328594 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

In this case, defendants have offered the affidavit of David J. Bradford, who represented defendants in another patent infringement case in this district. Based on his experience in that case, Mr. Bradford asserts that GM, GM-Ovonic, Ford Motor Company, and USABC "will not voluntarily testify or produce documents in this case." (D.I. 29 at Ex. 3) Defendants have not specifically identified any witnesses who have refused to testify; despite Mr. Bradford's opinion, the court does not find defendants' showing of the necessity of compulsory process sufficient to warrant transfer.

With respect to the availability of records, this court held in *Critikon*:

The location of documents, in the context of access to proof, in a document-intensive case such as this can be misleading. No matter where the trial is held, [defendant's] ... counsel and [plaintiff's] ... counsel will be required to travel to [various places] to select and produce the requested discovery. Regardless of where trial is held, the documents will be copied and mailed to the offices of counsel and subsequently transported to trial.

*6 821 F. Supp. at 966-67. In light of the wide geographical scope of discovery in this case, the possibility that the nonparties mentioned in Mr. Bradford's affidavit will have relevant evidence and will request protective orders in the Eastern District of Michigan is likewise unpersuasive. For these reasons, the court finds that defendants have not established that this factor compels the transfer of this action.

Based on the record as it presently stands, defendants have failed to demonstrate that the interests of justice dictate transferring this action.

### IV. CONCLUSION

For the forgoing reasons, defendants' motion to stay or dismiss the declaratory judgment action or, in the alternative, to transfer the case to the Eastern District of Michigan will be denied. Plaintiffs' motion to enjoin defendants' infringement suit in the Eastern District of Michigan will be granted. An order consistent with this opinion shall issue.

FN1. Toyota Motor Corporation ("Toyota")

and Toyota Motor Sales, U.S.A., Inc. ("Toyota Sales") were added as plaintiffs in an amended complaint dated March 7, 1996. (D.I. 11)

FN2. Defendants also argue that Michigan is a more convenient forum for the parties and nonparty witnesses. As discussed fully in the following section, the court finds this argument unpersuasive. Thus, the court will not consider convenience a factor in deciding whether to make an exception to the first filed rule.

D.Del.,1996.
Matsushita Battery Industrial Co., Ltd. v. Energy Conversion Devices, Inc.
Not Reported in F.Supp., 1996 WL 328594 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:96CV00101 (Docket) (Feb. 28, 1996)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 4

Westlaw.

Slip Copy
Slip Copy, 2006 WL 3355185 (D.Del.)
(Cite as: Slip Copy)

Page 1

Briefs and Other Related Documents
Epic Systems Corp. v. Acacia Research
Corp.D.Del.,2006.Only the Westlaw citation is cur-
rently available.

United States District Court,D. Delaware.
EPIC SYSTEMS CORPORATION, Plaintiff,
v.
ACACIA RESEARCH CORPORATION and, Re-
source Scheduling Corporation, Defendants.
No. CIVA 06-255 JJF.

Nov. 16, 2006.

Nicholas J. Seay, James R. Cole, Anthony A. To-
maselli, and Kristin Graham Noel, of Quarles &
Brady LLP, Madison, Wisconsin, Robert H.
Richards, III, Jeffrey L. Moyer, and Anne Shea Gaza,
of Richards, Layton & Finger, P.A., Wilmington,
Delaware, for Plaintiff.
Jonathan T. Suder, Edward E. Casto, Jr., and Christie
B. Lindsey, of Friedman, Suder & Cooke, Forth
Worth, Texas, Kathleen M. Jennings, and Karen V.
Sullivan, of Oberly, Jennings & Rhodunda, P.A.,
Wilmington, Delaware, for Defendants.

*MEMORANDUM OPINION*
FARNAN, J.
*1 Pending before the Court is Defendants' Motion
To Dismiss And, In The Alternative, Motion To
Transfer Venue (D.I.7).[FN1] For the reasons dis-
cussed below, the Court will deny the Motion in part
and grant the Motion in part.

