

# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SAMSUNG ELECTRONICS CO., LTD.,<br>SAMSUNG ELECTRONICS AMERICA, INC.,<br>SAMSUNG TELECOMMUNICATIONS<br>  AMERICA GENERAL, L.L.C.,<br>SAMSUNG SEMICONDUCTOR, INC., and<br>SAMSUNG AUSTIN SEMICONDUCTOR L.L.C.,<br><br>        Plaintiffs,<br><br>        v.<br><br>ON SEMICONDUCTOR CORP.<br><br>and<br><br>SEMICONDUCTOR COMPONENTS<br>INDUSTRIES, LLC,<br><br>        Defendants. | Civil Action No. 06-720 (***)<br><br> |

## PLAINTIFFS' ANSWERING BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

OF COUNSEL:

John M. Desmarais
James E. Marina
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800


Dated: January 12, 2007

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600
*alundgren@ycst.com*

*Attorneys for Samsung Electronics Co., Ltd.,*
*Samsung Electronics America, Inc., Samsung*
*Telecommunications America General, L.L.C.,*
*Samsung Semiconductor, Inc., and Samsung Austin*
*Semiconductor, L.L.C.*

## TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDING ................................................................................2

SUMMARY OF ARGUMENT ...............................................................................................................3

STATEMENT OF FACTS .......................................................................................................................5

ARGUMENT .............................................................................................................................................12

I.      LEGAL STANDARDS. ...............................................................................................................12

II.     SEC HAD A REASONABLE APPREHENSION OF BEING SUED BY DEFENDANTS
        WHEN IT FILED THE ORIGINAL COMPLAINT ON NOVEMBER 30, 2006.........................14

        A.      The Parties' Pre-Suit Settlement Discussions Were Carried Out Under Threat Of
                Litigation, And SEC Therefore Had A Reasonable Apprehension Of Suit. ....................14

        B.      The Filing Of The Texas Action Confirms That Defendants Were Planning To
                Sue SEC For Patent Infringement, And Therefore That SEC Had A Reasonable
                Apprehension Of Being Sued. .......................................................................................19

III.    THIS IS THE VERY TYPE OF CASE THE DECLARATORY JUDGMENT IS
        MEANT TO ADDRESS, AND THE COURT SHOULD THEREFORE HEAR THIS
        CASE. .............................................................................................................................................21

        A.      SEC's Declaratory Judgment Claims Comport With The Purpose Of The
                Declaratory Judgment Act. ...........................................................................................22

        B.                          REDACTED ...............................................................................23

        C.      The Court Should Not Reward Defendants' Blatant Forum-Shopping. ..........................27

CONCLUSION ........................................................................................................................................28

## TABLE OF AUTHORITIES

Page(s)

### Federal Cases

*Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,*
846 F.2d 731 (Fed. Cir. 1988)............................................................................ 12, 22, 23

*C.R. Bard, Inc. v. Schwartz,*
716 F.2d 874 (Fed. Cir. 1983)......................................................................................... 20

*Capo, Inc. v. Dioptics Medical Products, Inc.,*
387 F.3d 1352 (Fed. Cir. 2004)............................................................................. 21, 22, 23

*Clay Paky, S.p.A. v. Vari-Lite, Inc.,*
Case Nos. 99 Civ. 11401 and 11402 (BSJ),
2000 U.S. Dist. LEXIS 9802 (S.D.N.Y. July 12, 2000) .................................................... 16

*Correspondent Servs. Corp. v. First Equities Corp.,*
338 F.3d 119 (2d Cir. 2003)............................................................................................. 14

*Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation,*
297 F.3d 1343 (Fed. Cir. 2002)....................................................................................... 13

*Dow Chemical Co. v. Exxon Chemical Patents, Inc.,*
No. 94-572-SLR, 1995 WL 562289 (D. Del. Aug. 16, 1995).......................................... 14

*Electronics for Imaging, Inc. v. Coyle,*
394 F.3d 1341 (Fed. Cir. 2005)....................................................................................... 12

*Epic Systems Corp. v. Acacia Research Corp.,*
No. 06-255, 2006 WL 3355185 (D. Del. Nov. 16, 2006)...................................................12

*Fina Research S.A. v. Baroid, Ltd.,*
141 F.3d 1479 (Fed. Cir. 1998)....................................................................................... 12

*Goodyear Tire & Rubber Co. v. Releasomers, Inc.,*
824 F.2d 953 (Fed. Cir. 1987).............................................................................. 12, 20, 22

*Gotha v. United States,*
115 F.3d 176 (3d Cir. 1997)............................................................................................ 13

*Gould Elecs., Inc. v. United States,*
220 F.3d 169 (3d Cir. 2000)............................................................................................ 13

*Ivoclar Vivadent, Inc. v. Hasel,*
Case No. 02-CV-0316E(F),
2003 U.S. Dist. LEXIS 12611 (W.D.N.Y. June 30, 2003)............................................... 15

ii

*Livorsi Marine, Inc. v. Nordskog Publishing, Inc.*,
    268 F. Supp. 2d 994 (N.D. Ill. 2003) ................................................................ 18

*Millennium Products, Inc. v. Gravity Boarding Co., Inc.*,
    127 F. Supp. 2d 974 (N.D. Ill. 2000) ................................................................ 13

*Mortensen v. First Fed. Sav. and Loan*,
    549 F.2d 884 (3d Cir. 1977) ............................................................................. 13

*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*,
    57 F.3d 1051 (Fed. Cir. 1995) ........................................................................... 18

*Russell Corp. v. Sara Lee Corp.*,
    129 F. Supp. 2d 1165 (N.D. Ill. 2001) ........................................................ 25, 26

*Syngenta Crop. Protection, Inc. v. Monsanto Company*,
    Civil Action No. 03-1062 (KAJ) (D. Del. Apr. 6, 2004) ................................. 20

*Teva Pharms. USA, Inc. and Pfizer Inc.*,
    395 F.3d 1324 (Fed. Cir. 2005) ......................................................................... 19

*Vermeer Mfg. Co. v. Deere & Co.*,
    379 F. Supp. 2d 645 (D. Del. 2005) .................................................................. 18

*Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*,
    157 F.R.D. 215 (D. Del. 1993) .......................................................................... 27

**Statutes**

28 U.S.C. § 2201 ....................................................................................................... 10

Fed. R. Civ. P. 12(b)(1) ............................................................................................ 11

Plaintiffs Samsung Electronics Co., Ltd. ("SEC"), Samsung Electronics America, Inc. ("SEA"), Samsung Telecommunications America General, L.L.C. ("STA"), Samsung Semiconductor, Inc. ("SSI"), and Samsung Austin Semiconductor, L.L.C. ("SAS") submit this Answering Brief in opposition to Defendants' motion to dismiss for alleged lack of subject matter jurisdiction.

Defendants contend that SEC did not have a reasonable apprehension of being sued by Defendants when it filed this action on November 30, 2006. But Defendants' own conduct belies this contention. At 8:22 AM on Monday, December 4, 2006 — *less than two business days after SEC filed this action* — Defendants carried through on their threats of litigation and filed a duplicative patent infringement action against Plaintiffs in the United States District Court for the Eastern District of Texas, confirming that SEC's fear of being sued was not only reasonable, but dead right.

At bottom, this motion is an indirect attempt by Defendants to transfer this action to the Eastern District of Texas, a forum they perceive to be more favorable to their cause than the District of Delaware. That is the only explanation for Defendants' choice of forum, since — as set forth in Plaintiffs' pending motion to enjoin Defendants from pursuing the Texas action, which is incorporated herein by reference — the Eastern District of Texas has no relevant connection to any of the parties, witnesses, or sources of proof in this case.

As set forth below, because SEC had a reasonable apprehension of being sued by Defendants when it filed this action on November 30, 2006, Defendants' motion to dismiss for lack of subject matter jurisdiction should be denied.

## NATURE AND STAGE OF THE PROCEEDING

SEC filed its original Complaint in this action (the "Delaware Action") on November 30, 2006, seeking a declaration that three United States patents purportedly owned by Defendants — U.S. Patent Nos. 5,563,594 (the "'594 Patent"), 6,362,644 (the "'644 Patent"), and 5,361,001 (the "'001 Patent") — are invalid and not infringed by SEC (D.I. 1).

Less than two business days later, on Monday, December 4, 2006 at 8:22 AM, Defendants filed a patent infringement action against SEC in the United States District Court for the Eastern District of Texas, Case No. 6:06 cv 523 (the "Texas Action"), alleging infringement by SEC of the same three patents at issue in the Delaware Action and a fourth patent, U.S. Patent No. 5,000,827 (the "'827 Patent"). (Ex. 1.) Defendants also named four SEC affiliates as co-defendants in the Texas Action —SEA, STA, SSI, and SAS.

Plaintiffs filed an Amended Complaint in the Delaware Action on December 21, 2006, adding SEA, STA, SSI, and SAS as co-plaintiffs with SEC, adding a claim for declaratory judgment of noninfringement and invalidity of the '827 patent, and adding a claim against Defendants for infringement of an SEC patent — U.S. Patent No. 5,252,177 (the "'177 Patent") (D.I. 8). Plaintiffs also filed on December 21, 2006 a motion to enjoin Defendants from pursuing the Texas Action (D.I. 10-12.)

Plaintiffs SEA, STA, SSI, and SAS filed a motion to transfer the Texas Action to this Court based on the Fifth Circuit's first-to-file rule on December 26, 2006.[1] Defendants filed an opposition to the motion to transfer on January 8, 2007.

---

[1] SEC, a Korean company with offices in Korea, has not been properly served with the Complaint in the Texas Action, and therefore did not join in the motion to transfer. If

On December 27, 2006, Defendants filed this motion to dismiss, alleging that this Court does not have subject matter jurisdiction over this action because SEC did not have a reasonable apprehension of suit when it filed the original Complaint on November 30, 2006. Defendants also filed on the same day a motion to stay their response to Plaintiffs' motion to enjoin (D.I. 18), which Plaintiffs opposed on January 9, 2007 (D.I. 23).

On January 11, 2007, Defendants filed an opposition to Plaintiffs' motion to enjoin (D.I. 24), as well as a motion to dismiss the Amended Complaint as against SEA, STA, SSI, and SAS (D.I. 25).

### SUMMARY OF ARGUMENT

1.    SEC had an objectively reasonable apprehension of being sued by Defendants when it filed the Delaware Action on November 30, 2006, an apprehension that was proven to be correct when Defendants filed the Texas Action less than two business days later.



---

and when SEC is properly served by Defendants in the Texas Action via the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, it will join in the motion to transfer.



. This Court therefore had subject matter jurisdiction over this action as of November 30, 2006.

4.      Defendants nonetheless urge the Court to exercise its discretion under the Declaratory Judgment Act and dismiss this case.

REDACTED

5.      Defendants also argue that the Court should decline to hear this case because Defendants have been "unfairly deprived" of their forum of choice. But as set forth in Plaintiffs' motion to enjoin, the Eastern District of Texas has no relevant connection to the parties, witnesses, or sources of proof in this case. Defendants are in effect asking this Court to condone their blatant forum shopping through a dismissal of this case. The Court should not reward Defendants' tactics. Furthermore, SEC's choice

of the District of Delaware as a forum for this action is perfectly reasonable and appropriate, given that both Defendants are incorporated in Delaware. Defendants should not be heard to complain that they must litigate this case in their chosen state of incorporation.

## STATEMENT OF FACTS[2]

SEC manufactures and sells, among other things, semiconductor products known as dynamic random access memories, or DRAMs. On September 15, 2005, Defendants, REDACTED

, sent a letter to SEC accusing SEC of infringing the '594 and '644 patents REDACTED . (D.I. 12, Ex. 1.)

REDACTED

REDACTED

DB02:5710059.1                                                            065888.1001

REDACTED

DB02:5710059.1

065888.1001



DB02:5710059.1

065888.1001

REDACTED

DB02:5710059.1

065888.1001



DB02:5710059.1                                                    065888.1001

REDACTED

Thereafter, on Monday, December 4, 2006 at 8:22 AM, Defendants filed the Texas Action, which included claims against SEC, SEA, STA, SSI, and SAS for infringement of the '594, '644, and '001 patents, as well as a fourth patent not disclosed to SEC REDACTED ., the '827 patent.  (Ex. 1; Shim Dec. ¶ 15; D.I. 12, ¶ 19.)

Plaintiffs filed an Amended Complaint in the Delaware Action on December 21, 2006 adding SEA, STA, SSI, and SAS as co-plaintiffs, adding a request for declaratory judgment of noninfringement and invalidity of the '827 patent, and adding a claim of patent infringement against Defendants for infringement of SEC's '177 patent.  (D.I. 8.)

On December 27, 2006, Defendants filed this motion to dismiss for lack of subject matter jurisdiction, contending that SEC did not have reasonable apprehension of being sued by Defendants when it filed this action on November 30, 2006.

065888.1001

## ARGUMENT

### I.    Legal Standards.

The purpose of declaratory judgment actions in patent cases is "to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987); *see also Electronics for Imaging, Inc. v. Coyle*, 394 F.3d 1341, 1346 (Fed. Cir. 2005).

The Declaratory Judgment Act requires the existence of an actual controversy before a federal court may exercise jurisdiction in a declaratory judgment action. 28 U.S.C. § 2201. In a patent case, an actual case or controversy exists when there is: (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. *See, e.g., Fina Research S.A. v. Baroid, Ltd.*, 141 F.3d 1479, 1481 (Fed. Cir. 1998). Furthermore, "[w]hen the [patentee's] conduct . . . falls short of an express charge, one must consider the 'totality of the circumstances' in determining whether that conduct meets the first prong of the test." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 736 (Fed. Cir. 1988). Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). A Rule 12(b)(1) motion may present either a facial or factual challenge to the Court's subject matter jurisdiction. *See, e.g, Epic Systems Corp. v. Acacia Research Corp.*, No. 06-255, 2006 WL 3355185, *2 (D. Del. Nov. 16, 2006). In reviewing a facial challenge under Rule 12(b)(1), the Court must accept all factual allegations in the Complaint as true, and the Court may only consider the

complaint and documents referenced in or attached to the complaint. *Gould Elecs., Inc. v. United States*, 220 F.3d 169, 176 (3d Cir. 2000).

In reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the complaint. *Mortensen v. First Fed. Sav. and Loan*, 549 F.2d 884, 891 (3d Cir. 1977). Instead, the Court may consider evidence outside the pleadings, including affidavits, depositions, and testimony, to resolve any factual issues bearing on jurisdiction. *Gotha v. United States*, 115 F.3d 176, 179 (3d Cir. 1997). Any factual conflicts, however, should be resolved in favor of the exercise of jurisdiction. *See, e.g, Deprenyl Animal Health, Inc. v. University of Toronto Innovations Foundation*, 297 F.3d 1343, 1347 (Fed. Cir. 2002); *Millennium Products, Inc. v. Gravity Boarding Co., Inc.*, 127 F. Supp. 2d 974, 979 (N.D. Ill. 2000).

Defendants' motion to dismiss makes a factual, rather than a facial challenge,[3] to subject matter jurisdiction. (Br. at 14.) As set forth below, when the facts surrounding

---

[3] Nor could Defendants make a facial challenge to subject matter jurisdiction. The Complaint and Amended Complaint both allege facts that, if taken as true as they must be on a facial challenge, establish that an actual case or controversy had arisen under the Declaratory Judgment Act between SEC and Defendants as of the filing of the original Complaint on November 30, 2006. Specifically, the original Complaint and Amended Complaint both identically allege the following facts: (1) Defendants accused SEC of infringing the '594, '644, and '001 patents (D.I. 1, ¶¶ 13, 20, 27 and D.I. 8, ¶¶ 23, 33, 43); .-

REDACTED

. Taken as true, the foregoing allegations — an accusation of infringement by the patent holder          REDACTED

— are more than sufficient to plead the existence of an actual case or controversy between SEC and Defendants as of November 30, 2006 under Federal Circuit precedent. *See, e.g., EMC Corp. v. Norand Corp.*, 89 F.3d 807, 812 (Fed. Cir. 1996); *see also Dow*

13

the parties' pre-suit discussions are considered, it is clear that this Court had subject

matter jurisdiction over SEC's declaratory judgment claims as of the filing date of the

original Complaint, November 30, 2006.

## II.    SEC Had A Reasonable Apprehension Of Being Sued By Defendants When It Filed The Original Complaint On November 30, 2006.

### A.    The Parties' Pre-Suit Settlement Discussions Were Carried Out Under Threat Of Litigation, And SEC Therefore Had A Reasonable Apprehension Of Suit.

The factual record demonstrates that SEC had a reasonable apprehension of being

sued by Defendants when it filed the original Complaint on November 30, 2006, and this

Court therefore had subject matter jurisdiction over this action as of that date.[4]  The

Federal Circuit has held that when a patent holder and a target company are engaged in

patent licensing negotiations and the patent holder threatens during those negotiations to

file suit if it is not satisfied with the result of the negotiations, an actual controversy exists

---

*Chemical Co. v. Exxon Chemical Patents, Inc.*, No. 94-572-SLR, 1995 WL 562289, *7 (D. Del. Aug. 16, 1995) (a reasonable apprehension suit existed where there was an accusation of infringement, an offer of a license, a refusal of the offer, and implicit threats of litigation).

The Amended Complaint further alleges that Defendants explicitly threatened SEC with litigation *prior* to SEC's filing of the original Complaint, further demonstrating the existence of an actual case or controversy as of November 30, 2006. (D.I. 8, ¶ 26, 36, 46.)  Because the threats are alleged to have occurred *before* the filing of the original Complaint, these allegations relate back to the filing date of the original Complaint and may be used to demonstrate the existence of subject matter jurisdiction as of November 30, 2006, as Defendants concede in footnote 1 of their brief. *See, e.g., Correspondent Servs. Corp. v. First Equities Corp.*, 338 F.3d 119, 125 (2d Cir. 2003) (factual allegations in an amended complaint relate back to the filing date of the original complaint for purposes of establishing subject matter jurisdiction "if the underlying facts, if properly pled, would have supported jurisdiction at the time the action commenced").

[4] Defendants do not dispute that the second prong of the Federal Circuit's test for an actual case or controversy — present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity — is met in this case.

under the Declaratory Judgment Act and the target may file a declaratory judgment action

at any time. *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 812 (Fed. Cir. 1996). Indeed, in

*EMC*, the Federal Circuit found declaratory judgment jurisdiction where a single letter

from a patent holder "made it reasonably clear that [the patent holder] intended to resort

to litigation if it were not satisfied with the results of the parties' negotiations." *Id.* Thus,

unlike Defendants' September 6, 2006 letter, which made an explicit threat of litigation,

the letter in *EMC* contained only an implied threat of litigation. *Id.*

Furthermore, a reasonable apprehension of suit exists *even if the negotiations are*

*on-going* — as was the case in *EMC* — and Defendants' contention that a court can never

have subject matter jurisdiction over a declaratory judgment action where licensing

negotiations are ongoing finds no support in Federal Circuit precedent and is flatly

wrong. *EMC*, 89 F.3d at 811-12 ("A patentee's offer of a license, without more, is

insufficient to establish the predicate for declaratory judgment jurisdiction . . . and merely

proposed or ongoing license negotiations are likewise insufficient . . . But when the

patentee takes steps that create a reasonable apprehension that he will seek redress

through the courts, the alleged infringer is not required to wait for the patentee to decide

when and where to sue, but can take the initiative and seek declaratory relief."); *see also*

*Ivoclar Vivadent, Inc. v. Hasel*, Case No. 02-CV-0316E(F), 2003 U.S. Dist. LEXIS

12611, *23 (W.D.N.Y. June. 30, 2003) ("Thus, the fact that the parties may have been

negotiating a possible patent license is not dispositive, but merely a factor that is, in this

case, insufficient to overcome defendants' other threatening conduct that gave rise to

Ivoclar's reasonable apprehension of an imminent patent infringement suit by ABCO.");

*Clay Paky, S.p.A. v. Vari-Lite, Inc.*, Case Nos. 99 Civ. 11401 and 11402 (BSJ), 2000 U.S.

