IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

SAMSUNG ELECTRONICS CO., LTD.,
SAMSUNG ELECTRONICS AMERICA, INC.,
SAMSUNG TELECOMMUNICATIONS
   AMERICA GENERAL, L.L.C.,
SAMSUNG SEMICONDUCTOR, INC., and
SAMSUNG AUSTIN SEMICONDUCTOR L.L.C.,

           Plaintiffs,

           v.

ON SEMICONDUCTOR CORP.

and

SEMICONDUCTOR COMPONENTS
INDUSTRIES, LLC,

           Defendants.

Civil Action No. 06-720 (***)

REDACTED

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO ENJOIN DEFENDANTS FROM PURSUING A DUPLICATIVE TEXAS ACTION

OF COUNSEL:

John M. Desmarais
James E. Marina
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Dated: January 18, 2007

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
YOUNG CONAWAY STARGATT & TAYLOR, LLP
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600
*alundgren@ycst.com*

*Attorneys for Samsung Electronics Co., Ltd.,
Samsung Electronics America, Inc., Samsung
Telecommunications America General, L.L.C.,
Samsung Semiconductor, Inc., and Samsung Austin
Semiconductor, L.L.C.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...........................................................................................................1

ARGUMENT ................................................................................................................3

I.    This Action Is The First-Filed Action Because SEC Had A Reasonable Apprehension Of Being Sued By Defendants When It Filed The Original Complaint On November 30, 2006. ...................................................................3

II.    Because This Court Had Subject Matter Jurisdiction Over This Action As Of November 30, 2006, The Amended Complaint Does Not Change The Filing Date Of This Action For Purposes Of The First-Filed Rule. ....................................5

III.    The Delaware Action Is Also The First-Filed Action With Respect To The '827 Patent.........................................................................................................9

IV.    This Action Was Not Filed In Bad Faith. ......................................................11

V.    Judge Jordan's Elevation To The Third Circuit Does Not Warrant Departure From The First-Filed Rule. ..................................................................................15

CONCLUSION.............................................................................................................16

## TABLE OF AUTHORITIES

**Cases**

Page(s)

Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.,
846 F.2d 731 (Fed. Cir. 1988)............................................................................ 11

Capo, Inc. v. Dioptics Medical Products, Inc.,
387 F.3d 1352 (Fed. Cir. 2004).......................................................................... 10

Clay Paky, S.p.A. v. Vari-Lite, Inc.,
Nos. 99 Civ. 11401 and 11402 (BSJ),
2000 U.S. Dist. LEXIS 9802 (S.D.N.Y. July 12, 2000) .................................... 3

Correspondent Servs. Corp. v. First Equities Corp.,
338 F.3d 119 (2d Cir. 2003)................................................................................ 5

Goodyear Tire & Rubber Co. v. Releasomers, Inc.,
824 F.2d 953 (Fed. Cir. 1987)........................................................................... 10

Intel Corp. v. AmberWave Systems Corp.,
233 F.R.D. 416 (D. Del. 2005) ....................................................................... 8, 9

Ivoclar Vivadent, Inc. v. Hasel,
No. 02-CV-0316E(F),
2003 U.S. Dist. LEXIS 12611 (W.D.N.Y. June 30, 2003) ............................... 3

Jarvis v. United States of America,
No. 5L99cv163,
2000 U.S. Dist. LEXIS 15984 (E.D. Tex. Sept. 25, 2000) ................................ 8

Lincoln National Life Insurance Co. v. Transamerica Financial Life Insurance Co.,
No. 1:04-cv-396-TS,
2006 U.S. Dist. LEXIS 91358 (N.D. Ind. Dec. 18, 2006) ................................. 7

McGregor v. Lousiana State University Board of Supervisors,
3 F.3d 850 (5th Cir. 1993) ................................................................................. 7

Newark Branch, NAACP v. Millburn Township,
No. 89-4219, 1990 U.S. Dist. LEXIS 17559 (D.N.J. Dec. 27, 1990).............. 7

PE Corp. v. Competitive Technologies, Inc.,
No. 00-629-SLR,
2001 U.S. Dist. LEXIS 15792 (D. Del. Sept. 27, 2001) .................................... 6

Syngenta Crop. Protection, Inc. v. Monsanto Company,
Civil Action No. 03-1062 (KAJ) (D. Del. Apr. 6, 2004).................................... 4

*Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*,
    157 F.R.D. 215 (D. Del. 1993) .......................................................................................... 13

**INTRODUCTION**

Defendants' opposition to Plaintiffs' motion to enjoin is essentially a mirror image of Defendants' motion to dismiss for lack of subject matter jurisdiction, and for the same reasons that this Court should deny that motion, it should grant Plaintiffs' motion to enjoin.

Defendants argue that this action is not the first-filed action, contending that SEC did not have an objectively reasonable apprehension of being sued by Defendants when it filed this action on November 30, 2006. The record belies this contention, however.

REDACTED

Under Federal Circuit precedent, Defendants' litigation threats gave rise to an actual controversy within the meaning of the Declaratory Judgment Act. This Court therefore had subject matter jurisdiction over this action as of November 30, 2006.

Defendants also argue that because Plaintiffs filed an Amended Complaint after the Texas Action was filed, the Texas Action is the first-filed action. But this Court had subject matter jurisdiction over SEC's declaratory judgment claims against the '594, '644, and '001 patents as of November 30, 2006 based on Defendants' prior litigation threats, and the Amended Complaint does not change the filing date of those claims. Defendants also argue that the Texas Action is the first-filed action with respect to the '827 patent because the '827 patent was not included in the original Complaint. But because the '827 patent overlaps with the other patents in this action, this action is deemed to be first-filed with respect to the '827 patent as well.

Defendants further argue that this action was filed in bad faith, and urge this Court to find an exception to the first-filed rule. REDACTED . But the record shows that SEC filed this action in order to resolve the uncertainty and insecurity caused by Defendants' repeated litigation threats

REDACTED

. And because Defendants voluntarily put their patents at risk of adverse rulings by filing the Texas Action, the Delaware Action gives SEC no negotiating "leverage" whatsoever.

Finally, Defendants argue that this Court should depart from the first-filed rule because Judge Jordan, the judge originally assigned to this action, has been elevated to the Third Circuit. There is no reason to believe, however, that ultimate resolution of the parties' dispute will be delayed by Judge Jordan's elevation, and to deprive SEC of its choice of forum based on mere speculation would be fundamentally unfair and unwarranted.

The first-filed rule therefore applies, and the Court should enjoin Defendants from pursuing the second-filed Texas Action.

## ARGUMENT

**I.    This Action Is The First-Filed Action Because SEC Had A Reasonable Apprehension Of Being Sued By Defendants When It Filed The Original Complaint On November 30, 2006.**

Defendants' first argument against issuance of an injunction is that the Delaware Action is not the first-filed action because SEC allegedly did not have a reasonable apprehension of being sued by Defendants when it filed the original Complaint on November 30, 2006. But as set forth in Plaintiffs' opposition to Defendants' motion to dismiss (D.I. 27-29), which is incorporated herein by reference, the record[1] shows that SEC did have a reasonable apprehension of suit as of November 30, 2006. The Delaware Action is therefore the first-filed action.

The Federal Circuit has held that where a patent holder and a target company are engaged in patent licensing negotiations and the patent holder threatens, during those negotiations, to file suit if it is not satisfied with the result of the negotiations, an actual controversy exists under the Declaratory Judgment Act and the target may file a declaratory judgment action at any time. *EMC Corp. v. Norand Corp.*, 89 F.3d 807, 812 (Fed. Cir. 1996). Furthermore, a reasonable apprehension of suit exists even if the negotiations are on-going at the time the declaratory judgment action is filed. *Id.* at 811-12; *Ivoclar Vivadent, Inc. v. Hasel*, No. 02-CV-0316E(F), 2003 U.S. Dist. LEXIS 12611, *23 (W.D.N.Y. June. 30, 2003); *Clay Paky, S.p.A. v. Vari-Lite, Inc.*, Nos. 99 Civ. 11401 and 11402 (BSJ), 2000 U.S. Dist. LEXIS 9802, *15 (S.D.N.Y. July 12, 2000).

---

[1] The facts surrounding the parties' licensing discussions are set forth in the Declaration of Patrick Muir submitted in support of this motion (D.I. 12), and the Declarations of Patrick Muir and Jay Shim submitted in opposition to Defendants' motion to dismiss (D.I. 28 and 29.)

Defendants implicitly and explicitly threatened SEC with litigation no fewer than four times during ̲REDACTED̲ — during the parties' February 15, 2006 meeting, during their August 16, 2006 meeting, in Defendants' September 6, 2006 letter to SEC, and during a telephone conversation on September 15, 2006. (D.I. 28, ¶¶ 3, 5; D.I. 29, ¶ 6; D.I. 12, Ex. G.) Although Defendants deny the oral threats they made on February 15, August 16, and September 15, 2006, they cannot hide from the unambiguous litigation threat in their September 6 letter:

REDACTED

(D.I. 12, Ex. G.) Since the only other "path" for Defendants to enforce their legal rights and remedies would be to sue SEC, the threat of litigation in this letter is undeniable. Defendants were also *reemphasizing* this threat, which means they made it before. Further, just like in *EMC*, Defendants never abandoned this threatening posture during the weeks between the September 6, 2006 letter and the filing of the Delaware Action on November 30, 2006.

SEC was within its rights to file a declaratory judgment action the moment Defendants threatened to litigate if a satisfactory settlement could not be reached. SEC waited to file suit, however, on the chance that costly and time-consuming litigation could ultimately be avoided

REDACTED

SEC therefore chose to file a

4

declaratory judgment action to protect itself against the uncertainty and delay surrounding its right to sell the accused DRAM products caused by Defendants' threats. (D.I. 29, ¶¶ 12-14.) The fact that SEC had a reasonable apprehension of suit is confirmed by the fact Defendants actually sued SEC for patent infringement. *See, e.g., Syngenta Crop. Protection, Inc. v. Monsanto Company*, Civil Action No. 03-1062 (KAJ) (D. Del. Apr. 6, 2004), at 38-9. (D.I. 27, Ex. 2.)

In view of the foregoing, SEC had a reasonable apprehension of suit when it filed the original Complaint on November 30, 2006, and this Court had subject matter jurisdiction as of that date. This action is therefore the first-filed action, and this Court should enjoin Defendants from pursuing the second-filed Texas Action pursuant to the first-filed rule.

## II. Because This Court Had Subject Matter Jurisdiction Over This Action As Of November 30, 2006, The Amended Complaint Does Not Change The Filing Date Of This Action For Purposes Of The First-Filed Rule.

Defendants also argue that this action is the second-filed action because the Amended Complaint filed on December 21, 2006 "alleges new conduct – the subsequent filing of the Texas Action – that does not arise out of the conduct or occurrence set forth in the original Delaware complaint" (Opp. at 6) and therefore cannot relate back to the filing date of the original Complaint. This argument, however, misconstrues the Amended Complaint,[2] and is based on the incorrect assumption that this Court did not have subject matter jurisdiction over this action as of November 30, 2006.

---

[2] The Amended Complaint adds declaratory judgment claims by SEA, STA, SSI, and SAS against the '594, '644, and '001 patents, adds declaratory judgment claims by all of the Plaintiffs against the '827 patent, and adds a patent infringement claim by SEC against Defendants.

5

The Amended Complaint *does not assert any post-November 30 facts* as a basis

for SEC's original declaratory judgment claims against Plaintiffs with respect to the

'594,'644, and '001 patents. The Amended Complaint makes the *identical allegations* [3]

made in the original Complaint concerning those claims (*compare* D.I.1, ¶¶ 13-15, 20-

22, 27-29 and D.I. 8, ¶¶ 23-24, 33-34, 43-44) — allegations sufficient to plead a

declaratory judgment claim under Federal Circuit precedent such as *EMC* — and

expressly states that "because an actual and justiciable controversy had therefore arisen

between SEC and Defendants within the meaning of 28 U.S.C. § 2201, SEC filed its

declaratory judgment Complaint in this action on *November 30, 2006.*" (D.I. 8, ¶¶ 25,

35, 45.) Thus, the Amended Complaint *does not* assert the initiation of the Texas Action

on December 4, 2006 as the basis for SEC's declaratory judgment claims against the

'594, '644, and '001 patents, but unequivocally states that an actual case or controversy

under the Declaratory Judgment Action had arisen *by November 30, 2006.*[4]

Because this Court had subject matter jurisdiction over this action as of November

30, 2006, the fact that an Amended Complaint was subsequently filed adding declaratory

---

[3] The Amended Complaint further alleges that Defendants explicitly threatened SEC with litigation *prior* to SEC's filing of the original Complaint, further demonstrating the existence of an actual case or controversy as of November 30, 2006. (D.I. 8, ¶¶ 26, 36, 46.) Because the threats are alleged to have occurred *before* the filing of the original Complaint, these allegations relate back to the filing date of the original Complaint and may be used to demonstrate the existence of subject matter jurisdiction as of that date. *See, e.g., Correspondent Servs. Corp. v. First Equities Corp.*, 338 F.3d 119, 125 (2d Cir. 2003) (factual allegations in an amended complaint relate back to the filing date of the original complaint for purposes of establishing subject matter jurisdiction "when the underlying facts, if properly pled, would have supported jurisdiction at the time the action commenced").

[4] The filing of the Texas Action, of course, confirms that an actual case or controversy continues to exist between SEC and Plaintiffs.

6

judgment claims by SEA, STA, SSI, and SAS against the '594, '644, and '001 patents,

adding a declaratory judgment claim by all Plaintiffs against the '827 patent, and adding

a patent infringement claim by SEC against Defendants, has no bearing whatsoever on

the November 30, 2006 filing date of SEC's original declaratory judgment claims against

the '594, '644, and '001 patents.

All of the cases cited by Defendants are distinguishable and inapplicable to the

facts of this case. For example, in *PE Corp. v. Competitive Technologies, Inc.*, No. 00-

629-SLR, 2001 U.S. Dist. LEXIS 15792 (D. Del. Sept. 27, 2001), this Court held that an

amendment adding an infringement plaintiff did not relate back to the filing date of the

original complaint because at the time of filing of the original complaint the only named

plaintiff did not own the allegedly infringed patent and therefore lacked standing to sue.

Thus, unlike in this case, the Court did not have subject matter jurisdiction when the

original complaint was filed.

Similarly, in *Newark Branch, NAACP v. Millburn Township*, No. 89-4219, 1990

U.S. Dist. LEXIS 17559 (D.N.J. Dec. 27, 1990), the plaintiffs filed an amended

complaint to establish standing on the basis of events that occurred after the filing and

dismissal of the original complaint, and the court held that the claims in the amended

complaint did not relate back because the events on which standing was based had not

occurred when the original complaint was filed. In this case, however, SEC's declaratory

judgment claims against the '594, '644, and '001 patents are based on facts existing prior

to the filing of the original Complaint. *Fatir v. Dowdy*, No. 95-677-GMS, 2002 U.S.

Dist. LEXIS 16480 (D. Del. Sept. 4, 2002), in which the plaintiff sought to add a claim

based on events occurring after the filing date of the original complaint, is distinguishable for the same reason.

In *Lincoln National Life Insurance Co. v. Transamerica Financial Life Insurance Co.*, No. 1:04-cv-396-TS, 2006 U.S. Dist. LEXIS 91358 (N.D. Ind. Dec. 18, 2006), the plaintiff sought to amend an infringement complaint to add two more defendants two years after the original complaint was filed. The court held that the proposed amendment would not relate back, finding that the notice requirement of Fed. R. Civ. P 15(c)(3) that "within 120 days the party named in the amended pleading must have received sufficient notice of the institution of the action" had not been met. *Lincoln*, 2006 U.S. Dist. LEXIS 91358 at *10-11. In this case, however, the Amended Complaint did not add any additional defendants.

In *McGregor v. Lousiana State University Board of Supervisors*, 3 F.3d 850 (5th Cir. 1993), the court held that a new legal theory in an amended complaint that was time barred at the time of amendment could not relate back to the original complaint because the original complaint did not allege facts that would have put the defendant on notice of the new theory.

REDACTED

In *Jarvis v. United States of America*, No. 5L99cv163, 2000 U.S. Dist. LEXIS 15984 (E.D. Tex. Sept. 25, 2000), the court held that a claim added in the amended complaint arose out of a different set of circumstances with a different actor and different alleged conduct than alleged in the complaint, and therefore could not relate back the original complaint. In this case, SEC's declaratory judgment claims against the '594,

'644, and '001 patents in the Amended Complaint are based in the same events as alleged

in the original Complaint —    REDACTED    — and are asserted

against the same Defendants.

In view of the foregoing, the Delaware Action is the first-filed action with respect

to the '594, '644, and '001 patents.

**III.    The Delaware Action Is Also The First-Filed Action With Respect To The '827 Patent.**

Defendants argue that even if the Delaware Action is the first-filed action with

respect to the '594, '644, and '001 patents, the Delaware Action is the second-filed action

with respect to the '827 patent because the '827 patent was not included in the original

Complaint. But even though the '827 patent was not added to the Delaware Action until

after the Texas Action was filed, the Delaware Action is deemed to be the first-filed

action with respect to the '827 patent for purposes of determining priority under the first-

filed rule.

This Court addressed this issue in *Intel Corp. v. AmberWave Systems Corp.*, 233

F.R.D. 416 (D. Del. 2005). In *Intel*, the plaintiff had filed a declaratory judgment claim

for patent noninfringement and invalidity against two of the defendants' patents. After

the defendant filed an infringement action against the plaintiff in the Eastern District of

Texas on a third patent that issued after the original declaratory judgment action was

filed, the plaintiff sought leave to amend its complaint to add a declaratory judgment

claim against this third patent. The defendant opposed the motion, arguing that its Texas

action was the first-filed action with respect to the third patent and therefore was entitled

to priority. This Court, however, rejected that argument, holding that the declaratory

judgment action would be deemed to be the first-filed action with respect to the third

9

patent because there was a substantial overlap of issues among the defendants' patents. *Id.* at 418.

Just like in the *Intel* case, because all four of Defendants' patents relate to design and manufacture of semiconductor products and are asserted against SEC's DRAM products, presentation of the parties' respective infringement and noninfringement positions for all four patents "will require a judge, on the summary judgment motions that are sure to be filed, and a jury, at any trial of the case, to become familiar with the same field of art, the same fundamental science and technology associated with methods of semiconductor fabrication, the same allegedly infringing devices, and, in any damages analysis, the same pricing, sales, and related market data." *Id.* at 418. The Delaware Action is therefore the first-filed action with respect to the '827 patent.[5]

The fact that the '827 patent was not added to the Delaware Action until after the Texas Action was filed does not affect the priority analysis under the first-filed rule. In rejecting an argument similar to the argument made by Defendants, this Court in *Intel* noted that the defendant had not identified any precedent holding that "a case in which subject matter jurisdiction already exists cannot be supplemented by adding a dispute over a later-issued patent, nor does it hold that, when such supplementation occurs, relation back to the original filing date is inappropriate for purposes of determining which of two competing suits should go forward." *Id.* at 418 -19. This Court concluded that "at least for purposes of determining the priority of litigation between this court and the

_____

[5] Defendants point to the fact that they hid the '827 patent from SEC REDACTED as evidence that the '827 patent is unrelated to Defendants' other patents. But the fact that Defendants hid the '827 patent from SEC has no bearing whatsoever on whether the '827 patent in fact overlaps with Defendants' other patents.

Eastern District of Texas in this case, it is appropriate to consider this the first-filed action." *Id.* at 419. This case is an easier case than *Intel*, because, unlike the patent in *Intel*, the '827 patent issued before the original Complaint was filed on November 30, 2006. The only reason the '827 patent was not included in the original Complaint was that the Defendants kept it secret from SEC       REDACTED although they clearly intended to assert it against SEC. Thus, the declaratory judgment claims against the '827 patent effectively arise out of the same events as the declaratory judgment claims against the other patents — Defendants' pre-suit targeting of SEC.

In view of the foregoing, the Delaware Action is the first-filed action with respect to the '827 patent as well.

## IV.    This Action Was Not Filed In Bad Faith.

Defendants also argue that this action was filed in bad faith, but the record proves just the opposite — that SEC filed this action in good faith to resolve the uncertainty and insecurity caused by Defendants' repeated litigation threats and      REDACTED

The purpose of declaratory judgment actions in patent cases is "to provide the allegedly infringing party relief from uncertainty and delay regarding its legal rights." *Goodyear Tire & Rubber Co. v. Releasomers, Inc.*, 824 F.2d 953, 956 (Fed. Cir. 1987). The Federal Circuit has explained that the Declaratory Judgment Act was intended "to allow a party who is reasonably at legal risk because of an unresolved dispute, to obtain judicial resolution of that dispute without having to await the commencement of legal action by the other side." *Capo, Inc. v. Dioptics Medical Products, Inc.*, 387 F.3d 1352, 1354-55 (Fed. Cir. 2004) (internal citations omitted). Through the Declaratory Judgment Act, alleged infringers have a more attractive course of action than the "*in terrorem*

11

choice between the incurrence of a growing potential liability for patent infringement and abandonment of their enterprises; they could clear the air by suing for a judgment that would settle the conflict of interests." *Arrowhead Industrial Water, Inc. v. Ecolochem, Inc.*, 846 F.2d 731, 735 (Fed. Cir. 1988). The Declaratory Judgment Act thus protects industries from patentees who would "infect the competitive environment of the business community with uncertainty and insecurity" through the use of "guerrilla-like" tactics and attempts at "extra-judicial patent enforcement." *Id.*

This is a textbook case for application of the Declaratory Judgment Act. Defendants — who are seeking to enforce their patents against other members of the DRAM industry as well —accused SEC of infringing their patents through SEC's sales of DRAM products, sales that amount to more than $1 billion annually.