> FN1. In a letter dated July 13, 2006, Defend-
> ants withdrew the request for a transfer to
> the Eastern District of Texas. (D.I.20).

I. BACKGROUND

Plaintiff Epic Systems Corporation ("Epic") is a Wis-
consin corporation with its principal place of business
in Wisconsin. Defendants Acacia Research Corpora-
tion ("Acacia") and Research Scheduling Corporation
("RSC") are both Delaware corporations with their
principal places of business in California. RSC is a
wholly-owned subsidiary of Acacia Global Acquisi-

tion, which is a wholly-owned subsidiary of Acacia.

RSC acquired the rights to license and enforce U.S.
Patent No. 4,937,743 entitled "Method and System
For Scheduling, Monitoring And Dynamically Man-
aging Resources" ("the '743 patent"). This system
utilizes a computer system to manage multiple re-
sources in industries that rely on such functions in
their business operations.

On March 23, 2006, Acacia Vice President Edward J.
Treska sent a letter ("March 23 letter") informing
Plaintiff that Acacia believed Plaintiff's "Cadence"
product fell under the scope of the '743 patent and
would require a license. The letter also suggested that
other products might fall under the '743 Patent as
well. The letter further informed Plaintiff that RSC
was in the process of litigating infringement actions
against several companies for violation of the '743
Patent, and that RSC and Acacia were contemplating
adding additional parties to the action. The letter also
invited the opportunity to negotiate a licence.

On April 19, 2006, Plaintiff Epic filed the instant ac-
tion against Defendants Acacia and RSC seeking De-
claratory Judgment that the '743 Patent is invalid and
unenforceable and not infringed by Epic's products.
(D.I.1).

II. PARTIES' CONTENTIONS

By their Motion, Defendants contend the Court
should dismiss the Complaint in its entirety for lack
of subject matter jurisdiction pursuant to
Fed.R.Civ.P. 12(b)(1) and dismiss Plaintiff's claims
against Defendant Acacia for lack of subject matter
jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Spe-
cifically, Defendants contend Plaintiff's Complaint
fails to establish an "actual controversy" because
Plaintiff cannot show it had a reasonable apprehen-
sion of imminent suit by Defendants. Defendants fur-
ther contend that Plaintiff could have no reasonable
apprehension of imminent suit because Defendant
Acacia has no legal interest in the '743 patent and
thus, could not file a patent infringement suit against
Plaintiff. In the alternative, Defendants contend the

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355185 (D.Del.)
**(Cite as: Slip Copy)**

Court should decline to exercise jurisdiction in order to avoid discouraging licensing negotiations.

In response, Plaintiff contends that it had a reasonable apprehension of suit from the March 23 letter and that Defendants do not provide any evidence that Acacia does not have a legal interest in the patent at issue. Plaintiff further contends that the Court's jurisdiction should be exercised because this action presents the type of controversy the Declaratory Judgment Act was created to address.

## III. LEGAL STANDARD

*2 Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the Court must accept all factual allegations in the Complaint as true, and the Court may only consider the complaint and documents referenced in or attached to the complaint. Gould Electronics Inc. v. U.S. 220 F.3d 169, 176 (3d Cir.2000). In reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the complaint. Mortensen v. First Fed. Sav. and Loan, 549 F.2d 884, 891 (3d Cir.1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. Gotha v. United States, 115 F.3d 176, 179 (3d Cir.1997). Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that jurisdiction exists. Mortensen, 549 F.2d at 891.

## IV. DISCUSSION

### A. Whether Plaintiff Establishes An Actual Controversy For Purposes Of The Declaratory Judgment Act

Defendants contend Plaintiff has not established an "actual controversy" because it did not have suffi-

cient objectively reasonable apprehension of an imminent lawsuit. Specifically, Defendants contend that there was no threat of suit simply because it sent the March 23 letter intending to initiate negotiations to license the '743 patent. In response, Plaintiff contends that the March 23 letter contained threatening language which was sufficient to create reasonable apprehension of suit.