15

Dist. LEXIS 9802, *15 (S.D.N.Y. July 12, 2000) ("Just because the parties proceeded to initiate negotiations does not mean that the reasonable apprehension of litigation was ever removed. Vari-Lite, having made its threat of litigation, cannot now claim that Clay Paky and Coemar were unreasonable in their apprehension of impending litigation").

REDACTED

(D.I. 12, Ex. G.)  Since the only other "path" for Defendants to enforce their legal rights and remedies would be to sue SEC, the threat of litigation in this letter is undeniable.  Mr. Botsch was also *reemphasizing* this threat, which means that he made it before.  This letter thus *directly contradicts Mr. Botsch's sworn testimony* that he "never threatened Samsung with litigation" (Botsch Dec. ¶ 27), and calls into question Mr. Botsch's

16

disavowal of the litigation threats he made at the parties' February 15 and August 16, 2006 meetings and during his September 15, 2006 telephone conversation with Mr. Muir.

Further, just like in *EMC*, Defendants never abandoned this threatening posture during the weeks between the September 6, 2006 letter and the filing of the Delaware Action on November 30, 2006. Although Defendants cite to self-serving statements that they preferred an "amicable resolution" and preferred "not to litigate," the issue is not what they may have preferred, but what they were planning to do if settlement could not be reached. Defendants were prepared to litigate if a satisfactory settlement was not reached, and they informed SEC of that fact on a number of occasions. Further, as the Federal Circuit in *EMC* recognized, the Court must "look to substance rather than form" because "the parties are sensitive to the prospect of a declaratory judgment action and couch their exchanges in terms designed either to create or defeat declaratory judgment jurisdiction." *EMC*, 89 F.3d at 812.

SEC was within its rights to file a declaratory judgment action the moment Defendants threatened to litigate if a satisfactory settlement could not be reached. SEC waited to file suit, however, on the chance that costly and time-consuming litigation could ultimately be avoided

REDACTED

. SEC therefore chose to file a declaratory judgment action to protect itself against the uncertainty and delay concerning its right to sell the accused DRAM products caused by Defendants' threats. This is precisely the purpose of the Declaratory Judgment Act, and precisely what Mr. Shim told Mr. Botsch

17

and Mr. Cave during their telephone conversations on November 30, 2006 after SEC filed this action.

The various cases Defendants cite for the proposition that a reasonable apprehension of suit cannot exist when licensing negotiations are ongoing are either inapposite or distinguishable. For example, Defendants rely on *EMC*, but in *EMC* the Federal Circuit found that the declaratory judgment plaintiff had a reasonable apprehension of suit despite the fact that negotiations were ongoing, because a threat of litigation had been made. *EMC*, 89 F.3d at 812. Defendants also cite to *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha*, 57 F.3d 1051 (Fed. Cir. 1995), but, as even the Federal Circuit acknowledged in *EMC*, in that case — unlike in this case — the patent holder did not threaten litigation. *Phillips*, 57 F.3d at 1052. Defendants also cite to *Vermeer Mfg. Co. v. Deere & Co.*, 379 F. Supp. 2d 645 (D. Del. 2005), but once again in that case the patent holder did not threaten to sue as the patent holder in this case did. *Vermeer*, 379 F. Supp. 2d at 649. Finally, Defendants rely on *Livorsi Marine, Inc. v. Nordskog Publishing, Inc.*, 268 F. Supp. 2d 994 (N.D. Ill. 2003), but again the patent holder in that case did not threaten litigation and, in fact, the court distinguished *EMC* on that basis. *Livorsi*, 268 F. Supp. 2d at 999.

Defendants also seek to manufacture an argument that SEC did not have reasonable apprehension of suit by mischaracterizing Mr. Muir's declaration filed in connection with Plaintiffs' motion to enjoin Defendants from pursuing the Texas Action (D.I. 12). In that Declaration, Mr. Muir was addressing a potential allegation of anticipatory filing, which can be an exception to the first-filed rule upon which the motion to enjoin is based. (D.I. 11 at 9-13.) The fact that Defendants did not threaten to

18

file suit on or by a date certain does not mean that there was no threat of imminent litigation. As the Federal Circuit explained in *Teva Pharms. USA, Inc. and Pfizer Inc.*, 395 F.3d 1324 (Fed. Cir. 2005), the notion of immediacy in the declaratory judgment context has nothing to do with whether the patent holder will file suit by a date certain, but "reflects the Article III mandate that the injury in fact be 'concrete,' and 'actual or imminent, not conjectural or hypothetical.'" *Teva*, 395 F.3d at 1333. In this case, Defendants' litigation threats clearly satisfy the immediacy requirement of Article III. *EMC*, 89 F.3d at 811 ("We agree with EMC that the undisputed facts establish a sufficient controversy between the parties to give the district court statutory and constitutional authority to hear this declaratory judgment action."). In contrast, in *Teva* the patent holder did not threaten litigation, and the premature triggering of a 180-day exclusivity period under the Hatch-Waxman Act made it unlikely that the patent holder would file suit.

In view of the foregoing, SEC had a reasonable apprehension of being sued by Defendants when it filed the original Complaint on November 30, 2006. This Court, therefore, had subject matter jurisdiction over this action as of that date.

**B.      The Filing Of The Texas Action Confirms That Defendants Were Planning To Sue SEC For Patent Infringement, And Therefore That SEC Had A Reasonable Apprehension Of Being Sued.**

The fact that SEC had a reasonable apprehension of being sued by Defendants is confirmed by the fact Defendants actually ***sued SEC*** for patent infringement, and they did so less than two business days after SEC filed this action. This behavior is completely inconsistent with the picture Defendants paint in their motion papers of a patent holder that does not want to litigate.

19

Moreover, Defendants included in their Texas complaint a claim for infringement of a patent — the '827 patent — that they did not disclose to SEC prior to filing the Texas Action. Unless Defendants would have this Court believe that, in the period of less than two business days between the filing of the Delaware Action and the filing of the Texas Action, Defendants analyzed the '827 patent and SEC's products for the first time and made the determination to sue SEC on that patent, it is obvious that Defendants were planning for some time to assert the '827 patent against SEC, and, since they kept it a secret, that they were planning to assert the '827 patent in litigation against SEC.

Defendants are incorrect that the Court may not consider events that occurred after the November 30, 2006 filing date of the Delaware Action to determine whether it had subject matter jurisdiction as of that date. The Federal Circuit has held that, in determining whether there exists a reasonable apprehension of suit under the "totality of the circumstances," it is appropriate and proper for a court to consider events occurring after the filing of a declaratory judgment action. In *C.R. Bard, Inc. v. Schwartz*, 716 F.2d 874, 881 (Fed. Cir. 1983), for example, the Federal Circuit held that a patentee's statements made as late as oral argument on appeal could be used to show the existence of a reasonable apprehension of suit. In *Goodyear*, the Federal Circuit reversed a finding of no reasonable apprehension of suit in part because the patentee's "candid revelation" at oral argument that it might bring suit "was directly contrary to the implicit and necessary assumption . . . that there was no case or controversy." *Goodyear*, 824 F.2d at 956.

Indeed, this Court in *Syngenta Crop. Protection, Inc. v. Monsanto Company*, Civil Action No. 03-1062 (KAJ) (D. Del. Apr. 6, 2004), relied on the fact that the defendant

patent holder subsequently filed a patent infringement action in finding that a declaratory

judgment plaintiff had a reasonable apprehension of being sued by the patent holder:

> And finally, and not insignificantly, *you sued them*. You, in
> fact, did it. And what I — your opening lines in your brief are
> very telling to me on this point. You're distressed that they've
> taken away your forum of choice, which is not — I mean, that
> may very well go to the issue of where it is fair to try this, but
> *it speaks volumes about the reasonableness of apprehension*
> *of suit to me: That they thought you would sue them, and*
> *you did sue them*. And the — and *it only verifies that it was*
> *not unreasonable*.

(Ex. 2 at 38-39.)

Thus, far from being irrelevant, the fact that Defendants made good on their

repeated threats to sue SEC demonstrates that SEC's apprehension of being sued by

Defendants was not only reasonable, but was correct. But in any event, as discussed

above, even if Defendants had not filed suit, SEC still had a reasonable apprehension of

suit.

### III.    This Is The Very Type Of Case The Declaratory Judgment Is Meant To Address, And The Court Should Therefore Hear This Case.

Defendants also ask this Court to exercise its discretion under the Declaratory

Judgment Act to dismiss this case. But before a Court may dismiss a declaratory

judgment action on a discretionary basis, "[t]he court must determine whether hearing the

case would serve the objectives for which the Declaratory Judgment Act was created . . .

[W]hen these objectives are served, dismissal is rarely proper." *Capo, Inc. v. Dioptics*

*Medical Products, Inc.*, 387 F.3d 1352, 1355 (Fed. Cir. 2004) (internal citations omitted).

Furthermore, "[t]here must be well-founded reasons for declining to entertain a

declaratory judgment action. Absent such reasons, when there has been a direct charge of

infringement by the patentee, and an actual controversy exists due to ongoing activity that

21

has been accused of infringement, the accused infringer has the right to resolve the dispute." *Id.*

Because SEC's declaratory judgment claims comport with the objectives of the Declaratory Judgment Act, and because there are no well-founded reasons for declining to hear this declaratory judgment action, the Court should deny Defendants' motion to dismiss.

### A.    SEC's Declaratory Judgment Claims Comport With The Purpose Of The Declaratory Judgment Act.

The purpose of declaratory judgment actions in patent cases is "to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Goodyear*, 824 F.2d at 956. The Federal Circuit has explained that that the Declaratory Judgment Act was intended "to allow a party who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." *Capo*, 387 F.3d at 1354-55 (internal citations omitted). Through the Declaratory Judgment Act, alleged infringers have a more attractive course of action than the "*in terrorem* choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests." *Arrowhead*, 846 F.2d at 735. The Declaratory Judgment Act thus protects industries from patentees who would "infect the competitive environment of the business community with uncertainty and insecurity" through the use of "guerrilla-like" tactics and attempts at "extra-judicial patent enforcement." *Id.*

This is a textbook case for application of the Declaratory Judgment Act. Defendants — who are seeking to enforce their patents against other members of the

22

DRAM industry as well —accused SEC of infringing their patents through SEC's sales of DRAM products, sales that amount to more than $1 billion annually.



Faced with Defendants' litigation threats and their refusal to put a reasonable offer on the table, on the one hand, and SEC's growing potential liability for patent infringement on the other, SEC was perfectly within its rights to file a declaratory judgment action to resolve the uncertainty and insecurity caused by Defendants' tactics. *Capo*, 387 F.3d at 1354 -55; *Arrowhead*, 846 F.2d at 735.



DB02:5710059.1                                065888.1001

REDACTED

Third, Defendants' reliance on *EMC* is misplaced. In *EMC*, the declaratory judgment plaintiff and patent holder defendant were engaged in licensing discussions when the plaintiff filed suit. Because, REDACTED, the discussions were carried out under threat of litigation, the Federal Circuit found that the plaintiff had a reasonable apprehension of suit and that an actual controversy under the Declaratory Judgment Act existed. Nonetheless, the Federal Circuit affirmed the lower court's dismissal on discretionary grounds, citing a public policy against encouraging parties involved in licensing negotiations to file suit in order to gain leverage in the negotiations by forcing the patent holder "to consider whether as a practical matter it would be better to avoid litigation costs and any risk of adverse rulings that might render the patents less valuable. It would be reasonable to expect that, if there is in fact a market for the patents, the mere pendency of the lawsuit may negatively affect the value of the defendant's patents in that market and the price any potential purchaser, either the plaintiff or another prospective purchaser might be willing to pay." *EMC*, 89 F.3d at 810.

This policy concern does not apply to this case, however, because, unlike the patent holder in *EMC*, Defendants filed their own lawsuit against SEC, and therefore *voluntarily* made the choice to put their patents at risk of adverse rulings. If this Court

24

were to dismiss this action, Defendants' patents would still be in litigation in Texas,

REDACTED

In *EMC* on the other hand, because the patentee did not file its own lawsuit, dismissal of the declaratory judgment action erased any litigation-based leverage that the declaratory judgment plaintiff obtained by filing suit. Thus, the policy that *EMC* was seeking to protect does not apply to this case.

The facts of *EMC* differ from this case in a number of other significant respects as well. For example, in *EMC* the parties continued to negotiate after the declaratory judgment action was filed, meeting in person two times.

REDACTED

) Furthermore, unlike in *EMC*, it is clear that this is a case "in which there is no real prospect of a non-judicial resolution of the dispute." *EMC*, 89 F.3d at 814.

REDACTED

*See, e.g., Russell Corp. v. Sara Lee Corp.*, 129 F. Supp. 2d 1165, 1169 (N.D. Ill. 2001) (denying motion to dismiss on discretionary grounds where parties were at an impasse in negotiations).

REDACTED

25



Defendants also mischaracterize Mr. Shim's statements concerning a preference not to litigate — of course any prudent business prefers an amicable resolution over litigation, provided the terms of the resolution are acceptable — as well as Mr. Shim's statements concerning SEC's reasons for filing this action, in an attempt to make the facts of this case more resemble *EMC*. In *EMC*, however, the plaintiff invited the defendant to continue discussions after filing suit, and discussions in fact continue

REDACTED

. (Shim Dec. ¶ 12, 13.)  Rather, Mr. Shim made a single counteroffer, which Defendants rejected and called a "joke." *Id.*

REDACTED

Under these circumstances, to dismiss this action because SEC filed suit to remove a cloud over its business put there by Defendants' threats would thwart the very purpose of the Declaratory Judgment Act. *See, e.g, Russell*, 129 F. Supp. 2d at 1169 ("We see no basis to impose what would amount to a requirement that a party engage in and complete ADR before filing suit.  Russell was directly threatened with a lawsuit unless it paid for a license, something it was unwilling to do; under the circumstances, it was entitled to have its rights determined.").

DB02:5710059.1

065888.1001

**C.    The Court Should Not Reward Defendants' Blatant Forum-Shopping.**

Defendants also argue that the Court should exercise its discretion to dismiss this case because it should not be deprived of its forum of choice — the Eastern District of Texas —  But, as set forth in Plaintiffs' motion to enjoin Defendants from pursuing the Texas Action (D.I. 11 at 13-16), the Eastern District of Texas has no relevant connection to the parties, witnesses, or sources of proof. The inescapable conclusion is that Defendants' choice of the Eastern District of Texas is classic forum shopping. And by asking the Court to dismiss this action on that basis, Defendants are asking the Court to condone their improper litigation tactics. The Court should reject this argument out of hand.

REDACTED

Finally, as explained in Plaintiffs' motion to enjoin, SEC did not forum shop or file this action anticipatorily. (D.I. 11 at 9-13.) Because Defendants are both incorporated in Delaware, SEC's choice of Delaware as a forum for this dispute is both rational and appropriate, and Defendants should not be heard to complain that they have been forced to litigate in Delaware. *See, e.g., Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215, 218 (D. Del. 1993) ("Absent some showing of a unique or unexpected burden, [Delaware] corporations should not be successful in arguing that litigation in their state of incorporation is inconvenient.") Further, Delaware does not inconvenience Defendants, nor does it offer Plaintiffs any unfair advantage or convenience over the Defendants. (D.I. 11 at 12-16.)

DB02:5710059.1                                                                                            065888.1001

Accordingly, the Court should deny Defendants' request that the Court exercise its discretion to dismiss this case.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for lack of subject matter jurisdiction should be denied.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*[signature]*

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, Delaware 19801
(302) 571-6600
*alundgren@ycst.com*

OF COUNSEL:

John M. Desmarais
James E. Marina
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

*Attorneys for Plaintiffs Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Telecommunications America General, L.L.C., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor, L.L.C.*

Dated:  January 12, 2007

28

065888.1001

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on January 12, 2007, I caused

to be electronically filed a true and correct copy of the foregoing document with the Clerk of the

Court using CM/ECF, which will send notification that such filing is available for viewing and

downloading to the following counsel of record:

Karen Jacobs Louden, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

I further certify that on January 12, 2007, I caused a copy of the foregoing

document to be served by **hand delivery** on the above-listed counsel of record and on the

following non-registered participants in the manner indicated:

### BY FEDERAL EXPRESS

Kenneth R. Adamo, Esquire
Jones Day
2727 North Harwood Street
Dallas, TX 75201

T. Gregory Lanier, Esquire
Behrooz Shariati, Esquire
Jones Day
2882 Sand Hill Road, Suite 240
Menlo Park, CA 94025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street
Wilmington, DE 19801
302-571-6600
*alundgren@ycst.com*

# EXHIBIT 1

FILED CLERK
U.S. DISTRICT COURT

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

2006 DEC -4  AM 8: 22

TE . . . .... ERN

BY____ __ ____

|  |  |
|---|---|
| ON SEMICONDUCTOR CORPORATION, and SEMICONDUCTOR COMPONENTS INDUSTRIES, L.L.C.,<br> Plaintiffs,<br><br>v.<br><br>SAMSUNG ELECTRONICS CO., LTD., SAMSUNG ELECTRONICS AMERICA, INC., SAMSUNG TELECOMMUNICATIONS AMERICA GENERAL, L.L.C., SAMSUNG SEMICONDUCTOR, INC., and SAMSUNG AUSTIN SEMICONDUCTOR, L.L.C.,<br> Defendants. | Civil Action No. 6 06cv 523<br><br>COMPLAINT |

## COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff ON Semiconductor Corp. ("ON Semiconductor") and plaintiff Semiconductor

Components Industries, L.L.C. ("Semiconductor Components") (collectively, "Plaintiffs"), for

their Complaint against defendants Samsung Electronics Co., Ltd., Samsung Electronics

America, Inc., Samsung Telecommunications America General, L.L.C., Samsung

Semiconductor, Inc. and Samsung Austin Semiconductor, L.L.C. (collectively "Defendants"),

state as follows.

## THE PARTIES

1.    Plaintiff ON Semiconductor is a Delaware corporation with its principal place of

business at 5005 East McDowell Road, Phoenix, AZ 85008.

2.    Plaintiff Semiconductor Components, a Delaware limited liability company with its principal place of business at 5005 East McDowell Road, Phoenix, AZ 85008, is the principal domestic operating subsidiary of ON Semiconductor, and does business under the name of ON Semiconductor.

3.    On information and belief, Defendant Samsung Electronics Co., Ltd. ("SEC") is a corporation organized and existing under the laws of Republic of Korea with its principal place of business at Samsung Main Building, 250, Taepyong-ro 2-ka, Chung-ku, Seoul 100-742, South Korea. On information and belief, SEC manufactures and, in cooperation with its subsidiaries, markets throughout the world, including in this district and elsewhere in the United States, a variety of semiconductor products including dynamic random access memory ("DRAM") devices.