REDACTED

Faced with Defendants' litigation threats                                on the one hand, and SEC's growing potential liability for patent infringement on the other, SEC was perfectly within its rights to file a declaratory judgment action to resolve the uncertainty and insecurity caused by Defendants' threats.

12

Defendants nonetheless contend that SEC improperly filed this action

REDACTED

(D.I.

29, ¶ 13.)  Finally, because Defendants voluntarily put their patents at risk of adverse

rulings by filing the Texas Action, the Delaware Action gives SEC no negotiating

"leverage" whatsoever.

Defendants also contend that SEC misled them into believing that SEC would not

file suit so that SEC could gain a "tactical" advantage in litigation, presumably by

selecting a favorable forum.  As an initial matter, this argument presupposes that

Defendants negotiated in good faith with SEC.

  Moreover, SEC did not mislead

Defendants in any way.

13

REDACTED

Moreover, as explained in Plaintiffs' opening brief, SEC did not forum shop or file this action anticipatorily. (D.I. 11 at 9-13.) Because Defendants are both incorporated in Delaware, SEC's choice of Delaware as a forum for this dispute is both rational and appropriate, and Defendants should not be heard to complain that they have been forced to litigate in Delaware. *See, e.g., Wesley-Jessen Corp. v. Pilkington Visioncare, Inc.*, 157 F.R.D. 215, 218 (D. Del. 1993) ("Absent some showing of a unique or unexpected burden, [Delaware] corporations should not be successful in arguing that litigation in their state of incorporation is inconvenient.") Further, Delaware does not inconvenience Defendants, nor does it offer Plaintiffs any unfair advantage or convenience over Defendants, which Defendants tacitly concede in their opposition brief. SEC therefore did not gain any unfair tactical advantage over Defendants by filing an action in Delaware.

Defendants' selection of the Eastern District of Texas as the forum for the Texas Action, on the other hand, is classic forum shopping. As Defendants also tacitly concede in their opposition brief, the Eastern District of Texas has no relevant connection to the parties, witnesses, or sources of proof in this case. The only logical conclusion is that Defendants chose the Eastern District of Texas because they believed it would be more favorable to their cause. This Court should not condone such blatant forum shopping.

Accordingly, because the Delaware Action was filed in good faith, and because the Delaware Action is the first-filed action, Plaintiffs' motion to enjoin should be granted.

14

V.    **Judge Jordan's Elevation To The Third Circuit Does Not Warrant Departure From The First-Filed Rule.**

Defendants also argue that this Court should depart from the first-filed rule because of Judge Jordan's elevation to the Third Circuit. While Defendants contend that this case can "proceed more expeditiously in Texas," there is no reason to believe at this juncture that a replacement for Judge Jordan will not be promptly named or that the ultimate resolution of this Action will be delayed at all, let alone unduly delayed, and any suggestion to the contrary is mere conjecture.[6] Furthermore, to the extent this case is delayed, it will only be because Defendants object to their motion to dismiss being heard by Magistrate Judge Thynge, to whom this action has been assigned for all pre-trial matters.

Under the circumstances, depriving SEC of its choice of forum based entirely on the speculation that this case can "proceed more expeditiously in Texas" because Judge Jordan has been elevated to the Third Circuit would be fundamentally unfair and is unwarranted.

---

[6] The cases cited by Defendants are inapposite, because in those cases — unlike here — the second-filed action was much further developed than the first-filed action. *See Tuff Torq Corp. v. Hydro-Gear Ltd. P'ship*, 882 F. Supp. 359, 365 (D. Del. 1994) (second filed action was already scheduled for trial and discovery was underway); *Optical Recording Corp. v. Capitol-EMI Music, Inc.*, 803 F. Supp. 971, 974 (D. Del. 1992) (second filed court had already permitted discovery to commence and had scheduled trial); *One World Botanicals Ltd. v. Gulf Coast Nutritionals, Inc.*, 987 F. Supp. 317, 329 (D. N.J. 1997) (second filed court had already heard extensive oral arguments); *Hunt Manuf. Co. v. Fiskars OY AB*, No. 97-2460, 1997 U.S. Dist. LEXIS 15457 (Sept. 30, 1997) (second filed case had already been scheduled for trial). The Texas Action has not developed to any greater extent than this action — indeed a motion to transfer the Texas Action to this Court is pending and SEC has not been properly served with process — and thus the interests of judicial efficiency do not weigh against application of the first-filed rule.

15

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Plaintiffs' opening brief, Plaintiffs' motion to enjoin Defendants from pursuing the duplicative Texas Action should be granted.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Josy W. Ingersoll (No. 1088)
John W. Shaw (No. 3362)
Andrew A. Lundgren (No. 4429)
The Brandywine Building, 17th Floor
1000 West Street
Wilmington, DE 19801
302-571-6600
*alundgren@ycst.com*

*Attorneys for Samsung Electronics America, Inc., Samsung Telecommunications America General, L.L.C., Samsung Semiconductor, Inc., and Samsung Austin Semiconductor L.L.C.*

OF COUNSEL:

John M. Desmarais
James E. Marina
KIRKLAND & ELLIS LLP
153 East 53rd Street
New York, New York 10022-4675
(212) 446-4800

Dated:  January 18, 2007

16

## CERTIFICATE OF SERVICE

I, Andrew A. Lundgren, Esquire, hereby certify that on January 18, 2007, I caused

a copy of the foregoing document to be served upon the following counsel of record in the

manner indicated below:

### BY HAND DELIVERY

Karen Jacobs Louden, Esquire
Morris Nichols Arsht & Tunnell
1201 North Market Street
PO Box 1347
Wilmington, DE 19899-1347

### BY FEDERAL EXPRESS

Kenneth R. Adamo, Esquire
Jones Day
2727 North Harwood Street
Dallas, TX 75201

T. Gregory Lanier, Esquire
Behrooz Shariati, Esquire
Jones Day
2882 Sand Hill Road, Suite 240
Menlo Park, CA 94025

YOUNG CONAWAY STARGATT & TAYLOR, LLP

Andrew A. Lundgren (No. 4429)
The Brandywine Building
1000 West Street
Wilmington, DE 19801
302-571-6600
*alundgren@ycst.com*

# Unreported Cases

LEXSEE



Caution
As of: Jan 18, 2007

### CLAY PAKY, S.p.A., Plaintiff, v. VARI-LITE, INC., Defendant. COEMAR, S.p.A., Plaintiff, v. VARI-LITE, INC., Defendant.

#### 99 Civ. 11401 (BSJ), 99 Civ. 11402 (BSJ)

#### UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

#### 2000 U.S. Dist. LEXIS 9802

#### July 12, 2000, Decided
#### July 14, 2000, Filed

**DISPOSITION:** [*1] Defendant's motions to dismiss DENIED. Defendant's motions to transfer to the Northern District of Texas GRANTED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In two related cases, defendant moved to dismiss declaratory judgment actions on the grounds that the court lacked subject matter jurisdiction, the complaints did not state a claim upon which relief could be granted, and the court lacked personal jurisdiction. Alternatively, defendant requested transfer.

**OVERVIEW:** Defendant was a Texas corporation with its principal place of business in Texas, and an office in New York. On August 5, 1999, counsel for defendant sent a letter to one of the plaintiff's headquarters indicating that the plaintiff's products might infringe defendant's patent. A nearly identical letter was sent to a second plaintiff. Plaintiffs brought declaratory judgment actions. Defendant moved to dismiss on the grounds that subject matter jurisdiction did not exist under 28 U.S.C.S. § 220, and that the court lacked personal jurisdiction. The court found subject matter jurisdiction because plaintiffs' pleadings included allegations of a present and actual controversy. Accordingly, defendant's motions to dismiss

pursuant to Fed. R. Civ. P. 12(b)(6) was denied. The court next found that the defendant was doing business in New York and was subject to personal jurisdiction. Defendant's motion to dismiss under Fed. R. Civ. P. 12(b)(2) was therefore denied. Defendant's motion to transfer pursuant to 28 U.S.C.S. § 1404(a) was granted because the center of gravity of the case was in Texas.

**OUTCOME:** Defendant's motions to dismiss for lack of subject matter jurisdiction and lack of personal jurisdiction were denied. Plaintiffs' pleadings included allegations of an actual controversy. Defendant was doing business in New York and was subject to personal jurisdiction. Transfer was granted because center of gravity of litigation was Texas.

**CORE TERMS:** patent, apprehension, negotiation, infringe, personal jurisdiction, actual controversy, convenience, motions to dismiss, licensing, lawsuit, subject matter jurisdiction, lighting, selling, counteroffer, Declaratory Judgment Act, declaratory judgment action, charge of infringement, choice of forum, infringement, license, declaratory judgment, exercise of personal jurisdiction, doing business, out-of-state, terminated, injunction, undisputed, non-party, enclosed, patentee

**LexisNexis(R) Headnotes**

2000 U.S. Dist. LEXIS 9802, *1

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Declaratory Judgment Actions > General Overview*
[HN1] See 28 U.S.C.S. § 2201(a).

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Civil Procedure > Declaratory Judgment Actions > General Overview*
*Constitutional Law > The Judiciary > Case or Controversy > Ripeness*
[HN2] An actual controversy is a jurisdictional prerequisite and must be present before a declaratory judgment action is ripe for adjudication.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Patent Law > Infringement Actions > General Overview*
*Patent Law > Remedies > Declaratory Relief*
[HN3] The standard for determining whether an actual controversy is present in a declaratory judgment action concerning a patent has two elements: First, the defendant's conduct must have created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question. Second, plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
[HN4] In order to demonstrate the presence of an actual controversy, the plaintiff has the burden of establishing by a preponderance of the evidence, inter alia, that it has a reasonable apprehension that it will be sued.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Patent Law > Infringement Actions > General Overview*
[HN5] The test used to determine whether a plaintiff's apprehension of a lawsuit is reasonable is an objective one which focuses on whether the defendant's conduct rose to a level sufficient to indicate an intent to enforce its patent. An explicit charge of infringement would give rise to the reasonable apprehension necessary to demonstrate the presence of an actual controversy, however, an express charge of infringement is not essential.

*Civil Procedure > Justiciability > Case or Controversy Requirements > General Overview*
*Patent Law > Infringement Actions > General Overview*
[HN6] A court must consider the totality of the circumstances and determine whether the plaintiff has shown that objective circumstances support his apprehension of an impending lawsuit.

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN7] In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary matters outside the pleadings.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > General Overview*
*Patent Law > Jurisdiction & Review > Standards of Review > General Overview*
*Patent Law > Jurisdiction & Review > Subject Matter Jurisdiction > Appeals*
[HN8] Although under the Federal Circuit's courtesy rule, district courts sitting in patent actions are generally guided by the law of the regional circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law, Federal Circuit law governs both substantive and procedural issues intimately involved in the substance of enforcement of the patent rights.

*Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN9] In order to defeat a motion to dismiss for lack of personal jurisdiction, the non-moving parties, need initially make only a prima facie showing of jurisdiction.

2000 U.S. Dist. LEXIS 9802, *1

The court's analysis of the adequacy of a non-moving party's prima facie showing of personal jurisdiction requires that the court first examine whether the exercise of jurisdiction is proper under the forum state's law, and then address whether the exercise of personal jurisdiction comports with due process.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN10] N.Y. C.P.L.R. 301 provides general jurisdiction over a non-domiciliary defendant where that defendant is engaged in such a continuous and systematic course of doing business here as to warrant a finding of its presence in this jurisdiction. The non-domiciliary must be doing business in New York not occasionally or casually, but with a fair measure of permanence and continuity.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
[HN11] Jurisdiction under N.Y. C.P.L.R. 301 must satisfy the constitutional requirement of due process. The exercise of jurisdiction must be based on defendant's minimum contacts with the state and must comport with traditional notions of fair play and substantial justice.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN12] District courts may transfer an action to another district in which the action could have been brought when doing so would serve the convenience of the parties and the witnesses and would be in the interest of justice. 28 U.S.C.S. § 1404(a).

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN13] Whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN14] The burden of demonstrating the desirability of transfer lies with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum unless the defendant makes make a clear and convincing showing that the balance of convenience

favors the defendant's choice.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN15] In determining whether a transfer is warranted, a district court considers a number of factors, including: (1) the convenience of witnesses, (2) the location of relevant documents and the relative ease of access to sources of proof, (3) the convenience of the parties, (4) the locus of operative facts, (5) the availability of process to compel the attendance of unwilling witnesses, (6) the relative means of the parties, (7) the forum's familiarity with the governing law, (8) the weight accorded the plaintiff's choice of forum, and (9) trial efficiency and the interest of justice based on the totality of the circumstances.

*Civil Procedure > Venue > Federal Venue Transfers > Convenience Transfers*
[HN16] The core determination under 28 U.S.C.S. § 1404(a) is the center of gravity of the litigation, a key test of which is the convenience of witnesses. Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN17] The convenience of both the party and non-party witnesses is probably considered the single-most important factor in the analysis of whether a transfer should be granted.

*Civil Procedure > Venue > Federal Venue Transfers > General Overview*
[HN18] A plaintiff's choice of forum is generally entitled to substantial consideration. However, a plaintiff's choice is accorded less weight to the degree that the case's operative facts have little or no connection with the transferor forum.

COUNSEL: For CLAY PAKY S.P.A., plaintiff: Edward V. Filardi, Douglas R. Nemec, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York, NY.

JUDGES: Barbara S. Jones, UNITED STATES DISTRICT JUDGE.

OPINION BY: Barbara S. Jones

Page 3

**OPINION:**

**OPINION & ORDER**

BARBARA S. JONES
UNITED STATES DISTRICT COURT

In these two related cases, defendant Vari-Lite, Inc., moves pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, and Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure (Fed. R. Civ. P.) to dismiss the declaratory judgment actions brought separately by plaintiff Clay Paky S.p.A. and Coemar S.p.A., on the grounds that this Court lacks subject matter jurisdiction under the Declaratory Judgment Act, and the complaints do not state a claim upon which relief can be granted. n1 In addition, defendant moves to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2). In the alternative, defendant requests that this Court exercise its discretion under 28 U.S.C. § 1404 and transfer these actions to the Northern District of Texas, Dallas Division. For the following reasons, defendant's motions to dismiss are denied, and defendant's motion to transfer [*2] venue is granted.

> n1 On June 27, 2000, plaintiffs amended their respective complaints as of right. The amendments have no impact on the merits of the pending motions.

BACKGROUND

The following facts are, unless otherwise noted, undisputed. Vari-Lite is a Texas corporation with its principal place of business in Dallas, Texas, and an office in New York, New York. Vari-Lite is in the business of manufacturing and renting sound and lighting fixtures for use in stage, theater, television, and other applications. In particular, Vari-Lite manufactures "intelligent lighting" -- remotely controlled lights that change colors and positions, project images and are choreographed through the use of a computer. Among other patents, Vari-Lite currently owns U.S. Patent No. 4,392,187 ("the '187 patent"), entitled "Computer Controlled Lighting System." Vari-Lite products are manufactured, serviced and shipped from Vari-Lite's production facility in Dallas.

Plaintiffs Clay Paky and Coemar are Italian corporations, with their [*3] principal places of business in Italy, that manufacture various lighting products.

On August 5, 1999, counsel for Vari-Lite sent a letter to Clay Paky's Italian headquarters. n2 The entire letter is reprinted below:

> This firm represents Vari-Lite, Inc. ("Vari-Lite") in intellectual property matters.

> Vari-Lite is the owner of [the '187 patent], which covers lighting systems like the ones sold by Clay Paky. I have enclosed a copy of this patent for your review. Since the issuance of the '187 Patent, Vari-Lite has aggressively enforced its right to exclude others from making, using, or selling products covered by the '187 Patent. Most recently, a federal court in Texas ordered Martin to cease selling certain of its lighting products in the United States that infringe the '187 Patent. I have enclosed a copy of the injunction order for your review.

> It has come to our attention that Clay Paky sells a number of products in the United States that may infringe one or more claims of the '187 Patent. Specifically, we believe that the Stage Color line of luminaires (1200, 1000, 575, 300), Stage Zoom 1200, Stage Light 300, Golden Light 300, Golden Scan HPE, Stage Scan, Super Scan Zoom, [*4] Golden Scan 3, the MiniScan series, and Silverado may infringe claim 6 and other claims of the '187 Patent.

> This letter is to request that you cease and desist from making, using, selling, leasing, importing or offering for sale or lease in the United States the above-identified products, and any other products that infringe the '187 Patent. If you do not wish to discontinue such activities, please contact the undersigned to discuss the potential for licensing arrangement with Vari-Lite.

> If you believe that your products do

not infringe the '187 Patent, I would appreciate hearing from you the reasons why you believe your products do not infringe no later than August 16, 1999.

Thank you for your attention to this important matter, and I look forward to receiving your response.

(McCormack Aff. in 99 Civ. 11402, Ex. B.)

n2 The records in these actions are confused. The August 5, 1999, letter to Clay Paky is not in the Clay Paky record, but can be found in the Coemar record. (See McCormack Aff. in 99 Civ. 11402, Ex. B.) Not surprisingly, the August 5, 1999, letter to Coemar can be found as Exhibit B to defendant's affidavit in the Clay Paky action. (See McCormack Aff. in 99 Civ. 11401, Ex. B.)

[*5]

Also on August 5, 1999, defendant sent a nearly identical letter to Coemar. n3 Coemar contacted Vari-Lite's attorneys and requested a face-to-face meeting with Vari-Lite to discuss a license under the '187 patent.

n3 The letters to Clay Paky and Coemar are identical, except for the second sentence in the third paragraph that identifies which specific products "may infringe" the '187 patent.

On August 26, 1999, Bruno Dedoro, president of Coemar, faxed Vari-Lite's counsel a letter requesting a face-to-face meeting with Vari-Lite on August 30, 1999, when Dedoro planned to be in North America on other business. Dedoro wrote, "The purpose of this meeting would be to understand directly from Vari-Lite on which basis [sic] the mentioned licensing arrangements could be reached without wasting money in disputes . . . . Obviously my approach has not to be interpreted [sic] in any way as an acknowledgement [sic] of any kind of liability in respect of your client's claim." (McCormack Aff. in 99 Civ. 11402, [*6] Ex. C.) Later that day, Vari-Lite's counsel responded by fax suggesting that Dedoro meet with Vari-Lite's President and CEO Harry R. Brutsche, III, in New York on August 30, 1999, when Brutsche and his lawyer would be in New York on other

business.

On August 30, 1999, Vari-Lite CEO Brutsche met with Dedoro in New York and discussed a licensing arrangement. Brutsche and Dedoro agreed to continue negotiations on September 6, 1999, at a trade show in London both would be attending. The day after this initial meeting, Vari-Lite's counsel faxed Dedoro a proposal for a license. This August 31, 2000, letter makes no mention of litigation. n4

n4 Though there is no explicit mention of litigation, the letter, curiously, is captioned: "Re: *Vari-Lite, Inc. v. Martin Gruppen A/S, et al.*" (McCormack Aff. in 99 Civ. 11402, Ex. E.) The "Martin Gruppen" referenced in this letter is presumably the "Martin" mentioned in Vari-Lite's opening salvo to Coemar and Clay Paky and against whom Vari-Lite won an injunction.

On September 6, 1999, Brutsche [*7] and Dedoro met in London, and were joined by Pasquale Quadri and Enrico Caironi of Clay Paky. Through their representatives, Coemar and Clay Paky negotiated jointly at the meeting. Coemar and Clay Paky noted that each had historically enjoyed a good relationship with Vari-Lite and that they wanted to reach a resolution. Both Coemar and Clay Paky said that their presence in the U.S. market was not big enough to warrant litigation, which they wished to avoid. Both companies offered to make their financial records available to Vari-Lite in order to determine a reasonable royalty rate. Brutsche expressed his interest in entering into a licensing agreement with both Coemar and Clay Paky, and the three companies negotiated the amount of the licenses. Brutsche made no threats of litigation and no references to future litigation. Each company agreed to consider the offers on the table and to continue negotiations after Coemar and Clay Paky provided financial information.

On September 22, 1999, Coemar and Clay Paky sent a written joint proposal to Vari-Lite. Their joint proposal contained information regarding Coemar and Clay Paky's sales volumes and earnings. The joint proposal was a counteroffer [*8] to an earlier offer by Vari-Lite. Brutsche considered this joint proposal a starting point for negotiation in earnest as it provided him with his first glimpse at their financial data.

Brutsche responded to the joint proposal by letter to both Coemar and Clay Paky on October 7, 1999. In the letter, Brutsche thanked Coemar and Clay Paky for their counteroffer, but termed it "inadequate to compensate Vari-Lite for sales of infringing products in the United States by Coemar and Clay Paky." Brutsche concluded by reducing Vari-Lite's initial demand by ten percent. Brutsche made no threat or mention of litigation.

In response to Vari-Lite's counteroffer, Enrico Caironi, Commercial Director of Clay Paky, called Brutsche on October 26, 1999. Caironi said that he hoped Vari-Lite was not offended by Coemar and Clay Paky's low offer and that Clay Paky was still hoping to work something out with Vari-Lite.