The Declaratory Judgment Act "requires an actual controversy between the parties before a federal court may exercise jurisdiction." 28 U.S.C. § 2201(a); EMC Corp. v. Norand Corp., 89 F.3d 807, 801 (Fed.Cir.2004). An actual controversy exists when there are both "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." Gen-Probe, Inc. v. Vysis, Inc., 359 F.3d 1376, 1380 (Fed.Cir.2004) (quoting BP Chems. Ltd. v. Union Carbide Corp., 4 F.3d 975, 978 (Fed.Cir.1993)). When the patentee's conduct falls short of an explicit threat, a court must look to the "totality of the circumstances" to determine whether the patentee's conduct gives rise to reasonable apprehension under the first prong of the test. Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 736 (Fed.Cir.1988) (quoting Goodyear Tire & Rubber Co. v. Releasomers, Inc., 824 F.2d 953, 955 (Fed.Cir.1987)).

*3 The parties do not dispute that Plaintiff was engaging in activity or intended to engage in activity that could constitute infringement. Thus, the Court will focus its inquiry on whether Plaintiff had reasonable apprehension of imminent suit by Defendants.

The Court concludes that it is a reasonable reading of the March 23 letter to find that the paragraph in which Defendants state "we intend to add additional parties" to litigation pending in Texas involving the '743 patent constitutes an explicit threat of litigation. Further, considering the totality of the circumstances, the Court concludes that Plaintiff Epic has demonstrated reasonable apprehension of suit sufficient to establish an "actual controversy." Here, the March 23

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355185 (D.Del.)
(Cite as: Slip Copy)

letter was more than an offer to open licensing negotiations or a mere assertion of Defendants' bargaining position. The March 23 letter informed Plaintiff that Defendants intended to add parties to pending lawsuits in Texas against several companies for infringement of the '743 patent. Also in the March 23 letter, Defendants proposed royalty rates for a license which "will increase over time and as our litigation progresses." Although courts have held that an offer of a license is insufficient to create reasonable apprehension, "when the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer ... can take the initiative and seek declaratory relief." *EMC Corp.,* 89 F.3d at 811. The Court concludes Plaintiff could reasonably conclude from the March 23 letter that Defendants were ready and willing to bring an infringement suit directly against Plaintiff or add Plaintiff to the pending litigation in Texas. Thus, the Court concludes Plaintiff has established that an "actual controversy" exists.

### B. *Whether The Court Should Exercise Jurisdiction Under The Declaratory Judgment Act*

Having determined that the Court has subject matter jurisdiction under the Declaratory Judgment Act, the Court must determine whether it is appropriate to exercise that jurisdiction. While the Act grants the Court jurisdiction, the Act allows district courts to decline jurisdiction. In exercising this discretion, courts must be mindful that the purpose of the Act is to allow alleged infringers relief from uncertainty and delay.

Defendants contend that the Court should decline its jurisdiction to avoid hindering future licensing negotiations. In response, Plaintiff contends that Defendants have not offered a sound reason for the Court not to exercise jurisdiction. Plaintiff also argues that the Act was intended to alleviate the type of insecurity created by Defendant Acacia's March 23 letter.

In the circumstances here, the Court concludes that exercising jurisdiction is appropriate. The Court agrees with Plaintiff that Defendants have not provided sufficient reasons to support the Court declining jurisdiction. Accordingly, the Court will deny

Defendants' Motion To Dismiss to the extent it requests dismissal of Plaintiff's Complaint in its entirety (D.I.7).

### C. *Whether Acacia Should Be Dismissed From The Lawsuit.*

*4 Defendants contend that if jurisdiction is exercised, only RSC should be a Defendant and Acacia should be dismissed because Acacia had no standing to sue Plaintiff for patent infringement, and thus, Plaintiff could have no reasonable apprehension of a lawsuit with Acacia. In response, Plaintiff contends that Acacia should be a party to this lawsuit because Acacia has a legal interest in the '743 patent. Specifically, Plaintiff contends that statements in the March 23 letter such as "we intend to add additional parties," and "Acacia, through its subsidiaries, licenses and enforces patents," create a legal interest and infer that Acacia will bring the suit against Plaintiff or be involved in the litigation once it commenced.