4.    Defendant Samsung Electronics America, Inc. ("SEA") is a New York corporation with its principal place of business at 105 Challenger Road, Ridgefield Park, New Jersey 07660. On information and belief, SEA is a subsidiary of SEC and sells and otherwise markets, in this district and elsewhere in the United States, a variety of electronic and semiconductor products

5.    Defendant Samsung Telecommunications America General, L.L.C. ("STA") is a Delaware limited liability company with its principal place of business at 1301 East Lookout Drive, Richardson, Texas 75082. On information and belief, STA is a subsidiary of SEC and sells and otherwise markets, in this district and elsewhere in the United States, a variety of electronic and semiconductor products.

6.    Defendant Samsung Semiconductor, Inc. ("SSI") is a California corporation with its principal place of business at 3655 North First Street, San Jose, California 95134. On

MPI-4188v1                                    - 2 -

information and belief, SSI is a subsidiary of SEC and sells and otherwise markets, in this district and elsewhere in the United States, a variety of electronic and semiconductor products.

7.    On information and belief, Defendant Samsung Austin Semiconductor, L.L.C. ("SAS") is a Delaware limited liability company with its principal place of business at 12100 Samsung Boulevard, Austin, Texas 78754. On information and belief, SAS is a subsidiary of SEC and sells and otherwise markets, in this district and elsewhere in the United States, a variety of semiconductor products including DRAM devices.

## JURISDICTION AND VENUE

8.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338 because this action arises under the patent laws of the United States, including 35 U.S.C. § 271 *et seq.*

9.    This Court has personal jurisdiction over each of the Defendants. The Defendants have had minimum contacts with this forum as a result of business regularly conducted within the State of Texas and within this district and specifically as a result of, at least, the Defendants' distribution network wherein Defendants place their products that infringe Semiconductor Component's patents within the stream of commerce, which stream is directed at this district as well as Texas, and by committing the tort of patent infringement and/or contributing to or inducing acts of patent infringement by others within Texas and this district.

10.    Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b) and (c) and 1400(b) because Defendants have regularly conducted business in this judicial district and certain of the acts complained of herein occurred in this judicial district.

## COUNT 1 – INFRINGEMENT OF U.S. PATENT NO. 5,563,594

11.  The allegations contained in paragraphs 1 through 10 are incorporated by reference as if fully set herein.

12.  United States Patent No. 5,563,594 ("the '594 patent"), entitled "Circuit and Method of Timing Data Transfers," was duly and legally issued by the United States Patent and Trademark Office on October 8, 1996. Plaintiffs hold all right and interest in the '594 patent, including the right to sue for past, present and future infringement. A copy of the '594 patent is attached hereto as Exhibit A.

13.  Defendants are infringing the '594 patent under one or more sections of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States by the manufacture, use, sale, offer for sale and/or importation into the United States of product(s) falling within the scope of one or more claims of the '594 patent.

14.  On information and belief, Defendants also contribute to and/or induce the infringement of at least one claim of the '594 patent.

15.  Plaintiffs have been damaged by Defendants' infringement of the '594 patent. Plaintiffs are entitled to recover from each of the Defendants the damages sustained by them as a result of each of the Defendants' wrongful acts.

16.  Defendants' infringement of Semiconductor Component's exclusive rights under the '594 patent will continue to damage Plaintiffs' business, causing irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is enjoined by this Court.

17.  Defendants have had actual knowledge of the '594 patent and their infringement is deliberate and willful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT II – INFRINGEMENT OF U.S. PATENT NO. 6,362,644

18.    The allegations contained in paragraphs 1 through 17 are incorporated by reference as if fully set herein.

19.    United States Patent No. 6,362,644 ("the '644 patent"), entitled "Programmable Termination for Integrated Circuits," was duly and legally issued by the United States Patent and Trademark Office on March 26, 2002.  Plaintiffs hold all right and interest in the '644 patent, including the right to sue for past, present and future infringement.  A copy of the '644 patent is attached hereto as Exhibit B.

20.    Defendants are infringing the '644 patent under one or more sections of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States by the manufacture, use, sale, offer for sale and/or importation into the United States of product(s) falling within the scope of one or more claims of the '644 patent.

21.    On information and belief, Defendants also contribute to and/or induce the infringement of at least one claim of the '644 patent.

22.    Plaintiffs have been damaged by Defendants' infringement of the '644 patent. Plaintiffs are entitled to recover from each of the Defendants the damages sustained by Plaintiffs as a result of each of the Defendants' wrongful acts.

23.    Defendants' infringement of Semiconductor Component's exclusive rights under the '644 patent will continue to damage Plaintiffs' business, causing irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is enjoined by this Court.

24.    Defendants have had actual knowledge of the '644 patent and their infringement is deliberate and willful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

## COUNT III – INFRINGEMENT OF U.S. PATENT NO. 5,361,001

25.    The allegations contained in paragraphs 1 through 24 are incorporated by reference as if fully set herein.

26.    United States Patent No. 5,361,001 ("the '001 patent"), entitled "Circuit and Method of Previewing Analog Trimming," was duly and legally issued by the United States Patent and Trademark Office on November 1, 1994.  Plaintiffs hold all right and interest in the '001 patent, including the right to sue for past, present and future infringement.  A copy of the '001 patent is attached hereto as Exhibit C.

27.    Defendants are infringing the '001 patent under one or more sections of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States by the manufacture, use, sale, offer for sale and/or importation into the United States of product(s) falling within the scope of one or more claims of the '001 patent.

28.    On information and belief, Defendants also contribute to and/or induce the infringement of at least one claim of the '001 patent.

29.    Plaintiffs have been damaged by Defendants' infringement of the '001 patent. Plaintiffs are entitled to recover from each of the Defendants the damages sustained by Plaintiffs as a result of each of the Defendants' wrongful acts.

30.    Defendants' infringement of Semiconductor Component's exclusive rights under the '001 patent will continue to damage Plaintiff's business, causing irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is enjoined by this Court.

31.    Defendants have had actual knowledge of the '001 patent and their infringement is deliberate and willful, entitling Plaintiffs to increased damages under 35 U.S.C. § 284 and to attorney fees and costs incurred in prosecuting this action under 35 U.S.C. § 285.

MPI-41884v1                                    - 6 -

## COUNT IV – INFRINGEMENT OF U.S. PATENT NO. 5,000,827

32. The allegations contained in paragraphs 1 through 31 are incorporated by reference as if fully set herein.

33. United States Patent No. 5,000,827 ("the '827 patent"), entitled "Method and Apparatus for Adjusting Plating Solution Flow Characteristics at Substrate Cathode Periphery to Minimize Edge Effect," was duly and legally issued by the United States Patent and Trademark Office on March 19, 1991. Plaintiffs hold all right and interest in the '827 patent, including the right to sue for past, present and future infringement. A copy of the '827 patent is attached hereto as Exhibit D.

34. Defendants are infringing the '827 patent under one or more sections of 35 U.S.C. § 271 in this judicial district and elsewhere in the United States by the manufacture, use, sale, offer for sale and/or importation into the United States of product(s) falling within the scope of one or more claims of the '827 patent.

35. On information and belief, Defendants also contribute to and/or induce the infringement of at least one claim of the '827 patent.

36. Plaintiffs have been damaged by Defendants' infringement of the '827 patent. Plaintiffs are entitled to recover from each of the Defendants the damages sustained by Plaintiffs as a result of each of the Defendants' wrongful acts.

37. Defendants' infringement of Semiconductor Component's exclusive rights under the '827 patent will continue to damage Plaintiffs' business, causing irreparable harm, for which there is no adequate remedy at law, unless each of the Defendants is enjoined by this Court.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment in its favor against each of the Defendants, and requests the following relief:

A. An adjudication that Defendants have infringed, contributed to the infringement of, and/or induced infringement of the '594, '644, '001, and '827 patents;

B. An adjudication that the '594, '644, '001, and '827 patents are valid and enforceable;

C. An accounting of all damages sustained by Plaintiffs as a result of Defendants' acts of infringement;

D. An award to Plaintiffs of actual damages adequate to compensate them for Defendants' acts of direct, contributory, and/or inducement of infringement, together with prejudgment and post-judgment interest and costs;

E. An award to Plaintiffs of enhanced damages, up to and including trebling of Plaintiffs' damages, pursuant to 35 U.S.C. § 284 for Defendants' willful infringement;

F. A preliminary and permanent injunction order against further infringement of the '594, '644, '001 and '827 patents by each of the Defendants, their officers, agents, servants, employees, subsidiaries, and those persons acting in concert with it, including related individuals and entities, customers, representatives, manufacturers, OEMs, dealers, and distributors;

G. An award to Plaintiffs their costs and reasonable attorney fees incurred in this action as provided by 35 U.S.C. § 285; and

H. That the Court award such other relief as this Court deems just and proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues and claims so triable.

MPI-41884v1                              - 8 -

Date: December 4, 2006

Respectfully submitted.

*Nilda C Galvan*

Kenneth R. Adamo
State Bar No. 00846960
kradamo@jonesday.com
Hilda C. Galvan
State Bar No. 00787512
hcgalvan@jonesday.com
JONES DAY
2727 North Harwood Street
Dallas, Texas 75201-1515
Telephone: (214) 220-3939
Facsimile: (214) 969-5100

Tharan Gregory Lanier
tglanier@jonesday.com
CA Bar No. 138784
JONES DAY
2882 Sand Hill Road, Suite 240
Menlo Park, CA 94025
Telephone: (650) 739-3939
Facsimile: (650) 739-1900

Carl R. Roth
State Bar No. 17312000
cr@rothfirm.com
Michael C. Smith
ms@rothfirm.com
115 N Wellington Suite 200
P O Box 876
Marshall, Texas 75670
Telephone: (903) 935-1665
Facsimile: (903) 935-1797

ATTORNEYS FOR ON SEMICONDUCTOR
CORPORATION AND SEMICONDUCTOR
COMPONENTS INDUSTRIES, L.L.C.

Of Counsel:
Behrooz Shariati
JONES DAY
2882 Sand Hill Road, Suite 240
Menlo Park, CA 94025

MPI-41884x1

- 9 -

# EXHIBIT 2

1

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                      - - -

4   SYNGENTA CROP PROTECTION, INC.,    :        CIVIL ACTION
                                       :
5              Plaintiff              :
                                       :
6          vs.                        :
                                       :
7   MONSANTO COMPANY and              :
    MONSANTO TECHNOLOGY LLC,           :
8                                      :
               Defendants             :        NO. 03-1062 (KAJ)

9                      - - -

10
                                 Wilmington, Delaware
11                               Tuesday, April 6, 2004
                                 11:00 o'clock, a.m.
12
                       - - -
13
    BEFORE:  HONORABLE KENT A. JORDAN, U.S.D.C.J.
14
                       - - -
15
    APPEARANCES:
16
              YOUNG, CONAWAY, STARGATT & TAYLOR, LLP
17            BY:  JOHN W. SHAW, ESQ.

18                      -and-

19            FINNEGAN, HENDERSON, FARABOW, GARRETT &
              DUNNER, L.L.P.
20            BY:  DON O. BURLEY, ESQ. and
                   MICHAEL J. FLIBBERT, ESQ.
21
                   Counsel for Plaintiff
22

23                               Valerie J. Gunning
                                 Official Court Reporter
24

25

1   against giving Delaware -- I don't want to say give it

2   as much weight, but makes it more easy for Monsanto to

3   overcome the weight given to the Delaware filing.

4           The Symbol Technology case, I think in that

5   case you had a situation where two parties were sitting

6   down, this one had these patents, this one had these

7   patents (indicating), and then this one sued on these

8   patents, so the other side turned around and was afraid

9   about these patents.  It was one of those situations

10  where, yeah, maybe the patents aren't related, but they

11  were all being thrown into the same negotiation.  I

12  think that's a distinguishing factor there.

13          On the transfer, your Honor, I think this

14  case has nothing to do with Delaware other than some

15  parties are incorporated here.  Sure, suit was brought

16  first here, but I don't think that that should be -- I

17  think that's more recently overcome by the fact the

18  parties were trying to negotiate a license.  Syngenta

19  rushed to the courthouse and that activity should not be

20  encouraged by keeping the case here.

21          THE COURT:  Okay.  Thank you, sir.

22          I came into court on the basis of the papers

23  with my mind largely made up, but with an opportunity for

24  somebody to make a difference in their argument.  And

25  while the arguments are well presented, I'm still coming

1   out where I thought I would on the basis of the papers

2   and that is that the motion to dismiss is denied.  The

3   motion to transfer is denied.  The motion to enjoin is

4   granted.

5           And I'm not going to take the time because,

6   frankly, I don't think it adds to the body of

7   jurisprudence that's important to sit down and write you

8   something, but I will give you your reasons right now.

9           First, there's some dispute about the precise

10  language that the parties used in speaking to each other,

11  but it does not appear to be disputed that there was an

12  initial contact between Monsanto and Syngenta initiated

13  by Monsanto in which specific reference was made to, Oh,

14  you've got these new patents, and, excuse me, this new

15  product and you're going to have more than an implication

16  that you're going to have an issue with us about our

17  patents on the Monsanto side with the precise language of

18  the remark being in dispute, but a clear reference to

19  settle or litigate.  Settle or we turn to our legal

20  solutions, which I think any reasonable person would

21  interpret and understand to mean we come to a business

22  solution or we will be in court.

23          I don't think even if you take the most

24  generous wording from Monsanto and say, they said legal

25  solution instead of we go to court, that that meant,

37

1  you know, we'll send you a contract.  I mean, legal

2  solution in this context I think fairly implied we're

3  going to court.

4         I have to look at the totality of the

5  circumstances, too and, no matter who started it, the fact

6  remains that these two people are not strangers to each

7  other in court, so when somebody says we'll turn to legal

8  solutions in the context of what the parties have

9  experienced before, it was certainly not unreasonable to

10  think, well, that means we're going to see each other in

11  court again.

12         The analysts report is a factor.  It's hard

13  to know quite how to weigh that because I think Mr.

14  Spears has an excellent point.  You cannot control what

15  analysts say, but the reality is I have to look at the

16  reasonableness of the apprehension and it was not

17  unreasonable for them on the Syngenta side to believe

18  that when an analyst's report surfaces with a statement,

19  we believe Monsanto may sue on these patents, that the

20  source of that information was initially and originally

21  somebody from within Monsanto.

22         It might have got amplified, might have got

23  changed, but the seed of it somebody at Monsanto talking

24  about a patent dispute.  So it's a factor.  And it's not

25  unreasonable.

1    In fact, it would be wholly reasonable for

2  them to believe they are talking to the trade about our

3  product.  They are implying suit.

4    So when you say they are not being heard,

5  nothing has happened, no customers are threatened, there's

6  more than one way to threaten customers.  And putting a

7  vibe out through the trade press is one way it happens.

8  So it wasn't unreasonable for Syngenta under these

9  circumstances to interpret that as another indicator that

10  we're going to end up in court with these folks.

11    The they aren't being damaged at all argument

12  I think fails to admit an undisputed fact, which is there

13  was a product approved, actively being marketed, and

14  consequently, the damage meter was and is running,

15  because if you're right, they're going to pay you, right

16  back to the -- to the day they started messing around

17  with your patents.  And so that's, again, another factor

18  to be considered.

19    And, finally, and not insignificantly, you

20  sued them.  You, in fact, did it.  And what I -- your

21  opening lines in your brief are very telling to me on

22  this point.  You're distressed that they've taken away

23  your forum of choice, which is not -- I mean, that may

24  very well go to the issue of where is it fair to try

25  this, but it speaks volumes about the reasonableness of

1    apprehension of suit to me:  That they thought you would

2    sue them, and you did sue them.  And the -- and it only

3    verifies that it was not unreasonable.

4              Now, that is not a factor all by itself.  It's

5    certainly not dispositive, but it is a factor to be

6    weighed in the mix.  And when I weigh that totality of

7    circumstances, I'm persuaded that there was a reasonable

8    apprehension that they will be sued on these patents and

9    that reasonable apprehension turned out to be dead right.

10             So the motion to dismiss for lack of subject

11   matter jurisdiction is denied.

12             The motion to transfer was, frankly, less of

13   a challenge for me, because the -- it got a little bit of

14   the back of Monsanto's hand.  I don't think, frankly,

15   there was so much focus on that.  To the extent there was

16   focus, it did not meet what I believe is the primary

17   point, which is if you have got a rational, reasonable

18   basis for your selection forum, that's paramount.  It can

19   be outweighed, but you've got to have powerful factors to

20   outweigh it.

21             Here, there is a rational basis.  Two

22   Delaware corporations in court resolving their problem is

23   not an irrational thing, it just isn't.  You know, one

24   side or the other might prefer to be someplace else, but

25   the fact that you would be in your home turf, Monsanto,

40

1  does not make it unreasonable for Syngenta to sue you in

2  the place that Monsanto has chosen to be incorporated.

3          What I was able to take from the briefing

4  indicates to me that this is not only not local, it's not

5  even national.  It's got international implications.  This

6  is a product that two businesses, which are international

7  in character, are likely to be duking it out over, at

8  least in the business marketplace, and maybe in the legal

9  arena as well.  Outside the United States, too.

10          And so it is really a request to say, Hey,

11  give us our home turf, and that is not a sufficient basis

12  for disturbing a rationale choice of forum by the

13  plaintiff in the first instance.

14          I will note also that some of these home turf

15  decisions make specific note that you look at where you

16  are in relation physically to the plaintiff's headquarters

17  and, you know, for what it's worth, which in my mind isn't

18  a whole lot, but it's worth noting at least, they are

19  closer here than they would be out in the Eastern District

20  of Missouri to their American base.

21          And the reality of modern litigation s that

22  whether this is pending here or in the Eastern District,

23  you'd be doing exactly the same things.  You'll be going

24  around taking depositions.  You'll be exchanging documents.

25  You will be sending interrogatories to each other by

41

1  e-mail or by Fax or by overnight, but the reality is, the

2  way the modern litigation rule works, there's virtually

3  nothing that would be different by this suit being

4  pre-tried here as opposed to the Eastern District.

5       The real question then becomes:  Is there

6  some overwhelming issue with respect to trial it that

7  would make it so much less convenient for Monsanto to be

8  here as to be the Eastern District.

9       And while I don't doubt that it would be more

10  convenient to be in your own hometown, I find nothing in

11  the record that indicates to me that this can't be tried

12  and tried perfectly well by sophisticated and well-heeled

13  and experienced, even in this court, corporation like

14  Monsanto if the litigation goes forward here, so there's

15  nothing that does substantially outweigh the paramount

16. consideration which the plaintiff's choice, rational

17  choice of forums do under the law.

18       So those are the reasons that the motion

19  to transfer is denied, and similarly, as all parties

20  acknowledge why it makes sense for me to enjoin further

21  litigation, Monsanto's mirror image suit in the Eastern

22  District.

23       And I want to put something else on the

24  record.  It would certainly have been, I think in the

25  courts -- if I were looking at this from a self-

42

1    interested standpoint, I would drop-kick this case to

2    the Eastern District in a heartbeat because, heaven

3    knows, there's plenty of work in this District for the

4    Judges here to do.

5              This is not a -- this is not turf

6    consciousness or a desire to hold onto things.  On the

7    contrary, if you folks sat down and agreed to settle

8    the case, you might be happier than I, but not much, I

9    promise.  I just give you that assurance, that I'm not

10   holding onto this case because it is going to give

11   personal pleasure or there's a desire here to hold onto

12   stuff that ought to go elsewhere.

13             I am persuaded on the legal principles that

14   that is what I'm required to do, and that's why I'm doing

15   it.  I'm going to hold onto the case here because the

16   merits of what has been presented to me, Syngenta did have

17   a reasonable apprehension of suit.  Jurisdiction lies here.