Later that same day, Dedoro, from Coemar, called Brutsche and expressed his continuing interest in entering into a licensing agreement with Vari-Lite. He said that he would soon be prepared to present another counteroffer for an increased royalty or licensing fee. Brutsche and Dedoro agreed [*9] to continue negotiations on November 19, 1999, when both would be in Orlando, Florida for a trade show.

On November 17, 1999, Clay Paky and Coemar separately filed the complaints in these actions. Nonetheless, Brutsche and Dedoro met in Orlando on November 20, 1999. Dedoro proposed yet another increased counteroffer. Brutsche, who was under the impression that Dedoro was speaking on behalf of both Coemar and Clay Paky, told Dedoro that he would take this latest offer under advisement. There have been no negotiations since. On February 24, 2000, Vari-Lite filed the pending motions.

I. Subject Matter Jurisdiction

Defendant's principal motion is that subject matter jurisdiction does not exist under the Declaratory Judgment Act, 28 U.S.C. § 2201. The purpose of the Declaratory Judgement Act is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit. See Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 889 (Fed. Cir. 1992). [HN1] Section 2201(a) states:

In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights [*10] . . .

of any interested party seeking such declaration . . . . Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

28 U.S.C. § 2201(a). [HN2] An actual controversy is a jurisdictional prerequisite and must be present before a declaratory judgment action is ripe for adjudication. See Shell Oil, 970 F.2d at 887. [HN3] The standard for determining whether an actual controversy is present in a declaratory judgment action concerning a patent has two elements:

First, the defendant's conduct must have "created on the part of the declaratory plaintiff a reasonable apprehension that it will face an infringement suit if it commences or continues the activity in question." Second, "plaintiff must be engaged in an actual making, selling, or using activity subject to an infringement charge or must have made meaningful preparation for such activity."

BP Chemicals Ltd. v. Union Carbide Corp., 757 F. Supp. 303, 304 (S.D.N.Y. 1991) (citations omitted). [HN4] In order to demonstrate the presence of an actual controversy, "the plaintiff has the burden of establishing by a preponderance [*11] of the evidence, inter alia, that it has a reasonable apprehension that it will be sued." Shell Oil, 970 F.2d at 887.

[HN5] The test used to determine whether a plaintiff's apprehension of a lawsuit is reasonable is an objective one which focuses on whether the defendant's "conduct rose to a level sufficient to indicate an intent to enforce its patent." Id. at 888. An explicit charge of infringement would give rise to the reasonable apprehension necessary to demonstrate the presence of an actual controversy, however, an express charge of infringement is not essential. See Arrowhead Indus. Water, Inc. v. Ecolochem, Inc., 846 F.2d 731, 735 (Fed. Cir. 1988). Under the standard articulated by the Federal Circuit in Shell Oil and Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha, 57 F.3d 1051 (Fed. Cir. 1995), Vari-Lite's statements that '187 patent "covers" products sold by the plaintiffs and that those products

therefore "may infringe" the patent, in the context of a letter that is at least in part an invitation to negotiate a license -- that is, to find a commercial resolution -- may be sufficiently well-crafted [*12] to avoid being an express charge of infringement. See Shell Oil, 970 F.2d at 889; Phillips Plastics 57 F.3d at 1053-54.

Assuming, without deciding, that the statements in Vari-Lite's August 5, 1999, letter do not constitute an explicit charge of infringement, [HN6] I must consider the totality of the circumstances and determine whether the plaintiff has shown that objective circumstances support his apprehension of an impending lawsuit. See Shell Oil, 970 F.2d at 888; Phillips Plastics, 57 F.3d at 1053-54.

[HN7] In deciding a motion to dismiss for lack of subject matter jurisdiction, a court may consider evidentiary matters outside the pleadings. Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985). In these cases, an examination of the pleadings, the affidavits, and the correspondence between Vari-Lite, Clay Paky and Coemar, submitted as exhibits by the defendant, shows that the plaintiff's apprehension of a lawsuit was objectively reasonable.

Defendants contend that the parties were seeking a business solution and toward that end were involved in negotiations which were either [*13] (1) never terminated by any party, even after these suits were filed, or (2) unilaterally terminated by plaintiffs by filing these suits. The fact that Clay Paky or Coemar may have unilaterally terminated negotiations does not negate their reasonable apprehension of a lawsuit, however, especially when viewed in light of defendant's first letter which clearly threatened litigation. Defendant argues that merely informing Clay Paky and Coemar that Vari-Lite enforces its patent rights does not in and of itself create a reasonable apprehension of impending litigation. This argument may be true as far as it goes, but Vari-Lite's August 5, 1999, letters went much further than merely alerting Clay Paky and Coemar of Vari-Lite's patent. The letters warned that "Vari-Lite has aggressively enforced" its rights under the '187 patent and named a third party, Martin, that Vari-Lite had successfully enjoined. Vari-Lite even enclosed copies of the injunction order against Martin. "This is in effect a statement to the plaintiff to take notice that it is next on the list." United Aircraft Corp. v. Giannini Controls Corp., 1967 U.S. Dist. LEXIS 8901, 156 U.S.P.Q. 557, 558 (S.D.N.Y. 1967). Vari-Lite [*14]

as much as wrote, "If you don't think we mean business and are serious about this matter, look and see what we have done to another alleged infringer." See id.

Defendant contends that the August 5, 1999, letters were merely an invitation to Clay Paky and Coemar to engage in licensing negotiations, and thus were the type of communication that the Federal Circuit has previously held did not create a justiciable controversy. See Phillips Plastics, 57 F.3d at 1053. Defendant's reliance on the Phillips Plastic decision, however, is misplaced. In Phillips Plastics, the patentee had not stated nor suggested that it would pursue legal recourse if it were not satisfied with the outcome of the proposed licensing negotiations. Id. The Federal Circuit Court of Appeals held that such circumstances were not sufficiently adverse to create a justiciable controversy. Id. The holding in Phillips Plastics, however, is inapplicable in a case such as the ones presented here, where defendant has obliquely accused Clay Paky and Coemar of infringing its patent, made specific demands on Clay Paky and Coemar, and issued thinly veiled threats of resorting to litigation [*15] if its demands are not met. Just because the parties proceeded to initiate negotiations does not mean that the reasonable apprehension of litigation was ever removed. Vari-Lite, having made its threat of litigation, cannot now claim that Clay Paky and Coemar were unreasonable in their apprehension of impending litigation. n5

n5  This is not a case, like Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, where the defendant, having once made a threat, later alleviated any reasonable apprehension of litigation by entering into a covenant not to sue.

Plaintiffs have shown objective circumstances which support their reasonable apprehension of a lawsuit, thereby satisfying the first requirement of demonstrating that an actual controversy existed at the time this declaratory judgment action was commenced. As to the second element, there is no dispute among the parties that plaintiffs have engaged in selling activity subject to a charge of infringement. Therefore, subject matter jurisdiction exists over this dispute under [*16] the Declaratory Judgment Act, and Vari-Lite's motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) are DENIED.

Plaintiffs' pleadings include allegations of a present

Page 7

and actual controversy with respect to the validity, infringement, and enforceability of the '187 patent. Such allegations state a cause of action for which the requested relief, a declaratory judgment, could be granted. Accordingly, defendant's motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) are DENIED. The court must next consider defendant's alternative request that the complaint be dismissed on the ground of lack of personal jurisdiction, pursuant to Federal Rule of Civil Procedure 12(b)(2).

## II. Personal Jurisdiction

[HN8] Although under the Federal Circuit's "courtesy rule," district courts sitting in patent actions are generally guided by the law of the regional "circuit to which district court appeals normally lie, unless the issue pertains to or is unique to patent law," Molins PLC v. Quigg, 837 F.2d 1064, 1066, 5 U.S.P.Q.2D (BNA) 1526, 1527 (Fed. Cir. 1988) (citation omitted), Federal Circuit law governs both substantive and procedural issues "intimately involved in the substance of enforcement" [*17] of the patent rights. See Viam Corp. v. Iowa Export-Import Trading Co., 84 F.3d 424, 428 (Fed. Cir. 1996) (applying Federal Circuit law in holding that the district court had personal jurisdiction over out-of-state patentee defending an action seeking declaratory judgment of invalidity and noninfringement); see also Akro Corp. v. Luker, 45 F.3d 1541, 1543 (Fed. Cir. 1995) (Federal Circuit law governs personal jurisdiction issue when the out-of-state party is the patentee defending in a declaratory judgment action, rather than the alleged infringer); Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1564-65 (Fed. Cir. 1994) (applying Federal Circuit law in determining whether district court had personal jurisdiction over an out-of-state corporation accused of patent infringement). Therefore, the Court looks to Federal Circuit precedents in analyzing the personal jurisdictional issues.

[HN9] In order to defeat a motion to dismiss for lack of personal jurisdiction, Clay Paky and Coemar, as the non-moving parties, need initially make only a prima facie showing of jurisdiction. See United States v. Ziegler Bolt and Parts Co., 111 F.3d 878, 880 (Fed. Cir. 1997). [*18] The Court's analysis of the adequacy of a non-moving party's prima facie showing of personal jurisdiction requires that the Court first examine whether the exercise of jurisdiction is proper under the forum state's law, and then address whether the exercise of

personal jurisdiction comports with due process. See Graphic Controls Corp. v. Utah Medical Products, Inc., 149 F.3d 1382, 1385 (Fed. Cir. 1998).

[HN10] New York's CPLR 301 provides general jurisdiction over a non-domiciliary defendant where that defendant is "engaged in such a continuous and systematic course of doing business here as to warrant a finding of [its] presence in this jurisdiction." Beacon Enter., Inc. v. Menzies, 715 F.2d 757, 762 (2d Cir. 1983) (quoting Simonson v. Int'l Bank, 14 N.Y.2d 281, 200 N.E.2d 427, 251 N.Y.S.2d 433 (N.Y. 1964)). "The non-domiciliary must be doing business in New York not occasionally or casually, but with a fair measure of permanence and continuity." Id. (internal quotations omitted). It is undisputed that Vari-Lite has an office in New York, employing thirteen people and accounting for approximately twelve percent of Vari-Lite's [*19] revenues in the most recent fiscal year, as well as a New York bank account. Vari-Lite is "doing business" in New York and is therefore subject to this Court's exercise of personal jurisdiction. See Hoffritz for Cutlery, Inc. v. Amajac, Ltd., 763 F.2d 55, 58 (2d Cir. 1985).

[HN11] Jurisdiction under CPLR 301 must also satisfy the constitutional requirement of due process. The exercise of jurisdiction must be based on defendant's "minimum contacts" with the state and must comport with "traditional notions of fair play and substantial justice." International Shoe Co. v. State of Wash., Office of Unemployment Compensation and Placement, 326 U.S. 310, 316, 90 L. Ed. 95, 66 S. Ct. 154 (1945). By maintaining an office in New York, Vari-Lite "purposefully availed itself of the privilege of conducting activities within the forum State." Hanson v. Denckla, 357 U.S. 235, 253, 2 L. Ed. 2d 1283, 78 S. Ct. 1228 (1958). Given Vari-Lite's presence and continuous business in New York, Vari-Lite cannot complain that it could not have "reasonably anticipated being haled before a court" in New York. World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297, 100 S. Ct. 559, 62 L. Ed. 2d 490 (1980). [*20] Therefore, this Court's exercise of personal jurisdiction over Vari-Lite comports with due process. Accordingly, defendant's motions to dismiss, pursuant to Rule 12(b)(2) for lack of personal jurisdiction are DENIED.

## III. Change of Venue

In short, all aspects of defendant's motions to dismiss are denied. Defendant also moves pursuant to 28 U.S.C. §

2000 U.S. Dist. LEXIS 9802, *20

1404(a) to transfer venue from the Southern District of New York to the Northern District of Texas. [HN12] District courts may transfer an action to another district in which the action could have been brought when doing so would serve the convenience of the parties and the witnesses and would be in the interest of justice. See 28 U.S.C. § 1404(a). " [HN13] Whether to grant a change of venue requires a balancing of conveniences, which is left to the sound discretion of the district court." Filmline (Cross-Country) Productions, Inc. v. United Artists Corp., 865 F.2d 513, 520 (2d Cir. 1989). [HN14] The burden of demonstrating the desirability of transfer lies with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum unless the [*21] defendant makes "make a clear and convincing showing that the balance of convenience favors" the defendant's choice. Orb Factory Ltd. v. Design Science Toys Ltd., 6 F. Supp. 2d 203, 210 (S.D.N.Y. 1998) (internal quotation omitted).

[HN15] In determining whether a transfer is warranted, a district court considers a number of factors, including: (1) the convenience of witnesses; (2) the location of relevant documents and the relative ease of access to sources of proof; (3) the convenience of the parties; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with the governing law; (8) the weight accorded the plaintiff's choice of forum; and (9) trial efficiency and the interest of justice based on the totality of the circumstances. See, e.g., Pilates, Inc. v. Pilates Institute, Inc., 891 F. Supp. 175, 183 (S.D.N.Y. 1995); Stein v. Microelectronic Packaging, Inc., 1999 U.S. Dist. LEXIS 11375, No. 98 Civ. 8952, 1999 WL 540443 (S.D.N.Y. 1999) (MBM).

[HN16] The "core determination" under § 1404(a) is "the center of gravity of the litigation, a key test [*22] of which is the convenience of witnesses . . . . Courts routinely transfer cases when the principal events occurred, and the principal witnesses are located, in another district." Viacom Int'l, Inc. v. Melvin Simon Prods., Inc., 774 F. Supp. 858, 868 (S.D.N.Y. 1991); see also Hernandez v. Graebel Van Lines, 761 F. Supp. 983, 988 (E.D.N.Y. 1991) (" [HN17] The convenience of both the party and non-party witnesses is probably considered the single-most important factor in the analysis of whether a transfer should be granted.") (citing cases); Arrow Elec., Inc. v. Ducommun Inc., 724 F. Supp. 264,

265 (S.D.N.Y. 1989) ("In most cases, the convenience of the party and non-party witnesses is the most important factor in the decision whether to grant a motion for transfer.").

In the present case, these factors heavily favor transferring the case to Texas. It is undisputed that with the exception of plaintiffs, who reside in Italy, every witness -- both party and non-party -- resides or works in Dallas, Texas, and most, if not all, of the documentary evidence is in Texas. (See McCormack Aff. in 99 Civ. 11401, Ex. A; McCormack Aff. in 99 Civ. 11402, [*23] Ex. A.) In short, the "center of gravity" of this litigation is plainly in Texas, and the "local interest in having localized controversies decided at home" favors litigation there. Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508, 91 L. Ed. 1055, 67 S. Ct. 839 (1947).

To be sure, [HN18] a plaintiffs' choice of forum is generally entitled to "substantial consideration." In re Warrick, 70 F.3d 736, 741 (2d Cir. 1995). However, a plaintiff's choice "is accorded less weight to the degree that the case's operative facts have little or no connection with the transferor forum." Totonelly v. Cardiology Assocs. of Corpus Christi, Inc., 932 F. Supp. 621, 623 (S.D.N.Y. 1996). Here, the operative facts have no connection with New York whatsoever. Therefore, plaintiffs' choice of forum is entitled to less deference than it would usually receive, and transfer is warranted. Accordingly, defendant's transfer motions herein are GRANTED and it is hereby ORDERED that these actions be transferred to the Northern District of Texas for all further proceedings.

CONCLUSION

For the foregoing reasons, defendant's motions to dismiss are DENIED. Defendant's motions [*24] to transfer to the Northern District of Texas are GRANTED. The Clerk is directed to transfer these cases to the United States District Court for the Northern District of Texas.

**SO ORDERED:**

Barbara S. Jones

UNITED STATES DISTRICT JUDGE

New York, New York
July 12, 2000

LEXSEE



Cited
As of: Jan 18, 2007

### IVOCLAR VIVADENT, INC., Plaintiff, -vs- DR. ROBERT W. HASEL and ABCO RESEARCH, LLC., Defendants.

### 02-CV-0316E(F)

### UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF NEW YORK

### 2003 U.S. Dist. LEXIS 12611

### June 30, 2003, Decided

**DISPOSITION:** [*1] Defendants' motion to dismiss denied in its entirety. Defendants' motion to transfer venue granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff corporation sought a declaratory judgment pursuant to 28 U.S.C.S. § 2201(a) that certain patents owned by defendants, doctor and a limited liability company (LLC), were invalid and unenforceable. The doctor and the LLC moved to dismiss the complaint on the grounds that the court lacked personal and subject matter jurisdiction. In the alternative, the doctor and the LLC requested a transfer of the action under 28 U.S.C.S. § 1404(a).

**OVERVIEW:** The doctor was the inventor of patents for methods of restoring a tooth and the co-owner of the LLC, a Minnesota company whose function was to manage the prosecution and licensure of the patents. The corporation was a manufacturer of dental materials with its principal place of business in New York. The LLC sent two letters to the corporation indicating that several of its dental products infringed one of more of the LLC's patents. The corporation sought a declaratory judgment of non-infringement. The court found that the doctor and the LLC's activities in not only protecting its patents but soliciting licensing fees in New York, when combined

with their two "cease and desist" letters, evinced the requisite systemic and continuous activity to satisfy New York's "doing business" test. The LLC's communication of implicit threats of litigation to the corporation created a situation whereby it was reasonable for the corporation to apprehend the imminent commencement of a patent infringement action. Thus, the prerequisite under the Declaratory Judgment Act, 28 U.S.C.S. § 2201(a), that an actual controversy must have existed at the time the complaint was filed, was satisfied.

**OUTCOME:** The doctor and the LLC's motion to dismiss was denied in its entirety. The doctor and the LLC's motion to transfer venue was granted and the clerk of court was directed to transfer the case to the United States District Court for the District of Minnesota.

**CORE TERMS:** patent, patent infringement, personal jurisdiction, license, motion to dismiss, negotiation, settlement, actual controversy, manufacturer, apprehension, infringement, infringe, infringer, licensing, composite, flowable, lawsuit, subject matter jurisdiction, enforcing, exercise jurisdiction, doing business, imminent, ongoing, dental, apprehend, wit, licensing agreement, patent license, enclosed, permanence

**LexisNexis(R) Headnotes**

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN1] In opposition to a defendant's motion to dismiss for lack of personal jurisdiction, a plaintiff need make only a prima facie showing of personal jurisdiction in accordance with state law. In determining the disposition of a Fed. R. Civ. P. 12(b)(2) motion, the court may consider facts as presented in evidentiary material outside the pleadings. Such material is construed in the light most favorable to, and any doubts are resolved in favor of, the plaintiff.

*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > Constitutional Limits*
*Civil Procedure > Jurisdiction > Personal Jurisdiction & In Rem Actions > In Personam Actions > General Overview*
[HN2] N.Y. C.P.L.R. § 301 provides for jurisdiction over a foreign corporation if it does business in New York, not occasionally or casually, but regularly, continuously, and systematically thereby demonstrating a sufficiently fair measure of permanence to warrant a finding of the corporation's constructive presence here. That so-called "doing business" test requires a court to analyze the specific facts of each individual case to determine whether a foreign corporation's contacts and connections with New York demonstrate continuous and systematic activity. Finally, unlike New York's long-arm statute, a jurisdictional inquiry under N.Y. C.P.L.R. § 301 does not require that the plaintiff's cause of action emanate from or have any nexus to the defendant's business activity.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Patent Law > Inequitable Conduct > Burdens of Proof*
*Patent Law > Infringement Actions > Burdens of Proof*
[HN3] Section 2201(a) (28 U.S.C.S. § 2201(a)) of the Declaratory Judgment Act authorizes a court to declare the rights of an interested party in a case of actual controversy. The purpose of the Act is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit. However, a prerequisite to any claim brought pursuant to 28 U.S.C.S. § 2201(a) is that an actual controversy must have existed at the time the complaint was filed. And in a patent case, a plaintiff must demonstrate: (1) an explicit threat or other action by

the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit; and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. The plaintiff bears the burden of proving that there is an actual controversy. Nonetheless, even if the plaintiff shows that an actual controversy existed, the exercise of jurisdiction over that cause of action is not mandatory but within the sound discretion of the court.

*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > General Overview*
*Patent Law > Infringement Actions > General Overview*
*Patent Law > Remedies > Declaratory Relief*
[HN4] In the context of a patent claim under the Declaratory Judgment Act, 28 U.S.C.S. § 2201, the test for determining whether a plaintiff's apprehension was reasonable is an objective one which focuses on whether the defendant's conduct rose to a level sufficient to indicate an intent to enforce its patent. In determining whether the plaintiff has demonstrated the requisite reasonable apprehension, the court must objectively consider the totality of the circumstances.

*Civil Procedure > Justiciability > Case or Controversy Requirements > Actual Disputes*
*Civil Procedure > Venue > General Overview*
*Civil Procedure > Declaratory Judgment Actions > Federal Judgments > Discretion*
[HN5] In the context of the Declaratory Judgment Act, 28 U.S.C.S. § 2201(a), even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction.

**COUNSEL:** For Ivoclar Vivadent, Inc, PLAINTIFF: Paul V Nunes, Esq, Underberg & Kessler, Rochester, NY USA.

For Ivoclar Vivadent, Inc, PLAINTIFF: William L Prickett, Esq, Kimberly C Nuzum, Esq, Michael H Brodowski, Esq, Testa, Hurwitz & Thibeault, LLP, Boston, MA USA.