The applicable federal law provides that only a patentee, assignee, or exclusive licensee has standing to bring a patent suit. *Rite-Hite Corp. v. Kelly Co.,* 56 F.3d 1538, 1551-52 (Fed.Cir.1995). To the Court's knowledge, Acacia does not fall within any of these categories, and therefore, the Court concludes Acacia does not have standing to sue for infringement of the '743 patent. Accordingly, the Court will grant Defendant's Motion To Dismiss to the extent it requests dismissal of claims against Defendant Acacia (D.I.7).

### V. CONCLUSION

In sum, the Court will deny Defendants' Motion to the extent it requests dismissal of Plaintiff's Complaint in its entirety; however, the Court will grant the Motion to the extent it requests dismissal of claims against Defendant Acacia Research Corporation.

An appropriate Order will be entered.

### *ORDER*

At Wilmington, this *17* day of November, 2006, for the reasons set forth in the Memorandum Opinion is-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 3355185 (D.Del.)
**(Cite as: Slip Copy)**

sued this date,

IT IS HEREBY ORDERED that:

1) Defendants' Motion To Dismiss And In The Alternative Motion To Transfer Venue (D.I.7) is *DENIED in part* and *GRANTED in part.*

2) Remaining parties, within twenty (20) days of the date of this Order, shall submit a Joint Proposed Scheduling Order for the Court's consideration. If the parties are unable to reach an agreement, they shall outline their disputes in the Joint Proposed Scheduling Order.

D.Del.,2006.
Epic Systems Corp. v. Acacia Research Corp.
Slip Copy, 2006 WL 3355185 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1814093 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support of Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 31, 2006) Original Image of this Document (PDF)
• 2006 WL 1814092 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 23, 2006) Original Image of this Document (PDF)
• 2006 WL 1814091 (Trial Motion, Memorandum and Affidavit) Defendants' Opening Brief in Support of Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 9, 2006) Original Image of this Document (PDF)
• 2006 WL 1205318 (Trial Pleading) Complaint (Apr. 19, 2006) Original Image of this Document (PDF)
• 1:06cv00255 (Docket) (Apr. 19, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT 5

Westlaw.

Slip Copy
Slip Copy, 2006 WL 2927307 (E.D.Pa.)
**(Cite as: Slip Copy)**

Briefs and Other Related Documents

Dorman Products, Inc. v. Pontiac Coil, Inc.E.D.Pa.,2006.Only the Westlaw citation is currently available.

United States District Court,E.D. Pennsylvania.

DORMAN PRODUCTS, INC.

v.

PONTIAC COIL, INC.

**C.A. No. 06-3157.**

Oct. 10, 2006.

Anthony S. Volpe, John J. O'Malley, Ryan William O'Donnell, Volpe & Koenig PC, Philadelphia, PA, for Dorman Products, Inc.

Harrie R. Samaras, Benjamin E. Leace, Ratner Prestia, Valley Forge, PA, Kevin Alan Keeling, Ratner Prestia, Berwyn, PA, for Pontiac Coil, Inc.

*MEMORANDUM OPINION AND ORDER*

GOLDEN, J.

\*1 The Plaintiff brought this action, seeking a declaratory judgment that Defendant's "686 patent" is invalid. The following day, Defendant filed an action against the Plaintiff in the United States District Court for the Eastern District of Michigan for patent infringement. Presently before the Court are the motions of the Defendant to dismiss this action, or, in the alternative, to stay this action pending resolution of the Michigan action, the motion of the Defendant to dismiss for lack of personal jurisdiction and Plaintiff's motion to enjoin Defendant from proceeding with its patent infringement action in Michigan. For the reasons which follow, the motion to dismiss is granted and the remaining motions are denied as moot.