18   The choice of forum was not irrational or unreasonable.

19   There's no counterveiling and outweighing set of factors

20   for a transfer and it logically follows, then, that the

21   duplicative suit should be enjoined.

22             You'll get a one-sentence order from me that

23   says for the reasons stated in open court, the motions

24   to dismiss and transfer to denied, motion to enjoin is

25   granted.  And then you won't be spending any more time,

43

1   nor will I, on these preliminaries, and we can get to

2   the business of resolving the case on the merits.

3           All right.  Is there anything else that we

4   ought to be addressing while we're all together?  From the

5   plaintiff's side?

6           MR. FLIBBERT:  No, your Honor, I don't believe

7   so.

8           THE COURT:  From the defense?

9           MR. SPEARS:  Nothing further, your Honor.

10          THE COURT:  All right.  We're in recess.

11          (Court recessed at 11:55 p.m.)

12                          - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

# UNREPORTED CASES

LEXSEE 2000 US DIST LEXIS 9802

**CLAY PAKY, S.p.A., Plaintiff, v. VARI-LITE, INC., Defendant. COEMAR, S.p.A., Plaintiff, v. VARI-LITE, INC., Defendant.**

**99 Civ. 11401 (BSJ), 99 Civ. 11402 (BSJ)**

**UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK**

*2000 U.S. Dist. LEXIS 9802*

**July 12, 2000, Decided**
**July 14, 2000, Filed**

**DISPOSITION:** [*1] Defendant's motions to dismiss DENIED. Defendant's motions to transfer to the Northern District of Texas GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In two related cases, defendant moved to dismiss declaratory judgment actions on the grounds that the court lacked subject matter jurisdiction, the complaints did not state a claim upon which relief could be granted, and the court lacked personal jurisdiction. Alternatively, defendant requested transfer.

**OVERVIEW:** Defendant was a Texas corporation with its principal place of business in Texas, and an office in New York. On August 5, 1999, counsel for defendant sent a letter to one of the plaintiff's headquarters indicating that the plaintiff's products might infringe defendant's patent. A nearly identical letter was sent to a second plaintiff. Plaintiffs brought declaratory judgment actions. Defendant moved to dismiss on the grounds that subject matter jurisdiction did not exist under *28 U.S.C.S. § 220*, and that the court lacked personal jurisdiction. The court found subject matter jurisdiction because plaintiffs' pleadings included allegations of a present and actual controversy. Accordingly, defendant's motions to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* was denied. The court next found that the defendant was doing business in New York and was subject to personal jurisdiction. Defendant's motion to dismiss under *Fed. R. Civ. P. 12(b)(2)* was therefore denied. Defendant's motion to transfer pursuant to *28 U.S.C.S. § 1404*(a) was granted because the center of gravity of the case was in Texas.

**OUTCOME:** Defendant's motions to dismiss for lack of subject matter jurisdiction and lack of personal jurisdiction were denied. Plaintiffs' pleadings included allegations of an actual controversy. Defendant was doing business in New York and was subject to personal jurisdiction. Transfer was granted because center of gravity of litigation was Texas.

**CORE TERMS:** patent, apprehension, negotiation, infringe, personal jurisdiction, actual controversy, convenience, motions to dismiss, licensing, lawsuit, subject matter jurisdiction, lighting, selling, counteroffer, Declaratory Judgment Act, declaratory judgment action, charge of infringement, choice of forum, infringement, license, declaratory judgment, exercise of personal jurisdiction, doing business, out-of-state, terminated, injunction, undisputed, non-party, enclosed, patentee

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Declaratory Judgment Actions > General Overview*
[HN1] See *28 U.S.C.S. § 2201*(a).

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Civil Procedure > Declaratory Judgment Actions > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Ripeness*
[HN2] An actual controversy is a jurisdictional prerequisite and must be present before a declaratory judgment action is ripe for adjudication.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Patent Law > Infringement Actions > General Overview*
*Patent Law > Remedies > Declaratory Relief*
[HN3] The standard for determining whether an actual controversy is present in a declaratory judgment action concerning a patent has two elements: First, the defendant's conduct must have created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question. Second, plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
[HN4] In order to demonstrate the presence of an actual controversy, the plaintiff has the burden of establishing by a preponderance of the evidence, inter alia, that it has a reasonable apprehension that it will be sued.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Patent Law > Infringement Actions > General Overview*
[HN5] The test used to determine whether a plaintiff's apprehension of a lawsuit is reasonable is an objective one which focuses on whether the defendant's conduct rose to a level sufficient to indicate an intent to enforce its patent. An explicit charge of infringement would give rise to the reasonable apprehension necessary to demonstrate the presence of an actual controversy, however, an express charge of infringement is not essential.

*Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview*
*Patent Law > Infringement Actions > General Overview*

[HN6] A court must consider the totality of the circumstances and determine whether the plaintiff has shown that objective circumstances support his apprehension of an impending lawsuit.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN7] In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary matters outside the pleadings.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Patent Law > Jurisdiction & Review > Standards of Review > General Overview*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*
[HN8] Although under the Federal Circuit's courtesy rule, district courts sitting in patent actions are generally guided by the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law, Federal Circuit law governs both substantive and procedural issues intimately involved in the substance of enforcement of the patent rights.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN9] In order to defeat a motion to dismiss for lack of personal jurisdiction, the non-moving parties, need initially make only a prima facie showing of jurisdiction. The court's analysis of the adequacy of a non-moving party's prima facie showing of personal jurisdiction requires that the court first examine whether the exercise of jurisdiction is proper under the forum state's law, and then address whether the exercise of personal jurisdiction comports with due process.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN10] *N.Y. C.P.L.R. 301* provides general jurisdiction over a non-domiciliary defendant where that defendant is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction. The non-domiciliary must be

2000 U.S. Dist. LEXIS 9802, *

doing business in New York not occasionally or casually, but with a fair measure of permanence and continuity.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN11] Jurisdiction under *N.Y. C.P.L.R. 301* must satisfy the constitutional requirement of due process. The exercise of jurisdiction must be based on defendant's minimum contacts with the state and must comport with traditional notions of fair play and substantial justice.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN12] District courts may transfer an action to another district in which the action could have been brought when doing so would serve the convenience of the parties and the witnesses and would be in the interest of justice. *28 U.S.C.S. § 1404(a).*

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN13] Whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN14] The burden of demonstrating the desirability of transfer lies with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum unless the defendant makes make a clear and convincing showing that the balance of convenience favors the defendant's choice.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN15] In determining whether a transfer is warranted, a district court considers a number of factors, including: (1) the convenience of witnesses, (2) the location of relevant documents and the relative ease of access to sources of proof, (3) the convenience of the parties, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded the plaintiff's choice of forum, and (9) trial efficiency and the interest of justice based on the totality of the circumstances.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN16] The core determination under *28 U.S.C.S. § 1404(a)* is the center of gravity of the litigation, a key test of which is the convenience of witnesses. Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN17] The convenience of both the party and non-party witnesses is probably considered the single-most important factor in the analysis of whether a transfer should be granted.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN18] A plaintiff's choice of forum is generally entitled to substantial consideration. However, a plaintiff's choice is accorded less weight to the degree that the case's operative facts have little or no connection with the transferor forum.

COUNSEL: For CLAY PAKY S.P.A., plaintiff: Edward V. Filardi, Douglas R. Nemec, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York, NY.

JUDGES: Barbara S. Jones, UNITED STATES DISTRICT JUDGE.

OPINION BY: Barbara S. Jones

OPINION:

OPINION & ORDER

BARBARA S. JONES
UNITED STATES DISTRICT COURT

In these two related cases, defendant Vari-Lite, Inc., moves pursuant to the Declaratory Judgment Act, *28 U.S.C. § 2201*, and *Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure* (Fed. R. Civ. P.) to dismiss the declaratory judgment actions brought separately by plaintiff Clay Paky S.p.A. and Coemar S.p.A., on the grounds that this Court lacks subject matter jurisdiction under the Declaratory Judgment Act, and the complaints do not state a claim upon which relief can be granted. n1 In addition, defendant moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). In the alternative, defendant requests that this Court exercise its discretion under *28 U.S.C. § 1404* and transfer these actions to the Northern District of Texas, Dallas

Division. For the following reasons, defendant's motions to dismiss are denied, and defendant's motion to transfer [*2] venue is granted.

> n1 On June 27, 2000, plaintiffs amended their respective complaints as of right. The amendments have no impact on the merits of the pending motions.

BACKGROUND

The following facts are, unless otherwise noted, undisputed. Vari-Lite is a Texas corporation with its principal place of business in Dallas, Texas, and an office in New York, New York. Vari-Lite is in the business of manufacturing and renting sound and lighting fixtures for use in stage, theater, television, and other applications. In particular, Vari-Lite manufactures "intelligent lighting" - - remotely controlled lights that change colors and positions, project images and are choreographed through the use of a computer. Among other patents, Vari-Lite currently owns U.S. Patent No. 4,392,187 ("the '187 patent"), entitled "Computer Controlled Lighting System." Vari-Lite products are manufactured, serviced and shipped from Vari-Lite's production facility in Dallas.

Plaintiffs Clay Paky and Coemar are Italian corporations, with their [*3] principal places of business in Italy, that manufacture various lighting products.

On August 5, 1999, counsel for Vari-Lite sent a letter to Clay Paky's Italian headquarters. n2 The entire letter is reprinted below:

> This firm represents Vari-Lite, Inc. ("Vari-Lite") in intellectual property matters.

> Vari-Lite is the owner of [the '187 patent], which covers lighting systems like the ones sold by Clay Paky. I have enclosed a copy of this patent for your review. Since the issuance of the '187 Patent, Vari-Lite has aggressively enforced its right to exclude others from making, using, or selling products covered by the '187 Patent. Most recently, a federal court in Texas ordered Martin to cease selling certain of its lighting products in the United States that infringe the '187 Patent. I have enclosed a copy of the injunction order for your review.

> It has come to our attention that Clay Paky sells a number of products in the United States that may infringe one or more claims of the '187 Patent. Specifi-

cally, we believe that the Stage Color line of luminaires (1200, 1000, 575, 300), Stage Zoom 1200, Stage Light 300, Golden Light 300, Golden Scan HPE, Stage Scan, Super Scan Zoom, [*4] Golden Scan 3, the MiniScan series, and Silverado may infringe claim 6 and other claims of the '187 Patent.

> This letter is to request that you cease and desist from making, using, selling, leasing, importing or offering for sale or lease in the United States the above-identified products, and any other products that infringe the '187 Patent. If you do not wish to discontinue such activities, please contact the undersigned to discuss the potential for licensing arrangement with Vari-Lite.

> If you believe that your products do not infringe the '187 Patent, I would appreciate hearing from you the reasons why you believe your products do not infringe no later than August 16, 1999.

> Thank you for your attention to this important matter, and I look forward to receiving your response.

(McCormack Aff. in 99 Civ. 11402, Ex. B.)

> n2 The records in these actions are confused. The August 5, 1999, letter to Clay Paky is not in the Clay Paky record, but can be found in the Coemar record. (See McCormack Aff. in 99 Civ. 11402, Ex. B.) Not surprisingly, the August 5, 1999, letter to Coemar can be found as Exhibit B to defendant's affidavit in the Clay Paky action. (See McCormack Aff. in 99 Civ. 11401, Ex. B.)

[*5]

Also on August 5, 1999, defendant sent a nearly identical letter to Coemar. n3 Coemar contacted Vari-Lite's attorneys and requested a face-to-face meeting with Vari-Lite to discuss a license under the '187 patent.

> n3 The letters to Clay Paky and Coemar are identical, except for the second sentence in the third paragraph that identifies which specific products "may infringe" the '187 patent.

On August 26, 1999, Bruno Dedoro, president of Coemar, faxed Vari-Lite's counsel a letter requesting a face-to-face meeting with Vari-Lite on August 30, 1999, when Dedoro planned to be in North America on other business. Dedoro wrote, "The purpose of this meeting would be to understand directly from Vari-Lite on which basis [sic] the mentioned licensing arrangements could be reached without wasting money in disputes . . . . Obviously my approach has not to be interpreted [sic] in any way as an acknowledgement [sic] of any kind of liability in respect of your client's claim." (McCormack Aff. in 99 Civ. 11402, [*6] Ex. C.) Later that day, Vari-Lite's counsel responded by fax suggesting that Dedoro meet with Vari-Lite's President and CEO Harry R. Brutsche, III, in New York on August 30, 1999, when Brutsche and his lawyer would be in New York on other business.

On August 30, 1999, Vari-Lite CEO Brutsche met with Dedoro in New York and discussed a licensing arrangement. Brutsche and Dedoro agreed to continue negotiations on September 6, 1999, at a trade show in London both would be attending. The day after this initial meeting, Vari-Lite's counsel faxed Dedoro a proposal for a license. This August 31, 2000, letter makes no mention of litigation. n4

n4 Though there is no explicit mention of litigation, the letter, curiously, is captioned: "Re: *Vari-Lite, Inc. v. Martin Gruppen A/S, et al.*" (McCormack Aff. in 99 Civ. 11402, Ex. E.) The "Martin Gruppen" referenced in this letter is presumably the "Martin" mentioned in Vari-Lite's opening salvo to Coemar and Clay Paky and against whom Vari-Lite won an injunction.

On September 6, 1999, Brutsche [*7] and Dedoro met in London, and were joined by Pasquale Quadri and Enrico Caironi of Clay Paky. Through their representatives, Coemar and Clay Paky negotiated jointly at the meeting. Coemar and Clay Paky noted that each had historically enjoyed a good relationship with Vari-Lite and that they wanted to reach a resolution. Both Coemar and Clay Paky said that their presence in the U.S. market was not big enough to warrant litigation, which they wished to avoid. Both companies offered to make their financial records available to Vari-Lite in order to determine a reasonable royalty rate. Brutsche expressed his interest in entering into a licensing agreement with both Coemar and Clay Paky, and the three companies negotiated the amount of the licenses. Brutsche made no threats of litigation and no references to future litigation. Each company agreed to consider the offers on the table and to

continue negotiations after Coemar and Clay Paky provided financial information.

On September 22, 1999, Coemar and Clay Paky sent a written joint proposal to Vari-Lite. Their joint proposal contained information regarding Coemar and Clay Paky's sales volumes and earnings. The joint proposal was a counteroffer [*8] to an earlier offer by Vari-Lite. Brutsche considered this joint proposal a starting point for negotiation in earnest as it provided him with his first glimpse at their financial data.

Brutsche responded to the joint proposal by letter to both Coemar and Clay Paky on October 7, 1999. In the letter, Brutsche thanked Coemar and Clay Paky for their counteroffer, but termed it "inadequate to compensate Vari-Lite for sales of infringing products in the United States by Coemar and Clay Paky." Brutsche concluded by reducing Vari-Lite's initial demand by ten percent. Brutsche made no threat or mention of litigation.

In response to Vari-Lite's counteroffer, Enrico Caironi, Commercial Director of Clay Paky, called Brutsche on October 26, 1999. Caironi said that he hoped Vari-Lite was not offended by Coemar and Clay Paky's low offer and that Clay Paky was still hoping to work something out with Vari-Lite.

Later that same day, Dedoro, from Coemar, called Brutsche and expressed his continuing interest in entering into a licensing agreement with Vari-Lite. He said that he would soon be prepared to present another counteroffer for an increased royalty or licensing fee. Brutsche and Dedoro agreed [*9] to continue negotiations on November 19, 1999, when both would be in Orlando, Florida for a trade show.

On November 17, 1999, Clay Paky and Coemar separately filed the complaints in these actions. Nonetheless, Brutsche and Dedoro met in Orlando on November 20, 1999. Dedoro proposed yet another increased counteroffer. Brutsche, who was under the impression that Dedoro was speaking on behalf of both Coemar and Clay Paky, told Dedoro that he would take this latest offer under advisement. There have been no negotiations since. On February 24, 2000, Vari-Lite filed the pending motions.

I. Subject Matter Jurisdiction

Defendant's principal motion is that subject matter jurisdiction does not exist under the Declaratory Judgment Act, *28 U.S.C. § 2201*. The purpose of the Declaratory Judgement Act is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit. See *Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 889 (Fed. Cir. 1992)*. [HN1] Section 2201(a) states:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights [*10] . . . of any interested party seeking such declaration . . . . Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

*28 U.S.C. § 2201*(a). [HN2] An actual controversy is a jurisdictional prerequisite and must be present before a declaratory judgment action is ripe for adjudication. See *Shell Oil, 970 F.2d at 887*. [HN3] The standard for determining whether an actual controversy is present in a declaratory judgment action concerning a patent has two elements:

First, the defendant's conduct must have "created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question." Second, "plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity."

*BP Chemicals Ltd. v. Union Carbide Corp., 757 F. Supp. 303, 304 (S.D.N.Y. 1991)* (citations omitted). [HN4] In order to demonstrate the presence of an actual controversy, "the plaintiff has the burden of establishing by a preponderance [*11] of the evidence, inter alia, that it has a reasonable apprehension that it will be sued." *Shell Oil, 970 F.2d at 887*.

[HN5] The test used to determine whether a plaintiff's apprehension of a lawsuit is reasonable is an objective one which focuses on whether the defendant's "conduct rose to a level sufficient to indicate an intent to enforce its patent." *Id. at 888*. An explicit charge of infringement would give rise to the reasonable apprehension necessary to demonstrate the presence of an actual controversy, however, an express charge of infringement is not essential. See *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed. Cir. 1988)*. Under the standard articulated by the Federal Circuit in Shell Oil and *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051 (Fed. Cir. 1995)*, Vari-Lite's statements that '*187 patent* "covers" products sold by the plaintiffs and that those products therefore "may infringe" the patent, in the context of a letter that is at least in part an invitation to negotiate a license -- that is, to find a commercial resolution -- may be sufficiently well-crafted [*12] to avoid being an express charge of infringement. See *Shell Oil, 970 F.2d at 889; Phillips Plastics 57 F.3d at 1053-54*.

Assuming, without deciding, that the statements in Vari-Lite's August 5, 1999, letter do not constitute an explicit charge of infringement, [HN6] I must consider the totality of the circumstances and determine whether the plaintiff has shown that objective circumstances support his apprehension of an impending lawsuit. See *Shell Oil, 970 F.2d at 888; Phillips Plastics, 57 F.3d at 1053-54*.

[HN7] In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary matters outside the pleadings. *Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985)*. In these cases, an examination of the pleadings, the affidavits, and the correspondence between Vari-Lite, Clay Paky and Coemar, submitted as exhibits by the defendant, shows that the plaintiff's apprehension of a lawsuit was objectively reasonable.

Defendants contend that the parties were seeking a business solution and toward that end were involved in negotiations which were either [*13] (1) never terminated by any party, even after these suits were filed, or (2) unilaterally terminated by plaintiffs by filing these suits. The fact that Clay Paky or Coemar may have unilaterally terminated negotiations does not negate their reasonable apprehension of a lawsuit, however, especially when viewed in light of defendant's first letter which clearly threatened litigation. Defendant argues that merely informing Clay Paky and Coemar that Vari-Lite enforces its patent rights does not in and of itself create a reasonable apprehension of litigation. This argument may be true as far as it goes, but Vari-Lite's August 5, 1999, letters went much further than merely alerting Clay Paky and Coemar of Vari-Lite's patent. The letters warned that "Vari-Lite has aggressively enforced" its rights under the '*187 patent* and named a third party, Martin, that Vari-Lite had successfully enjoined. Vari-Lite even enclosed copies of the injunction order against Martin. "This is in effect a statement to the plaintiff to take notice that it is next on the list." *United Aircraft Corp. v. Giannini Controls Corp., 1967 U.S. Dist. LEXIS 8901, 156 U.S.P.Q. 557, 558 (S.D.N.Y. 1967)*. Vari-Lite [*14] as much as wrote, "If you don't think we mean business and are serious about this matter, look and see what we have done to another alleged infringer." See *id*.