For Robert W Hasel, Abco Research, LLC, DEFENDANTS: Jeremiah J McCarthy, Phillips Lytle Hitchcock Blaine & Huber, Buffalo, NY USA.

**JUDGES:** JOHN T. ELFVIN, S.U.S.D.J.

**OPINION BY:** JOHN T. ELFVIN

**OPINION:**

MEMORANDUM and ORDER n1

n1 This decision may be cited in whole or in any part.

Plaintiff Ivoclar Vivadent, Inc. ("Ivoclar") commenced this action April 26, 2002, pursuant to 28 U.S.C. § 2201(a), seeking a declaration that certain patents owned by defendants Dr. Robert W. Hasel and ABCO Research, LLC ("ABCO") are invalid and unenforceable. Defendants now move to dismiss the Complaint pursuant to Rules 12(b)(2)and 12(b)(6) of the Federal Rules [*2] of Civil Procedure ("FRCvP") n2 on the grounds that this Court lacks personal and subject matter jurisdiction. In the alternative, defendants request that this Court exercise its discretion pursuant to 28 U.S.C. § 1404(a) and transfer this action to the United States District Court for the District of Minnesota. For the reasons stated hereinbelow, defendants' motion to dismiss will be denied and its request to transfer venue will be granted.

n2 Although defendants have erroneously cited FRCvP 12(b)(6) as the basis for its motion to dismiss for lack of subject matter jurisdiction, the Court will treat such as a motion to dismiss pursuant to FRCvP 12(b)(1).

The following facts are undisputed unless otherwise noted. Hasel, a resident of the State of Minnesota, is the inventor of U.S. Patent Nos. 5,547,379 ("the '379 patent"), 5,944,527 ("the '527 patent") and 6,315,567 ("the '567 patent") -- each entitled "Method of Restoring a Tooth." Hasel and Andrew Grossman are co-owners of ABCO, a Minnesota [*3] corporation whose function is to manage the prosecution and licensure of Hasel's patents. Hasel Decl. P5. Hasel assigned the rights to the three patents to ABCO. Ivoclar is a manufacturer of dental materials with its principal place of business in the Town of Amherst, N.Y.

On January 26, 2000 Grossman sent a letter to Robert A. Ganley, Ivoclar's Chairman of the Board, indicating that several of its marketed dental products infringed one or more of ABCO's patents and concluded with an offer for a license. n3 Hasel Decl. ABCO's counsel sent another letter to Ivoclar on December 4, 2001. The letter reads, in pertinent part:

"For nearly two years, ABCO and Dr. Hasel pursued patent infringement litigation against Kerr Corporation concerning Kerr's sales of its flowable composite, Revolution(R). Last June, on the eve of trial, after completing all fact and expert discovery, dispositive motions and final pretrial procedures, Kerr agreed to settle the litigation on terms favorable to ABCO. Enclosed is a copy of the Consent Judgment entered by the Court in which Kerr stipulated that the '379 and '537 Patents are valid and enforceable and that Kerr's sales of its Revolution(R) product [*4] and their use constitute infringement of the '527 Patent. As part of the settlement and to allow it to continue to sell its Revolution(R) products, Kerr also agreed to an ongoing license and royalty arrangement with ABCO.

\* \* \* \* \*

"Now that the litigation against Kerr has concluded and ABCO's patent portfolio has been strengthened by the issuance of the '567 Patent, ABCO will be enforcing these patents against other infringers.

"Please be advised that ABCO believes that Vivadent/Ivoclar's sales of flowable composite products may infringe one or more claims of the '379 Patent, the '527 Patent, and/or '567 Patent." Compl., Ex. A.

Based on these two letters, plaintiff filed its Complaint seeking a declaratory judgment of non-infringement. In moving to dismiss pursuant to FRCvP 12(b)(2), defendants initially argued that the sending of those two letters was insufficient to subject them to the personal jurisdiction of this Court. In response, plaintiff has offered evidence of defendants' other activities in New

York.

n3 The pertinent text of the letter reads as follows:

"This letter is to advise you, and to provide notice to you under 35 U.S.C. § 287, that Vivadent/Ivoclar North America, Inc.'s Tetric Flow, Heliomolar Flow and Compoglass Flow products and possibly other restorative products infringe one or more claims of U.S. Patent Nos. 5,547,379 and 5,944,527. A copy of each patent is enclosed.

"ABCO Research, LLC would be pleased to provide Vivadent/Ivoclar North America, Inc. with a nonexclusive license under the patents (enclosed)." Hasel Decl., Annex.

[*5]

ABCO sent seven letters to Harry Schein, Inc. ("Schein") -- one of Ivoclar's distributors whose headquarters are located in Melville, N.Y. -- between June 20, 2001 and November 16, 2001, regarding Schein's alleged infringement of ABCO's patents and a possible licensing agreement. The first such letter, dated June 20, 2001, contained virtually identical warnings and allegations as the subsequent December 4, 2001 letter sent to Ivoclar and also specified various products, including two of Ivoclar's -- viz., the Heliomolar(R) Flow and the Tetric(R) Flow --, that ABCO believed "may infringe one or more of the claims of the '527 Patent, and, depending on their chemical makeup, perhaps the '379 Patent as well." Decl. of Alan S. Hasel, Esq., Ex. B. Plaintiff also asserts that defendants met with Schein, on or about July 23, 2001, at Schein's offices in Melville to discuss ABCO's claims of infringement and a possible licensing agreement. n4 Korman Decl. P12. At the meeting, ABCO allegedly "informed Schein that [it] planned to file a patent infringement lawsuit against dental manufacturers, including Ivoclar." Id. P16. Ivoclar subsequently sent Schein a November 2, 2001 letter by [*6] which it indicated that ABCO had "elected to

proceed to actively enforce their patents directly against manufacturers of flowable composites other than Kerr, including manufacturers who sell their flowable composites through Harry Schein." n5 Id., Ex. G.

n4 Plaintiff alleges that defendants also met with Pentron Corporation -- another dental manufacturer that had been accused of patent infringement by defendants -- on January 25, 2002 in New York City, to discuss the terms of a possible license agreement between the two parties. Korman Decl. P18.

n5 Plaintiff claims that defendants filed separate lawsuits, on or about November 2, 2001, against two such manufacturers -- to wit, Danville Manufacturing, Inc. and Pulpdent Corporation -- in the United States District Court for the District of Minnesota. Korman Decl. P17.

Korman also alleges that ABCO's counsel called him several times between February and March of 2002 and offered to meet with him in New York City, or elsewhere, to discuss settlement of defendants' [*7] infringement claims against Ivoclar. The parties agreed to meet, in Chicago, Ill. on April 29, 2002. Ivoclar then commenced this action by filing its complaint with this Court on April 26, 2002. Three days later, on April 29, 2002, Korman met with Grossman and ABCO's attorney, Harry Manbeck, Jr., Esq., in Chicago to discuss settlement of the patent infringement claims. The tone and content of that meeting has been vigorously debated by its participants. Manbeck and Grossman describe the meeting as "cordial" during which Korman had indicated his belief that Ivoclar's products did not infringe ABCO's patents and that such patents may be invalid. When asked to provide information supporting his position, Korman indicated to them that he would have to speak with his associates and get back to them. Manbeck and Grossman also assert that Korman told them that he had filed the April 26, 2002 Complaint but that "he would hold off on serving [it] pending further discussions with us." Grossman Decl. P3; see also Manbeck Decl. P8 ("During the meeting, Mr. Korman mentioned that he had filed the complaint in this action the previous Friday, April 26. However, he also said that he would hold [*8] off on serving the complaint pending further discussions with us."). Both Grossman and Manbeck assert that they were both led to believe that further discussions with Korman

would follow, pending Korman's attempts to obtain the relevant information. Manbeck then spoke with Korman on June 13, 2002 during which conversation Korman told Manbeck that his European associates were finalizing their position and had been providing him with information for his review and that he would call Manbeck the following Monday, June 17. Manbeck asserts that Korman did not call on June 17 and that he has had no further contact with Korman since that time. Grossman also claims that he had no further contact with Korman after the April 29, 2002 meeting. Plaintiff served defendants with its Complaint on August 14, 2002.

Korman's version of events regarding the April 29, 2002 meeting is much different from that of defendants. Korman disputes defendants' contention that the meeting "was part of ongoing settlement discussions which provided a reasonable probability of producing a non-judicial resolution of [the] dispute." Korman Sur-Reply Decl. P2. Korman alleges that, by April 26, 2002, prospects for settlement [*9] "were very slim" and that, although there had been no apparent change in either party's position before the April 29, 2002 meeting, he "planned to go ahead with the meeting so long as any hope remained ***." Id. P3. Korman further states that he "did not expect the discussions to result in a settlement and [he] did not provide either Mr. Manbeck or Mr. Grossman any basis from which a reasonable person could conclude that settlement was more than an improbable possibility" and that he "went ahead with the meeting with very low expectations for a settlement." Ibid. Thus, Korman concludes that Ivoclar "had a reasonable apprehension of being sued for patent infringement based on defendants' threats and their actual litigation against other companies." Ibid.

Defendants' first argument in support of its motion to dismiss is that this Court lacks personal jurisdiction over them. They argue that both defendants are "located in Minnesota" and are "neither authorized nor licensed to do business in New York, nor do they have offices, employees, assets, or telephone listings in this state." Defendants further maintain that the two letters sent to plaintiff -- dated January 26, 2000 and [*10] December 4, 2001 -- are insufficient to subject them to this Court's personal jurisdiction.

Plaintiff points to the nature of defendants' business -- viz., licensing and enforcing patents -- and, for purposes of establishing personal jurisdiction under New

York's Civil Practice Law and Rules ("CPLR") § 301, contends that they are "doing business" in New York. Additionally, plaintiff argues that defendants are subject to this Court's personal jurisdiction pursuant to CPLR § 302(a)(1) -- New York's long-arm statute -- because their New York activities qualify as a transaction of business as provided for by the statute.

[HN1] In opposition to defendants' motion to dismiss, plaintiff need make only a prima facie showing of personal jurisdiction in accordance with New York law. See Graphic Controls Corp. v. Utah Medical Products, Inc., 1997 U.S. Dist. LEXIS 7448, 1997 WL 276232, at *2 (W.D.N.Y. 1997) (applying New York law in determining whether the court had personal jurisdiction over the foreign defendant), aff'd, 149 F.3d 1382 (Fed. Cir. 1998); Capitol Records, Inc. v. Optical Recording Corp., 810 F. Supp. 1350, 1352 (S.D.N.Y. 1992) (applying New York law and [*11] holding that the plaintiff needs only make a prima facie showing of personal jurisdiction in opposition to foreign defendant's FRCvP 12(b)(2) motion). In determining the disposition of a FRCvP 12(b)(2) motion, the court may consider facts as presented in evidentiary material outside the pleadings. Teachers' Retirement Sys. of LA v. A.C.L.N., Ltd., 2003 U.S. Dist. LEXIS 7869, 2003 WL 21058090, at *7 (S.D.N.Y. 2003). Such material is construed in the light most favorable to, and any doubts are resolved in favor of, the plaintiff. Ibid.; Graphic Controls, 1997 U.S. Dist. LEXIS 7448, [WL] at *2.

CPLR § 301 [HN2] provides for jurisdiction over a foreign corporation if it "does business in New York, not occasionally or casually, but regularly, continuously and systematically thereby demonstrating a sufficiently fair measure of permanence to warrant a finding of the corporation's constructive presence here." Graphic Controls, 1997 U.S. Dist. LEXIS 7448, [WL] at *2. This so-called "doing business" test requires a court to analyze the specific facts of each individual case to determine whether a foreign corporation's contacts and connections with New York demonstrate continuous and systematic activity. Ibid. (citing Landoil Resources Corp. v. Alexander & Alexander Servs., Inc., 918 F.2d 1039, 1043 (2d Cir. 1990)). [*12] Finally, unlike New York's long-arm statute, a jurisdictional inquiry under CPLR § 301 does not require that the plaintiff's cause of action "emanate from or have any nexus to the defendant's business activity." Ibid.

Defendants' activities in New York are substantial and sufficiently continuous to support the exercise of personal jurisdiction over them under CPLR § 301. Initially, it is important to note that ABCO's sole function is to manage, enforce and license its patents and that it lacks the "traditional indicia of doing business because it does not manufacture or sell tangible goods." *Capitol Records, at 1353.* Accordingly, the frequency and nature of ABCO's New York business activities must be analyzed within such a context in determining whether such contacts demonstrate the requisite degree of permanence. *See Capitol Records, at 1353* (noting that, for the purposes of establishing personal jurisdiction, a company's business activities conducted in New York must not be peripheral to its "main business" but must be a substantial part of that corporation's business). ABCO sent at least ten letters, between January 26, 2000 and December 4, 2001, to three different [*13] companies that related to its efforts to enforce and license its patents. n6 In addition, ABCO's counsel made numerous phone calls to plaintiff during which ABCO had offered to meet with Ivoclar in New York to negotiate a possible license, solicited licensing fees and reiterated its infringement claims. Korman Decl. P9. ABCO also traveled to New York twice to meet with Schein and Pentron Corp. to discuss possible licensing agreements. Defendants do not dispute that they engaged in such activities and, while the Court recognizes that, without more, the two letters that ABCO had sent to Ivoclar would be insufficient for this Court to exercise jurisdiction over defendants -- *see Red Wing Shoe Co., Inc. v. Hockerson-Halberstadt, Inc.,* 148 F.3d 1355, 1360-1361 (Fed. Cir. 1998) (finding that three cease-and-desist letters did not confer personal jurisdiction over a foreign defendant) -- , defendants' other activities in not only protecting its patents but soliciting licensing fees in New York, when combined with their two "cease and desist" letters, evince the requisite permanence -- i.e., systemic and continuous activity -- to satisfy New York's "doing business" test. Thus, [*14] although ABCO has no offices, employees, assets or telephone listings in New York, it is subject to the personal jurisdiction of this Court because it has extensively engaged in its primary business activity -- to wit, enforcing and licensing its patents -- in New York. Accordingly, defendants' motion to dismiss for lack of personal jurisdiction will be denied. n7

n6 Such letters comprised the two "cease and desist" letters to Ivoclar, a virtually identical one sent to Heraeus Kulzer, Inc. and the previously discussed seven letters that had been sent to Schein.

n7 The Court will decline to address whether ABCO is subject to personal jurisdiction under CPLR § 302 inasmuch as the issue is moot.

The Court next addresses defendants' motion to dismiss based on its argument that there was no actual controversy at the time plaintiff filed its complaint and that this Court therefore lacks subject matter jurisdiction over this case.

Section 2201(a) of the Declaratory Judgment Act [HN3] authorizes a court to declare the [*15] rights of an interested party in a case of actual controversy. 28 U.S.C. § 2201. The purpose of the Act "is to protect threatened parties from the uncertainty and anxiety resulting from a looming lawsuit." *Clay Paky, S.p.A. v. Vari-Lite, Inc.,* 2000 U.S. Dist. LEXIS 9802, 2000 WL 977709, at *3 (S.D.N.Y. 2000). However, a prerequisite to any claim brought pursuant to section 2201(a) is that an actual controversy must have existed at the time the complaint was filed. *Bausch & Lomb Inc. v. CIBA Corp.,* 39 F. Supp. 2d 271, 273 (W.D.N.Y. 1999); *see also R & P Pools, Inc. v. New Kayak Pool Corp.,* 2001 U.S. Dist. LEXIS 1505, 2001 WL 135823, at *2 (W.D.N.Y. 2001) ("To proceed in the absence of a case or controversy would involve the court in rendering a forbidden advisory opinion.") (quotation and citation omitted). And, in a case such as this, plaintiff must demonstrate "'(1) an explicit threat or other action by the patentee, which creates a reasonable apprehension on the part of the declaratory plaintiff that it will face an infringement suit, and (2) present activity which could constitute infringement or concrete steps taken with the intent to conduct such activity. [*16] '" n8 *R & P Pools,* 2001 U.S. Dist. LEXIS 1505, [WL] at *2 (quoting *B.P. Chemicals, Ltd. v. Union Carbide Corp.,* 4 F.3d 975, 978) (Fed. Cir. 1993). The plaintiff bears the burden of proving that there is an actual controversy. *Ibid.* Nonetheless, even if plaintiff shows that an actual controversy existed, the exercise of jurisdiction over this cause of action is not mandatory but within the "sound discretion of [this] court." *Ibid.*

n8 There is no issue for the Court regarding plaintiff's satisfaction of the second prong inasmuch as it is undisputed that plaintiff has sold

a product that allegedly infringes defendants' patents.

Plaintiff contends that an actual controversy existed because it had a reasonable apprehension that ABCO would imminently file a patent infringement suit. [HN4] The test for determining whether plaintiff's apprehension was reasonable is an objective one "which focuses on whether the defendant's 'conduct rose to a level sufficient to indicate an intent to enforce its patent.'" *Clay Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *4 [*17] (quoting *Shell Oil Co. v. Amoco Corp., 970 F.2d 885, 888 (Fed. Cir. 1992)).* In determining whether plaintiff has demonstrated the requisite reasonable apprehension, the Court must objectively consider the totality of the circumstances. n9 *Ibid.*

> n9 In deciding defendants' motion to dismiss for lack of subject matter jurisdiction, this Court may consider evidence outside the pleadings. *Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985).*

Plaintiff contends that the efforts put forth by ABCO in attempting to enforce and license its patents n10 created a situation where it was reasonable for Ivoclar to apprehend that ABCO was imminently close to filing a patent infringement action against it. Plaintiff places particular significance on the threatening language contained within ABCO's December 4, 2001 letter by which ABCO had (1) alleged that Ivoclar's products may have infringed its patents, (2) informed Ivoclar that it had obtained a Consent Judgment [*18] in its patent infringement action against Kerr corporation, (3) informed Ivoclar that it "will be enforcing [its] patents against other infringers" and (4) invited Ivoclar to negotiate a license. *See* Compl., Ex. A.

> n10 Conduct which included the two letters sent to Ivoclar, the various phone conversations between counsel for Ivoclar and ABCO, the seven letters sent to Schein and the commencement of three separate lawsuits against other alleged infringers -- to wit, Kerr Corporation, Pulpdent Corporation and Danville Manufacturing, Inc.

Defendants counter that no actual controversy existed at the time plaintiff filed its Complaint because the parties were still conducting settlement negotiations with regard to the alleged patent infringement. In support, defendants direct the Court to the fact that Ivoclar had commenced this action on April 26, 2002 -- three days before the parties' April 29, 2002 settlement conference in Chicago -- and that Korman had subsequently agreed at the conclusion of such meeting [*19] to refrain from serving the Complaint pending further discussions. Defendants argue that such facts refute plaintiff's contention that it reasonably believed that it was facing an imminent patent infringement lawsuit and, further, that to allow plaintiff to utilize its premature complaint as a negotiating tool during ongoing negotiations would defeat the purpose of the Declaratory Judgment Act.

Plaintiff has shown that it was objectively reasonable for it to apprehend that it was the target of an imminent patent infringement lawsuit by ABCO. Defendants' December 4, 2001 letter warned Ivoclar that (1) several of its marketed products "may infringe" ABCO patents, (2) ABCO had pursued patent infringement litigation for nearly two years against another alleged infringer, Kerr Corporation, resulting in a settlement with "terms favorable to ABCO" and (3) it "will be enforcing [its] patents against other infringers." Such warnings, in effect, were "a statement to the plaintiff to take notice that it is next on the list." *Clay Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *4 (quotations and citations omitted). n11 In other words, it was reasonable for Ivoclar to interpret the letter as a threat from ABCO by which ABCO [*20] was saying to Ivoclar, "If you don't think we mean business and are serious about this matter, look and see what we have done to another alleged infringer." *Ibid.* (quotation and citation omitted). In addition to such implicit threats of litigation, defendants' other conduct -- to wit, commencing litigation against other alleged infringers and indicating to Schein that it had "elected to proceed to actively enforce their patents directly against manufacturers of flowable composites other than Kerr, including manufacturers who sell their flowable composites through Harry Schein" n12 -- contributed to an environment or, more appropriately, adverse circumstances whereby it would have been reasonable for Ivoclar to apprehend that ABCO was about to commence a patent infringement action against it.

n11 *See also Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *4 (finding that a letter, similar to the one here that was sent by ABCO, -- by which the defendant had warned the declaratory plaintiff that (1) it had aggressively enforced its patent rights against a named third-party, (2) plaintiff's product "may infringe" the defendant's patent, (3) plaintiff should "cease and desist" from selling its product and (4) if plaintiff chose to continue selling its product to contact the defendant in order to discuss a license -- was one that "clearly threatened litigation").

[*21]

n12 Korman Decl., Ex. G.