The relevant facts for purposes of the motions before the Court are as follows: On April 19, 2006, counsel for Defendant Pontiac Coil, Inc. ("Pontiac") sent a cease and desist letter to the President of Plaintiff R & B, Inc. (now Dorman), alleging patent infringement. See Exhibit A to Defendant's Response to Plaintiff's Motion to Enjoin. In the letter, Pontiac's counsel recommended that Dorman engage patent counsel to review the allegations. On April 27, 2006, Dorman's General Counsel responded by letter stating that he had referred the matter to outside intellectual property counsel for review and further stating that "we will respond more fully upon completion of that review." Exhibit B. Apparently, Dorman's General Counsel did not respond. As a result, on July 13, 2006, Pontiac's counsel sent a letter to Dorman's General Counsel along with a draft complaint for patent infringement to be filed in the United States District Court for the Eastern District of Michigan. The letter stated that Pontiac had waited nearly three months for a reply to its previous cease and desist letter. The letter concluded by stating:

We enclose herewith a copy of the Complaint which we have been instructed to file in the United States District Court for the Eastern District of Michigan. Please advise if you are willing to accept service of the Complaint on behalf of the company.

Exhibit C.

On July 18, 2006, a day or two after receiving the draft complaint, Dorman filed this action, seeking a declaratory judgment of patent invalidity. The next day, Defendant filed the previously forwarded draft complaint in the Eastern District of Michigan.

In its motion to dismiss, Pontiac argues that although this action was filed first, it must nevertheless be dismissed because by filing this action only after it received a draft complaint, Dorman was engaging in forum shopping and acting in bad faith. Dorman denies that it had any ulterior motives in filing this declaratory judgment action and argues that the first-filed rule mandates that this court retain jurisdiction over this declaratory judgment action .[FN1]

> FN1. The Michigan action was filed only one day after this action was filed. Thus, to the extent Dorman contends this action was filed first, it was filed only one day ahead of the Michigan action.

The question of whether a patent infringement suit, like this one, should yield to a previously filed de-

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2006 WL 2927307 (E.D.Pa.)
(Cite as: Slip Copy)

claratory action asserting the same patent rights "raises the issue of national uniformity in patent cases," and, therefore, requires application of Federal Circuit case law. *Genentech, Inc. v. Eli Lilly & Co., 998 F.2d 931, 937 (Fed.Cir.1993).* The Federal Circuit applies the "general rule whereby the forum of the first-filed case is favored, unless consideration of judicial economy, and the just and effective disposition of disputes, require otherwise." *Id.* Exceptions to the general rule are not rare. However, there "must be sound reason that would make it unjust or inefficient to continue the first-filed action. Such reason may be the convenience and availability of witnesses, or absence of jurisdiction over necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest." *Id.* (citing *Kahn v. General Motors Corp., 889 F.2d 1078, 1081-83 (Fed.Cir.1989)*).

*2 In arguing that an exception to the first-to-file rule applies, Pontiac directs our attention to *Serco Services Co. v. Kelley Co., 51 F.3d 1037 (Fed.Cir.1995)*. In *Serco,* Kelley Company, Inc. sent Serco Services Company, Inc. a letter asserting that Serco was infringing Kelley's patent. The letter demanded a reply and threatened legal action. Serco failed to reply, but Kelley did not file a patent infringement action. Several months later, Kelley sent Serco a second letter, dated September 8, 1993, demanding that Serco respond by September 20 or face a patent infringement suit. On September 20, Serco responded by letter denying Kelley's infringement claims. Meanwhile, on September 17, Serco had filed an action in the District Court for the Northern District of Texas, seeking a declaration that it was not infringing Kelley's patent. On September 20, Kelley filed a patent infringement action against Serco in the District Court for the Eastern District of Wisconsin. Kelley later filed a motion in the federal court in Texas to dismiss the Texas declaratory judgment action, arguing that the Texas action was filed in anticipation of Kelley's infringement action, and that convenience factors favored litigating the parties' dispute in Wisconsin. The court agreed and dismissed the Texas declaratory judgment action.