Defendant contends that the August 5, 1999, letters were merely an invitation to Clay Paky and Coemar to engage in licensing negotiations, and thus were the type of communication that the Federal Circuit has previously

held did not create a justiciable controversy. See *Phillips Plastics, 57 F.3d at 1053*. Defendant's reliance on the Phillips Plastic decision, however, is misplaced. In Phillips Plastics, the patentee had not stated nor suggested that it would pursue legal recourse if it were not satisfied with the outcome of the proposed licensing negotiations. Id. The Federal Circuit Court of Appeals held that such circumstances were not sufficiently adverse to create a justiciable controversy. Id. The holding in Phillips Plastics, however, is inapplicable in a case such as the ones presented here, where defendant has obliquely accused Clay Paky and Coemar of infringing its patent, made specific demands on Clay Paky and Coemar, and issued thinly veiled threats of resorting to litigation [*15] if its demands are not met. Just because the parties proceeded to initiate negotiations does not mean that the reasonable apprehension of litigation was ever removed. Vari-Lite, having made its threat of litigation, cannot now claim that Clay Paky and Coemar were unreasonable in their apprehension of impending litigation. n5

> n5 This is not a case, like *Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852*, where the defendant, having once made a threat, later alleviated any reasonable apprehension of litigation by entering into a covenant not to sue.

Plaintiffs have shown objective circumstances which support their reasonable apprehension of a lawsuit, thereby satisfying the first requirement of demonstrating that an actual controversy existed at the time this declaratory judgment action was commenced. As to the second element, there is no dispute among the parties that plaintiffs have engaged in selling activity subject to a charge of infringement. Therefore, subject matter jurisdiction exists over this dispute under [*16] the Declaratory Judgment Act, and Vari-Lite's motions to dismiss pursuant to *Fed. R. Civ. P. 12(b)(1)* are DENIED.

Plaintiffs' pleadings include allegations of a present and actual controversy with respect to the validity, infringement, and enforceability of the '187 patent. Such allegations state a cause of action for which the requested relief, a declaratory judgment, could be granted. Accordingly, defendant's motions to dismiss pursuant to *Fed. R. Civ. P. 12(b)(6)* are DENIED. The court must next consider defendant's alternative request that the complaint be dismissed on the ground of lack of personal jurisdiction, pursuant to *Federal Rule of Civil Procedure 12(b)(2)*.

II. Personal Jurisdiction

[HN8] Although under the Federal Circuit's "courtesy rule," district courts sitting in patent actions are generally guided by the law of the regional "circuit to which

district court appeals normally lie, unless the issue pertains to or is unique to patent law," *Molins PLC v. Quigg, 837 F.2d 1064, 1066, 5 U.S.P.Q.2D (BNA) 1526, 1527 (Fed. Cir. 1988)* (citation omitted). Federal Circuit law governs both substantive and procedural issues "intimately involved in the substance of enforcement" [*17] of the patent rights. See *Viam Corp. v. Iowa Export-Import Trading Co., 84 F.3d 424, 428 (Fed. Cir. 1996)* (applying Federal Circuit law in holding that the district court had personal jurisdiction over out-of-state patentee defending an action seeking declaratory judgment of invalidity and noninfringement); see also *Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995)* (Federal Circuit law governs personal jurisdiction issue when the out-of-state party is the patentee defending a declaratory judgment action, rather than the alleged infringer); *Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564-65 (Fed. Cir. 1994)* (applying Federal Circuit law in determining whether district court had personal jurisdiction over an out-of-state corporation accused of patent infringement). Therefore, the Court looks to Federal Circuit precedents in analyzing the personal jurisdictional issues.

[HN9] In order to defeat a motion to dismiss for lack of personal jurisdiction, Clay Paky and Coemar, as the non-moving parties, need initially make only a prima facie showing of jurisdiction. See *United States v. Ziegler Bolt and Parts Co., 111 F.3d 878, 880 (Fed. Cir. 1997)*. [*18] The Court's analysis of the adequacy of a non-moving party's prima facie showing of personal jurisdiction requires that the Court first examine whether the exercise of jurisdiction is proper under the forum state's law, and then address whether the exercise of personal jurisdiction comports with due process. See *Graphic Controls Corp. v. Utah Medical Products, Inc., 149 F.3d 1382, 1385 (Fed. Cir. 1998)*.

[HN10] New York's CPLR 301 provides general jurisdiction over a non-domiciliary defendant where that defendant is "engaged in such a continuous and systematic course of doing business here as to warrant a finding of [its] presence in this jurisdiction." *Beacon Enter., Inc. v. Menzies, 715 F.2d 757, 762 (2d Cir. 1983)* (quoting *Simonson v. Int'l Bank, 14 N.Y.2d 281, 200 N.E.2d 427, 251 N.Y.S.2d 433 (N.Y. 1964))*. "The non-domiciliary must be doing business in New York not occasionally or casually, but with a fair measure of permanence and continuity." Id. (internal quotations omitted). It is undisputed that Vari-Lite has an office in New York, employing thirteen people and accounting for approximately twelve percent of Vari-Lite's [*19] revenues in the most recent fiscal year, as well as a New York bank account. Vari-Lite is "doing business" in New York and is therefore subject to this Court's exercise of personal jurisdiction.

See *Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985)*.

[HN11] Jurisdiction under CPLR 301 must also satisfy the constitutional requirement of due process. The exercise of jurisdiction must be based on defendant's "minimum contacts" with the state and must comport with "traditional notions of fair play and substantial justice." *International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945)*. By maintaining an office in New York, Vari-Lite "purposefully availed itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958)*. Given Vari-Lite's presence and continuous business in New York, Vari-Lite cannot complain that it could not have "reasonably anticipated being haled before a court" in New York. *World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980)*. [*20] Therefore, this Court's exercise of personal jurisdiction over Vari-Lite comports with due process. Accordingly, defendant's motions to dismiss, pursuant to Rule 12(b)(2) for lack of personal jurisdiction are DENIED.

III. Change of Venue

In short, all aspects of defendant's motions to dismiss are denied. Defendant also moves pursuant to *28 U.S.C. § 1404(a)* to transfer venue from the Southern District of New York to the Northern District of Texas. [HN12] District courts may transfer an action to another district in which the action could have been brought when doing so would serve the convenience of the parties and the witnesses and would be in the interest of justice. See *28 U.S.C. § 1404(a)*. "[HN13] Whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court." *Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d 513, 520 (2d Cir. 1989)*. [HN14] The burden of demonstrating the desirability of transfer lies with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum unless the [*21] defendant makes "make a clear and convincing showing that the balance of convenience favors" the defendant's choice. *Orb Factory Ltd. v. Design Science Toys Ltd., 6 F. Supp. 2d 203, 210 (S.D.N.Y. 1998)* (internal quotation omitted).

[HN15] In determining whether a transfer is warranted, a district court considers a number of factors, including: (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses;

(6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interest of justice based on the totality of the circumstances. See, e.g., *Pilates, Inc. v. Pilates Institute, Inc., 891 F. Supp. 175, 183 (S.D.N.Y. 1995); Stein v. Microelectronic Packaging, Inc., 1999 U.S. Dist. LEXIS 11375, No. 98 Civ. 8952, 1999 WL 540443 (S.D.N.Y. 1999)* (MBM).

[HN16] The "core determination" under § 1404(a) is "the center of gravity of the litigation, a key test [*22] of which is the convenience of witnesses . . . . Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district." *Viacom Int'l, Inc. v. Melvin Simon Prods., Inc., 774 F. Supp. 858, 868 (S.D.N.Y. 1991); see also Hernandez v. Graebel Van Lines, 761 F. Supp. 983, 988 (E.D.N.Y. 1991)* ("[HN17] The convenience of both the party and non-party witnesses is probably considered the single-most important factor in the analysis of whether a transfer should be granted.") (citing cases); *Arrow Elec., Inc. v. Ducommun Inc., 724 F. Supp. 264, 265 (S.D.N.Y. 1989)* ("In most cases, the convenience of the party and non-party witnesses is the most important factor in the decision whether to grant a motion for transfer.").

In the present case, these factors heavily favor transferring the case to Texas. It is undisputed that with the exception of plaintiffs, who reside in Italy, every witness -- both party and non-party -- resides or works in Dallas, Texas, and most, if not all, of the documentary evidence is in Texas. (See McCormack Aff. in 99 Civ. 11401, Ex. A; McCormack Aff. in 99 Civ. 11402, [*23] Ex. A.) In short, the "center of gravity" of this litigation is plainly in Texas, and the "local interest in having localized controversies decided at home" favors litigation there. *Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947)*.

To be sure, [HN18] a plaintiffs' choice of forum is generally entitled to "substantial consideration." *In re Warrick, 70 F.3d 736, 741 (2d Cir. 1995)*. However, a plaintiff's choice "is accorded less weight to the degree that the case's operative facts have little or no connection with the transferor forum." *Totonelly v. Cardiology Assocs. of Corpus Christi, Inc., 932 F. Supp. 621, 623 (S.D.N.Y. 1996)*. Here, the operative facts have no connection with New York whatsoever. Therefore, plaintiffs' choice of forum is entitled to less deference than it would usually receive, and transfer is warranted. Accordingly, defendant's transfer motions herein are GRANTED and it is hereby ORDERED that these actions be transferred to the Northern District of Texas for all further proceedings.

CONCLUSION

For the foregoing reasons, defendant's motions to dismiss are DENIED. Defendant's motions [*24] to transfer to the Northern District of Texas are GRANTED. The Clerk is directed to transfer these cases to the United States District Court for the Northern District of Texas.

SO ORDERED:

Barbara S. Jones

UNITED STATES DISTRICT JUDGE

New York, New York
July 12, 2000

Westlaw.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 562289 (D.Del.)
(Cite as: Not Reported in F.Supp.)

H
Briefs and Other Related Documents
Dow Chemical Co. v. Exxon Chemical Patents,
Inc.D.Del.,1995.Only the Westlaw citation is
currently available.
United States District Court, D. Delaware
DOW CHEMICAL COMPANY, Plaintiff,
v.
EXXON CHEMICAL PATENTS, INC. and Exxon
Corporation, Defendants.
**Civ. A. No. 94-572-SLR.**

Aug. 16, 1995.

Donald F. Parsons, of Morris, Nichols, Arsht &
Tunnell, Wilmington, Delaware, for plaintiff. Of
counsel: Harry J. Roper, Raymond N. Nimrod,
Aaron A. Barlow, of Roper & Quigg, Chicago,
Illinois; and L. Wayne White, of Dow Chemical
Company, Freeport, Texas.
William J. Wade, of Richards, Layton & Finger,
Wilmington, Delaware, for defendants. Of
Counsel: David W. Plant, Glenn A. Ousterhout,
Duane-David Hough, Eric R. Hubbard, of Fish &
Neave, New York, New York.

MEMORANDUM OPINION
SUE L. ROBINSON, District Judge.

I. INTRODUCTION

*1 In this declaratory judgment action brought by
the Dow Chemical Company ("Dow"), plaintiff
seeks a declaration that the manufacture, sale, or
use of wire and cable devices which utilize Dow
ENGAGE polymers do not infringe United States
Patent No. 5,246,783 (the " '783 patent") held by
defendants, and that this patent is invalid. Plaintiff
also seeks a declaration that Exxon Corporation ("
Exxon Corp.") unfairly interfered with Dow's
contractual relations, as well as injunctive and
monetary relief.[FN1] (D.I. 62, Ex. 1). Before the
court is defendants' motion to dismiss for want of

subject matter jurisdiction. (D.I.66) For the reasons
that follow, the court shall deny defendants' motion.

II. BACKGROUND

Both parties in this litigation manufacture certain
polymers for use in, *inter alia,* wire and cable
devices. (D.I. 32 at 5) Two of defendants' polymers
are sold under the trade names VISTALON and
EXACT. Plaintiff's relevant product has the trade
name ENGAGE.

On September 21, 1993, the '783 patent was issued
to Exxon Chemical Patents, Inc.. (D.I. 9, Ex. 1)
The patent is entitled "Electrical Devices
Comprising Polymeric Insulating or
Semiconducting Members" and relates to wire and
cable devices covered with a polymer consisting of
particular characteristics. (*Id.;* D.I. 61 at 7) Also in
September of 1993, Dow introduced its first line of "
ITP [FN2]" polymer products under the trademark
name of AFFINITY. By February of 1994, Dow
had introduced a second line of ITP products, the
ENGAGE products, with two polymers (ENGAGE
CL 8001 and ENGAGE CL 8002) specifically for
cable wire use. (D.I. 26 at ¶¶ 9-7) By June, Dow
also developed a third ENGAGE product,
ENGAGE CL 8003, which is also designed for wire
and cable use.[FN3] (*Id.*)

The conduct of Exxon following the introduction of
its patent falls into two main categories. The first
category concerns Exxon's conduct toward plaintiff
and some significant communications between the
two. On December 15, 1993, Edward T. Duffy ("
Duffy"), Manager of Planning Polymers
Technology for Exxon Chemical, sent to Edwin
Gambrell ("Gambrell"), Vice President of Dow's
Business Platform for Insight Technology (which
includes ENGAGE), a November 10, 1993 press
release concerning the '783 patent. In the
accompanying letter, Exxon Chemical informed
Dow of the patent and stated:

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 562289 (D.Del.)
(Cite as: Not Reported in F.Supp.)

To the best of my knowledge neither Dow nor its affiliates make, use or sell a product in the U.S. which falls within the scope of U.S. patent 5246783 . Accordingly, our patent might not apply directly to Dow's operations, but Dow is in a better position to make that assessment than I. In contrast, Dow's sale of ethylene polymers, based on metallocene technology, to the wire and cable industry, as described in your December 14 press release, could present patent related issues.

Under the circumstances Dow may have an interest in examining Exxon Chemical's patent (US 5246783). I believe that examination will lead Dow to conclude it would be appropriate to advise certain customers of the existence of Exxon Chemical's patent so those customers can test whether their wire and cable devices made with certain Dow polymers raise possible patent related issues.

*2 (D.I. 9, Ex. 2) (emphasis added).

Defendants had additional direct in-person communications with plaintiff. The relevant meetings occurred in the context of negotiations between the parties concerning a joint venture identified as project Xavier. While the parameters of the project remain unclear to the court, what is certain is that the joint venture negotiations coincided with, and were not entirely unrelated to, an ongoing interference proceeding conducted between the two parties with the United States Patent and Trademark Office (the "PTO"). (D.I. 52 at ¶ 7) The relevant meetings were the last of eleven such meetings occurring between February and August of 1994.

With respect to Exxon's conduct at two of these meetings, Gambrell alleges that on August 16, 1994, Doug Selman ("Selman") and Greg McPike (" McPike") of Exxon, stated that the '783 patent " gave Exxon the ability to stop Dow from participating in the wire and cable market...." (D.I. 25 at ¶ 3) Selman and McPike deny this allegation, arguing that because the purpose of their meeting was to encourage a joint venture, the tone of their meetings was congenial. Therefore, they argue that they would have said nothing hostile to a Dow representative. (D.I. 42 at ¶ 8; 39 at ¶¶ 16-26)

Gambrell also alleges that these actions were essentially repeated at a second meeting which took place August 29, 1994. Specifically, he alleges that McPike stated that "Exxon had been using the ' 783 patent aggressively in the marketplace so that wire and cable customers would be concerned about buying Dow's ENGAGE materials...." (D.I. 25 at ¶ 4) McPike denies making such statements, averring that it would have been counterproductive to do so. FN4

As to what actually occurred at these meetings, the dispute becomes simply a contest of fact between affiants. Given the contextual background noted *supra,* i.e., during August 1994 defendants were preparing a lengthy motion alleging inequitable conduct on the part of plaintiff before the PTO, and plaintiff had already considered this litigation (D.I. 58 at 9; 61 at 17), the court finds Gambrell's version of the tone of the meetings more compelling. FN5 On January 5, 1995, two months after plaintiff filed its original complaint, but five months before the stipulated amended filing date, G.S. Rizzo, Exxon Senior Vice President, wrote A.J. Carbone of Dow reemphasizing defendants' offer to license its product at $.075 per pound. (D.I. 67, Ex. 1)

The second area of activity which is relevant to the question of jurisdiction concerns defendants' conduct towards their and Dow's customers. In February of 1994, Exxon Chemical issued a letter to all potential customers announcing the patent and inviting them to license with Exxon Chemical. In describing Exxon Chemical's patent, Harland R. DeWitt ("DeWitt"), Director of Electricals and Specialty Polymer Group, stated the following:

The ethylene copolymers used to manufacture [wire and cable] devices specifically include polymers made with single site or metallocene catalysts, such as our EXACT plastomer resins. The existence of long chain branching in such polymers would not of itself preclude devices made with these polymers from being covered by Exxon's patent.

*3 We invite you to review [the accompanying press release's] content and to consider whether

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 3

Not Reported in F.Supp., 1995 WL 562289 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

your company's products (commercial and under development) are covered by its claims. If so, one easy way to license is to purchase EXACT plastomers from Exxon Chemical.... Licensing is also available for those who wish to manufacture covered devices not using Exxon polymers.

(D.I. 9, Ex. 4) (emphasis added). The letter continued to provide information as to the appropriate person to contact for information about both the EXACT product and licensing arrangements for products covered by the patent. No company has yet to accept defendants' offer to license at $.075 per pound. (D.I. 69 at 15)

Plaintiff argues that these letters were nothing more than veiled threats of litigation. This argument is supported by defendants' concession that the February 1994 letter's reference to "long chain polymers" was a direct reference to plaintiff's products. While defendants further argue that they included said reference to address a misconception in the marketplace created by Dow representatives for the benefit of the parties' customers, such does not alter the fact or the effect of the statement itself. (D.I. 33 at B44)

Activity occurring between defendants and customers also includes face-to-face meetings. Specifically, plaintiff urges, as a basis for jurisdiction, certain statements allegedly made by Peter C. Attwood ("Attwood"), Senior Account Executive for Exxon Chemical's Electricals and Specialty Polymers Group, to various Dow and Exxon customers. As a preliminary matter, the court notes that Exxon held out Attwood as an authoritative Exxon representative on the patent. Attwood had previously signed a December 13, 1993 letter sent to various customers announcing the patent and concluding with the following statement: "[I]f you have any questions about this patent or EXACT resins, please do not hesitate to call me...." [FN6] (D.I. 33 at B211)

Thomas A. Carr ("Carr"), Senior Product Manager for Dow, alleges that Attwood threatened American Insulated Wire ("AIW") by telling AIW's representatives that they could not use the ENGAGE polymer without violating the patent.