Defendants argue however that the holding in *Phillips Plastics Corp. v. Kato Hatsujou Kabushiki Kaisha,* 57 F.3d 1051 (Fed. Cir. 1995), lends support for its motion to dismiss. In *Phillips Plastics,* the Federal Circuit Court of Appeals held that the defendant's conduct in merely attempting to conduct license negotiations did not create a justiciable controversy. Significantly, the Court held that, "the offer of a patent license does not create an actual controversy" and that "when there are proposed or ongoing license negotiations, a litigation controversy normally does not arise until the negotiations have broken down." *Phillips Plastics,* at 1053. Seizing on such language, defendants argue that no justiciable controversy existed in this case because plaintiff filed its Complaint three days before a scheduled meeting where the parties were supposed to discuss a licensing agreement. Defendants' reliance on *Phillips Plastics* is misplaced because therein the patentee had merely invited license negotiations and had neither "stated nor suggested [*22] that it would pursue legal recourse if it were not satisfied with the outcome of the proposed licensing negotiations." *Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *5; *see also Conmed Corp. v. ERBE Electromedizin GMBH,* 129 F. Supp. 2d 461, 466 (N.D.N.Y. 2001) (distinguishing *Phillips Plastics* based on the same premise); *EMC Corp. v. Norand Corp.,* 89 F.3d 807, 812 (Fed. Cir. 1996) (distinguishing *Phillips Plastics* as a case where all that was present was "negotiation unaccompanied by threats of legal action"). Here, in contrast, ABCO communicated implicit threats of litigation, which created a situation whereby it was reasonable for Ivoclar to apprehend the imminent commencement of a patent infringement action. As explained by the *Clay Paky* court, defendants' oblique accusations of patent infringement and "thinly veiled threats of resorting to litigation" render the present case inapposite to that of *Phillips Plastics. Clay-Paky,* 2000 U.S. Dist. LEXIS 9802, [WL] at *5. Furthermore, the fact that the parties had entered into negotiations regarding a possible patent license does not necessarily mean that ABCO's reasonable apprehension of litigation had necessarily been removed. *See ibid.* ("Just [*23] because the parties proceeded to initiate negotiations does not mean that the reasonable apprehension of litigation was ever removed."). Thus, the fact that the parties may have been negotiating a possible patent license is not dispositive, but merely a factor that is, in this case, insufficient to overcome defendants' other threatening conduct that gave rise to Ivoclar's reasonable apprehension of an imminent patent infringement suit by ABCO.

Having found that the Court has both personal jurisdiction over the defendants and subject matter jurisdiction over this case, the Court must finally determine whether to exercise jurisdiction in this case. *See EMC Corp.,* at 810 [HN5] ("Even if there is an actual controversy, the district court is not required to exercise declaratory judgment jurisdiction, but has discretion to decline that jurisdiction.") (citing *Public Serv. Comm'n v. Wycoff Co.,* 344 U.S. 237, 241, 97 L. Ed. 291, 73 S. Ct. 236 (1952)). However, the issue has become moot and the Court will decline to exercise jurisdiction in this case because plaintiff has now joined in defendants' request to transfer venue, pursuant to 28 U.S.C. § 1404(a), from the Western District [*24] of New York to the District of Minnesota. n13 Therefore, rather than exercise jurisdiction in this matter, the Court will transfer this case to the District of Minnesota inasmuch as both parties have indicated that such Court is a mutually preferable and convenient forum.

n13 Plaintiff and defendants have submitted a Stipulation and Order dated June 27, 2003 by which they have agreed to transfer this action to the United States District Court for the District of Minnesota provided that this Court finds an actual case or controversy.

Accordingly, it is hereby **ORDERED** that

Page 8

defendants' motion to dismiss is denied in its entirety, that defendants' motion to transfer venue is granted and that the Clerk of this Court is directed to transfer this case to the United States District Court for the District of Minnesota.

DATED: June 30, 2003

JOHN T. ELFVIN

S.U.S.D.J.

LEXSEE



Analysis
As of: Jan 18, 2007

BILLY W. JARVIS, Plaintiff v. UNITED STATES OF AMERICA, Defendant

No. 5:99cv163

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF
TEXAS, TEXARKANA DIVISION

2000 U.S. Dist. LEXIS 15984; 86 A.F.T.R.2d (RIA) 6291

September 25, 2000, Decided
September 26, 2000, Entered, Filed

**DISPOSITION:** [*1] Defendant's Motion to Dismiss Count II DENIED.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff sued defendant United States pursuant to 26 U.S.C.S. § 7431(a)(1) to recover actual and punitive damages for alleged wrongful disclosure of "return information with respect to" him, in violation of 26 U.S.C.S. § 6103. Defendant moved to dismiss one count under Fed. R. Civ. P. 12(b)(1).

**OVERVIEW:** Plaintiff sued defendant United States for violating 26 U.S.C.S. § 6103 by an Internal Revenue Service (IRS) employee wrongfully disclosing to others that the IRS was investigating plaintiff for having wrongfully disclosed tax information, and was considering prosecution. Defendant moved to dismiss one count for lack of subject matter jurisdiction because it was time barred. Denying the motion, the court found that plaintiff discovered the alleged wrongful disclosure within the two-year limitations period of 26 U.S.C.S. § 7431(d). The disclosure did not relate back to the date of plaintiff's original pleading, as it arose out of a different set of circumstances. Information conveyed to plaintiff's attorney in another unrelated matter was not imputed to plaintiff, as the attorney's representation did not extend to detecting all possible claims plaintiff may have had

against defendant.

**OUTCOME:** Defendant's motion to dismiss was denied. Claim for wrongful disclosure by IRS agent was discovered by plaintiff within two-year limitation period. Disclosure, arising out of different circumstances, did not relate back to original pleading. Information had by attorney was not imputed to plaintiff.

**CORE TERMS:** disclosure, deposition, subject matter jurisdiction, return information, tax information, disclose, cause of action, facial attack, set forth, unauthorized, challenging, motion to dismiss, tax return, new claim, investigating, recommending, supplemental, prosecuting, wrongfully, discover, attaches, reply, fax

**LexisNexis(R) Headnotes**

*Governments > Federal Government > Claims By & Against*
*Tax Law > Federal Tax Administration & Procedure > Audits & Investigations > Disclosure of Information (IRC secs. 6103-6104, 6108-6110, 6713, 7213, 7216, 7431, 7435) > Damages for Unauthorized Inspection & Disclosure*
[HN1] 26 U.S.C.S. § 7431(a)(1) provides that if an

2000 U.S. Dist. LEXIS 15984, *1; 86 A.F.T.R.2d (RIA) 6291

employee of the United States knowingly or negligently discloses any return information "with respect to a taxpayer," in violation of 26 U.S.C.S.§ 6103, such taxpayer may sue the United States for damages.

*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses*
*Governments > Federal Government > Claims By & Against*
*Governments > Legislation > Statutes of Limitations > Time Limitations*
[HN2] The statute of limitations on filing an action seeking damages for alleged wrongful disclosure of tax information is two years from the "date of discovery by the taxpayer" of the unauthorized disclosure. 26 U.S.C.S. § 7431(d).

*Civil Procedure > Jurisdiction > Subject Matter Jurisdiction > Jurisdiction Over Actions > General Overview*
*Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Motions to Dismiss*
[HN3] A motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1) challenges a court's subject matter jurisdiction and seeks dismissal of the lawsuit due to a court's lack of authority to hear the dispute. A motion challenging the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations is a facial attack. In a facial attack, the district court will accept all material allegations of the complaint as true and construe them in the light most favorable to the non-movant. Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits may be considered.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN4] See Fed. R. Civ. P.15(c).

COUNSEL: For BILLY W JARVIS, plaintiff: James Clark Wyly, Sean Fletcher Rommel, Miller James et al, A Paul Miller, Miller James Miller Wyly & Hornsby, Texarkana, TX.

For BILLY W JARVIS, plaintiff: John David Copeland, Johnson & McElroy, Dallas, TX.

For UNITED STATES OF AMERICA, defendant: Ruth Harris Yeager, AUSA, U S Attorney's Office, Tyler, TX.

For UNITED STATES OF AMERICA, defendant: Stuart D Gibson, U S Department of Justice, Washington, DC.

JUDGES: DAVID FOLSOM, UNITED STATES DISTRICT JUDGE.

OPINION BY: DAVID FOLSOM

OPINION:

ORDER

CAME ON TO BE CONSIDERED THIS DAY Defendant's Motion to Dismiss Count II (Docket Entry # 12). The Court, after reviewing the motion, response, reply, and Plaintiff's response to Defendant's reply, finds the motion is not well taken and should be DENIED.

I. BACKGROUND

On, July 21, 1999, Plaintiff filed this cause of action pursuant to 26 U.S.C. § 7431(a)(1) n1 to recover actual and punitive damages for alleged wrongful disclosure of "return information with respect to" him, in violation of 26 U.S.C. § 6103. On December 9, 1999, Plaintiff filed an amended [*2] complaint. Count I in the amended complaint is identical to the sole count in the original complaint, n2 and Count II adds further allegations of wrongful disclosure.

> n1 [HN1] Section 7431(a)(1) provides if an employee of the United States knowingly or negligently discloses any return information "with respect to a taxpayer," in violation of § 6103, "such taxpayer" may sue the United States for damages.

> n2 Defendant also has a motion to dismiss pending regarding Count I of the original complaint.

Specifically, Plaintiff alleges that on or about May 28, 1997, an Internal Revenue Service ("IRS") employee wrongfully disclosed to others that the IRS was investigating Plaintiff for having wrongfully disclosed tax information, and the IRS was considering recommending prosecuting Plaintiff for these alleged

offenses. Plaintiff contends the wrongful disclosure was made when IRS Agent Bruce Mason asked these third persons to sign "waivers" authorizing the IRS to disclose their tax information to the prosecuting United [*3] States Attorney. n3

n3 The waiver states in part:

Whereas the undersigned members of the Moncrief family have been informed that the Internal Security Division ("ISD") of the U.S. Treasury Department, after an investigation, is considering recommending the prosecution of Billy Wayne Jarvis of Sherman, Texas for the unlawful disclosure of confidential tax return information belonging to the Moncrief family and for obstruction of justice. Whereas the ISD has requested that the Moncriefs authorize Bruce Mason of ISD and his designees to disclose to the office of the the United States Attorney for the Northern District of Texas the tax return information that Mr. Jarvis unlawfully disclosed to third parties, for the stated purpose of permitting the U.S. Attorney's office to prosecute Mr. Jarvis for his violations of federal law.

## II. DEFENDANT'S MOTION TO DISMISS

Defendant files its motion arguing the Court lacks subject matter jurisdiction because a cause of action for wrongful disclosure must be [*4] brought within two years of the date Plaintiff discovers the disclosure. n4 Defendant maintains Plaintiff first discovered the disclosures referred to in Count II more than two years before he filed the amended complaint. Additionally, Defendant contends the new claim in the amended complaint does not arise from the same conduct as the wrongful disclosure claim in the original complaint and, therefore, does not relate back to the date of the original complaint.

n4 [HN2] The statute of limitations on filing an action seeking damages for alleged wrongful disclosure of tax information is two years from the "date of discovery by the taxpayer" of the unauthorized disclosure. 26 U.S.C. § 7431(d).

Plaintiff responds the important date is not the date of disclosure, but the date Plaintiff discovered the disclosure. Plaintiff contends the wrongful disclosure that is the subject of Count II was made on May 28, 1997. However, Plaintiff argues he did not discover Mason's disclosure until February 10, 1998. Because [*5] he filed his amended complaint on December 8, 1999, Plaintiff maintains it was filed less than two years after be discovered the unauthorized disclosure and is, therefore, timely.

## III. DISCUSSION

[HN3] A motion to dismiss pursuant to Rule 12(b)(1) challenges a court's subject matter jurisdiction and seeks dismissal of the lawsuit due to a court's lack of authority to hear the dispute. A motion challenging the court's subject matter jurisdiction based on the sufficiency of the pleading's allegations is a facial attack. In a facial attack, the district court will accept all material allegations of the complaint as true and construe them in the light most favorable to the non-movant. Scheuer v. Rhodes, 416 U.S. 232, 237, 40 L. Ed. 2d 90, 94 S. Ct. 1683 (1974); U.S. v. Ritchie, 15 F.3d 592, 598 (6th Cir. 1994). Factual attacks, on the other hand, challenge the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits may be considered.

Defendant files its motion challenging the existence of subject matter jurisdiction in fact. In addition to its motion, Defendant [*6] attaches the amended complaint, Plaintiff's initial disclosures and Charles W. Moncrief's transcript deposition. n5 To support his position, Plaintiff attaches the affidavit and supplemental affidavit of David Stagner, n6 the cover sheet of a fax from Mr. Stagner to Plaintiff dated February 10, 1998, and a copy of the waiver at issue.

n5 Mr. Moncrief is one of the fourteen people who reviewed and signed the waiver at issue.

2000 U.S. Dist. LEXIS 15984, *6; 86 A.F.T.R.2d (RIA) 6291

n6 Mr. Stagner represented Mr. Jarvis (Plaintiff in this action) as a defendant in litigation filed in the 153rd District Court of Texas, Cause No. 153-157970-95, styled Moncrief, et al v. Moncrief, et al v. Richardson, et al.

For the foregoing reasons, the Court finds Defendant's motion should be denied. On October 24, 1997, Mr. Moncrief testified under oath in a deposition n7 attended by Mr. Stagner that IRS Agent Mason had disclosed to Mr. Moncrief and others that the IRS was investigating Plaintiff for wrongful disclosure and the IRS planned to recommend to the U.S. Attorney that [*7] Plaintiff be prosecuted for tax crimes. During his deposition, Mr. Moncrief identified the waiver which memorialized this disclosure. A copy of this document was not sent to Mr. Stagner until January 31, 1998, and he did not have the opportunity to review its contents until that date.

n7 Mr. Moncrief's testimony was taken in connection with Cause No. 153-157970-95, Moncrief, et al v. Moncrief, et al v. Richardson, et al.

Defendant argues that upon hearing the testimony regarding the waivers during the October 24, 1997 deposition, Mr. Stagner had knowledge of the improper disclosure. Moreover, Defendant contends that because Mr. Stagner was acting as Plaintiff's attorney during that deposition, the information Mr. Stagner received should be imputed to Plaintiff on the same date.

In making its determination the Court first determined if the new claim as set forth in the amended complaint relates back to the date of the original complaint. [HN4] FED. R. CIV. PRO.15(c) states that:

whenever the claim or defense [*8] asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading.

This is not the case in the instant litigation. The alleged wrongful disclosure plead in Count II was made by a different person, on a different date, and consisted of different alleged "return information" than the wrongful disclosure plead in Plaintiff's original complaint. The matters added in Count II arose out of a different set of circumstances than those in Count I and do not relate back to the date of the original pleading.

The Court does not find it necessary to make a determination as to when Mr. Stagner first learned of the alleged wrongful disclosure. At the time of the Moncrief deposition, Mr. Stagner was acting as Plaintiff's defense counsel in a state court civil action involving tort claims asserted by private individuals against Plaintiff. According to Mr. Stagner's affidavits, he was hired strictly to defend the state court case. Mr. Stagner's representation of Plaintiff in the state court case did not extend to detecting all possible causes of [*9] action against the government Plaintiff might have had and reporting those possibilities back to Plaintiff. Martin Marietta Corp. v. Gould, Inc, 70 F.3d 768, 775 (4th Cir.).

In his supplemental affidavit, Mr. Stagner states:

After the deposition was over, I did not mention the waiver to my client, and he had no way of knowing of its existence, much less its content. I did not give the waiver any more thought until January 30, 1998, when Hugh Connor, a Moncrief lawyer, faxed me a copy of the waiver. I transmitted a copy of the waiver to my client by fax dated February 10, 1998, and that is the first time that I ever brought it to his attention.

There is ample evidence before the Court to find that Plaintiff first learned of the alleged wrongful disclosure on February 10, 1998. Because Plaintiff filed his amended complaint on December 8, 1999, less than two years after he discovered the alleged wrongful disclosure, Plaintiff's complaint is timely and should not be dismissed.

CONCLUSION

Based on the foregoing, it is

ORDERED that Defendant's Motion to Dismiss Count II is DENIED.

SIGNED this 25th day of September, 2000.

Page 4

2000 U.S. Dist. LEXIS 15984, *9; 86 A.F.T.R.2d (RIA) 6291

DAVID FOLSOM                                    UNITED [*10]  STATES DISTRICT JUDGE

LEXSEE

**LINCOLN NATIONAL LIFE INSURANCE COMPANY, Plaintiff, v. TRANSAMERICA FINANCIAL LIFE INSURANCE COMPANY, Defendant.**

**CAUSE NO. 1:04-CV-396 TS**

**UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF INDIANA, FORT WAYNE DIVISION**

**2006 U.S. Dist. LEXIS 91358**

**December 18, 2006, Decided
December 18, 2006, Filed**

**CORE TERMS:** good cause, patent, first-filed, deadline, amended pleading, infringement, join, amend, declaratory action, motion to amend, undue delay, occurrence, misnomer, annuity, selling, lawsuit, declaratory relief, undue prejudice, litigated, sister, sound reason, proper forum, administering, deliberately, mistakenly, infringing, precedence, correcting, willfully, infringed

**COUNSEL:** [*1] For Lincoln National Life Insurance Company, Plaintiff: D Randall Brown, LEAD ATTORNEY, Gary C Furst, LEAD ATTORNEY, Carrie Marie Raver, LEAD ATTORNEY, Barnes & Thornburg LLP - FW/IN, Fort Wayne, IN.

For Transamerica Financial Life Insurance Company, Defendant: Glenn Johnson PHV, LEAD ATTORNEY, Shuttleworth & Ingersoll PLC, Cedar Rapids, IA.

**JUDGES:** Theresa L. Springmann, UNITED STATES DISTRICT JUDGE.

**OPINION BY:** Theresa L. Springmann

**OPINION:**

**OPINION AND ORDER**

**A. Background**

On October 22, 2004, the Plaintiff, Lincoln Life Insurance Company, sued the Defendant, Transamerica Financial Life Insurance Company, for infringing its U.S. Patent No. 6,611,815 ('815 Patent). The Patent relates to a data processing method for administering an annuity product having guaranteed lifetime payments. The Plaintiff alleges that the Defendant willfully and deliberately infringed this patent by selling annuities under its Guaranteed Principal Solution Rider ("GPSR") and 5-for-Life Rider options.

The Defendant answered the Complaint on June 15, 2005, and amended the Answer on June 27, 2005. At the August 2, 2005, preliminary pretrial conference, the Court approved the Report of the Parties' Planning [*2] Meeting, which set May 15, 2006, as "the last date for the parties to seek leave of Court to amend the pleadings."

On August 8, 2006, the Plaintiff was issued another patent--U.S. Patent No. 7,089,201 ('201 Patent)--relating to a computerized method for administering annuity products. That same day, the Defendant and its two sister companies, Transamerica Life Insurance Company ("TLIC") and Western Reserve Life Assurance Company of Ohio ("WRL"), filed a declaratory judgment action in the Northern District of Iowa, seeking a declaration that their GPSR and 5-for-Life Rider products do not infringe the Plaintiff's rights under the '201 Patent.

Three days later, on August 11, 2006, the Plaintiff moved to amend its Complaint to include an allegation that, in addition to infringing the '815 Patent, the Defendant also infringed the '201 Patent by willfully and deliberately selling and offering to sell variable annuities under its GPSR and 5-for-Life Rider options. n1

Page 1

n1 The Plaintiff did not learn about the suit in Iowa until August 14, 2006, when it received the summons.

[*3]

The Defendant responded to the Plaintiff's motion on August 28, 2006. The Plaintiff replied on September 14, 2006, and contemporaneously moved to amend the Complaint not only to add a claim for infringement of the '201 Patent, but also to join TLIC and WRL as defendants. On October 9, 2006, the Defendant objected to the Plaintiff's joining any other defendants and reiterated its objections to adding a new infringement claim.

## B. The Parties' Contentions

The Plaintiff recognizes that the deadline for amending the Complaint has passed and, that to prevail upon its motion, it must satisfy the mandates of Federal Rules of Civil Procedure 15 and 16. The Plaintiff insists that good cause exists to allow a claim for infringement of the '201 Patent because the Patent was not issued until after the deadline for amending the Complaint passed. The Plaintiff submits that adding the claim conforms with Rule 15 as it will not cause undue delay or make the case too complex or confusing to a jury. The Plaintiff contends that the claim concerning the '201 Patent should be litigated by this Court, despite the [*4] earlier-filed action for declaratory relief in Iowa.

Likewise, the Plaintiff argues that, under Rule 15(c)(3) and (d), it should be permitted to join TLIC and WRL as defendants. The Plaintiff claims that it mistakenly thought the Defendant and TLIC were one and the same company and asks leave to join TLIC as a means of correcting a misnomer. In addition, the Plaintiff suggests that WRL, as well as TLIC, may be added as defendants because they had notice of the suit within 120 days of it being filed, and the suit arose out of conduct that WRL and TLIC were also engaged in. Thus, the Plaintiff asserts that amended claims against WRL and TLIC would take precedence over the action for declaratory relief in Iowa.

The Defendant objects in all respects to the Plaintiff's motion to amend. The Defendant argues that the '815 and '201 Patents embody two distinct inventions, which should be litigated separately. It also argues that the Plaintiff has not shown that good cause exists to ignore

the deadlines set out by the Court. In addition, the Defendant insists that introduction of the '201 Patent would only increase the complexity of an already complex case, confuse the jury, and needlessly [*5] delay trial. Finally, the Defendant asserts that, under the first-filed rule, Iowa is the proper forum for litigating any claims related to the '201 Patent.

Similarly, the Defendant opposes the addition of other defendants as untimely and not justified by good cause. It maintains that the Plaintiff offers no reasonable explanation as to why it waited for almost two years to sue WRL and TLIC under the '815 Patent. Further, the Defendant insists that the Plaintiff cannot satisfy the requirements of Rule 15(c)(3) because it was not mistaken about the Defendant's identity. Finally, the Defendant submits that WRL and TLIC did not know, nor have reason to know, that, but for the Plaintiff's misidentification of the proper defendants, they would have been sued along with the Defendant.