On appeal, the Federal Circuit ruled that the district court had not abused its discretion in dismissing the Texas action. The Court noted the general rule that the first-filed action is normally preferred. *Serco, 51 F.3d at 1039.* In *Serco,* however, two factors supported dismissing the first-filed suit. First, the district court's determination that the Texas action was anticipatory was a factor weighing in favor of its dismissal, even though the Court noted that the impact of forum shopping in patent cases has been tempered by the existence of the Court of Appeals for the Federal Circuit. *Id.* at 1040. Independently, however, the Federal Circuit found that the presence of convenience factors favoring the Wisconsin action was "sound reason" to dismiss the first-filed Texas action. The Court noted that all of Kelley's witnesses were located in Wisconsin, while Serco's witnesses were scattered throughout the country. Also, while some of Serco's documents were located at its Canadian headquarters, all of Kelley's documents were located in Wisconsin. The presence of these convenience factors further supported the court's decision to dismiss the first-filed Texas action. *Id.*

The circumstances in this case are indeed strikingly similar to those in *Serco,* wherein the Federal Circuit employed the anticipatory filing exception to the first-filed rule. As in in *Serco,* Pontiac's counsel sent Dorman a letter asserting that Dorman was infringing on Pontiac's patent. Although Dorman's General Counsel replied that he would respond upon further review by outside intellectual property counsel, Dorman's General counsel never did respond. Pontiac, like Kelley, did not file a patent infringement action. Several months later, Pontiac, like Kelley, sent Dorman a second letter along with a draft complaint for patent infringement. The letter inquired whether Dorman would accept service of the complaint. Instead of responding, Dorman filed this action, seeking a declaratory judgment of patent invalidity.

*3 Dorman could have filed this declaratory judgment action in April when it initially received Pontiac's cease and desist letter. Instead it chose to file the declaratory judgment action immediately after it received a copy of Pontiac's proposed patent infringement complaint. Having received the draft, Dorman had to realize litigation was imminent. Indeed, Pontiac filed its patent infringement action only one day after Dorman filed this declaratory judgment action.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Under these circumstances, as in *Serco,* the Court concludes that Plaintiff's declaratory judgment action was filed in anticipation of Defendant's patent infringement action in Michigan.

In addition, the Court has serious doubts whether it would have personal jurisdiction over Michigan-based Pontiac. Indeed, Pontiac has raised this issue in its motion to dismiss for lack of personal jurisdiction. Dorman has requested time to take discovery on this issue. However, Dorman does admit that it sells its products in Michigan. *See* Exhibit F at p. 16. Therefore, any concerns about personal jurisdiction can be alleviated by deferring to the Michigan action.

For the foregoing reasons, the Court finds that special exceptions to the first-filed rule are prevalent in this case, most notably the anticipatory filing exception. Accordingly, the Court will dismiss this action without prejudice to Plaintiff asserting its patent invalidity claims in Michigan.

### ORDER

The motion of the Defendant to dismiss [Doc. # 9] is GRANTED.

This case is DISMISSED WITHOUT PREJUDICE to Plaintiff reasserting its patent invalidity claims in the action pending in the United States District Court for the Eastern District of Michigan.

The motion of the Plaintiff to enjoin [Doc. # 12] is DENIED as moot.

The motion of the Defendant to dismiss based on lack of personal jurisdiction [Doc. # 13] is DENIED as moot.

The motion of the Defendant for leave to file a reply brief [Doc. # 17] is DENIED as moot.

IT IS SO ORDERED.

E.D.Pa.,2006.
Dorman Products, Inc. v. Pontiac Coil, Inc.
Slip Copy, 2006 WL 2927307 (E.D.Pa.)

Briefs and Other Related Documents (Back to top)

• 2:06cv03157 (Docket) (Jul. 18, 2006)

END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.