Carr also claims that Attwood made similar statements to representatives of Triangle Wire and Cable ("TWC").[FN7] (D.I. 26 at ¶¶ 15(a), 15(b), 16)

Carr's allegations are uniformly hearsay. Attwood denies engaging in any such behavior and insists that he followed Exxon's policy with respect to the '783 patent, by explaining to the customer that its attorney should review the patent claims and determine if its product is covered by the patent and, if so, should contact its polymer supplier to receive information about the polymer being supplied. (D.I. 41 at ¶ 4) With respect to AIW, Attwood acknowledges that he was asked directly by AIW employees over lunch whether the Dow ENGAGE polymers were covered by the patent. They also asked him what Exxon would do if a customer used a polymer covered by the patent but did not pay a license. Attwood avers that he explained the licensing policy, telling the AIW employees that it was unlikely that Exxon would sue a customer, but that it might consider defending its patent. (Id. at ¶ 10(e)) Attwood also disputes Carr's allegations with respect to TWC. (Id. at ¶ 12) Attwood's claim that his comments were consistent with company policy is supported by contemporaneous records which indicate that a copy of the patent was mailed to the customer, and that TWC was awaiting Dow's response to its inquiry about the '783 patent. (Id., Ex. 8, 9) Attwood acknowledges that TWC called a meeting in June of 1994 to discuss the patent and, in said meeting, Exxon's attorney explained that Dow's patent concerning its own technology had no effect on whether a resulting product was covered by the Exxon's '783 patent. (Id. at ¶ 12(e))

*4 Were these the only allegations against Attwood and Exxon, the court would be compelled to favor the non-hearsay evidence over that of Mr. Carr. However, for two customers, General Cable Corporation ("General Cable") and BICC Corporation ("BICC"), plaintiff offers the testimony of said companies' representatives.[FN8] This evidence supports the version of Attwood's behavior as described by Carr. Thomas Falcofsky ("Falcofsky"), Corporate Vice President of Purchasing for General Cable, avers that after

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                                          Page 4

Not Reported in F.Supp., 1995 WL 562289 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

receipt of the February letter from Exxon, he believed that a potential conflict may have existed between Dow's product and the '783 patent. This belief was confirmed after meeting with Attwood.
He felt that Attwood was "looking really to intimidate our relationship with Dow over this material." (D.I. 33 at B169-170, 200) He further " vaguely recalls the conversation" in which he inquired from Attwood about licensing information "with respect to the wire and cable patent" and " with respect to technology relating to the manufacture of polymers." [FN9] (Id. at B171-172) He further avers that his request was not well received and that Attwood stated that he would get back to him with information. Falcofsky cannot recall whether anyone ever contacted him with licensing information nor does he recall anyone ever informing him of the possibility of obtaining a license under the patent in order to use Dow's products. (Id. at B173-175) After his discussions with Attwood, Falcofsky believed that licensing under the patent was not readily available to General Cable if it were to use Dow's products.

Attwood's version of the facts differs greatly from Falcofsky's. Attwood denies ever making any of the alleged threats. Moreover, he states that Falcofsky inquired from him only about licenses to manufacture Exxon's EXACT polymers. Attwood states that he was surprised by this request since manufacturing polymers was not General Cable's business. Attwood's version of events is supported by a contemporaneous record in which he notes " Tom requested the name of a contact for EXACT licensing. Considering the nature of General Cable's business this request was unusual, but Tom would not elaborate on the reasons for his interest." (D.I. 41, Ex. 4) On May 30, 1994 Attwood sent a letter to Falcofsky identifying Mike Jeffries as the appropriate contact person for such an inquiry. (Id., Ex. 6)

In surreply to defendants' representations, plaintiff also offers the testimony of Cardiff of BICC. He avers that prior to October 24, 1994, he believed that defendants would take legal action against Dow's customers if they used Dow's ENGAGE polymers to make wire and cable products.[FN10] (D.I. 54 at B345) Cardiff based this belief in part on

the February 1994 letter. (Id.) An April 1994 meeting also occurred between defendants and BICC for which the minutes of said meeting were kept. Evidence exists of record to find that defendants stated that the use of "alternative material," including Dow's material, would infringe the relevant patent. (Id. at 354, Cardiff at 86; D.I. 33 at B234)

**\*5** Plaintiff claims that, based on its knowledge of the above acts, it grew apprehensive of a lawsuit against it by Exxon. (D.I. 62 at ¶ 23) On October 25, 1994 plaintiff commenced this action seeking declaratory judgment concerning the '783 patent and a claim of unfair business practice against defendants. The court held oral argument on March 2, 1995. As stipulated by the parties, plaintiff then filed an amended complaint seeking the same relief on May 5, 1995. (D.I. 62; 65)

### III. DISCUSSION

Jurisdiction by this court over plaintiff's patent claim can only arise from the Declaratory Judgment Act (the "Act"). 28 U.S.C. §§ 2201 and 2202. " The existence of an actual controversy is an absolute predicate for declaratory judgment jurisdiction. When there is no actual controversy the court has no jurisdiction to decide the case. When there is an actual controversy and thus jurisdiction, the exercise of that jurisdiction is discretionary." *Spectronics Corp. v. H.B. Fuller Co.,* 940 F.2d 631, 633-634 (Fed.Cir.), *cert. denied,* 502 U.S. 1013 (1991) (citations omitted). No absolute right to a declaratory judgment exists. *Serco Servs. Co. L.P. v. Kelley Co., Inc.,* 34 U.S.P.Q.2d 1217 (Fed.Cir.1995); *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 733 n. 6 (Fed.Cir.1988). When a defendant files a motion to challenge the court's jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1), the plaintiff has the burden of proof and must establish an actual case or controversy on the totality of the circumstances. *Spectronics,* 940 F.2d at 634 (citing *Maryland Casualty Co. v. Pacific Coal & Oil Co.,* 312 U.S. 270, 272 (1941)). When a factual dispute exists, it is plaintiff's burden to establish jurisdiction by the preponderance of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 562289 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

Page 5

evidence. *West Interactive Corp. v. First Data Resources, Inc.*, 972 F.2d 1295, 1297 (Fed.Cir.1992).

"The presence or absence of jurisdiction must be determined on the facts existing at the time the complaint under consideration was filed." *Arrowhead*, 846 F.2d at 734 fn. 2; *see also West Interactive*, 972 F.2d at 1296. Therefore, the party seeking a declaratory judgment, in this case Dow, must plead facts initially sufficient to establish the existence of an actual controversy on May 5, 1995. *Arrowhead*, 846 F.2d at 736.

The purpose of the Act is to enable a party who is reasonably at risk because of an unresolved dispute to obtain a judicial resolution of that dispute without having to await commencement of legal action by the other side. *B.P. Chemicals, Ltd. v. Union Carbide Corp.*, 4 F.3d 975, 977 (Fed.Cir.1992). Thus, the Act seeks to balance the interest of a plaintiff to resolve an imminent legal matter and that of a defendant who has no intention of seeking a lawsuit.

The Federal Circuit has set forth the following two-prong standard for determining whether "a case of actual controversy" exists in actions seeking a declaratory judgment of patent non-infringement or invalidity:
*6 First, the accused infringer must have actually produced or prepared to produce an allegedly infringing product. *Jervis B. Webb Co. v. Southern Sys., Inc.*, 742 F.2d 1388, 1398-99, 222 USPQ (BNA) 943, 949 (Fed.Cir.1984). The first prong " looks to the accused infringer's conduct and ensures that the controversy is sufficiently real and substantial." *Lang v. Pacific Marine and Supply Co.*, 895 F.2d 761, 764, 13 USPQ2d (BNA) 1820, 1822 (Fed.Cir.1990).... Second, the patent holder's conduct must create an objectively reasonable apprehension on the part of the accused infringer that the patent holder will initiate suit if the allegedly infringing activity continues.

*Spectronics*, 940 F.2d at 634 (citations omitted). Thus, the first prong of the test reviews plaintiff's conduct and the second that of defendant. *Arrowhead*, 846 F.2d at 736; *B.P. Chemicals*, 4

F.3d at 978. These actions are reviewed objectively. *Mobil Oil Corp. v. Advanced Envtl. Recycling Technologies, Inc.*, 26 U.S.P.Q.2d 1238, 1239 (D.Del.1992).

### A. Count One

#### 1. Preparation

Dow has the burden to establish that its customers have produced or are prepared to produce an infringing product. The Federal Circuit Court of Appeals has noted that this prong of the test requires plaintiff or its customers to "be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity." *Arrowhead*, 846 F.2d at 736. More recently the Federal Circuit has stated this test is met by establishing "present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *In re Laitran Machinery, Inc.*, 1995 U.S.App. LEXIS 6558, at *8 (Fed.Cir. March 21, 1995) (emphasis added).

As noted, the actual controversy must exist at the filing of the complaint. Subsequent to plaintiff's original complaint, it filed a supplemental complaint. Therefore the relevant date by which plaintiff must demonstrate adequate preparation is May 5, 1995. In said complaint plaintiff alleges that General Cable [FN11] has manufactured and sold portable cords in commercial quantities made from ENGAGE CL 8001.

Specifically, James Hemphill, a Dow project leader, avers that Dow began shipping commercial quantities of ENGAGE CL 8001 to General Cable in 1995. Indeed, the record reflects that General Cable purchased over $86,000 of ENGAGE CL 8001 which is enough polymer to produce between 200,000 and 1.8 million portable cords. (D.I. 70) Hemphill also avers that he has witnessed General Cable's production of portable cords using ENGAGE CL 8001. Dow purchased 100 such cords though its wholesaler, Wholesale Electric. (D.I. 63, Ex. A, ¶¶ 5-11; Ex. B, ¶¶ 5-6) This

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                    Page 6

Not Reported in F.Supp., 1995 WL 562289 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

product, therefore, is commercially available.

Even if the court were to accept defendants'
argument that the product was not "commercially
available," defendants would not meet success. At
a minimum, the record reflects "meaningful
preparation" to production. The law does not offer
bright guidelines for determining what actions by a
possible patent infringer adequately constitute "
meaningful preparation." It is clear that a plaintiff
need not have engaged in the actual manufacture,
use, or sale of an infringing product. *Interdigital
Technology Corp. v. OKI Am.,* 845 F.Supp 276
(E.D.Pa1994). This court has previously held that
jurisdiction exists when a minimal amount of testing
remains. *BOC Healthcare, Inc. v. Nellcor, Inc.,* No.
92-715-SLR (D.Del. March 30, 1993). The court
notes, however, that in *BOC* the defendant
acknowledged that the product, if marketed,
infringed.

*7 The Federal Circuit requires that the activity of
the plaintiff and customers merely constitute "
concrete steps" with the intent to produce an
infringing product. Such has occurred prior to May
5, 1995, as evidenced by the commercial sale of
products using the ENGAGE technology by
General Cable. Therefore, the record reflects that
as of May 1995, Dow and at least General Cable
have taken concrete steps towards production with
the intent to make or sell a possibly infringing
product. *In re Laitran,* 1995 U.S.App. LEXIS
6558 at *8.

2. Reasonable Apprehension of Suit

"[A] patent holder's conduct must create an
objectively reasonable apprehension on the part of
the accused infringer that the patent holder will
initiate suit if the allegedly infringing activity
continues." *Spectronics.* 940 F.2d at 634 (*citing
Arrowhead,* 846 F.2d at 736); *B.P. Chemicals,* 4
F.3d at 978. "The 'reasonable apprehension of suit'
test requires more than the nervous state of mind of
a possible infringer; it requires that the objective
circumstances support such an apprehension."
*Phillips Plastics Corp. v. Kato Hatsujou Kabushiki
Kaisha,* 93-1530, slip op. at 5 (Fed.Cir. June 15,

1995). Whether a reasonable apprehension of suit
exists is determined by the totality of the
circumstances. *Arrowhead,* 846 F.2d at 737; *Mobil,*
26 USPQ2d at 1239. Such an analysis is done on
a case by case basis.

The record indicates that plaintiff did, at the time of
filing this action, have a reasonable apprehension
that it, directly or indirectly, would be sued by
defendants should Dow and its customers continue
producing the products at issue. While the court
agrees with defendants that the letters sent to both
plaintiff and the customers did not explicitly
threaten plaintiff or its customers, the specific
reference to Dow and its products add to the totality
of the circumstances which indicate a reasonable
apprehension of suit.

The most compelling of this evidence is the
information put forth by Gambrell of the threats
made by McPike and Selman. As discussed, the
court embraces Gambrell's description of the
relevant conversations occurring during the project
Xavier negotiations. Moreover, the representations
of Falcofsky and Cardiff, while not without flaws,
are worthy of some credence. (Cardiff, at 51-52;
D.I. 54 at B345)

Defendants contend that the January 5, 1995 letter
offering a license and plaintiff's refusal of such offer
(D.I. 67 at 3), as well as a lack of knowledge on
their part of the properties of plaintiff's product,
implicitly preclude the existence of a case or
controversy. Such a position is myopic and ignores
the context in which this litigation has developed.
With respect to the offer to license, it is simply
outweighed by other actions of defendants which
have implied a threat to sue. Moreover, the law
does not require a party to either 1) enter into a
licensing agreement for what it considers an invalid
patent or 2) to engage in a costly business while
awaiting suit by the patent holder. The Declaratory
Judgment Act protects parties from such a
Hobbesian choice, and allows them to sue for
declaratory relief.

*8 With respect to defendants' lack of knowledge as
to plaintiff's product, while the court is unwilling to
embrace plaintiff's position (which would require a

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

Not Reported in F.Supp., 1995 WL 562289 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

defendant to stipulate that it will not sue in order to eliminate a case or controversy), the court also refuses to adopt defendants' representation that insufficient information to sue is an adequate substitute for a stipulation not to sue. "Although a patentee's refusal to give assurances that it will not enforce its patent is relevant to the determination, this factor is not dispositive." *B.P. Chemicals*, 4 F.3d at 980 (citations omitted).

Therefore, while no one incident recited above may be sufficient to satisfy plaintiff's burden, reviewing the incidents under the totality of the circumstances-letters from defendants to Dow and their customers with veiled references to Dow's products, direct threats to Dow executives, and veiled threats to Dow customers by Exxon sales representatives-the court concludes that plaintiff has demonstrated a reasonable apprehension of suit.

## IV. CONCLUSION

For the reasons stated, the court shall deny defendants' motion to dismiss plaintiff's suit. The parties' remaining arguments concerning Count II are moot. An order consistent with this memorandum opinion shall issue.

FN1. The defendants shall hereinafter be collectively referred to as "Exxon."

FN2. ITP products are those which are produced using INSIGHT technology. (D.I. 26 at ¶ 3)

FN3. Exxon claims that by December of 1993 it had made the policy decision to 1) extend or offer a license to all of its customers; 2) refrain from assertions or threats of infringement by marketing and sales representatives; and 3) refer inquiries concerning patent infringement to customers' own counsel. (D.I. 61 at 8)

FN4. While the minutes of said meeting, drafted by Exxon and uncorrected by Gambrell after their receipt, do not reflect

such statements, the court notes that soon thereafter defendants filed interference proceedings in the PTO against plaintiff. (D.I. 39 at ¶¶ 26-29; 52 at ¶ 21)

FN5. Exxon's argument that the conversations which occurred are similar to the "high level negotiations" which occurred in *Shell Oil Co. v. Amoco Corp.*, 970 F.2d 885 (Fed.Cir.1992) is misplaced. The negotiations in *Shell* were licensing negotiations, naturally lending themselves to statements about the effects of failing to purchase a license. *Id.* at 888. Such comments would be less receptive in another setting.

FN6. Exxon argues that it did not authorize Attwood to threaten lawsuits. (D.I. 67 at 16) Viewed objectively, however, because the letter signed by Attwood indicates an apparent authority to address issues with respect to the patent, his statements about the patent could create a reasonable apprehension of suit.

FN7. General Cable, AIW, BICC, and Triangle have all requested indemnification from Dow. (D.I. 61 at 56, 58)

FN8. Plaintiff accuses defendants of intimidating customers into not filing promised affidavits which would support plaintiff's allegations of threats. As evidence, they selectively offer a portion of the testimony of Larry Cardiff ("Cardiff" ), Vice President of Procurement for BICC, while ignoring his explicit statement that he was not directly threatened by defendants. (Cardiff, 67-68, 100; D.I. 54 at B349, B371)

FN9. Falcofsky is "not certain, but believe[s] [he] did" ask about both topics. (*Id.* at B172) He is not sure that he asked about the polymers, but is more sure that he requested licensing information about the wire and cable products. (*Id.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                                                    Page 8

Not Reported in F.Supp., 1995 WL 562289 (D.Del.)
**(Cite as: Not Reported in F.Supp.)**

        B173-175)

        FN10. This witness no longer believes that
        simply the customer would be sued and, in
        light of this litigation, believes that Dow
        would be as well. (*Id.*)

        FN11. The court focusses on the
        production by General Cable because it is
        the most advanced in production of the
        customers at issue.

D.Del.,1995.
Dow Chemical Co. v. Exxon Chemical Patents, Inc.
Not Reported in F.Supp., 1995 WL 562289 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 1:94cv00572 (Docket) (Oct. 25, 1994)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Slip Copy                                                                Page 1

Slip Copy, 2006 WL 3355185 (D.Del.)
(Cite as: Slip Copy)

Briefs and Other Related Documents
Epic Systems Corp. v. Acacia Research
Corp.D.Del.,2006.Only the Westlaw citation is
currently available.
United States District Court,D. Delaware.
EPIC SYSTEMS CORPORATION, Plaintiff,
v.
ACACIA RESEARCH CORPORATION and,
Resource Scheduling Corporation, Defendants.
**No. CIVA 06-255 JJF.**

Nov. 16, 2006.

Nicholas J. Seay, James R. Cole, Anthony A.
Tomaselli, and Kristin Graham Noel, of Quarles &
Brady LLP, Madison, Wisconsin, Robert H.
Richards, III, Jeffrey L. Moyer, and Anne Shea Gaza
, of Richards, Layton & Finger, P.A., Wilmington,
Delaware, for Plaintiff.
Jonathan T. Suder, Edward E. Casto, Jr., and
Christie B. Lindsey, of Friedman, Suder & Cooke,
Forth Worth, Texas, Kathleen M. Jennings, and
Karen V. Sullivan, of Oberly, Jennings &
Rhodunda, P.A., Wilmington, Delaware, for
Defendants.

*MEMORANDUM OPINION*
FARNAN, J.
*1 Pending before the Court is Defendants' Motion
To Dismiss And, In The Alternative, Motion To
Transfer Venue (D.I.7).[FN1] For the reasons
discussed below, the Court will deny the Motion in
part and grant the Motion in part.

> FN1. In a letter dated July 13, 2006,
> Defendants withdrew the request for a
> transfer to the Eastern District of Texas.
> (D.I.20).

I. BACKGROUND

Plaintiff Epic Systems Corporation ("Epic") is a
Wisconsin corporation with its principal place of
business in Wisconsin. Defendants Acacia Research
Corporation ("Acacia") and Research Scheduling
Corporation ("RSC") are both Delaware
corporations with their principal places of business
in California. RSC is a wholly-owned subsidiary of
Acacia Global Acquisition, which is a
wholly-owned subsidiary of Acacia.

RSC acquired the rights to license and enforce U.S.
Patent No. 4,937,743 entitled "Method and System
For Scheduling, Monitoring And Dynamically
Managing Resources" ("the '743 patent"). This
system utilizes a computer system to manage
multiple resources in industries that rely on such
functions in their business operations.

On March 23, 2006, Acacia Vice President Edward
J. Treska sent a letter ("March 23 letter") informing
Plaintiff that Acacia believed Plaintiff's "Cadence"
product fell under the scope of the '743 patent and
would require a license. The letter also suggested
that other products might fall under the '743 Patent
as well. The letter further informed Plaintiff that
RSC was in the process of litigating infringement
actions against several companies for violation of
the '743 Patent, and that RSC and Acacia were
contemplating adding additional parties to the
action. The letter also invited the opportunity to
negotiate a licence.