## C. Legal Standard for Motions to Amend

The parties agree that the Plaintiff's motion to amend pleadings after the amendment deadline has passed may be brought only if it complies with Rule 16(b)(6). That Rule prohibits modification of a pretrial schedule "except upon a showing of a good cause and by leave of the district judge." The "'good cause' standard primarily considers the diligence of the [*6] party seeking amendment." *Trustmark Ins. Co. v. Gen. & Cologne Life Re of Am.*, 424 F.3d 542, 553 (7th Cir. 2005) (citing *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 609 (9th Cir. 1992)).

If the Plaintiff demonstrates good cause, the Court should allow amendments freely "when justice so requires." Fed. R. Civ. P. 15(a). That is, "in the absence of any apparent or declared reason--such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc."--leave should be given. *Foman v. Davis*, 371 U.S. 178, 182, 83 S. Ct. 227, 9 L. Ed. 2d 222 (1962). But "[i]t is settled that the grant of leave to amend the pleadings pursuant to Rule 15(a) is within the discretion of the trial court." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 330, 91 S. Ct. 795, 28 L. Ed. 2d 77 (1971).

Thus, the Court must first consider if the Plaintiff has good cause to amend the pleadings three months after the deadline. If so, the Court will continue to inquire [*7] whether the amendment will cause undue delay or undue prejudice to the Defendant, and whether the amendment is futile.

## D. Application of the Standard

The Court agrees with the Defendant that the amended pleadings would create confusion, excessive delay, undue prejudice, and inefficiency. In addition, the Court finds no good cause to allow joinder of additional defendants two years after the lawsuit commenced. Lastly, the amended pleadings would duplicate the declaratory cause of action in Iowa.

The Plaintiff claims that it could not have added a claim under the '201 Patent before the amendment deadline passed because the patent did not issue until August 8. Although the Court wonders why the Plaintiff did not seek an extension of the May 15 deadline, since it had a pending patent, it accepts the Plaintiff's justification. However, the Plaintiff does not sufficiently explain why it did not attempt to join TLIC and WRL before May 15.

The Plaintiff submits that it did not sue TLIC initially because it thought the Defendant and TLIC were the same entity, and that the Defendant led them to believe such was the case. Moreover, it claims that it did not know that WRL was also [*8] selling the products that allegedly infringe its patents. It is difficult for the Court to understand why a party as sophisticated as the Plaintiff would be confused about the Defendant's relation to TLIC. After all, the Plaintiff's own exhibit from Indiana Department of Insurance identifies TLIC and the Defendant as two different entities, domiciled in different states, possessing different mailing addresses. (See DE 68, Ex. 10) In addition, the Court finds no adequate explanation in the Plaintiff's briefs why it could not have known before May 15 that WRL, the Defendant's sister company, was selling the same products as the Defendant. These voids are a considerable obstacle for the Plaintiff's showing of good cause to add additional defendants to the lawsuit.

Regardless of the good cause consideration, there is another reason why the Court may not permit the amendments: they would confuse the case. The interpretation of the '801 Patent alone has generated over 170 pages in briefs, and the addition of the '201 Patent, which is a separate invention, would set the case back and complicate litigation that by its nature is already complicated, Contrary to the Plaintiff's suggestion, [*9] including the two claims in one lawsuit would hinder judicial economy and efficiency. The addition of two more defendants would only exasperate the situation. Worse yet, the jurors would be the ones who would have to bear the brunt of the complexities. This situation would cause undue delay that would extend beyond the delay that appears to be inevitable once discovery begins.

Moreover, the Plaintiff's attempt to join TLIC and WRL as defendants and to bring the '201 Patent claim against them is futile. TLIC and WRL, along with the Defendant, sued the Plaintiff in the northern district of Iowa over the same claim three days before the Plaintiff introduced the amendment in this case. As such, the Iowa case is first-filed, and the Court defers to its sister court's earlier jurisdiction over the claim. *Genentech, Inc. v. Eli Lilly and Co.*, 998 F.2d 931, 937 (Fed. Cir. 1993) (citation omitted), *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995) ("The general rule favors the forum of the first-filed action, whether or not it is a declaratory action.").

The Plaintiff's arguments to the contrary are unconvincing. The Plaintiff maintains [*10] that its motion to amend constitutes a first-filed claim because both the '201 Patent claim and the additional defendants relate back to the original '815 claim and thus should be treated as though they were filed on the date of the original pleading. This may be true regarding the '201 Patent, but not TLIC and WRL. To obtain the benefits of relation back when a new party is named, the amended pleading must satisfy the elements of Rule 15(c)(3): (1) it must arise out of the same conduct, transaction, or occurrence set forth in the original pleading; and (2) within 120 days the party named in the amended pleading must have received sufficient notice of the institution of the action that it will not be prejudiced in maintaining a defense, and has known or should have known that, but for a mistake in identity it would have been named in the original pleading. *See* Fed. R. Civ. P. 15(c)(3). Thus, in addition to the same occurrence or transaction requirement, both fair notice and awareness of mistake in identity must be satisfied before an amended pleading may relate back under Rule 15(c)(3).

Even if the Court were to construe the Plaintiff's [*11] proposed amendments as satisfying the first part of the test, n2 the Plaintiff's attempt to relate back claims against TLIC and WRL would fail under the second part. First, the Plaintiff does not even assert that it made a mistake in WRL's identity, See *Worthington v. Wilson*, 8 F.3d 1253, 1257 (7th Cir. 1993) Because [plaintiff's] failure to name [defendants] was due to a lack of knowledge as to their identity, and not a mistake in their names, [plaintiff] was prevented from availing himself of the relation back doctrine of Rule 15(c)."), and there is no reason to believe that WRL should have known, within 120 days of the lawsuit being filed, that it was the company the Plaintiff intended to sue as well. As the Defendant points out, WRL had no reason to think that the Plaintiff chose to sue the Defendant by itself for any but strategic reasons. Similarly, even if the Plaintiff mistakenly omitted TLIC from the original Complaint, no evidence exists that TLIC knew or should have known that it was meant to be a target of the suit and would not have been missed but for the Plaintiff's mistake in identity. n3 Under the circumstances, TLIC had no reason to question [*12] the Plaintiff's litigation tactics. As a result, the Plaintiff cannot establish that the amended Complaint should be deemed first-filed in relation to TLIC and WRL. n4

n2 At least one court in the Seventh Circuit would disagree with such an assessment. *See Ill. Tool Works, Inc. v. Foster Grant Co., Inc.*, 395 F. Supp. 234, 250-51 (D.C. Ill. 1974) ("Rule 15(c) of the Federal Rules of Civil Procedure states that an amended pleading 'relates back to the date of the original pleading' 'whenever the claim or defense asserted in the amended pleading arose out of the same conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading.' This rule does not apply here. An alleged infringement of one patent is not the 'same conduct, transaction or occurrence' as the alleged infringement of another patent.").

n3 The Plaintiff characterizes its proposed amendment as to the TLIC as correcting a misnomer. That is a wrong characterization. A misnomer involves a correct defendant sued under a wrong name. Here however, the Plaintiff has a correct defendant but wants to add another one as well, which is not an action to correct a

misnomer.
[*13]

n4 In its briefs, the Plaintiff continually draws the Court's attention to the fact that the Iowa case is an action for declaratory relief. The Plaintiff believes that this fact should play a significant role in deciding the proper forum for the proposed claims. However,

> [t]he considerations affecting transfer to or dismissal in favor of another forum do not change simply because the first-filed action is a declaratory action. When the declaratory action can resolve the various legal relations in dispute and afford relief from the controversy that gave rise to the proceeding, and absent sound reason for a change of forum, a first-filed declaratory action is entitled to precedence as against a later-filed patent infringement action.

*Genentech, Inc.*, 998 F.2d at 938.

However, a first-filed case does not automatically foreclose a party from making an identical claim in a different forum. The Plaintiff could show that there is "sound reason that would make it unjust or inefficient to continue the first-filed action." *Genentech, Inc.*, 998 F.2d at 938. [*14]

> Such reason may be the convenience and availability of witnesses, or absence of jurisdiction over all necessary or desirable parties, or the possibility of consolidation with related litigation, or considerations relating to the real party in interest. The Court cautioned against "rigid mechanical solution[s]" to questions of forum, stressing the importance of conservation of judicial resources and the

comprehensive disposition of litigation.

*Id.* (citation omitted). Yet, the Plaintiff's reasons fall short. As noted above, consolidating the '815 and '201 Patents is impracticable, and no issue exists as to the convenience and availability of witnesses or absence of jurisdiction over all necessary or desirable parties. The Court believes that justice will be best served if the claims against TLIC and WRL are litigated in the Iowa district court. The latter point underscores an additional reason for not including the '201 Patent claim in this litigation, even if no other defendants are added. If the Court allowed the Plaintiff to add another claim, the Plaintiff would be fighting two battles on the '201 Patent, where as only one fight, in Iowa, suffices. The '201 [*15]

claim is already pending in an Iowa district court, and better yet, it involves all the parties the Plaintiff wants to enjoin: the Defendant, TLIC, and WRL. For these reasons, the Court will deny the Plaintiff's motion to amend in its entirety.

**E. Order**

The Court denies the Plaintiff's motion for leave to amend Complaint [DE 64].

SO ORDERED on December 18, 2006.

S/ Theresa L. Springmann

UNITED STATES DISTRICT JUDGE

LEXSEE 1990 US DIST LEXIS 17559



Analysis
As of: Jan 18, 2007

**NEWARK BRANCH, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, NEW JERSEY STATE CONFERENCE, NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, AND THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE, Plaintiffs, v. MILLBURN TOWNSHIP, NEW JERSEY, Defendant**

Civil Action No. 89-4219

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY

*1990 U.S. Dist. LEXIS 17559*

**December 27, 1990, Decided**

**NOTICE:** [*1]

NOT FOR PUBLICATION

**CORE TERMS:** declarant, non-uniformed, fire department, hiring, preliminary injunction, declaration, police officer, ripeness, police department, municipal, eligible, standing to challenge, certification, cross-motion, municipality, irreparable injury, resident, likelihood of success, reasonably possible, lack of standing, residency, deprive, futility, motion to dismiss, time limit, notice, police officers, fire fighter, fill, Civil Rights Act

**COUNSEL:**

EVEREALD F. THOMPSON, ESQ., Assistant General Counsel, Baltimore, Maryland, -and- DAVID L. ROSE, ESQ., JOSHUA N. ROSE, ESQ., Washington, D.C., -and- JONATHAN M. HYMAN, ESQ., Rutgers Constitutional Litigation Clinic, Newark, New Jersey, (Attorneys for Plaintiffs).

KATHY M. HOOKE, ESQ., RICHARD H. EPSTEIN, ESQ., CLAPP & EISENBERG, Newark, New Jersey, (Attorneys for Defendant).

**JUDGES:**

Alfred M. Wolin, United States District Judge.

**OPINION BY:**

WOLIN

**OPINION:**

OPINION

*I. BACKGROUND*

Plaintiff associations filed this action on October 11, 1989. They filed an amended complaint on November 16, 1989. Defendant moved to dismiss for lack of standing, and this Court filed an order on June 13, 1990 that would dismiss the amended complaint within 21 days unless plaintiffs filed a second amended complaint within that period. The accompanying opinion stated that in order for plaintiffs to derive standing from injury to an individual, the individual must (1) be a member of plaintiffs, (2) be qualified for the position to which he or she applied, and (3) in some way have attempted to apply for that position. June 13, 1990 Opinion at 9. The Court found that plaintiffs had failed to derive standing [*2] under this test. Id. The plaintiffs did file a timely second amended complaint, and defendant now moves to dismiss the amended complaint with prejudice for lack of standing. Because both parties have attached declarations, depositions, and exhibits relating to the motion to dismiss, the Court will consider the standing issue under

1990 U.S. Dist. LEXIS 17559, *

*Rule 56 of the Federal Rules of Civil Procedure.* Plaintiffs have cross-moved for a preliminary injunction. For the reasons stated herein, defendant's motion and plaintiffs' cross-motion are denied.

## II. DISCUSSION

### A. Standing

In order to satisfy the Article III case or controversy requirement, "[a] plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen v. Wright, 468 U.S. 737, 751, 104 S. Ct. 3315, 3324 (1984).* In enacting Title VII of the Civil Rights Act of 1964, n1 Congress intended to confer standing to the full extent authorized by Article III. *NAACP v. Harrison, 907 S. Ct. 1408, 1412, n.7 (1990).* Because plaintiff associations are bringing this case on behalf of their members, they must satisfy the requirements of associational [*3] standing:

An association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441 (1977); see also Int'l Union, United Automobile, Aerospace, and Agricultural Implement Workers of America v. Brock, 477 U.S. 274, 290, 106 S. Ct. 2523, 2533 (1986)* ("We therefore reaffirm the principles we set out in Hunt. . . ."). n2

n1 Plaintiffs have challenged defendant's hiring practices under § 703(a)(2) of the Civil Rights Act of 1964, as amended, *42 U.S.C.A. § 2000e-2*(a)(2)(1981), which provides in relevant part that it is unlawful for an employer "to limit, segregate or classify . . . applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities because of such individual's race. . . ."

[*4]

n2 In this case, the Court in effect dismissed the original complaint because plaintiffs failed to establish part (a) of the Hunt three-part test for associational standing. June 13, 1990 Opinion at 6-7, 14.

In *NAACP v. Harrison*, this Court (Debevoise, J.) dismissed, on standing grounds, a complaint challenging a different municipality's application of the same statutory residency requirement at issue in this case. *907 F.2d at 1410-11.* The Court of Appeals for the Third Circuit, affirming, held that the plaintiffs had failed to establish standing under any one of three possible tests:

The NAACP simply has not alleged or shown that at least one of its members, although not formally applying for municipal employment with Harrison, [1] did everything reasonably possible to make known to Harrison of his or her employment, [2] was deterred from applying for a municipal job by Harrison's discriminatory practices and would have applied for the position but for those practices, or [3] had a real and genuine interest in municipal employment with Harrison but reasonably believed that a formal application [*5] would be futile. . . .

*Id. at 1415* (citations omitted). n3 The Court of Appeals assumed without deciding that any such allegation would establish standing in a disparate impact case. Id. The Court of Appeals, although affirming the dismissal, held that plaintiffs should have been given an opportunity to amend their complaint. *Id. at 1416* (holding that dismissal for lack of standing did not preclude amendment).

n3 Defendant quotes this passage in such a way that it implies that in addition to the "everything reasonably possible" requirement, plaintiff must have been deterred from applying by defendant's discriminatory practices and would have applied but for those practices; alternatively, declarant argues, plaintiff must have a real and genuine interest in employment but for the futility of doing so. Defendant's Brief at 23. Defendant's interpretation ignores the Court of Appeals' citations, which, in effect, punctuate the disjunctive test, and which this Court has replaced with bracketed numbers. The Court finds defendant's interpretation strained and rejects it.

[*6]

After the Court of Appeals issued its decision, the plaintiffs in Harrison filed another complaint which, the Court held, failed to satisfy the specificity requirement for civil rights complaints. Opinion of July 12, 1990 at 3. Plaintiffs amended their complaint again and the Court held that they had satisfied the specificity requirement. Id. at 7. Then, after a trial on the merits, the Court held that plaintiffs had established standing. Opinion of September 6, 1990 at 23. Judge Debevoise compared the facts established in the two cases:

Case 1:06-cv-00720-JJF    Document 54-2    Filed 02/12/2007    Page 21 of 35

Page 3
1990 U.S. Dist. LEXIS 17559, *

I dismissed the prior action brought by the same plaintiffs on the ground that . . . they were unable to show that any of their members had sought or were seeking employment with the Town of Harrison. After the prior action was dismissed, plaintiffs identified a number of black persons who had taken and passed the police or fire fighter examinations and who, but for the residence requirements, would have been able to apply for a position with the Harrison police or fire departments. Plaintiffs also identified a black person who wished to apply for a clerical or nursing trainee position in the non-uniformed sector of the Harrison workforce. [*7]

* * *

During the period October 1989 to early January 1990, 18 of these persons, all of whom had become NAACP members, wrote to the personnel director of the Town of Harrison [to apply for police, fire, or non-uniformed jobs].

Id. at 12-13. The Town rejected these applicants because they were not on the eligibility lists, which they were barred from as non-residents. Id. at 21. This rejection established the standing of plaintiff associations. Id. Plaintiffs also attained standing because several police officer candidates had passed the qualifying examinations and would have applied for a position in Harrison but for the statement contained in the examination announcements and application that only Harrison residents need apply. Id. at 22. Plaintiffs' members who desired employment in Harrison but who did not apply had standing due to the futility of attempting to apply. Id. at 23.

### 1. Standing on the Basis of Events After the Date of the Original Complaint

The central question posed in defendant's motion for summary judgment is whether plaintiffs may establish standing on the basis of facts that occurred after the filing of the original complaint. In [*8] reaching this question, the Court finds that plaintiffs have not established standing with respect to uniformed or non-uniformed positions n4 on the basis of facts that occurred before the filing of the original complaint. Plaintiffs argue that, with respect to members who applied for positions in Millburn after the suit was filed, they were threatened with injury at the time suit was filed. Plaintiffs' Letter Brief at 2. The Court does not buy plaintiffs' argument that members who applied for Millburn jobs after filing were threatened with injury before filing. By this reasoning, any of plaintiffs' members would have standing as of a certain date because of the mere possibility that they might be harmed by an allegedly discriminatory policy at some future date. The mere possibility of future action

by plaintiffs and defendants -- here, application and rejection -- does not create a case or controversy.

n4 The Court will consider standing to challenge defendant's hiring policies for uniformed and non-uniformed personnel separately. Millburn gives residents preference for uniformed personnel under *N.J.S.A. § 40A:14-10.1a* (1980) (members of fire department) and § 40A:14-123.1a (members of police force). Allegedly, however, Millburn's non-uniformed employees are hired through word of mouth and not pursuant to a de jure residents-only requirement or preference.

[*9]

Defendant argues that because plaintiffs did not have standing when they filed their original Complaint, "any attempt to create 'standing' after the fact" must be unavailing. Defendant's Brief at 16-17 (citing *Sims v. Florida Dep't of Highway Safety & Motor Vehicles, 862 F.2d 1449, 1458* (11th Cir.) (en banc), cert. denied, *110 S. Ct. 64 (1989)*). The Eleventh Circuit Court of Appeals stated in that "we must determine standing at the time plaintiff files suit." *862 F.2d at 1458*. Sims, however, does not involve an amended complaint and has no bearing on whether plaintiffs can cure standing deficiencies in their original complaint by filing an amended complaint. Deposit Guaranty Nat'l Bank v. Roper, upon which Sims relies, states only that plaintiffs' complaint established the case or controversy requirement, *Roper, 445 U.S. 326, 372 100 S. Ct. 1170, 1171 (1980)*, not that events subsequent to the complaint may not establish standing. Because standing was likewise held to exist in *Sims, 862 F.2d at 1458-59*, Sims does not support defendant's position. With respect to defendant's reliance on Sims, the Court notes Justice Douglas' observation that "generalizations [*10] about standing to sue are worthless as such." *Association of Data Process Service Organizations v. Camp, 397 U.S. 150, 151, 90 S. Ct. 827, 829 (1970)*, cited in C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure: Jurisdiction 2d § 3531 at 347 (1984).

Justice Douglas' generalization about the worthlessness of generalizations about standing could also apply to the general rule that "[a] case or controversy must exist at all stages of the action." 6A Moore's Federal Practice para. 57.11 at 57-84 (1984) (citation omitted), cited in Defendant's Brief at 16. The same authority states that even if the existence of a case or controversy was questionable at the time the action commenced, courts have held it sufficient if a justiciable question existed at the time of the ruling on the merits. 6A Moore's para. 57.11

at 57-89 through 90 n.10 (citations omitted). In any event, both passages from Moore's relate to declaratory judgments, which are not at issue here.

The standing concern which the defendant raises is one of ripeness.

Ripeness and mootness easily could be seen as the time dimensions of standing. Each assumes that an asserted injury would be adequate [*11] [to establish standing]; ripeness then asks whether an injury that has not yet happened is sufficiently likely to happen, and mootness asks whether an injury that has happened is too far beyond a useful remedy.

Id. § 3531.12 (citing *Warth v. Seldin, 422 U.S. 490, 499 n.10, 95 S. Ct. 2197, 2205 (1975))*. Defendant's argument can be viewed as a contention that plaintiffs' case was unripe when the original complaint was filed, and cannot be ripened by events subsequent to that filing. This argument has two implications for this case: first, whether events subsequent to the filing of a summons and complaint can overcome ripeness problems; and second, if so, whether, as a procedural matter, plaintiffs successfully overcome those ripeness problems.