On April 19, 2006, Plaintiff Epic filed the instant
action against Defendants Acacia and RSC seeking
Declaratory Judgment that the '743 Patent is invalid
and unenforceable and not infringed by Epic's
products. (D.I.1).

II. PARTIES' CONTENTIONS

By their Motion, Defendants contend the Court
should dismiss the Complaint in its entirety for lack
of subject matter jurisdiction pursuant to

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3355185 (D.Del.)
**(Cite as: Slip Copy)**

Fed.R.Civ.P. 12(b)(1) and dismiss Plaintiff's claims against Defendant Acacia for lack of subject matter jurisdiction pursuant to Fed.R.Civ.P. 12(b)(1). Specifically, Defendants contend Plaintiff's Complaint fails to establish an "actual controversy" because Plaintiff cannot show it had a reasonable apprehension of imminent suit by Defendants. Defendants further contend that Plaintiff could have no reasonable apprehension of imminent suit because Defendant Acacia has no legal interest in the '743 patent and thus, could not file a patent infringement suit against Plaintiff. In the alternative, Defendants contend the Court should decline to exercise jurisdiction in order to avoid discouraging licensing negotiations.

In response, Plaintiff contends that it had a reasonable apprehension of suit from the March 23 letter and that Defendants do not provide any evidence that Acacia does not have a legal interest in the patent at issue. Plaintiff further contends that the Court's jurisdiction should be exercised because this action presents the type of controversy the Declaratory Judgment Act was created to address.

### III. LEGAL STANDARD

*2 Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a complaint for lack of jurisdiction over the subject matter, or if the plaintiff lacks standing to bring his claim. Motions brought under Rule 12(b)(1) may present either a facial or factual challenge to the Court's subject matter jurisdiction. In reviewing a facial challenge under Rule 12(b)(1), the standards relevant to Rule 12(b)(6) apply. In this regard, the Court must accept all factual allegations in the Complaint as true, and the Court may only consider the complaint and documents referenced in or attached to the complaint. *Gould Electronics Inc. v. U.S.,* 220 F.3d 169, 176 (3d Cir.2000). In reviewing a factual challenge to the Court's subject matter jurisdiction, the Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations in the complaint. *Mortensen v. First Fed. Sav. and Loan,* 549 F.2d 884, 891 (3d Cir.1977). Instead, the Court may consider evidence outside the pleadings, including

affidavits, depositions and testimony, to resolve any factual issues bearing on jurisdiction. *Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997). Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that jurisdiction exists. *Mortensen,* 549 F.2d at 891.

### IV. DISCUSSION

*A. Whether Plaintiff Establishes An Actual Controversy For Purposes Of The Declaratory Judgment Act*

Defendants contend Plaintiff has not established an " actual controversy" because it did not have sufficient objectively reasonable apprehension of an imminent lawsuit. Specifically, Defendants contend that there was no threat of suit simply because it sent the March 23 letter intending to initiate negotiations to license the '743 patent. In response, Plaintiff contends that the March 23 letter contained threatening language which was sufficient to create reasonable apprehension of suit.

The Declaratory Judgment Act "requires an actual controversy between the parties before a federal court may exercise jurisdiction." 28 U.S.C. § 2201(a); *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 801 (Fed.Cir.2004). An actual controversy exists when there are both "(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory judgment plaintiff that it will face an infringement suit and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity." *Gen-Probe, Inc. v. Vysis, Inc.,* 359 F.3d 1376, 1380 (Fed.Cir.2004) (quoting *BP Chems. Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978 (Fed.Cir.1993)). When the patentee's conduct falls short of an explicit threat, a court must look to the "totality of the circumstances" to determine whether the patentee's conduct gives rise to reasonable apprehension under the first prong of the test. *Arrowhead Indus. Water, Inc. v. Ecolochem, Inc.,* 846 F.2d 731, 736 (Fed.Cir.1988) (quoting *Goodyear Tire & Rubber Co. v.*

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy, 2006 WL 3355185 (D.Del.)
**(Cite as: Slip Copy)**

*Releasomers, Inc.,* 824 F.2d 953, 955 (Fed.Cir.1987)).

**\*3** The parties do not dispute that Plaintiff was engaging in activity or intended to engage in activity that could constitute infringement. Thus, the Court will focus its inquiry on whether Plaintiff had reasonable apprehension of imminent suit by Defendants.

The Court concludes that it is a reasonable reading of the March 23 letter to find that the paragraph in which Defendants state "we intend to add additional parties" to litigation pending in Texas involving the '743 patent constitutes an explicit threat of litigation. Further, considering the totality of the circumstances, the Court concludes that Plaintiff Epic has demonstrated reasonable apprehension of suit sufficient to establish an "actual controversy." Here, the March 23 letter was more than an offer to open licensing negotiations or a mere assertion of Defendants' bargaining position. The March 23 letter informed Plaintiff that Defendants intended to add parties to pending lawsuits in Texas against several companies for infringement of the '743 patent. Also in the March 23 letter, Defendants proposed royalty rates for a license which "will increase over time and as our litigation progresses." Although courts have held that an offer of a license is insufficient to create reasonable apprehension, " when the patentee takes steps that create a reasonable apprehension that he will seek redress through the courts, the alleged infringer ... can take the initiative and seek declaratory relief." *EMC Corp.,* 89 F.3d at 811. The Court concludes Plaintiff could reasonably conclude from the March 23 letter that Defendants were ready and willing to bring an infringement suit directly against Plaintiff or add Plaintiff to the pending litigation in Texas. Thus, the Court concludes Plaintiff has established that an "actual controversy" exists.

### B. *Whether The Court Should Exercise Jurisdiction Under The Declaratory Judgment Act*

Having determined that the Court has subject matter jurisdiction under the Declaratory Judgment Act, the Court must determine whether it is appropriate

to exercise that jurisdiction. While the Act grants the Court jurisdiction, the Act allows district courts to decline jurisdiction. In exercising this discretion, courts must be mindful that the purpose of the Act is to allow alleged infringers relief from uncertainty and delay.

Defendants contend that the Court should decline its jurisdiction to avoid hindering future licensing negotiations. In response, Plaintiff contends that Defendants have not offered a sound reason for the Court not to exercise jurisdiction. Plaintiff also argues that the Act was intended to alleviate the type of insecurity created by Defendant Acacia's March 23 letter.

In the circumstances here, the Court concludes that exercising jurisdiction is appropriate. The Court agrees with Plaintiff that Defendants have not provided sufficient reasons to support the Court declining jurisdiction. Accordingly, the Court will deny Defendants' Motion To Dismiss to the extent it requests dismissal of Plaintiff's Complaint in its entirety (D.I.7).

### C. *Whether Acacia Should Be Dismissed From The Lawsuit.*

**\*4** Defendants contend that if jurisdiction is exercised, only RSC should be a Defendant and Acacia should be dismissed because Acacia had no standing to sue Plaintiff for patent infringement, and thus, Plaintiff could have no reasonable apprehension of a lawsuit with Acacia. In response, Plaintiff contends that Acacia should be a party to this lawsuit because Acacia has a legal interest in the '743 patent. Specifically, Plaintiff contends that statements in the March 23 letter such as "we intend to add additional parties," and "Acacia, through its subsidiaries, licenses and enforces patents," create a legal interest and infer that Acacia will bring the suit against Plaintiff or be involved in the litigation once it commenced.

The applicable federal law provides that only a patentee, assignee, or exclusive licensee has standing to bring a patent suit. *Rite-Hite Corp. v. Kelly Co.,* 56 F.3d 1538, 1551-52 (Fed.Cir.1995).

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                    Page 4

Slip Copy, 2006 WL 3355185 (D.Del.)
**(Cite as: Slip Copy)**

To the Court's knowledge, Acacia does not fall within any of these categories, and therefore, the Court concludes Acacia does not have standing to sue for infringement of the '743 patent. Accordingly, the Court will grant Defendant's Motion To Dismiss to the extent it requests dismissal of claims against Defendant Acacia (D.I.7).

### V. CONCLUSION

In sum, the Court will deny Defendants' Motion to the extent it requests dismissal of Plaintiff's Complaint in its entirety; however, the Court will grant the Motion to the extent it requests dismissal of claims against Defendant Acacia Research Corporation.

An appropriate Order will be entered.

### ORDER

At Wilmington, this *17* day of November, 2006, for the reasons set forth in the Memorandum Opinion issued this date,

IT IS HEREBY ORDERED that:

1) Defendants' Motion To Dismiss And In The Alternative Motion To Transfer Venue (D.I.7) is *DENIED in part* and *GRANTED in part.*

2) Remaining parties, within twenty (20) days of the date of this Order, shall submit a Joint Proposed Scheduling Order for the Court's consideration. If the parties are unable to reach an agreement, they shall outline their disputes in the Joint Proposed Scheduling Order.

D.Del.,2006.
Epic Systems Corp. v. Acacia Research Corp.
Slip Copy, 2006 WL 3355185 (D.Del.)

Briefs and Other Related Documents (Back to top)

• 2006 WL 1814093 (Trial Motion, Memorandum and Affidavit) Defendants' Reply Brief in Support

of Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 31, 2006) Original Image of this Document (PDF)
• 2006 WL 1814092 (Trial Motion, Memorandum and Affidavit) Plaintiff's Answering Brief in Opposition to Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 23, 2006) Original Image of this Document (PDF)
• 2006 WL 1814091 (Trial Motion, Memorandum and Affidavit) Defendants' Opening Brief in Support of Defendants' Motion to Dismiss and in the Alternative Motion to Transfer Venue (May 9, 2006) Original Image of this Document (PDF)
• 2006 WL 1205318 (Trial Pleading) Complaint (Apr. 19, 2006) Original Image of this Document (PDF)
• 1:06cv00255 (Docket) (Apr. 19, 2006)

END OF DOCUMENT

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

LEXSEE 2003 US DIST LEXIS 12611


IVOCLAR VIVADENT, INC., Plaintiff, -vs- DR. ROBERT W. HASEL and ABCO
RESEARCH, LLC., Defendants.

02-CV-0316E(F)

UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF
NEW YORK

*2003 U.S. Dist. LEXIS 12611*

June 30, 2003, Decided

**DISPOSITION:** [*1] Defendants' motion to dismiss denied in its entirety. Defendants' motion to transfer venue granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation sought a declaratory judgment pursuant to 28 U.S.C.S. § 2201(a) that certain patents owned by defendants, doctor and a limited liability company (LLC), were invalid and unenforceable. The doctor and the LLC moved to dismiss the complaint on the grounds that the court lacked personal and subject matter jurisdiction. In the alternative, the doctor and the LLC requested a transfer of the action under 28 U.S.C.S. § 1404(a).

**OVERVIEW:** The doctor was the inventor of patents for methods of restoring a tooth and the co-owner of the LLC, a Minnesota company whose function was to manage the prosecution and licensure of the patents. The corporation was a manufacturer of dental materials with its principal place of business in New York. The LLC sent two letters to the corporation indicating that several of its dental products infringed one or more of the LLC's patents. The corporation sought a declaratory judgment of non-infringement. The court found that the doctor and the LLC's activities in not only protecting its patents but soliciting licensing fees in New York, when combined with their two "cease and desist" letters, evinced the requisite systemic and continuous activity to satisfy New York's "doing business" test. The LLC's communication of implicit threats of litigation to the corporation created a situation whereby it was reasonable for the corporation to apprehend the imminent commencement of a patent

infringement action. Thus, the prerequisite under the Declaratory Judgment Act, 28 U.S.C.S. § 2201(a), that an actual controversy must have existed at the time the complaint was filed, was satisfied.

**OUTCOME:** The doctor and the LLC's motion to dismiss was denied in its entirety. The doctor and the LLC's motion to transfer venue was granted and the clerk of court was directed to transfer the case to the United States District Court for the District of Minnesota.

**CORE TERMS:** patent, patent infringement, personal jurisdiction, license, motion to dismiss, negotiation, settlement, actual controversy, manufacturer, apprehension, infringement, infringe, infringer, licensing, composite, flowable, lawsuit, subject matter jurisdiction, enforcing, exercise jurisdiction, doing business, imminent, ongoing, dental, apprehend, wit, licensing agreement, patent license, enclosed, permanence

**LexisNexis(R) Headnotes**


*Civil Procedure > Jurisdiction > Personal Jurisdiction*
*& In Rem Actions > In Personam Actions > General*
*Overview*
*Civil Procedure > Pleading & Practice > Defenses,*
*Demurrers, & Objections > Motions to Dismiss*
[HN1] In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, a plaintiff need make only a prima facie showing of personal jurisdiction in accordance with state law. In determining the disposition of a Fed. R. Civ. P. 12(b)(2) motion, the court may consider facts as presented in evidentiary material outside

the pleadings. Such material is construed in the light most favorable to, and any doubts are resolved in favor of, the plaintiff.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN2] N.Y. C.P.L.R. § 301 provides for jurisdiction over a foreign corporation if it does business in New York, not occasionally or casually, but regularly, continuously, and systematically thereby demonstrating a sufficiently fair measure of permanence to warrant a finding of the corporation's constructive presence here. That so-called "doing business" test requires a court to analyze the specific facts of each individual case to determine whether a foreign corporation's contacts and connections with New York demonstrate continuous and systematic activity. Finally, unlike New York's long-arm statute, a jurisdictional inquiry under N.Y. C.P.L.R. § 301 does not require that the plaintiff's cause of action emanate from or have any nexus to the defendant's business activity.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN3] Section 2201(a) (28 U.S.C.S. § 2201(a)) of the Declaratory Judgment Act authorizes a court to declare the rights of an interested party in a case of actual controversy. The purpose of the Act is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit. However, a prerequisite to any claim brought pursuant to 28 U.S.C.S. § 2201(a) is that an actual controversy must have existed at the time the complaint was filed. And in a patent case, a plaintiff must demonstrate: (1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit; and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. The plaintiff bears the burden of proving that there is an actual controversy. Nonetheless, even if the plaintiff shows that an actual controversy existed, the exercise of jurisdiction over that cause of action is not mandatory but within the sound discretion of the court.

*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview*

*Patent Law > Infringement Actions > General Overview*
*Patent Law > Remedies > Declaratory Relief*
[HN4] In the context of a patent claim under the Declaratory Judgment Act, 28 U.S.C.S. § 2201, the test for determining whether a plaintiff's apprehension was reasonable is an objective one which focuses on whether the defendant's conduct rose to a level sufficient to indicate an intent to enforce its patent. In determining whether the plaintiff has demonstrated the requisite reasonable apprehension, the court must objectively consider the totality of the circumstances.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Civil Procedure > Venue > General Overview*
*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Discretion*
[HN5] In the context of the Declaratory Judgment Act, 28 U.S.C.S. § 2201(a), even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction.

**COUNSEL:** For Ivoclar Vivadent, Inc, PLAINTIFF: Paul V Nunes, Esq, Underberg & Kessler, Rochester, NY USA.

For Ivoclar Vivadent, Inc, PLAINTIFF: William L Prickett, Esq, Kimberly C Nuzum, Esq, Michael H Brodowski, Esq, Testa, Hurwitz & Thibeault, LLP, Boston, MA USA.

For Robert W Hasel, Abco Research, LLC, DEFENDANTS: Jeremiah J McCarthy, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY USA.

**JUDGES:** JOHN T. ELFVIN, S.U.S.D.J.

**OPINION BY:** JOHN T. ELFVIN

**OPINION:**

MEMORANDUM and ORDER n1

n1 This decision may be cited in whole or in any part.

Plaintiff Ivoclar Vivadent, Inc. ("Ivoclar") commenced this action April 26, 2002, pursuant to *28 U.S.C. § 2201(a)*, seeking a declaration that certain patents owned by defendants Dr. Robert W. Hasel and ABCO Research, LLC ("ABCO") are invalid and unenforceable.

Case 1:06-cv-00720-JJF     Document 53-2     Filed 02/12/2007     Page 39 of 44

Page 3
2003 U.S. Dist. LEXIS 12611, *

Defendants now move to dismiss the Complaint pursuant to *Rules 12(b)(2)and 12(b)(6)* of the Federal Rules [*2] of Civil Procedure ("FRCvP") n2 on the grounds that this Court lacks personal and subject matter jurisdiction. In the alternative, defendants request that this Court exercise its discretion pursuant to *28 U.S.C. § 1404(a)* and transfer this action to the United States District Court for the District of Minnesota. For the reasons stated hereinbelow, defendants' motion to dismiss will be denied and its request to transfer venue will be granted.

> n2 Although defendants have erroneously cited *FRCvP 12(b)(6)* as the basis for its motion to dismiss for lack of subject matter jurisdiction, the Court will treat such as a motion to dismiss pursuant to *FRCvP 12(b)(1)*.

The following facts are undisputed unless otherwise noted. Hasel, a resident of the State of Minnesota, is the inventor of *U.S. Patent Nos. 5,547,379* ("the '379 patent") 5,944,527 ("the '527 patent") and 6,315,567 ("the '567 patent") -- each entitled "Method of Restoring a Tooth." Hasel and Andrew Grossman are co-owners of ABCO, a Minnesota [*3] corporation whose function is to manage the prosecution and licensure of Hasel's patents. Hasel Decl. P5. Hasel assigned the rights to the three patents to ABCO. Ivoclar is a manufacturer of dental materials with its principal place of business in the Town of Amherst, N.Y.

On January 26, 2000 Grossman sent a letter to Robert A. Ganley, Ivoclar's Chairman of the Board, indicating that several of its marketed dental products infringed one or more of ABCO's patents and concluded with an offer for a license. n3 Hasel Decl. ABCO's counsel sent another letter to Ivoclar on December 4, 2001. The letter reads, in pertinent part:

> "For nearly two years, ABCO and Dr. Hasel pursued patent infringement litigation against Kerr Corporation concerning Kerr's sales of its flowable composite, Revolution(R). Last June, on the eve of trial, after completing all fact and expert discovery, dispositive motions and final pretrial procedures, Kerr agreed to settle the litigation on terms favorable to ABCO. Enclosed is a copy of the Consent Judgment entered by the Court in which Kerr stipulated that the *'379* and *'537* Patents are valid and enforceable and that Kerr's sales of its Revolution(R) product [*4] and their use constitute infringement

of the '527 Patent. As part of the settlement and to allow it to continue to sell its Revolution(R) products, Kerr also agreed to an ongoing license and royalty arrangement with ABCO.

> *****

> "Now that the litigation against Kerr has concluded and ABCO's patent portfolio has been strengthened by the issuance of the '567 Patent, ABCO will be enforcing these patents against other infringers.

> "Please be advised that ABCO believes that Vivadent/Ivoclar's sales of flowable composite products may infringe one or more claims of the *'379 Patent*, the '527 Patent, and/or '567 Patent." Compl., Ex. A.

Based on these two letters, plaintiff filed its Complaint seeking a declaratory judgment of non-infringement. In moving to dismiss pursuant to *FRCvP 12(b)(2)*, defendants initially argued that the sending of those two letters was insufficient to subject them to the personal jurisdiction of this Court. In response, plaintiff has offered evidence of defendants' other activities in New York.

> n3 The pertinent text of the letter reads as follows:

> > "This letter is to advise you, and to provide notice to you under *35 U.S.C. § 287*, that Vivadent/Ivoclar North America, Inc.'s Tetric Flow, Heliomolar Flow and Compoglass Flow products and possibly other restorative products infringe one or more claims of *U.S. Patent Nos. 5,547,379* and 5,944,527. A copy of each patent is enclosed.