In determining ripeness, a court may consider events that occurred after the filing of the complaint. *American Motorists Ins. Co. v. United Furnace Co., 876 F.2d 293, 302 n.4 (2d Cir. 1989)*. The court stated that "it is irrelevant whether the case was ripe for review when the complaint was filed. Intervening events relevant to the ripeness inquiry should be considered and may be determinative." Id. (citations omitted). Accord [*12] *Henley v. Herring, 779 F.2d 1553, 1555 (11th Cir. 1986)*. In Henley, a property owner brought a § 1983 action to challenge a state university's attempt to take possession of a city street without resort to condemnation proceedings. *Id. at 1554*. Although the university and the municipality had not taken certain actions prior to the filing of the complaint, they did so before the district court ruled. *Id. at 1555*. The Court of Appeals held that the case was ripe for adjudication when the district court ruled. Id. See also Wright, Miller & Cooper § 3532.1 at 136 ("Ripeness should be decided on the basis of all the information available to the court."); see also generally *Buckley v. Valeo, 424 U.S. 1, 114-17, 96 S. Ct. 612, 680-81 (1976)* (reviewing court will consider facts arising since lower court adjudication); *Blanchette v. Connecticut General Ins. Co., 419 U.S. 102, 139-40, 95 S. Ct. 335, 356-57 (1974)* (same). Therefore, in determining the ripeness of this case for adjudication, the Court may consider events which occurred after the filing of the original complaint. n5

n5 The Court appreciates, without agreeing with, defendant's argument by analogy to diversity jurisdiction. Defendant's Brief at 17-19 (citing, e.g., *Newman-Green, Inc. v. Alfonzo-Larrain, 109 S. Ct. 2218 (1989))*. Because the Court views the standing issue in terms of ripeness, the rule that the facts creating diversity jurisdiction must exist as of the date of the original complaint simply has no applicability here.

[*13]

*Rule 15 of the Federal Rules of Civil Procedure* governs the amendment of complaints. Rule 15(c) provides, in relevant part, that "whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the original pleading." Thus, under Rule 15(c), claims in an amended complaint that share a common factual basis with the original complaint relate back to the date of the original complaint. However, Rule 15(c) cannot enlarge federal jurisdiction. *Doe v. O'Bannon, 91 F.R.D. 442, 447 (E.D. Pa. 1981)*. In Doe, plaintiffs filed a complaint challenging Pennsylvania regulations reducing the state's funding of abortions. *Id. at 443*. Later, plaintiffs amended to add a free exercise of religion claim. The plaintiff who raised the free exercise claim was not pregnant as of the date of the original complaint and had had her abortion by the date of the amended complaint. *Id. at 446*. The district court dismissed the free exercise claim for lack of standing and specifically held that plaintiffs could not use relation back to establish standing [*14] because the free exercise claim had nothing to do with the original claims. *Id. at 447*.

In the present case, plaintiffs seek to establish standing on the basis of various members' job applications in the winter of 1989-90. These applications occurred after the filing and dismissal of the original complaint but before the filing of the second amended complaint. Allegations concerning these facts in the amended compliant could not relate back to the original complaint because they did not exist as of the date of the original complaint. Therefore, as in Doe, relation back under Rule 15(c) does not aid plaintiffs in establishing jurisdiction.

Nevertheless, the jurisdictional facts in this case are not as defective as they were in Doe, where plaintiff was not pregnant as of the original complaint but had already had an abortion by the time of the amended complaint. Here, plaintiffs' members had not all received jobs as of the time plaintiffs amended the complaint. The question, then, is whether the lack of facts establishing standing as of the original complaint forever precludes standing even though such facts have occurred by the date of the

amended complaint. The Court holds [*15] that these new facts can establish standing.

The Court specifically holds that it will consider membership-related events that occurred after the filing of the original complaint. Defendant argues that because the members on whom plaintiffs' standing depends did not join plaintiffs until after the original filing, the Court should dismiss the amended complaint. Defendant's Brief at 19-21. The District of Columbia Circuit has held that "a petitioner asserting organizational standing cannot succeed if the new affiliation it pleads came about only after the statutory time limit." *Petro-Chem Processing, Inc. v. EPA, 866 F.2d 433, 437 (D.C. Cir. 1989)*. According to a prominent commentator, however, this ruling bears only on limits to judicial review of agency action, rather than "on the question whether an organization that initially lacks standing can resurrect a challenge to an ongoing activity by recruiting new members who do have standing." C. Wright, A. Miller & E. Cooper, § 3531.5, at 184 n.130 (1990 Supp.). For the reasons stated above -- i.e., that plaintiffs may use post-filing facts to "ripen" their case -- the Court decides the question presented in the affirmative. [*16]

Defendant's argument that the statutory period for review of a regulation in Petro-Chem is analogous to Title VII's 90-day right-to-sue period does not persuade the Court. Although the Court of Appeals of the District of Columbia Circuit stopped just short of stating that the time limit for agency review was jurisdictional, it did state the importance of administrative finality was served by strict adherence to the time limit. *866 F.2d at 437*. Recently, however, the D.C. Circuit stated that the provision containing the time limit, *42 U.S.C. § 6976*, "defines the scope of this court's jurisdiction to review agency actions." *Hazardous Waste Treatment Council v. EPA, 910 F.2d 974, 975 (1990)* (emphasis added). This Court concludes that the time limit to sue and seek review under this provision has jurisdictional import. On the other hand, the 90-day right-to-sue requirement in *42 U.S.C. § 2000e(f)(1)* is not jurisdictional and is subject to tolling and waiver. E.g., *Gooding v. Warner-Lambert Co., 744 F.2d 354, 358 (3d Cir. 1984)* (citing *Zipes v. Trans World Airways, 455 U.S. 385, 102 S. Ct. 1127 (1982))*, cited in Defendant's October 31, 1990 Letter Brief at 2. [*17] Because of this distinction, Petro-Chem is not analogous here. Moreover, the Court finds nothing "inconsistent" or "unfair" in determining that plaintiffs' second amended complaint is the operative pleading for standing purposes even though only the original complaint was timely under the right-to-sue limitation period. See Defendant's Brief at 20. Title VII does not exist for the purpose of making work for the EEOC or the United States Post Office.

Given the lack of a ripeness problem, the Court must decide whether, as a procedural matter, it may consider events which occurred after the filing of the original complaints. n6 A pleading which asserts "transactions or occurrences or events which have taken place since the date of the pleading sought to be supplemented" is a supplemental pleading. Rule 15(d). A district court may permit a supplemental pleading "upon motion of a party . . ., upon reasonable notice and upon such terms as are just. . . ." Id. A recent opinion from the Eastern District of Pennsylvania holds that a plaintiff may file a supplemental complaint to establish standing. *West v. Sullivan, 1990 WESTLAW 107862 (July 26, 1990)*. In West, Judge Lord [*18] held that the complaint as it existed failed to establish standing, but that plaintiff's motion to file a supplemental complaint to overcome this deficiency would be granted. Id. at 2-3. The Court will follow West in concluding that if plaintiffs have fulfilled the requirements of Rule 15(d), the Court will consider whether standing exists on the basis of the amended complaint.

> n6 Plaintiffs certainly could have amended their original complaint to state facts that existed as of the date of the original complaint. *Harrison, 907 F.2d at 1417* (plaintiff may amend complaint to allege facts that will establish standing).

Plaintiffs have never formally moved to supplement their first amended complaint in order, as in West, to establish standing. However, defendant has been on notice since before the Court dismissed the first amended complaint that plaintiffs intended to go forward on the basis of standing-related facts that occurred after the date of the first complaint. See January 26, 1990 Hearing Transcript [*19] at 17-18 (defendant's counsel's argument that all facts establishing standing must have occurred before date of original complaint). In light of defendant's current motion to dismiss due to lack of standing as of the original complaint, plaintiffs' opposition to the motion is similar to a cross-motion to supplement their first amended complaint. Although plaintiffs' second amended complaint has already been filed, the Court has never passed on whether plaintiffs may supplement their complaint to allege standing-related facts. Under these circumstances, the Court will deem Rule 15(d)'s notice and hearing requirements for the filing of a supplemental pleading to be satisfied. Therefore, the Court will consider events after the filing of the first complaint in determining whether standing exists.

*2. Facts Establishing Standing*

*(a) Non-Uniformed Positions*

The only two people from whom plaintiffs claim derivative standing to challenge Millburn's hiring of non-uniformed employees are Dwayne and Jason Chavis. Plaintiffs' Brief at 21-24. The Court has previously held, however, that neither Dwayne nor Jason Chavis was qualified for the position to which he applied. June 13, [*20] 1990 Opinion at 13 & n.8. "Under the laws of the case doctrine, once an issue is decided, it will not be relitigated in the same case, except in unusual circumstances." *Hayman Cash Register Co. v. Sarokin, 669 F.2d 162, 165 (3d Cir. 1982).* Plaintiffs do not argue that unusual circumstances exist that require the Court to reverse itself. They do not raise new facts or argue new law with respect to the Chavises' qualifications, and the Court concludes that its earlier decision as to Dwayne and Jason Chavis is law of the case with respect to standing to challenge petitioner's hiring of non-uniformed employees. The Court holds that no standing exists.

Because plaintiffs have no standing to challenge defendant's hiring of non-uniformed positions, plaintiffs' second amended complaint is dismissed as to that challenge. The Court warned in its June 13, 1990 Opinion at 15, that a second dismissal would be with prejudice. The Court is mindful of its obligations under *Foman v. Davis, 371 U.S. 178, 182, 83 S. Ct. 227, 230 (1962),* to grant amendment liberally. In this case, however, plaintiffs' inability to present any new members interested in non-uniformed positions with Millburn indicates [*21] that a third amended complaint would be futile. Millburn's alleged "word-of-mouth" hiring policies apparently pose a factually more difficult case than a de jure residents-only policy. Over a year after filing its complaint, plaintiffs do not have standing to challenge defendant's policies in hiring non-uniformed employees. Plaintiffs cannot find someone interested in, and qualified for, non-uniformed jobs. Due to the apparent futility of further amendment, plaintiffs' second amended complaint is dismissed with prejudice as to non-uniformed positions.

### (b) Fire Department Positions

Plaintiffs offer three fire fighter candidates: Timothy Wise, Tyrone Jenkins and Mark Anthony Lee. Plaintiffs' Brief at 18. The Court has previously held that plaintiffs cannot derive standing from Mr. Wise and Mr. Jenkins because they had already been hired by Newark and had no interest in working elsewhere. June 13, 1990 Opinion at 12 & n.5. Therefore, again as a matter of law of the case, plaintiffs cannot derive standing from their injury, if any. Mr. Lee was held ineffective to give plaintiffs standing because he "was not a member of plaintiffs when the amended complaint was filed. . . ." [*22] Id. at 12. Note that plaintiffs' filing of the second amended complaint overcame this disability: Mr. Lee was a member of the NAACP as of the date of the most recent complaint. n7 Other than the date of Mr. Lee's membership,

defendant raises two other problems with Mr. Lee's candidacy: that he has never applied to take an examination for Millburn, and that he was not aware of Millburn's residency preference before being contacted by the NAACP. Defendant's Exhibit A. n8 Although plaintiffs argue that, under *Harrison,* their members need not have made formal applications, they have not presented the Court with a letter of inquiry from Mr. Lee to the fire department. n9 Nor have plaintiffs presented a letter of inquiry from any other alleged member professing interest in a position in Millburn's fire department.

> n7 The Court did not discuss in its June 15, 1990 Opinion whether Mr. Lee was a member as of the date of the original complaint.

> n8 The Court appreciates Exhibits A and B to the Certification of Richard Epstein. These exhibits state clearly defendant's objections to the standing of each of plaintiffs' purported members. Mr. Lee appears on Exhibit B as a police officer, rather than fire fighter candidate. This conflict is irrelevant in light of plaintiffs' apparent failure to submit any letter of inquiry to Millburn for a fire fighter position.

[*23]

> n9 Exhibit K to the Certification of Mr. Epstein is a sample standardized letter sent to Millburn by each new defendant. Mr. Lee, however, was not a new declarant. See June 13, 1990 Opinion at 12 & n.6.

The Court concludes that plaintiffs have no standing to challenge defendant's hiring of fire fighters. Therefore, the Court will dismiss plaintiffs' second amended complaint with prejudice as to its challenge of defendant's hiring policy for fire department jobs. The Court frankly finds that plaintiffs' treatment of their members' applications to the fire department to be very confusing. The Court cannot be certain that plaintiffs do not have members who have submitted letters of inquiry to the fire department. Therefore, this dismissal will be stayed for 30 days, within which time plaintiffs may produce copies of declarations, letters of inquiry, and responses for fire department applicants (1) whom defendant has already deposed; and (2) other than Timothy Wise and Tyrone Jenkins.

### (a) The Police Officer Defendants

Plaintiffs have listed five new declarants ("the declarants") in their second [*24] amended complaint. n10

These declarants state that, although they are not Mill-burn residents, they are interested in becoming police officers in Millburn or other New Jersey municipalities. All of the declarations were dated in December of 1989 and were prepared by the NAACP for this case and cases against other municipalities. The declarations read, in blank, as follows:

DECLARATION OF [NAME]

I, (name, address), hereby declare that the following statements are true:

1. I am black and am a member of the Newark Branch, NAACP. My telephone number is ( )    (days) and ( )    (evenings).

2. I have a high school diploma, and a New Jersey driver's license. I am between 18 and 35 years of age and physically fit. I believe that I am qualified to be a police officer.

3. I am interested in obtaining employment as a po-lice officer with the City of Clifton, the Town of Kearny, the Town of Harrison, the Township of West Orange, the Borough of Fort Lee, the Millburn Township, or the City of Bayonne.

4. I took the most recent examination for entry level police officer position with the City of Newark. I passed the examination and am on the current list of eligibles for positions with [*25]  the City of Newark. To date, I have not received a job offer.

5. When I submitted my application for a police of-ficer position, and when I took the examination, I was told that because I am a resident of Newark, I was eligi-ble to apply only for jobs with Newark. I would have applied for jobs with the municipalities listed above if I had been eligible to do so.

6. I have recently submitted letters of application to Bayonne, Clifton, Fort Lee, Harrison, Kearny, Millburn, and West Orange.

I hereby declare under penalty of perjury that the foregoing is true and correct.

Executed this    day of December, 1989.

Exhibits C-G to the Certification of Richard Epstein.

n10 The five declarations, attached as Ex-hibit I to the Certification of Richard Epstein, are those of Deborah Allen, LeRoy Shoulars, Jr., Cary Tate, Elby Roberts and Tyrone Moore.

Reginald Adams' declaration is also attached; however, Mr. Adams was not a new declarant.

Counsel for defendant has certified that each of the new declarants wrote a letter of [*26]  inquiry to Mill-burn stating in its entirety:

(Name, address)

December   , 1989

Business Administration
Millburn Township
Town Hall
375 Millburn Avenue
Millburn, New Jersey 07041

Dear Sir:

I write you now in the hope that you will consider me for a job as a police officer with your police depart-ment. I reside in Newark at the above address, am be-tween 18-35 years old, physically fit and am a high school graduate. I took the most recent police officer examination with the City of Newark and have been placed on the current list of eligibles for the job. They have not offered me a job.

I would like to work for your police department. If there is anything else you need to know or any forms I should fill out, please let me know. Otherwise, please consider this my application.

Very truly yours,
(Name)

Certification of Richard Epstein para. 13 & Exhibit K.

Timothy P. Gordon, Business Administrator, re-sponded with his own form letters which state, on Mill-burn stationery:

January 8, 1990

(Name, address)

Dear   :

Thank you for your letter expressing interest in em-ployment by Millburn Township.

Please be advised that under state law, the Township can only make offers for employment [*27]  as a police officer from lists of certified eligible persons provided to us by the New Jersey Department of Personnel. The most recent certified lists provided to us by the Department of Personnel have now expired and we must await new cer-tified lists from the Department of Personnel before con-

sidering applicants for employment as police officers in the Township.

We will be happy to consider your application in accordance with the normal Department of Personnel procedures if your name appears on the new certified eligible lists when we receive them.

Sincerely,

Timothy P. Gordon
Business Administrator

Certification of Richard Epstein para. 14 & Exhibit L.

Plaintiffs submit that this exchange of letters between the declarants and Millburn establishes standing. Plaintiffs' Brief at 38. Plaintiffs, argue that the declarants (and others) did everything reasonably possible to apply for jobs. Id. at 39. Plaintiffs therefore urge the Court to follow Judge Debevoise in holding that standing exists under the Court of Appeals' Harrison decision. Id. at 36-37. Defendants argue that the declarants' form letters, initiated by plaintiffs, did not constitute everything reasonably [*28] possible. Defendant's Brief at 23.

In Harrison, the Court of Appeals held that "the NAACP has not alleged or shown that at least one of its members, although not formally applying for municipal employment with Harrison, did everything reasonably possible to make known to Harrison of his or her interest in such employment. . . ." 907 F.2d at 1415 (citing EEOC v. Metal Service Co., 892 F.2d 341, 349 (1990)). n11 The Harrison plaintiffs failed to show "that any of the NAACP's members ever tried to apply for a municipal job with Harrison, or took any steps, reasonable or not, to try and secure such a job . . . ." Id. The Court of Appeals discussed the standard for expressing interest in a position in Metal Service, 892 F.2d at 348-52. In that case, plaintiffs' initial job applications and periodic inquiries satisfied "any application requirement for establishing a prima facie case." Id. at 349 (emphasis added). Thus, the minimum effort necessary to establish standing falls somewhere between failure to make any effort, Harrison, 907 F.2d at 1415, and consistent and sustained effort. Metal Service, 892 F.2d at 349.

n11 The Court disagrees with defendant's argument that the Court of Appeals' Harrison decision did not state new principles of standing in Title VII cases. Defendant's Reply Brief at 9-10. Metal Service Co. is not a standing case; it states the elements of a prima facie case. 892 F.2d at 348. The Court of Appeals' Harrison decision, rather than this Court's June 13, 1990 Opinion (issued two days before Harrison was published)

states the law of standing for purposes of defendant's motion.

[*29]

The fact that the declarants did not follow up on their form letters does not, under the facts of this case, deprive plaintiffs of standing. The letters concluded by stating that if there was "anything else you need to know or any forms I should fill out, please let me know. Otherwise, please consider this my application." The text of defendant's acknowledgment indicates that the declarants' form letters were enough to convey their interest in the positions: "Thank you for your letter expressing interest in employment in Millburn Township." Exhibit L to Certification of Richard Epstein (emphasis added). Declarants did enough to register their interest.

Defendant's response, that the declarant's "application" would only be considered if his or her name appeared on the new certified eligible list, was, in effect, a rejection on the basis of residency. Harrison, September 6, 1990 Opinion at 21 (Debevoise, J.). This is because -- as defendant knew -- the declarants did not live in Millburn. Therefore, their names could and would not appear on the new certified eligible list. Declarants' letters of inquiry, and defendant's rejections on the basis of residency, establishes standing [*30] for plaintiffs to challenge defendants hiring of police department employees.

Aside from defendant's general objections, defendant finds fault with the standing of each of the declarants on the basis of statements made at their depositions. One, Cary Tate, stated that he was not a member of the NAACP. Tr. 7:23-8:11. As plaintiffs' counsel admitted at oral argument, plaintiffs have the burden of proving membership, and with Cary Tate the NAACP fails to meet its burden.

Having reviewed all of defendant's objections to declarants, the Court holds that plaintiffs derive standing to challenge defendant's residency preference from the following declarants: Deborah Allen, LeRoy Shoulars, Jr., Elby Roberts and Tyrone Moore. Because of this holding, the Court will not reach the issue of whether plaintiffs also have standing on the basis of previous declarants. However, the Court notes that one of the major disabilities of the previous declarants was that they did not become members of plaintiffs until after the first amended complaint. June 13, 1990 Opinion at 10. Plaintiffs have overcome this problem by filing a second amended complaint after these individuals had become members.

The standing [*31] plaintiffs derive from these four declarants occurs only under the first test in Harrison, i.e., the informal application test. Plaintiffs' deterrence and/or futility arguments (the second and third Harrison

tests) are not persuasive. The New Jersey Department of Personnel's notices for fire and police department applications did indeed inform the prospective applicants that they could only apply to Millburn if they were residents of Millburn at the time they applied and at the time they were appointed. Plaintiffs' Exhibits 4 and 5. Defendant is responsible for this language because it barred non-residents from taking its exams. But Harrison requires more than deterrence in the air, and more than theoretical futility. Plaintiffs' members must have been deterred from applying to defendant; they must have believed it futile. *907 F.2d at 1415.*

The Court gives no credence whatever to paragraph five of the declarations, which states that each declarant was told, when he or she submitted the Newark application, that he or she was only eligible to apply for jobs with Newark and would have applied for jobs with Millburn and other towns if he or she had been eligible. The Court [*32] finds it hard to swallow that the declarants and other newly minted members all would have applied, but for the residents-only requirement in the notices, to the very same seven municipalities that plaintiffs would someday sue. It is not surprising that the declarants had difficulty in their depositions defending paragraph five of the declarations. The Court gives paragraph five no weight.

*B. Plaintiff's Cross-Motion for a Preliminary Injunction*

To obtain a preliminary injunction, the moving party must show both a likelihood of success on the merits and the probability of irreparable harm if relief is not granted. *Hohe v. Casey, 868 F.2d 69, 72 (3d Cir. 1989)* (quotation omitted). In addition to these factors, courts generally consider the effect the proposed injunction would have, if granted, on the non-moving party; and the public interest. C. Wright, A. Miller & E. Cooper, Federal Practice & Procedure § 2938 (1973 & 1990 Supp.). In the present case, the Court finds that, while plaintiffs have shown a likelihood of success on the merits with respect to the police department, n12 they have failed to show a probability of irreparable harm if the requested relief is [*33] not granted. Because plaintiffs do not satisfy one of the two requisites for preliminary relief, the Court will deny their motion without reaching the balance of harm and public interest considerations.

n12 The lack of standing for non-uniformed and fire department positions moots plaintiffs' cross-motion with respect to such positions. Even if the Court reverses itself as to the fire department positions, however, the lack of irreparable injury will nevertheless bar the entry of a preliminary injunction. Plaintiff's Brief at 47-50 (ar-

gument for preliminary injunction does not identify member ready, willing and able to take fire department position).