> > "ABCO Research, LLC would be pleased to provide Vivadent/Ivoclar North America, Inc. with a nonexclusive license under the patents (enclosed)." Hasel Decl., Annex.

[*5]

Case 1:06-cv-00720-JJF     Document 53-2     Filed 02/12/2007     Page 40 of 44

Page 4
2003 U.S. Dist. LEXIS 12611, *

ABCO sent seven letters to Harry Schein, Inc. ("Schein") -- one of Ivoclar's distributors whose headquarters are located in Melville, N.Y. -- between June 20, 2001 and November 16, 2001, regarding Schein's alleged infringement of ABCO's patents and a possible licensing agreement. The first such letter, dated June 20, 2001, contained virtually identical warnings and allegations as the subsequent December 4, 2001 letter sent to Ivoclar and also specified various products, including two of Ivoclar's -- *viz.*, the Heliomolar(R) Flow and the Tetric(R) Flow --, that ABCO believed "may infringe one or more of the claims of the '527 Patent, and, depending on their chemical makeup, perhaps the *'379 Patent* as well." Decl. of Alan S. Korman, Esq., Ex. B. Plaintiff also asserts that defendants met with Schein, on or about July 23, 2001, at Schein's offices in Melville to discuss ABCO's claims of infringement and a possible licensing agreement. n4 Korman Decl. P12. At the meeting, ABCO allegedly "informed Schein that [it] planned to file a patent infringement lawsuit against dental manufacturers, including Ivoclar." *Id.* P16. Ivoclar subsequently sent Schein a November 2, 2001 letter by [*6] which it indicated that ABCO had "elected to proceed to actively enforce their patents directly against manufacturers of flowable composites other than Kerr, including manufacturers who sell their flowable composites through Harry Schein." n5 *Id.*, Ex. G.

> n4 Plaintiff alleges that defendants also met with Pentron Corporation -- another dental manufacturer that had been accused of patent infringement by defendants -- on January 25, 2002 in New York City, to discuss the terms of a possible license agreement between the two parties. Korman Decl. P18.

> n5 Plaintiff claims that defendants filed separate lawsuits, on or about November 2, 2001, against two such manufacturers -- to wit, Danville Manufacturing, Inc. and Pulpdent Corporation -- in the United States District Court for the District of Minnesota. Korman Decl. P17.

Korman also alleges that ABCO's counsel called him several times between February and March of 2002 and offered to meet with him in New York City, or elsewhere, to discuss settlement of defendants' [*7] infringement claims against Ivoclar. The parties agreed to meet, in Chicago, Ill. on April 29, 2002. Ivoclar then commenced this action by filing its complaint with this Court on April 26, 2002. Three days later, on April 29, 2002, Korman met with Grossman and ABCO's attorney, Harry Manbeck, Jr., Esq., in Chicago to discuss settlement of the patent infringement claims. The tone and content of that meeting has been vigorously debated by its participants. Manbeck and Grossman describe the meeting as "cordial" during which Korman had indicated his belief that Ivoclar's products did not infringe ABCO's patents and that such patents may be invalid. When asked to provide information supporting his position, Korman indicated to them that he would have to speak with his associates and get back to them. Manbeck and Grossman also assert that Korman told them that he had filed the April 26, 2002 Complaint but that "he would hold off on serving [it] pending further discussions with us." Grossman Decl. P3; *see also* Manbeck Decl. P8 ("During the meeting, Mr. Korman mentioned that he had filed the complaint in this action the previous Friday, April 26. However, he also said that he would hold [*8] off on serving the complaint pending further discussions with us."). Both Grossman and Manbeck assert that they were both led to believe that further discussions with Korman would follow, pending Korman's attempts to obtain the relevant information. Manbeck then spoke with Korman on June 13, 2002 during which conversation Korman told Manbeck that his European associates were finalizing their position and had been providing him with information for his review and that he would call Manbeck the following Monday, June 17. Manbeck asserts that Korman did not call on June 17 and that he has had no further contact with Korman since that time. Grossman also claims that he had no further contact with Korman after the April 29, 2002 meeting. Plaintiff served defendants with its Complaint on August 14, 2002.

Korman's version of events regarding the April 29, 2002 meeting is much different from that of defendants. Korman disputes defendants' contention that the meeting "was part of ongoing settlement discussions which provided a reasonable probability of producing a nonjudicial resolution of [the] dispute." Korman Sur-Reply Decl. P2. Korman alleges that, by April 26, 2002, prospects for settlement [*9] "were very slim" and that, although there had been no apparent change in either party's position before the April 29, 2002 meeting, he "planned to go ahead with the meeting so long as any hope remained ***." *Id.* P3. Korman further states that he "did not expect the discussions to result in a settlement and [he] did not provide either Mr. Manbeck or Mr. Grossman any basis from which a reasonable person could conclude that settlement was more than an improbable possibility" and that he "went ahead with the meeting with very low expectations for a settlement." *Ibid.* Thus, Korman concludes that Ivoclar "had a reasonable apprehension of being sued for patent infringement based on defendants' threats and their actual litigation against other companies." *Ibid.*

Defendants' first argument in support of its motion to dismiss is that this Court lacks personal jurisdiction over them. They argue that both defendants are "located in Minnesota" and are "neither authorized nor licensed to do business in New York, nor do they have offices, employees, assets, or telephone listings in this state." Defendants further maintain that the two letters sent to plaintiff -- dated January 26, 2000 and [*10] December 4, 2001 -- are insufficient to subject them to this Court's personal jurisdiction.

Plaintiff points to the nature of defendants' business -- viz., licensing and enforcing patents -- and, for purposes of establishing personal jurisdiction under New York's Civil Practice Law and Rules ("CPLR") § 301, contends that they are "doing business" in New York. Additionally, plaintiff argues that defendants are subject to this Court's personal jurisdiction pursuant to CPLR § 302(a)(1) -- New York's long-arm statute -- because their New York activities qualify as a transaction of business as provided for by the statute.

[HN1] In opposition to defendants' motion to dismiss, plaintiff need make only a prima facie showing of personal jurisdiction in accordance with New York law. See Graphic Controls Corp. v. Utah Medical Products, Inc., 1997 U.S. Dist. LEXIS 7448, 1997 WL 276232, at *2 (W.D.N.Y. 1997) (applying New York law in determining whether the court had personal jurisdiction over the foreign defendant), aff'd, 149 F.3d 1382 (Fed. Cir. 1998); Capitol Records, Inc. v. Optical Recording Corp., 810 F. Supp. 1350, 1352 (S.D.N.Y. 1992) (applying New York law and [*11] holding that the plaintiff needs only make a prima facie showing of personal jurisdiction in opposition to foreign defendant's FRCvP 12(b)(2) motion). In determining the disposition of a FRCvP 12(b)(2) motion, the court may consider facts as presented in evidentiary material outside the pleadings. Teachers' Retirement Sys. of LA v. A.C.L.N., Ltd., 2003 U.S. Dist. LEXIS 7869, 2003 WL 21058090, at *7 (S.D.N.Y. 2003). Such material is construed in the light most favorable to, and any doubts are resolved in favor of, the plaintiff. Ibid.; Graphic Controls, 1997 U.S. Dist. LEXIS 7448, [WL] at *2.

CPLR § 301 [HN2] provides for jurisdiction over a foreign corporation if it "does business in New York, not occasionally or casually, but regularly, continuously and systematically thereby demonstrating a sufficiently fair measure of permanence to warrant a finding of the corporation's constructive presence here." Graphic Controls, 1997 U.S. Dist. LEXIS 7448, [WL] at *2. This so-called "doing business" test requires a court to analyze the specific facts of each individual case to determine whether a foreign corporation's contacts and connections with New York demonstrate continuous and systematic activity. Ibid. (citing Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990)). [*12] Finally, unlike New York's long-arm statute, a jurisdictional inquiry under CPLR § 301 does not require that the plaintiff's cause of action "emanate from or have any nexus to the defendant's business activity." Ibid.

Defendants' activities in New York are substantial and sufficiently continuous to support the exercise of personal jurisdiction over them under CPLR § 301. Initially, it is important to note that ABCO's sole function is to manage, enforce and license its patents and that it lacks the "traditional indicia of doing business because it does not manufacture or sell tangible goods." Capitol Records, at 1353. Accordingly, the frequency and nature of ABCO's New York business activities must be analyzed within such a context in determining whether such contacts demonstrate the requisite degree of permanence. See Capitol Records, at 1353 (noting that, for the purposes of establishing personal jurisdiction, a company's business activities conducted in New York must not be peripheral to its "main business" but must be a substantial part of that corporation's business). ABCO sent at least ten letters, between January 26, 2000 and December 4, 2001, to three different [*13] companies that related to its efforts to enforce and license its patents. n6 In addition, ABCO's counsel made numerous phone calls to plaintiff during which ABCO had offered to meet with Ivoclar in New York to negotiate a possible license, solicited licensing fees and reiterated its infringement claims. Korman Decl. P9. ABCO also traveled to New York twice to meet with Schein and Pentron Corp. to discuss possible licensing agreements. Defendants do not dispute that they engaged in such activities and, while the Court recognizes that, without more, the two letters that ABCO had sent to Ivoclar would be insufficient for this Court to exercise jurisdiction over defendants -- see Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc., 148 F.3d 1355, 1360-1361 (Fed. Cir. 1998) (finding that three cease-and-desist letters did not confer personal jurisdiction over a foreign defendant) -- , defendants' other activities in not only protecting its patents but soliciting licensing fees in New York, when combined with their two "cease and desist" letters, evince the requisite permanence -- i.e., systemic and continuous activity -- to satisfy New York's "doing business" test. Thus, [*14] although ABCO has no offices, employees, assets or telephone listings in New York, it is subject to the personal jurisdiction of this Court because it has extensively engaged in its primary business activity -- to wit, enforcing and licensing its patents -- in New York. Accordingly, defendants' motion to dismiss for lack of personal jurisdiction will be denied. n7

n6 Such letters comprised the two "cease and desist" letters to Ivoclar, a virtually identical one sent to Heraeus Kulzer, Inc. and the previously discussed seven letters that had been sent to Schein.

n7 The Court will decline to address whether ABCO is subject to personal jurisdiction under *CPLR § 302* inasmuch as the issue is moot.

The Court next addresses defendants' motion to dismiss based on its argument that there was no actual controversy at the time plaintiff filed its complaint and that this Court therefore lacks subject matter jurisdiction over this case.

*Section 2201(a) of the Declaratory Judgment Act* [HN3] authorizes a court to declare the [*15] rights of an interested party in a case of actual controversy. *28 U.S.C. § 2201.* The purpose of the Act "is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit." *Clay Paky, S.p.A. v. Vari-Lite, Inc., 2000 U.S. Dist. LEXIS 9802, 2000 WL 977709, at *3 (S.D.N.Y. 2000).* However, a prerequisite to any claim brought pursuant to *section 2201(a)* is that an actual controversy must have existed at the time the complaint was filed. *Bausch & Lomb Inc. v CIBA Corp., 39 F. Supp. 2d 271, 273 (W.D.N.Y. 1999); see also R & P Pools, Inc. v. New Kayak Pool Corp., 2001 U.S. Dist. LEXIS 1505, 2001 WL 135823, at *2 (W.D.N.Y. 2001)* ("To proceed in the absence of a case or controversy would involve the court in rendering a forbidden advisory opinion.") (quotation and citation omitted). And, in a case such as this, plaintiff must demonstrate "'(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. [*16] '" n8 *R & P Pools, 2001 U.S. Dist. LEXIS 1505, [WL] at *2 (quoting B.P. Chemicals, Ltd. v. Union Carbide Corp., 4 F.3d 975, 978) (Fed. Cir. 1993).* The plaintiff bears the burden of proving that there is an actual controversy. *Ibid.* Nonetheless, even if plaintiff shows that an actual controversy existed, the exercise of jurisdiction over this cause of action is not mandatory but within the "sound discretion of [this] court." *Ibid.*

n8 There is no issue for the Court regarding plaintiff's satisfaction of the second prong inasmuch as it is undisputed that plaintiff has sold a product that allegedly infringes defendants' patents.

Plaintiff contends that an actual controversy existed because it had a reasonable apprehension that ABCO would imminently file a patent infringement suit. [HN4] The test for determining whether plaintiff's apprehension was reasonable is an objective one "which focuses on whether the defendant's 'conduct rose to a level sufficient to indicate an intent to enforce its patent.'" *Clay Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *4 [*17] (quoting *Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888 (Fed. Cir. 1992)).* In determining whether plaintiff has demonstrated the requisite reasonable apprehension, the Court must objectively consider the totality of the circumstances. n9 *Ibid.*

n9 In deciding defendants' motion to dismiss for lack of subject matter jurisdiction, this Court may consider evidence outside the pleadings. *Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985).*

Plaintiff contends that the efforts put forth by ABCO in attempting to enforce and license its patents n10 created a situation where it was reasonable for Ivoclar to apprehend that ABCO was imminently close to filing a patent infringement action against it. Plaintiff places particular significance on the threatening language contained within ABCO's December 4, 2001 letter by which ABCO had (1) alleged that Ivoclar's products may have infringed its patents, (2) informed Ivoclar that it had obtained a Consent Judgment [*18] in its patent infringement action against Kerr corporation, (3) informed Ivoclar that it "will be enforcing [its] patents against other infringers" and (4) invited Ivoclar to negotiate a license. *See* Compl., Ex. A.

n10 Conduct which included the two letters sent to Ivoclar, the various phone conversations between counsel for Ivoclar and ABCO, the seven letters sent to Schein and the commencement of three separate lawsuits against other alleged infringers -- to wit, Kerr Corporation, Pulpdent Corporation and Danville Manufacturing, Inc.

Defendants counter that no actual controversy existed at the time plaintiff filed its Complaint because the parties were still conducting settlement negotiations with regard to the alleged patent infringement. In support, defendants direct the Court to the fact that Ivoclar had commenced this action on April 26, 2002 -- three days before the parties' April 29, 2002 settlement conference in Chicago -- and that Korman had subsequently agreed

at the conclusion of such meeting [*19] to refrain from serving the Complaint pending further discussions. Defendants argue that such facts refute plaintiff's contention that it reasonably believed that it was facing an imminent patent infringement lawsuit and, further, that to allow plaintiff to utilize its premature complaint as a negotiating tool during ongoing negotiations would defeat the purpose of the *Declaratory Judgment Act.*

Plaintiff has shown that it was objectively reasonable for it to apprehend that it was the target of an imminent patent infringement lawsuit by ABCO. Defendants' December 4, 2001 letter warned Ivoclar that (1) several of its marketed products "may infringe" ABCO patents, (2) ABCO had pursued patent infringement litigation for nearly two years against another alleged infringer, Kerr Corporation, resulting in a settlement with "terms favorable to ABCO" and (3) it "will be enforcing [its] patents against other infringers." Such warnings, in effect, were "a statement to the plaintiff to take notice that it is next on the list." *Clay Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *4 (quotations and citations omitted). n11 In other words, it was reasonable for Ivoclar to interpret the letter as a threat from ABCO by which ABCO [*20] was saying to Ivoclar, "If you don't think we mean business and are serious about this matter, look and see what we have done to another alleged infringer." *Ibid.* (quotation and citation omitted). In addition to such implicit threats of litigation, defendants' other conduct -- to wit, commencing litigation against other alleged infringers and indicating to Schein that it had "elected to proceed to actively enforce their patents directly against manufacturers of flowable composites other than Kerr, including manufacturers who sell their flowable composites through Harry Schein" n12 -- contributed to an environment or, more appropriately, adverse circumstances whereby it would have been reasonable for Ivoclar to apprehend that ABCO was about to commence a patent infringement action against it.

n11 *See also Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *4 (finding that a letter, similar to the one here that was sent by ABCO, -- by which the defendant had warned the declaratory plaintiff that (1) it had aggressively enforced its patent rights against a named third-party, (2) plaintiff's product "may infringe" the defendant's patent, (3) plaintiff should "cease and desist" from selling its product and (4) if plaintiff chose to continue selling its product to contact the defendant in order to discuss a license -- was one that "clearly threatened litigation").

[*21]

n12 Korman Decl., Ex. G.

Defendants argue however that the holding in *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051 (Fed. Cir. 1995),* lends support for its motion to dismiss. In *Phillips Plastics,* the Federal Circuit Court of Appeals held that the defendant's conduct in merely attempting to conduct license negotiations did not create a justiciable controversy. Significantly, the Court held that, "the offer of a patent license does not create an actual controversy" and that "when there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down." *Phillips Plastics, at 1053.* Seizing on such language, defendants argue that no justiciable controversy existed in this case because plaintiff filed its Complaint three days before a scheduled meeting where the parties were supposed to discuss a licensing agreement. Defendants' reliance on *Phillips Plastics* is misplaced because therein the patentee had merely invited license negotiations and had neither "stated nor suggested [*22] that it would pursue legal recourse if it were not satisfied with the outcome of the proposed licensing negotiations." *Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *5; *see also Conmed Corp. v. ERBE Electromedizin GMBH, 129 F. Supp. 2d 461, 466 (N.D.N.Y. 2001)* (distinguishing *Phillips Plastics* based on the same premise); *EMC Corp. v. Norand Corp., 89 F.3d 807, 812 (Fed. Cir. 1996)* (distinguishing *Phillips Plastics* as a case where all that was present was "negotiation unaccompanied by threats of legal action"). Here, in contrast, ABCO communicated implicit threats of litigation, which created a situation whereby it was reasonable for Ivoclar to apprehend the imminent commencement of a patent infringement action. As explained by the *Clay Paky* court, defendants' oblique accusations of patent infringement and "thinly veiled threats of resorting to litigation" render the present case inapposite to that of *Phillips Plastics. Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *5. Furthermore, the fact that the parties had entered into negotiations regarding a possible patent license does not necessarily mean that ABCO's reasonable apprehension of litigation had necessarily been removed. *See ibid.* ("Just [*23] because the parties proceeded to initiate negotiations does not mean that the reasonable apprehension of litigation was ever removed."). Thus, the fact that the parties may have been negotiating a possible patent license is not dispositive, but merely a factor that is, in this case, insufficient to overcome defendants' other threatening conduct that gave rise to Ivoclar's reasonable apprehension of an imminent patent infringement suit by ABCO.

Having found that the Court has both personal jurisdiction over the defendants and subject matter jurisdic-

tion over this case, the Court must finally determine whether to exercise jurisdiction in this case. *See EMC Corp., at 810* [HN5] ("Even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction.") (citing *Public Serv. Comm'n v. Wycoff Co., 344 U.S. 237, 241, 97 L. Ed. 291, 73 S. Ct. 236 (1952)).* However, the issue has become moot and the Court will decline to exercise jurisdiction in this case because plaintiff has now joined in defendants' request to transfer venue, pursuant to *28 U.S.C. § 1404(a),* from the Western District [*24] of New York to the District of Minnesota. n13 Therefore, rather than exercise jurisdiction in this matter, the Court will transfer this case to the District of Minnesota inasmuch as both parties have indicated that such Court is a mutually preferable and convenient forum.

n13 Plaintiff and defendants have submitted a Stipulation and Order dated June 27, 2003 by which they have agreed to transfer this action to the United States District Court for the District of Minnesota provided that this Court finds an actual case or controversy.

Accordingly, it is hereby ***ORDERED*** that defendants' motion to dismiss is denied in its entirety, that defendants' motion to transfer venue is granted and that the Clerk of this Court is directed to transfer this case to the United States District Court for the District of Minnesota.

DATED: June 30, 2003

JOHN T. ELFVIN

S.U.S.D.J.