*1. Likelihood of Success on the Merits*

Section 703(a)(2) of Title VII of the Civil Rights Act of 1964, as amended, *42 U.S.C.A. § 2000e-2(a)(2)* provides in relevant part that it is unlawful for an employer "to limit, segregate or classify . . . applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities . . . [*34] . . because of such individual's race . . . ." A plaintiff establishes a prima facie Title VII disparate impact case by showing that an employment practice, neutral on its face but causing a substantial adverse impact on a protected group, has no legitimate business purpose. *Metal Service, 892 F.2d at 346.* Millburn's preference for resident applicants for police officer positions is an employment practice that is facially neutral with respect to race. However, plaintiffs have offered compelling evidence that this policy adversely affects blacks, who are a protected group under Title VII. Plaintiffs' case is compelling because so few blacks live in Millburn and therefore, under Millburn's employment policies, so few blacks have the opportunity to work for Millburn. The number of blacks who live in Millburn is so small that, regardless of any disagreement about the size of the available pool of qualified black applicants for Millburn jobs, Millburn's policy probably has a substantial adverse impact on blacks.

Plaintiffs allege, and defendant admits, that six-tenths of one percent of Millburn's population is black. Second Amended Complaint para. 6; Answer para. 6. Defendant has [*35] also admitted that of its approximately 215 full-time employees, only four are black. Answer to Amended Complaint para. 7. Thus, about one-half of one percent of defendant's full-time employees are black. However, defendant has four black employees in its public works department. Affidavit of Timothy Gordon para. 5. The Court concludes on the basis of Mr. Gordon's affidavit and the declaration and report of plaintiffs' expert, Herbert Hammerman, defendant does not employ any black police officers. Mr. Hammerman filed a declaration in which he opines that the representation of blacks in the private workforce is 10.7 percent and that this statistic provides the "best evidence" of the labor pool available to Millburn as a municipal employer. Exhibit 12 to Plaintiffs' Motion for Summary Judgment or Preliminary Injunction, filed December 1, 1989. The Court finds initially, without relying on the accuracy of Mr. Hammerman's conclusions, that there is a likelihood that the residency requirement for police department positions has something to do with the fact that it employs no blacks. See Harrison, Opinion of Sep-

tember 6, 1990 (Debevoise, J.) (no experts needed to established marked [*36] disparity in municipal employment caused in substantial part by Harrison's residency requirement). The Court agrees with Judge Debevoise's determination that the residency requirements at issue do not serve a legitimate business goal. Harrison, September 6, 1990 Opinion at 36-39. The Court therefore concludes that plaintiffs have established a likelihood of success on the merits as to hiring of police officers.

### 2. Lace of Irreparable Harm

A party moving for a preliminary injunction has the burden of proving irreparable injury. *Hohe, 868 F.2d at 72.* Establishing a risk of irreparable harm is not enough; plaintiff must make a "clear showing of immediate irreparable injury." Id. (quotations omitted; emphasis added). In this case, plaintiffs have not clearly shown the probability of an immediate, irreparable injury. Therefore, the Court must deny their motion.

Plaintiffs have not brought to the Court's attention any police department job that defendant intends to fill and that one of plaintiffs' members is ready, willing and able to fill. Without such a showing the Court will not enter a preliminary injunction. Cf. Harrison, July 12, 1990 Opinion at 20 [*37] (refusing preliminary injunction where no available municipal jobs). However, in view of the public importance of this case, the Court will request the magistrate assigned to this case to set it down for a pretrial conference as soon as discovery is complete.

### III. CONCLUSION

Defendant's motion to dismiss the second amended complaint for lack of standing will be denied as to police department positions but granted, with prejudice, as to fire department and non-uniformed positions. The dismissal as to defendant's hiring of fire department employees will be stayed for 30 days and will be vacated if

plaintiffs can produce documentation of letters of inquiry by their members to defendant's fire department as provided herein. Plaintiffs' cross-motion for a preliminary injunction will be denied because, although plaintiffs have shown a likelihood of success on the merits, they have failed to show clearly an immediate risk of irreparable injury. The Court will request the magistrate assigned to this case to set it down for a pretrial conference as soon as discovery is complete.

An order in accordance with this Opinion is attached.

### ORDER

In accordance with the Court's Opinion filed [*38] herewith, it is on this 27th day of December, 1990

ORDERED that defendant's motion to dismiss the second amended complaint for lack of standing is denied as to police department positions; and it is further

ORDERED that plaintiffs' second amended complaint is dismissed, with prejudice, as to plaintiffs' challenge against defendant's practices and policies of hiring for non-uniformed positions; and it is further

ORDERED that plaintiffs' second amended complaint is dismissed, with prejudice, as to defendant's hiring of fire department employees. This dismissal will be stayed for 30 days and will be vacated if plaintiffs can produce appropriate documentation of letters of inquiry sent be their members to defendant's fire department; and it is further

ORDERED that plaintiffs' cross-motion for a preliminary injunction is denied because plaintiffs failed to show an immediate and irreparable injury.

The magistrate assigned to this case is requested to set it down for a pre-trial conference as soon as discovery is complete.

LEXSEE



Cited
As of: Jan 18, 2007

PE CORPORATION and COMPETITIVE TECHNOLOGIES, INC., Plaintiffs, v.
AFFYMETRIX, INC., Defendant and Third-Party Plaintiff, v. PERSEPTIVE
BIOSYSTEMS, INC., Third-Party Defendant.

Civil Action No. 00-629-SLR

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF DELAWARE

2001 U.S. Dist. LEXIS 15792

September 27, 2001, Decided

**DISPOSITION:** [*1] Plaintiffs' motion to amend the complaint (D.I. 29) granted. Defendant's motion to dismiss for lack of subject matter jurisdiction (D.I. 20) granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiffs, the patentee and the parent company of the exclusive licensee, sued defendant company alleging infringement of five patents. The company moved to dismiss for lack of subject matter jurisdiction. Plaintiffs moved to amend the complaint.

**OVERVIEW:** The patentee granted an exclusive license to the patents at issue to a company later acquired by the licensee. The patentee also gave up the right to participate in lawsuits to protect the patents. The company claimed plaintiffs lacked standing to sue. As a result, plaintiffs requested the company's permission to substitute the licensee as a plaintiff in the action. The company refused, and so plaintiffs asked the court's permission to amend the complaint to add the licensee as a plaintiff. It appeared that the failure to designate the licensee as a plaintiff was merely a clerical error, allowing for plaintiffs' amendment. However, the amendment did not relate back to the original complaint's filing date because the named plaintiffs lacked standing. The parent company had no proprietary interest in the patents at issue, and

therefore lacked standing to sue. The patentee had given up its right to participate in litigation to protect the patents, so it too lacked standing.

**OUTCOME:** The court granted plaintiffs' motion to amend the complaint, but the amended complaint did not relate back to the filing date of the original complaint. Thus, the court granted the company's motion to dismiss for lack of subject matter jurisdiction.

**CORE TERMS:** patent, motion to dismiss, infringement, motion to amend, filing date, amend, license, patentee, patent infringement, licensee, sole right, Patent Act, subject matter jurisdiction, exercise of jurisdiction, legal title, own name, jurisdictional, prudential, freely, responsive pleading, third parties, proper party, unrestricted, prosecute, thereupon, worldwide, paid-up

**LexisNexis(R) Headnotes**

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN1] Fed. R. Civ. P. 15(a) allows courts to freely permit amendments to complaints as justice requires. Courts commonly permit amendments where clerical mistakes

are involved and the errors were made in good faith. Courts are also encouraged to grant pretrial amendments so that parties may fully present the issues.

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN2] An amended complaint that contains an additional or substituted party will only relate back to the original complaint's filing date if it satisfies the requirements of Fed. R. Civ. P. 15(c)(3).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview*
[HN3] See Fed. R. Civ. P. 15(a).

*Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back*
[HN4] See Fed. R. Civ. P. 15(c)(3).

*Civil Procedure > Justiciability > Standing > General Overview*
[HN5] Standing in a patent infringement case is derived from the United States Patent Act, which provides that a patentee shall have remedy by civil action for infringement of his patent. 35 U.S.C.S. § 281. The term "patentee" includes not only the patentee to whom the patent was issued but also the successors in title to the patentee. 35 U.S.C.S. § 100(d).

*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Procedure > Jurisdiction > General Overview*
*Governments > Courts > Authority to Adjudicate*
[HN6] The question of standing to sue is a jurisdictional one. Standing is a threshold issue in every federal case, determining the power of the court to entertain the suit. Federal courts are under an independent obligation to examine their own jurisdiction, and standing is perhaps the most important of the jurisdictional doctrines.

*Civil Procedure > Justiciability > Standing > General Overview*
[HN7] Standing cannot be inferred argumentatively from averments in the pleadings, but rather must affirmatively appear in the record. Additionally, the party who seeks the exercise of jurisdiction in its favor has the burden of

clearly alleging facts demonstrating that it is a proper party to invoke judicial resolution of the dispute.

*Civil Procedure > Justiciability > Standing > General Overview*
*Civil Procedure > Jurisdiction > General Overview*
*Patent Law > Ownership > Conveyances > Licenses*
[HN8] U.S. Const. art. III requires a party invoking federal jurisdiction to establish that: (1) it has suffered an injury-in-fact that is concrete and actual or imminent; (2) the injury is causally related to the actions of the defendant; and (3) the harm is redressable by a favorable decision. Standing doctrine embraces not only this three-prong U.S. Const. art. III standing test, but also judicially self-imposed limits, known as prudential limits, on the exercise of jurisdiction. Thus, as a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the United States Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the Lujan requirements.

*Civil Procedure > Justiciability > Standing > General Overview*
*Patent Law > Ownership > Conveyances > Licenses*
[HN9] The right to sue for infringement is ordinarily an incident of legal title to the patent. Consequently, the issue generally framed for the courts is whether a licensee has obtained sufficient rights in the patent to be entitled to seek relief from infringement without joining the patent owner.

**COUNSEL:** Steven J. Balick, Esquire and Steven T. Margolin, Esquire, Ashby & Geddes, Wilmington, Delaware, for Plaintiffs and Third-Party Defendant.

David A. Kalow, Esquire, John J. Santalone, Esquire, Philip A. Byler, Esquire and William D. Schmidt, Esquire, Of Counsel, Kalow & Springut LLP, New York, New York, for Plaintiffs and Third-Party Defendant.

Thomas P. Preston, Esquire, Reed Smith LLP, Wilmington, Delaware, for Defendant.

Ronald J. Schultz, Esquire, Cole M. Fauver, Esquire and Nicholas S. Boebel, Esquire, Of Counsel, Robins, Kaplan, Miller & Ciresi L.L.P., Minneapolis, Minnesota, for Defendant.

2001 U.S. Dist. LEXIS 15792, *1

Robert J. Koch, Esquire, Of Counsel, Fulbright & Jaworski, Washington, D.C., for Defendant.

**JUDGES:** Sue L. Robinson, United States District Judge.

**OPINION BY:** Sue L. Robinson

**OPINION:**

### MEMORANDUM OPINION

Dated: September 27, 2001
Wilmington, Delaware

**ROBINSON, Chief Judge**

## I. INTRODUCTION

Plaintiffs PE Corporation ("PE") n1 and Competitive Technologies, Inc. ("Competitive Technologies") filed this action on July 5, 2000 against [*2] defendant Affymetrix, Inc. ("Affymetrix") alleging infringement of United States Patent Nos. 4,458,066; 4,500,707; 5,132,418; 5,153,319 and 4,973,679. Currently before the court are defendant's motion to dismiss for lack of subject matter jurisdiction (D.I. 20) and plaintiffs' motion to amend the complaint. (D.I. 29) For the following reasons, the court shall grant both motions.

> n1 Although PE apparently has changed its corporate name, the court will refer to it as PE, consistent with the briefing on its motion.

## II. BACKGROUND

In 1981, University Patents, Inc., now Competitive Technologies, granted a license to the patents in suit to Applied Biosystems, Inc. ("ABI"), which was later acquired by PE Corporation (NY) ("PE(NY)"). In 1988, the parties amended the agreement to grant ABI, now PE(NY), "a worldwide, exclusive (even as to UPI [now Competitive Technologies]), unrestricted and fully paid-up license" to the patents in suit, including the right to grant sublicences. n2 Significantly, the agreement [*3] of amendment also granted ABI (now PE(NY)) the

sole right and responsibility to file, refile,

prosecute, extend, maintain, defend and prosecute interferences and/or appeals for the Licensed Patents in various Patent Offices throughout the world. . . .

As of June 30, 1988 and thereafter, ABI shall have the sole right and responsibility to bring or defend patent infringement and patent validity suits and otherwise defend the Licensed Patents against third parties in suits thereupon, and shall be solely responsible for all costs and expenses therefor incurred after June 30, 1988, including, but not limited to, attorney's fees and expenses, court costs, expert fees and other trial expenses and any assessments of damages for claims or counterclaims related to the Licensed Patents.

(D.I. 34, Ex. 1-D)

> n2 This exclusive license was subject to a nonexclusive license granted to Beckman Instruments, Inc.

In July 2000, PE and Competitive Technologies filed this action against Affymetrix. On January 30, 2001, Affymetrix [*4] filed a motion to dismiss, alleging that neither PE nor Competitive Technologies has standing to sue. On January 25, 2001, prior to filing the motion to dismiss, Affymetrix instituted a declaratory judgment action over the patents in suit in the Southern District of New York.

On February 9, 2001, plaintiffs requested Affymetrix's permission to substitute PE(NY) for PE as plaintiff in this action. n3 Affymetrix did not agree to plaintiffs' request. Consequently, on February 16, 2001, plaintiffs filed a cross-motion to amend the complaint to add PE(NY) as a plaintiff.

> n3 PE(NY) is a wholly-owned subsidiary of PE.

### III. PLAINTIFF'S MOTION TO AMEND THE COMPLAINT

#### A. Standard of Review

[HN1] Federal Rule of Civil Procedure 15(a) allows courts to freely permit amendments to complaints as justice requires. n4 Courts commonly permit amendments where clerical mistakes are involved and the errors were made in good faith. Courts are also encouraged to grant pretrial amendments so that parties may fully present the [*5] issues. See Moore's Federal Practice, § 15.14[1]. [HN2] An amended complaint that contains an additional or substituted party will only relate back to the original complaint's filing date if it satisfies the requirements of Federal Rule of Civil Procedure 15(c)(3). n5

> n4 [HN3] Rule 15(a) provides, in pertinent part:
>
> > A party may amend the party's pleading once as a matter of course at any time before a responsive pleading is served or, if the pleading is one to which no responsive pleading is permitted and the action has not been placed upon the trial calendar, the party may so amend it at any time within 20 days after it is served. Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires.
>
> n5 [HN4] Rule 15(c)(3) provides, in pertinent part:
>
> > An amendment of a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted if [the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence

set forth or attempted to be set forth in the original pleading] and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment

> > (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and
> > (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against the party.

[*6]

#### B. Discussion

Plaintiffs argue that they should be permitted to amend the complaint because their error was made in good faith. Specifically, plaintiffs claim that the numerous and confusing mergers and name changes of PE and PE(NY) led to designating the wrong party as a plaintiff. (D.I. 30, Ex. A) The court finds no evidence to suggest that plaintiffs' failure to designate PE(NY) as a plaintiff in this litigation was anything but a clerical error. Therefore, based on the record presented, plaintiffs' motion to amend the complaint to add PE(NY) as a plaintiff is granted.

The next issue is whether the amended complaint relates back to the original complaint's filing date of July 5, 2000, or maintains the filing date of the motion to amend, February 16, 2001. Plaintiffs rely on Calgon Corp. v. Nalco Chem., 726 F. Supp. 983 (D. Del. 1989) and Schering Corp. v. Amgen, Inc., 969 F. Supp. 258 (D. Del. 1997) to support their position that the amended complaint should relate back to the original filing date. Schering and Calgon are inapposite, however, because

Page 4

they involve licensees who possessed some, but not all, substantial rights in the [*7] patents at issue and who failed to join the patent owners. The present case concerns the addition of the party possessing all substantial rights to the patent. Therefore, to determine whether the amended complaint relates back to July 2000, the court must resolve the issues raised by defendant's motion to dismiss, that is, whether the original plaintiffs had standing to sue in the first instance.

## IV. DEFENDANT'S MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION

### A. Standard of Review

[HN5] Standing in a patent infringement case is derived from the Patent Act, which provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281. The term "patentee" includes "not only the patentee to whom the patent was issued but also the successors in title to the patentee." 35 U.S.C. § 100(d). [HN6] "The question of standing to sue is a jurisdictional one." Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1551 (Fed. Cir. 1995). Standing is a "threshold issue in every federal case, determining the power of the court to entertain the suit." Warth v. Seldin, 422 U.S. 490, 498, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975). [*8] Federal courts are under an independent obligation to examine their own jurisdiction, and standing "is perhaps the most important of [the jurisdictional] doctrines." FW/PBS Inc. v. City of Dallas, 493 U.S. 215, 231, 107 L. Ed. 2d 603, 110 S. Ct. 596 (1990).

It is well settled that [HN7] standing cannot be "inferred argumentatively from averments in the pleadings," Grace v. Am. Cent. Ins. Co., 109 U.S. 278, 284, 27 L. Ed. 932, 3 S. Ct. 207 (1883), but rather "must affirmatively appear in the record." Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382, 28 L. Ed. 462, 4 S. Ct. 510 (1884). Additionally, the party who seeks the exercise of jurisdiction in its favor has the burden of clearly alleging facts demonstrating that it is a proper party to invoke judicial resolution of the dispute. Id. In the present case, the court must determine whether there is affirmative evidence in the record indicating that PE and Competitive Technologies have standing to sue Affymetrix for patent infringement.

### B. Discussion

[HN8] Article III of the Constitution requires a party invoking federal jurisdiction to establish that: 1) it has suffered an [*9] injury-in-fact that is concrete and actual or imminent; 2) the injury is causally related to the actions of the defendant; and 3) the harm is redressable by a favorable decision. See Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc., 248 F.3d 1333, 1346 (Fed. Cir. 2001) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992)). Standing doctrine embraces not only this "three-prong Article III standing test," but also "judicially self-imposed limits, known as prudential limits, on the exercise of jurisdiction." 248 F.3d at 1348. Thus, "as a prudential principle, an exclusive licensee having fewer than all substantial patent rights possesses standing under the Patent Act as long as it sues in the name of, and jointly with, the patent owner and meets the Lujan requirements." Id.

Upon reviewing the record, the court finds that PE lacked constitutional standing to sue Affymetrix because it had no proprietary interest in the patents in suit. The question remains whether Competitive Technologies had constitutional standing, having transferred substantial rights in the patents to PE(NY). [*10]

As recognized by the Federal Circuit in Abbott Labs. v. Diamedix Corp., 47 F.3d 1128, 1131 (Fed. Cir. 1995), [HN9] "the right to sue for infringement is ordinarily an incident of legal title to the patent." Consequently, the issue generally framed for the courts is whether a licensee has obtained sufficient rights in the patent to be entitled to seek relief from infringement without joining the patent owner. If that were the issue presented by the parties in the present case, the answer would be self-evident: PE(NY) has obtained sufficient rights in the patent to bring an infringement suit in its own name. Indeed, the license of record specifically grants to PE(NY) "a worldwide, exclusive (even as to [Competitive Technologies]), unrestricted and fully paid-up license" and the "sole right and responsibility to bring or defend patent infringement and patent validity suits and otherwise defend the Licensed Patents against third parties in suits thereupon. . . ." (D.I. 34, Ex. 1-D at 4)(emphasis added) Thus, Competitive Technologies, as patent owner, cannot maintain suit in its own name and is not a necessary party to this litigation.

The court recognizes that, [*11] because Competitive Technologies retains legal title to the patents

in suit and receives royalties from Beckman Instruments, Inc., under most circumstances one would conclude that Competitive Technologies retains sufficient proprietary interests in the patents to participate in the infringement action. Nevertheless, the parties at bar entered into an agreement whereby Competitive Technologies gave up the right to participate in lawsuits to protect the patents in suit. Given these circumstances, the court finds it illogical to essentially determine the proper forum for this litigation based on the fact that the patent owner filed suit in Delaware first, when the patent owner did not have the right to file suit at all.

## V. CONCLUSION

For the reasons stated, although plaintiffs' motion to amend the complaint is granted, the court finds that the amended complaint does not relate back to July 2000. Therefore, the New York action is the first-filed action

and, under the reasoning of Crosley Corp. v. Hazeltine Corp., 122 F.2d 925, 929 (3d Cir. 1941), defendant's motion to dismiss is granted.

## ORDER

At Wilmington, this 27th day of September, 2001, consistent [*12] with the memorandum opinion issued this same day;

IT IS ORDERED that plaintiffs' motion to amend the complaint (D.I. 29) is granted, but the amended complaint does not relate back to the filing date of the original complaint. Thus, defendant's motion to dismiss for lack of subject matter jurisdiction (D.I. 20) is granted.

Sue L. Robinson

United States District Judge